1   Kelly M. Dermody (State Bar No. 171716)
    Heather H. Wong (State Bar No. 238546)
2   LIEFF, CABRASER, HEIMANN &
    BERNSTEIN, LLP
3   275 Battery Street, 30th Floor
    San Francisco, CA  94111-3339
4   Telephone:  (415) 956-1000
    Facsimile:  (415) 956-1008
5   email: kdermody@lchb.com
    email: hwong@lchb.com
6

7   Adam T. Klein                          James M. Finberg (State Bar No. 114850)
    Piper Hoffman (pro hac vice)           ALTSHULER BERZON
    Justin M. Swartz (pro hac vice)        177 Post Street, Ste. 300
8   OUTTEN & GOLDEN LLP                    San Francisco, CA  94108
    3 Park Avenue, 29th Floor              Telephone:  (415) 421-7151
9   New York, New York 10016               Facsimile:  (415) 362-8064
    Telephone:  (212) 245-1000
10  Facsimile:  (212) 977-4005

11  [Additional counsel listed on signature page]

12  *Attorneys for the Plaintiffs*

13              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
14            SAN FRANCISCO / OAKLAND DIVISION

15

16  DAISY JAFFE, DENISE WILLIAMS, and      Case No. C-06-3903 TEH
    MARGARET BENAY CURTIS-BAUER,
17  on behalf of themselves and all others  PLAINTIFF'S SEPARATE MEMORANDUM
    similarly situated,                    OF POINTS AND AUTHORITIES IN
18                                         SUPPORT OF JOINT MOTION FOR:  (1)
                                           PRELIMINARY APPROVAL OF CLASS
19            Plaintiffs,                  ACTION SETTLEMENT; (2) PROVISIONAL
                                           CERTIFICATION OF SETTLEMENT
20       v.                                CLASS; (3) APPROVAL AND
                                           DISTRIBUTION OF NOTICE OF
21  MORGAN STANLEY & CO.                   SETTLEMENT; AND (4) APPROVAL OF A
    INCORPORATED, f/k/a MORGAN             SCHEDULE FOR THE FINAL
22  STANLEY DW INC.                        SETTLEMENT APPROVAL PROCESS

23                                         Date:        November 26, 2007
            Defendant.                     Time:        1:30 p.m.
24                                         Courtroom:   12

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................... 2

    I.     Litigation History ................................................................................... 2

    II.    Settlement Negotiations ........................................................................ 4

SUMMARY OF SETTLEMENT TERMS.................................................................... 4

    I.     Injunctive Relief .................................................................................... 4

    II.    Monetary Relief .................................................................................. 11

CLASS ACTION SETTLEMENT PROCEDURE...................................................... 13

ARGUMENT ................................................................................................................... 14

    I.     Preliminary Approval of the Settlement Is Appropriate ..................... 14

          A.    The Terms of the Proposed Settlement Are Fair and Within the
                 Range of Reasonableness ........................................................ 15

                1.    The Settlement Is the Product of Experienced Counsels'
                      Serious, Arms' Length, Informed Negotiations........................ 16

                2.    The Proposed Settlement Amount and the Allocation
                      Process are Fair and Reasonable .................................. 17

                3.    The Settlement's Terms Provide Meaningful Injunctive
                      Relief........................................................................... 17

                  4.    Liability Is Contested, and the Settlement Provides
                      Reasonable Compensation for Class Members' Damages in
                      Light of the Risks of Proceeding through Class
                      Certification, Summary Judgment, Trial and Appeal ................. 18

                5.    Trial and Appeal of This Action Would Be Complex,
                      Expensive and Time Consuming, and Would Delay
                      Recovery ..................................................................... 18

    II.    Provisional Certification of the Class Is Appropriate .......................... 19

                1.    Numerosity Is Satisfied.................................................. 19

                  2.    Commonality Is Satisfied............................................... 20

                  3.    Typicality Is Satisfied .................................................... 21

                  4.    Adequacy Is Satisfied.................................................... 22

                  5.    Certification of the Class Is Proper under Rule 23(b)................... 22

                      a.    Final Certification Under 23(b)(2) is Appropriate........... 22

                      b.    Certification Under 23(b)(3) is Appropriate .................... 23

    III.   Plaintiff's Counsel Should Be Appointed as Class Counsel................ 24

    IV.   The Proposed Class Notice Is Appropriate ......................................... 25

          A.    The Proposed Class Notice Satisfies Due Process................... 25

          B.    The Notice Plan and Claims Process Are Appropriate ............ 25

**TABLE OF CONTENTS**
(continued)

Page

V.   The Proposed Scheduling Order; A Final Approval Hearing Should Be
      Scheduled ........................................................................................................... 26

VI.   Conclusion ......................................................................................................... 27

1

# TABLE OF AUTHORITIES

2

**Page**

3

4

<u>CASES</u>

*Alaniz v. California Processors, Inc.*,
    73 F.R.D. 269 (N.D. Cal. 1976) ........................................................................................ 16

5

*Amchem Prods. Inc. v. Windsor*,
    521 U.S. 591 (1997) ............................................................................................... 23, 25

6

*Arnold v. United Artists Theatre Circuit, Inc.*,
    158 F.R.D. 439 (N.D. Cal. 1994) ...................................................................................... 20

7

*Barefield v. Chevron U.S.A., Inc.*,
    No. C 86-2427 THE,1987 WL 65054 (N.D. Cal. 1987) ...................................................... 22, 23

8

9

*Boyd v. Bechtel Corp.*,
    485 F. Supp. 610 (N.D. Cal. 1979) ......................................................................... 15, 16, 17

10

*Brown v. Title Ticor Ins. Co.*,
    982 F.2d 386 (9th Cir. 1992) ............................................................................................ 24

11

*Churchill Village, L.L.C. v. General Elec.*,
    361 F.3d 566 (9th Cir. 2004) ............................................................................................ 15

12

13

*Class Plaintiffs v. City of Seattle*,
    955 F.2d 1268 (9th Cir. 1992) .......................................................................................... 15

14

*Cotton v. Hinton*,
    559 F.2d 1326 (5th Cir. 1977) .......................................................................................... 15

15

16

*Dukes v. Wal-Mart, Inc.*,
    474 F.3d 1214 (9th Cir. 2007) .................................................................................. 21, 22, 24

17

*Ellis v. Naval Air Rework Facility*,
    87 F.R.D. 15 (N.D. Cal. 1980) .......................................................................................... 17

18

*Ellis. v. Costco Wholesale Corp.*,
    240 F.R.D. 627 (N.D. Cal. 2007) ............................................................................... 21, 24

19

*General Tele. Co. of Southwest v. Falcon*,
    457 U.S. 147 (1982) ......................................................................................................... 22

20

21

*Glass v. UBS Fin. Serv., Inc.*,
    No. C-06-4068 MMC, 2007 WL 221862 (N.D. Cal. January 26, 2007) ................................. 20

22

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1988) ................................................................................... passim

23

24

*In re DJ Orthopedics, Inc. Sec. Litig.*,
    No. 01-CV-2238KRBB, 2004 W.L. 1445101 (S.D. Cal. June 21, 2004) ................................ 16

25

*In re General Motors Corp. Pick-up Truck Fuel*,
    55 F.3d 768 (3d Cir. 1995) ......................................................................................... 14, 20

26

27

*In re Tableware Antitrust Litigation*,
    484 F. Supp.2d 1078 (N.D. Cal. 2007) ............................................................................... 18

28

-iii-

**TABLE OF AUTHORITIES**
(continued)

Page

*In re United Energy Corp. Solar Power Modules Tax Shelter Investments,*
   Nos. CV 87-3962KN(GX), CV 86-3538KN(GX), 1989 WL 73211
   (C.D. Cal. March 9, 1989) ................................................................. 17

*L.H. v. Schwarzenegger,*
   No. CIV. S-06-2042 LKK/GGH, 2007 WL 662463 (E.D.Cal. Feb. 28, 2007) ........................ 20

*Linney v. Cellular Alaska P'ship,*
   Nos. C-96-3008 DLJ, C-97-0203 DLJ, C-97-0425 DLJ, C-97-0457 DLJ, 1997 W.L. 450064
   (N.D. Cal. July 18, 1997) ................................................................ 16

*Molski v. Gleich,*
   318 F.3d 937 (9th Cir. 2003) ........................................................ 23, 24

*Murray v. Local 2620, Dist. Counsel 57, American Federation of State, County and Municipal
   Empl., AFL-CIO,*
   192 F.R.D. 629 (N.D. Cal. 2000) ........................................................ 22

*Officers for Justice v. Civil Serv. Comm'n,*
   688 F.2d 615 (9th Cir. 1982), *cert. denied, Byrd v. Civil Serv. Comm'n,* 459 U.S. 1217
   (1983) .................................................................................. 15

*Ortiz v. Fibreboard Corp.,*
   527 U.S. 815 (1999) .................................................................... 24

*Robinson v. Metro-North Commuter R.R.,*
   267 F.3d 147 (2d Cir. 2001) ........................................................... 23

*Rosenburg v. Int'l Business Mach. Corp.,*
   No. CV 06-00430 PJH, 2007 WL 2043855 (N.D. Cal. July 12, 2007) ..................... 20

*Safeco Corp. v. Van Bronkhorst,*
   529 F.2d 943 (9th Cir. 1976) .......................................................... 15

*Savino v. Computer Credit, Inc.,*
   172 F.R.D. 346 (E.D.N.Y. 1997), *aff'd,* 164 F.3d 81 (2d Cir. 1998) ..................... 21

*Staton  v. Boeing,*
   327 F.3d 938 (9th Cir. 2003) .......................................................... 22

*Ste. Marie v. Eastern Railroad Assoc.,*
   72 F.R.D. 443 (S.D. N.Y. 1976), *rev'd on other grounds,* 650 F.2d 395 (2d Cir. 1982) ......... 25

*Stender v. Lucky Stores, Inc.,*
   No. C 88-1467 MHP, 1990 WL 192734 (N.D. Cal. June 8, 1990) ........................ 22

*Torrisi v. Tucson Elec. Power Co.,*
   8 F.3d 1370 (9th Cir. 1993) ........................................................... 27

*Weinberger v. Kendrick,*
   698 F.2d 61 (2d Cir. 1982) ............................................................ 16

*Young v. Polo Retail, LLC,*
   No. C-02-4546 VRW, 2006 WL 3050861 (N.D. Cal. Oct. 25, 2006) ..................... 16

# TABLE OF AUTHORITIES
## (continued)

**Page**

## <u>STATUTES</u>

29 U.S.C. § 621, *et seq.*.................................................................................................. 3

42 U.S.C. § 1981 .................................................................................................... 3, 20

42 U.S.C. § 2000e, *et seq.* .......................................................................................... 2

California Gov't Code § 12940 .................................................................................... 2

## <u>RULES</u>

Federal Rule of Civil Procedure
   Rule 23(g)(1)(C)(i) ................................................................................................ 25

Federal Rules of Civil Procedure
   Rule 23(a) .............................................................................................. 20, 21, 23

Federal Rules of Civil Procedure 23 ................................................................... 14, 26

Federal Rules of Civil Procedure 23(a)(4) .......................................................... 23, 25

Federal Rules of Civil Procedure
   23(e) .................................................................................................................. 1, 14

Federal Rules of Civil Procedure
   Rule 23(a)(1) ..................................................................................................... 20, 21

Federal Rules of Civil Procedure
   Rule 23(a)(2) ........................................................................................................... 21

Federal Rules of Civil Procedure
   Rule 23(b) .......................................................................................................... 20, 23

Federal Rules of Civil Procedure
   Rule 23(b)(2) ..................................................................................................... 23, 24

Federal Rules of Civil Procedure
   Rule 23(b)(3) ........................................................................................................... 24

Federals Rule of Civil Procedure
   Rule 23(c)(3) ........................................................................................................... 26

Federals Rule of Civil Procedure
   Rule Rule 23(c)(2)(B) ............................................................................................. 26

Federl Rule of Civil Procedure
   Rule 23(g)(1)(C)(ii) ................................................................................................ 25

Fedral Rule of Civil Procedure
   Rule 23(g) ............................................................................................................... 25

## <u>TREATISES</u>

1 *Newberg* § 3.5 ......................................................................................................... 20

*4 Herbert B. Newberg and Alba Conte,*
   *Newberg on Class Actions,* (4 ed. 2002)§ 11.22, *et seq.*.......................................... 14

PLAINTIFFS' MPA ISO MOTION FOR ORDER GRANTING
PRELIM APP OF PROPOSED SETTLEMENT
CASE NO. 06-3903 TEH

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3   *4 Newberg*
        § 11.26 ................................................................................................................. 18

4

    *4 Newberg*
5       § 11.27 ........................................................................................................... 14, 20

6   *4 Newberg*
        § 11.41 ................................................................................................................. 15

7   *4 Newberg*
        § 11:24 *et seq.* ................................................................................................. 15

8

    *Manual for Complex Litigation*
9       § 21.632 ............................................................................................................... 16

10  *Manual for Complex Litigation*
        § 21:62 ................................................................................................................. 16

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## PLAINTIFF'S MEMORANDUM AND POINTS OF AUTHORITIES

2

## INTRODUCTION

3       The parties respectfully seek certification of a Settlement Class and request that the Court

4   grant preliminary approval of the Settlement and Settlement Agreement, attached as Exhibit 1 to

5   the Proposed Order.  Subject to Court approval, the parties have settled Plaintiff's and Class

6   Members' claims for comprehensive injunctive relief and significant monetary relief of

7   approximately $16,000,000.  The proposed Settlement Agreement resolves all of Plaintiff's and

8   Class Members' outstanding claims except the non-class claims asserted individually by Plaintiff

9   Jaffe.  *See* Second Amended Complaint, ¶¶ 113-121 (Ms. Jaffe's individual claims).[1]

10      The parties' proposed Settlement satisfies all of the criteria for preliminary approval under

11  federal law.  The Settlement was negotiated at arms' length and falls well within the range of

12  possible approval.  Not only is the monetary relief provided to Class Members substantial, but the

13  extensive injunctive relief provided for in the Settlement Agreement will materially advance the

14  goal of equal employment opportunity for African American and Latino Financial Advisors and

15  Registered Financial Advisor Trainees at MS-GWMG. Accordingly, the parties respectfully

16  request that the Court grant preliminary approval of the proposed Settlement Agreement (attached

17  as Exhibit 1 to the Proposed Order), direct distribution of Class Notice and a Claim Form

18  (attached as Exhibits 2 and 3 to the Proposed Order), and approve the proposed schedule for final

19  approval.  The parties also respectfully request that in connection with the settlement process, the

20  Court certify a Settlement Class consisting of all African American and Latinos who were

21  employed as Financial Advisors or Registered Financial Advisor Trainees in the Global Wealth

22  Management Group of Morgan Stanley & Co. Incorporated or its predecessor(s) at any time

23  between October 12, 2002 and the date of the preliminary approval of the Settlement.

24

25

26

27  _____

[1] Denise Williams has informed Class Counsel that she intends to opt out, and to file her own
individual lawsuit alleging both the claims she has brought in the complaint and her attached
EEOC charge, including an age discrimination claim not addressed in the complaint.  *Dermody Decl.* ¶ 35.

28

PLAINTIFFS' MPA ISO MOTION FOR ORDER GRANTING
PRELIM APP OF  PROPOSED SETTLEMENT
CASE NO. 06-3903 TEH

# FACTUAL AND PROCEDURAL BACKGROUND

## I.     Litigation History

After an extensive investigation, Ms. Jaffe filed a Class Action Complaint on June 22, 2006, asserting claims on behalf of a nationwide Class of female Financial Advisors employed by MS-GWMG and a Subclass of all female Financial Advisors employed by MS-GWMG in California.  The Complaint asserted claims for gender discrimination under Title VII, 42 U.S.C. § 2000e, *et seq.*, and, with respect to California Subclass, the California Fair Employment and Housing Act, Cal. Gov't Code § 12940 ("FEHA").  The Complaint also asserted non-class claims of age discrimination on behalf of Ms. Jaffe individually under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* and under California's FEHA. (Complaint at ¶¶ 51-58.)[2]

A First Amended Complaint adding Plaintiff Denise Williams as a class representative and her individual claims of race discrimination under Title VII, Michigan's Elliot-Larsen Civil Rights Act, and 42 U.S.C. § 1981 was filed on October 12, 2006.  The First Amended Complaint also added a Subclass of female Financial Advisors who reside in Michigan under Michigan's Elliot-Larsen Civil Rights Act, M.C.L.A. § 37.2101, *et seq.*

Plaintiff's counsel continued to investigate claims of race discrimination against African American and Latino Financial Advisors and Registered Financial Advisor Trainees at Morgan Stanley.  In January of 2007,  Ms. Williams also informed Morgan Stanley of her intention to file a Second Amended Complaint to add allegations that the company engaged in class-wide race

---

[2] Simultaneously with the filing of the original Complaint by Ms. Jaffe, another class action complaint against Morgan Stanley alleging gender discrimination against a class of female Financial Advisors in violation of Title VII was filed in the United States District Court in the District of Columbia, *Augst-Johnson v. Morgan Stanley DW, Inc.,* Case No. 06-C-01142-RWR. Because of the advanced stage of settlement talks in that putative class action, the Court stayed the class claims of gender discrimination in this case on January 19, 2007, until August 6, 2007. The parties in the *Augst-Johnson* matter eventually reached a tentative settlement of the nationwide gender claims and received preliminary approval of the gender class settlement on July 17, 2007.  The court approved the *Augst-Johnson* settlement following a final approval hearing on October 11, 2007.  The class-wide gender discrimination claims of Plaintiffs Jaffe and Williams will therefore be addressed in connection with the settlement of the *Augst-Johnson* gender class action in the District of Columbia.  Jaffe and Williams thus no longer pursue their gender discrimination claims or seek certification of a class of female Financial Advisors in this case.

discrimination.  MS-GWMG agreed to toll the race claims and stay the filing of the Second

Amended Complaint to pursue settlement discussions with Plaintiff Williams in hopes of

resolving the class-wide race claims.

In connection with settlement discussions, MS-GWMG produced a substantial number of

documents (including vast amounts of data) from which Plaintiff's counsel's experts conducted

numerous data analyses.  This information, along with witness interviews and information

regarding MS-GWMG policies, alerted Plaintiff to the scope of systemic problems affecting

African American and Latino Financial Advisors and Registered Financial Advisor Trainees.

Plaintiff Curtis-Bauer subsequently joined the case.  On August 2, 2007, Plaintiff filed a

Second Amended Complaint adding Curtis-Bauer as a class representative.  *See* Second Amended

Complaint at ¶ 19.  Ms. Curtis-Bauer alleges, on behalf of herself and others similarly situated,

that Morgan Stanley discriminated against African American and Latino Financial Advisors and

Registered Financial Advisor Trainees.  Specifically, she alleges discrimination against African

Americans and Latinos in compensation, account distributions, partnerships, business

opportunities, and other terms and conditions of employment.

Consistent with the Second Amended Complaint, the Settlement Class defined herein and

in the Settlement Agreement consists of all African Americans and Latinos who were employed

as Financial Advisors or Registered Financial Advisor Trainees in the Global Wealth

Management Group of Morgan Stanley & Co. Incorporated or its predecessor at any time

between October 12, 2002 and the date of the preliminary approval of the settlement.  *See*

Settlement Agreement, § III.D.1.

As described herein, the parties have conducted a thorough examination and investigation

of the facts and law relating to Plaintiff's claims.  This investigation informed counsel regarding

the strengths and weaknesses of their respective positions and provided them a full opportunity to

assess the litigation risks presented in this case.  Accordingly, approval of this settlement is

appropriate.

**II.     Settlement Negotiations**

The parties participated in negotiations with the assistance of an experienced mediator, Hunter Hughes, Esq. of Atlanta, Georgia.  Counsel for the parties are experienced class action lawyers who retained Mr. Hughes for his expertise in mediating many complex actions, including those involving race discrimination in employment.  Mr. Hughes also has familiarity with MS-GWMG's practices through his work as a mediator in the *Augst-Johnson* action, the related gender discrimination case against MS-GWMG.  The parties here had multiple face-to-face negotiating sessions in March, July and August  2007.  *Dermody Decl.*  ¶¶ 36-39.  Under the supervision of the mediator, the parties' negotiations were conducted at arms' length.  *Id*.  The terms of the parties' agreement following those negotiations are contained in the Settlement Agreement, attached as Exhibit 1 to the proposed preliminary approval order, and are summarized below.

## SUMMARY OF SETTLEMENT TERMS

The proposed Settlement Agreement provides comprehensive injunctive relief and substantial monetary relief.

**I.     Injunctive Relief**

MS-GWMG has agreed to implement comprehensive relief addressing the claims in this action.  During the five-year period of the Settlement Agreement, the parties anticipate that MS-GWMG will spend approximately $7,500,000 on diversity efforts, including programs for training, re-education, and other development programs for African American and Latino Financial Advisors and Registered Financial Advisor Trainees.  MS-GWMG will also retain two jointly-appointed Industrial Psychologists, a Diversity Monitor and employees who will work on diversity programs.  The Settlement Agreement also obligates MS-GWMG to the following injunctive relief:

**A.     Hiring:**  MS-GWMG will maintain its commitment to increase diversity in the Financial Advisor position, including the representation rate of Latino and African American Financial Advisors.  MS-GWMG will maintain a dedicated position within MS-GWMG whose primary function is the sourcing and recruitment of qualified diverse candidates, including

1    qualified Latinos and African Americans. *See* Settlement Agreement, § VII.B.  MS-GWMG will

2    work with the Industrial Psychologists to identify and develop sourcing alternatives for qualified

3    Latino and African American Financial Advisors, including but not limited to, developing

4    relationships with organizations and educational institutions with high representation rates of

5    Latinos and African Americans and historical connections with those communities.  MS-GWMG

6    will continue to source qualified diverse candidates for its various entry-level positions, including

7    the Summer Internship Program, the Richard B. Fischer Scholarship Program and/or successor or

8    similar programs.  Furthermore, MS-GWMG will inform any third-party recruiter or executive

9    search firm it utilizes in its sourcing efforts that MS-GWMG expects that the vendor will present

10    a diverse slate of candidates, where possible.

11    **B.**      **Development Opportunities.**  MS-GWMG will work with the Industrial

12    Psychologists to develop initiatives designed to attract and retain African Americans and Latinos

13    to MS-GWMG as Financial Advisors, and to enhance their success.  *See* Settlement Agreement,

14    § VII.E.  The Industrial Psychologists shall make recommendations for increasing participation of

15    African American and Latino Financial Advisors and Registered Financial Advisor Trainees in

16    development opportunities.  MS-GWMG will provide additional resources to assist Registered

17    Financial Advisor Trainees in obtaining the Series 7 registration (and passing the Series 7 test)

18    necessary to be a licensed broker.

19    MS-GWMG will also conduct exit interviews of Financial Advisors and Registered

20    Financial Advisor Trainees who terminate voluntarily and will report the results annually to the

21    Industrial Psychologists, the jointly-appointed Diversity Monitor and individuals within MS-

22    GWMG responsible for hiring Financial Advisors and Registered Financial Advisor Trainees.

23    *See* Settlement Agreement, § VII.E.

24    MS-GWMG will maintain its commitment to the biannual Minority Business Exchange.

25    *See* Settlement Agreement, § VII.E.

26    **C.**      **Diversity-Related Compensation:**  Branch Manager compensation will have a

27    meaningful diversity component designed to measure and reward efforts at diversifying

28    representation rates in the Financial Advisor position including the recruiting, training, and

1  retaining qualified African American and Latino Financial Advisors.  *Id.* at § VII.C.  Field sales

2  management will be required to report on their best efforts and results in the areas of sourcing,

3  recruiting, mentoring, training and promoting a diverse workforce, including qualified African

4  American and Latino Financial Advisors and Registered Financial Advisor Trainees.  Field sales

5  management will be reviewed and held accountable (including through bonus compensation) by

6  senior MS-GWMG management for these efforts.  *Id.*  The Diversity Monitor will review the

7  diversity-related quarterly self-assessment for field sales management and the diversity

8  component of the Branch Manager compensation process.  *Id.*

9       **D.**     **Branch Management Posting.**  MS-GWMG will post all available field sales

10  management positions on its Internal Job Bank, as well as minimum requirements for

11  qualification for those management positions, for a minimum of five (5) business days.  *See*

12  Settlement Agreement, § VII.C.  MS-GWMG will also develop and implement a computerized

13  system to generate an electronic mail notification to Financial Advisors who request to be

14  informed of new management job postings.  *Id.*  Either the hiring manager or Human Resources

15  will follow up with each applicant/candidate for field sales management positions in a timely

16  manner.  *Id.*

17       **E.**     **Branch Management Training.**  MS-GWMG has developed and implemented a

18  comprehensive management assessment and development program to make the assessment and

19  selection process for branch managers formalized and transparent.  *See* Settlement Agreement,

20  § VII.C.  MS-GWMG will provide all management-level field personnel with diversity training

21  no less than every other year.  *Id.* at § VII.C.  MS-GWMG will also provide diversity-related

22  training to field sales branch management that incorporates elements of the Implicit Association

23  Test or similar tool agreed upon by the parties.

24       **F.**     **Account Distribution**.  The Power Ranking system, which is used to determine

25  account distributions, will be revised to ensure fairness by reducing reliance on historical factors

26  and weighting more heavily criteria that reflect recent performance.  *See* Settlement Agreement,

27  § VII.D.1-2.  MS-GWMG will provide the methodology for calculating the Power Rankings to

28  each Financial Advisor upon hire and will make it available to all Financial Advisors

1   electronically.  *Id*. at § VII.D.2.b.  MS-GWMG will also inform each Financial Advisor of his or

2   her individual ranking at the time an account distribution is made.  *Id*. at § VII.D.2.c. The actual

3   distribution of a departing Financial Advisor's book will be made available to a Financial Advisor

4   in the Branch confidentially upon request.  *Id.*

5           After a full calendar year has passed following implementation of these new Power

6   Ranking criteria, the Industrial Psychologists will review how the process has been operating,

7   including all exceptions and complaints.  In addition, the Industrial Psychologists will review

8   annually the actual account distributions and related compensation data and the rankings of

9   African American and Latino Financial Advisors on each of the individual factors and use such

10  information in considering recommendations, if any, for changes to the Power Ranking formula.

11  *See* Settlement Agreement, § VII.D.2.d.  They will report their findings and recommendations to

12  the Diversity Monitor on an annual basis. *Id.*  Class counsel and counsel for Morgan Stanley will

13  discuss annually the findings of the Industrial Psychologists and whether further appropriate

14  changes to the Power Ranking criteria or distribution process should be made.  *Id.*

15          MS-GWMG will issue a comprehensive account distribution policy statement that will

16  include policies covering the distribution of the accounts of departing Financial Advisors, retiring

17  Financial Advisors, departing partners, and leads, call-ins, and walk-ins.  *See* Settlement

18  Agreement, § VII.D.3.a.  MS-GWMG will also train Branch Managers on the policy.  *Id.*  MS-

19  GWMG will enhance its technology to allow its account distribution process to be computer

20  automated, subject to branch manager review to ensure compliance with regulatory requirements.

21  The results of all account distributions shall be stored and readily retrievable for monitoring to

22  ensure compliance with account distribution policies *Id.* at § VII.D.3.d.

23          Any book of business formerly serviced by a retiring or departing Financial Advisor,

24  serviced by a producing manager who is transferred to a non-producing branch manager position,

25  or serviced by a Financial Advisor who moves to a non-producing sales manager position, will be

26  distributed through the Power Ranking system unless a Joint Production Arrangement/Agreement

27  has been in effect for twenty-four (24) months or longer.  *See* Settlement Agreement, § VII.D.4.a;

28  VII.D.5.a; § VII.D.7.  The Industrial Psychologists will also make recommendations for

1   increasing participation of African Americans and Latinos in the receipt of retiring Financial

2   Advisor's books of business.  *Id.* at § VII.D.4.b; § VII.D.5.b.

3         Each Branch Office will implement a "Financial Advisor of the Day" program in which

4   all client prospects who either walk in or telephone the branch and who are seeking a Financial

5   Advisor shall be directed to the Financial Advisor serving as the Financial Advisor of the Day.

6   *See* Settlement Agreement, § VII.D.6.a-f.

7         Any disputes between MS-GWMG and a Financial Advisor or a Registered Financial

8   Advisor Trainee concerning any account distribution will initially go through MS-GWMG's

9   internal complaint process, which includes access to mediation and tolling of administrative

10   charge deadlines.  *See* Settlement Agreement, § VII.D.8.

11         **G.     Complaint Process and Training.**  The complaint process will be communicated

12   in writing to all Financial Advisors and Registered Financial Advisor Trainees upon hire and

13   annually.  *See* Settlement Agreement, § VII.F.

14         MS-GWMG will provide its Human Resources staff supporting Financial Advisors and

15   Registered Financial Advisor Trainees with appropriate training regarding compliance with state,

16   federal, and local EEO laws; MS-GWMG's anti-discrimination and harassment policies; the

17   Settlement Agreement; and the best practices for complaint investigation and resolution.  *See*

18   Settlement Agreement, § VII.F.  Human Resources will be trained to treat all complaints or

19   inquiries as confidentially as legally possible and to carry out their duties in a manner consistent

20   with the law.  In addition, Human Resources will implement controls designed to ensure that only

21   non-complaining employees or managers with a need to know will be advised of a complaint or

22   investigation.  In all instances, upon being informed of a complaint or investigation, the non-

23   complaining employees and managers so informed will be reminded of MS-GWMG's policy

24   against retaliation.  MS-GWMG will retain documents sufficient to show complaints by African

25   American and Latino Financial Advisors and Registered Financial Advisor Trainees of race or

26   color discrimination, race or color bias, and/or retaliation related to such complaints for the term

27   of the Settlement Agreement.  *Id.*

28         **H.          Communications.**  MS-GWMG shall distribute its Non-Discrimination

725261.1          -8-          PLAINTIFFS' MPA ISO MOTION FOR ORDER GRANTING
                               PRELIM APP OF  PROPOSED SETTLEMENT
                               CASE NO. 06-3903 TEH

and Anti-Harassment Policy to all employees upon hire (in hard copy or by electronic mail) and then on an annual basis via email from Morgan Stanley's CEO. *See* Settlement Agreement, § VII.A.  The President and COO of MS-GWMG will also issue a separate statement annually in support of the Policy and its underlying tenets.

      **I.**      **Appointments.**  The parties will jointly appoint a Diversity Monitor who shall be external to and independent of the MS-GWMG, but will report directly to the COO and President of MS-GWMG.  The Diversity Monitor will monitor MS-GWMG's effort to carry out the terms of the Settlement Agreement, and report to Lead Counsel and MS-GWMG semi-annually.  *See* Settlement Agreement, § VII.G.1.a-i.  The Diversity Monitor will monitor by (a) receiving monthly reports regarding complaints of Financial Advisors and Registered Financial Advisor Trainees alleging race discrimination and resolution of investigations of such complaints through the CARE program or otherwise; (b) reviewing quarterly reports regarding the branches in which Branch Managers have filed exception reports reflecting a deviation from the account distribution process; (c) reviewing account distribution data, exception reports, and complaints to monitor policy compliance and, if potential non-compliance is identified, will inform MS-GWMG and Class Counsel (and MS-GWMG shall be required to take appropriate corrective actions to address instances of non-compliance); (d) reviewing the diversity-related quarterly self-assessment process for field sales management and the diversity component of the branch manager compensation process; (e) monitoring bi-annual training of management on EEO policies, and policies against discrimination and retaliation, and ensure that the training agreed to was implemented; (f) reviewing how Human Resources handles investigations and the resolution process for inquiries and complaints; (g) reviewing the annual results of the exit interviews of African American and Latino Financial Advisors and Registered Financial Advisor Trainees; (h) providing reports to Class Counsel and MS-GWMG at least semi-annually regarding the items monitored, including the analysis of the account distribution system; and (i) maintaining records for the term of this Settlement Agreement.  *Id.*

      The parties will also jointly appoint Industrial Psychologists Dr. Kathleen Lundquist and Dr. Irwin Goldstein to work with MS-GWMG and Class Counsel to improve the representation

and success rates of African Americans and Latinos in the Financial Advisor and Registered

Financial Advisor Trainee positions. *See* Settlement Agreement, § VII.G.2.a.  The Industrial

Psychologists will monitor the implementation of the programs, policies and initiatives set forth

in the Settlement Agreement and will report their findings to the Diversity Monitor. *Id.* at

§ VII.G.2.b. They will report annually on the representation rates and efforts to recruit African

Americans and Latinos in the Registered Financial Advisor Trainee and Financial Advisor

positions and present recommendations to a senior executive panel of MS-GWMG and Class

Counsel. *Id.* at § VII.G.2.b-c.  The Industrial Psychologists will also review how the revised

account distribution process has been operating and provide the Diversity Monitor with findings

of any deviations from the account distribution system. *Id.* at § VII.G.2.d.  They will make

recommendations (a) concerning sourcing and recruitment strategies and programs to improve the

representation rates of African Americans and Latinos in the Financial Advisor and Registered

Financial Advisor Trainee positions; (b) for increasing the Series 7 passage rates of African

American and Latino Registered Financial Advisor Trainees; (c) for increasing the production

and earnings of African American and Latino Financial Advisors, including policies and practices

with respect to training, development, and mentoring; (d) for increasing participation of African

American and Latino Financial Advisors in the receipt of retiring Financial Advisors' books of

business; (e) for increasing participation of African American and Latino Financial Advisors in

partnerships; (f) concerning policies and practices with respect to training, development, and

mentoring, that will enhance opportunities for African American and Latino Registered Financial

Advisors and Financial Advisor Trainees; (g) concerning a mentoring program for all Registered

Financial Advisor Trainees and Financial Advisors; and (h) concerning a system of semi-annual

internal data collection and a monitoring process.

     **J.**     **Term of Settlement Agreement:**  The Settlement Agreement will be for five

years.  During that time, as set forth above, MS-GWMG will collect data regarding hiring,

retention, compensation, partnerships, account distributions, and complaints of race or color

discrimination, among other things.  *See* Settlement Agreement, § IX.A.  MS-GWMG, with input

from the Industrial Psychologists and consent from Class Counsel, will create and implement a

1   system for monitoring compliance with the policies designed under the Settlement Agreement,

2   including the account distribution policy. *Id.* at § IX.B. The Diversity Monitor will provide

3   Class Counsel with semi-annual reports regarding the data collected through the monitoring

4   system, including the analysis of the account distribution system. *Id.* at § IX.C. MS-GWMG and

5   Class Counsel will meet at least once every six months regarding compliance. *Id.* at § IX.D.

6   **II.    Monetary Relief**

7          In addition to the significant, comprehensive injunctive relief described above, MS-

8   GWMG will establish a Settlement Fund of $16 million plus interest at the rate of 5% per annum

9   from the date of Preliminary Approval until the deposit into the Settlement Fund less the specified

10   credits for opt outs, if any. *See* Settlement Agreement, § § IV.C.9 and VIII.A. This sum includes

11   payment for (a) all amounts to be paid to Class Members, including the Named Plaintiff; (b) all

12   attorney's fees and costs awarded by the Court; and (c) all costs in connection with the Settlement

13   Fund. *Id.* The Settlement Sum does not include Morgan Stanley's share of taxes or contributions

14   (*i.e.*, FICA, FUTA, SUTA and Medicare) which will be paid separately by Morgan Stanley to the

15   Claims Administrator in addition to the $16 million fund. *Id.*

16          The Claims Administrator will serve as Trustee of the Settlement Fund and will act as a

17   fiduciary in the handling, management and distribution of the Settlement Fund. *See* Settlement

18   Agreement, § VIII.B. Although the Claims Administrator will provide MS-GWMG's counsel

19   and payroll department with the names and social security numbers of those Class Members who

20   submitted Claim Forms ("Claimants"), the identity of the Claimants and the content of the

21   Claims Forms will otherwise be confidential. *Id.* at § VIII.C.

22          Morgan Stanley, through its counsel, will provide the dates each Claimant was employed

23   by MS-GWMG as a Financial Advisor and/or a Registered Financial Advisor Trainee and

24   earnings information for those Claimants to the Claims Administrator, who will in turn provide

25   the information to each Claimant. *See* Settlement Agreement, § VIII.C. Any disagreement

26   regarding the accuracy of this information shall be resolved by the Special Master. *Id.*

27          Under the Settlement, 85% of the Class monetary fund will be paid to Claimants based on

28   their responses to a Claim Form. The responses will generate points for Claimants based on the

1   number of weeks they worked during the class period, with the potential for an enhancement of

2   payment if on their Claim Form they describe extraordinary emotional distress, termination,

3   and/or constructive discharge.  The allocation formula provides that both Financial Advisors and

4   Registered Financial Advisor Trainees will receive 1 point for each week worked during the class

5   period.  The enhancement for emotional distress provides that the Special Master may allocate up

6   to 50 additional points for extraordinary emotional distress as described on the Claim Form.  See

7   Settlement Agreement, § VIII.D.2.  The enhancement for termination/constructive discharge

8   provides that the Special Master may allocate up to 50 additional points for responses to questions

9   on the Claim Form about termination and constructive discharge.  *See id.*

10         Fifteen percent of the Class monetary fund will be paid to Claimants based upon an

11   Earnings Regression Analysis developed by Class Counsel's statistical expert.  Class Members

12   whose annual earnings in any year during the class period fall two standard deviations below the

13   mean earnings curve for Caucasian Financial Advisors and Registered Financial Advisor Trainees

14   in their branch are eligible for a monetary award under the Earnings Regression Component.  *See*

15   Settlement Agreement, § VIII.D.2.  Eligible Class Members will be paid based upon the Class

16   Member's earnings during that year controlling for (a) the Class Member's length of tenure at

17   Morgan Stanley; (b) the Class Member's registration date; and (c) the Class Member's branch

18   office location.  *Id.*

19         The Special Master will determine the monetary award to be paid to each Claimant from

20   the Settlement Fund.  *See* Settlement Agreement, § VIII.D.3.a.  The Special Master will submit

21   the proposed allocation to the Court under seal for *in camera* review.  *Id.*, § VIII.D.3.c.  The

22   Claims Administrator will then send Notice and/or Releases to the Claimants and make awards

23   after Releases are executed.  *Id.* § VII.D.3.d.  Any undistributed funds that remain after six

24   months from the mailing of the Notice of Award due to unsubmitted releases shall be distributed

25   to 501(c)(3) organizations advancing opportunities for African Americans and/or Latinos,

26   including opportunities in the financial services industry, as jointly selected by Class Counsel and

27   MS-GWMG.  *Id.*

28

1    The Settlement Agreement provides that the Special Master shall maintain the allocation

2    list for a period of five years.  *See* Settlement Agreement, § VIII.D.3.e. MS-GWMG will not be

3    permitted to have access to it except upon notice to Class Counsel and a showing of good cause.

4    *Id.*

5                          **CLASS ACTION SETTLEMENT PROCEDURE**

6    Judicial proceedings under Federal Rule of Civil Procedure 23 have led to a defined

7    procedure and specific criteria for settlement approval in class action settlements.  The Rule 23(e)

8    settlement approval procedure describes three distinct steps:

9         (1) Certification of a settlement class and preliminary approval of
10        the proposed settlement after submission to the Court of a written
          motion for preliminary approval;

11        (2) Dissemination of mailed and/or published notice of settlement
          to all affected  Class members; and
12

13        (3) A formal fairness hearing, or final settlement approval hearing,
          at which Class members may be heard regarding the settlement, and
          at which evidence and argument concerning the fairness, adequacy,
14        and reasonableness of the settlement is presented.

15   These procedures safeguard Class members' procedural due process rights and enable the

16   Court to fulfill its role as the guardian of class interests.  *See* 4 *Herbert B. Newberg and Alba*

17   *Conte, Newberg on Class Actions,* § 11.22, *et seq.* (4th ed. 2002).

18   With this Motion, the parties request that the Court take the first step in the settlement

19   approval process and grant certification of a Settlement Class and preliminary approval of the

20   proposed Settlement and Settlement Agreement.

21   Settlement Class certification is appropriate at the preliminary approval stage where, as

22   here, the proposed Settlement Class — as it is defined in the parties' Settlement Agreement —

23   has not previously been certified by the Court, and where, as here, the Plaintiff asserts the

24   requirements for certification are met and Defendant, for settlement purposes only, consents to

25   Settlement Class certification.  *4 Newberg* § 11.27; Settlement Agreement, § III.D.1.  The

26   practical purpose of the Settlement Class certification is to avoid the costs of litigating class status

27   while facilitating a global settlement, to ensure distribution to all Settlement Class members of the

28

1   notice of the terms of the proposed Settlement Agreement, and to set the date and time of the final

2   approval hearing.  *In re Gen. Motors Corp. Pick-up Truck Fuel*, 55 F.3d 768, 784 (3d Cir. 1995).

3        The parties also request that the Court appoint Plaintiff's counsel as Class Counsel and the

4   Named Plaintiff as adequate Class Representative.  The additional rulings sought on this Motion

5   — approving the form, content and distribution of Class Notice, and scheduling a formal fairness

6   hearing — facilitate the settlement approval process, and are also typically made at the

7   preliminary approval stage.  4 *Newberg* § 11:24, *et seq.*

8                     **ARGUMENT**

9   **I.    Preliminary Approval of the Settlement Is Appropriate**

10        It is well established that the law favors and prefers the compromise and settlement of

11   class action suits.  *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982),

12   *cert. denied, Byrd v. Civil Serv. Comm'n,* 459 U.S. 1217 (1983); *Safeco Corp. v. Van Bronkhorst*,

13   529 F.2d 943, 950 (9th Cir. 1976) (emphasizing that the policy in favor of settlement is

14   "particularly true in class actions"); *see also* 4 *Newberg* § 11.41 (citing cases); *Churchill Village,*

15   *L.L.C. v. General Elec.*, 361 F.3d 566, 576 (9th Cir. 2004) (quoting *Class Plaintiffs v. City of*

16   *Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)); *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir.

17   1977) ("the policy favoring settlement is even stronger in view of the emphasis placed upon

18   voluntary reconciliation.").

19        The approval of a proposed settlement class action is a matter of discretion for the trial

20   court.  *Churchill*, 361 F.3d at 575.  In exercising that discretion, however, the court should

21   recognize that as a matter of sound policy, settlements of disputed claims are encouraged and a

22   settlement approval hearing should "not be turned into a trial or rehearsal for trial on merits."

23   *Officers for Justice*, 688 F.2d at 650; *see also Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 617 (N.D.

24   Cal. 1979).  Furthermore, courts must give "proper deference to the private consensual decision

25   of the parties," since "the court's intrusion upon what is otherwise a private consensual agreement

26   negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a

27   reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion

28   between, the negotiating parties, and the settlement, taken as a whole, is fair, reasonable and

1   adequate to all concerned." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1988).  If

2   the settlement was achieved through experienced counsels' arm's-length negotiations, in the

3   absence of fraud, collusion or the like, the Court should be hesitant to substitute its own judgment

4   for that of counsel.  *Linney v. Cellular Alaska P'ship*, Nos. C-96-3008 DLJ, C-97-0203 DLJ,

5   C-97-0425 DLJ, C-97-0457 DLJ, 1997 W.L. 450064, at *5 (N.D. Cal. July 18, 1997) (Jensen, J.);

6   *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982).

7          To grant preliminary approval of this class action settlement, the Court need only find that

8   the settlement falls within the range of possible approval, or "the range of reasonableness."  *See,

9   e.g.*, *Young v. Polo Retail, LLC*, No. C-02-4546 VRW, 2006 WL 3050861, at *5 (N.D. Cal. Oct.

10  25, 2006); *In re DJ Orthopedics, Inc. Sec. Litig.*, No. 01-CV-2238KRBB, 2004 W.L. 1445101, at

11  *3 (S.D. Cal. June 21, 2004); *Boyd*, 485 F. Supp. at 615; *Alaniz v. California Processors, Inc.*,

12  73 F.R.D. 269, 273 (N.D. Cal. 1976).  The *Manual for Complex Litigation, Fourth* (Fed. Judicial

13  Center 2004) ("*Manual*") characterizes the preliminary approval stage as an "initial evaluation"

14  of the fairness of the proposed settlement made by the court on the basis of written submissions

15  and informal presentation from the settling parties.  *Manual*, §21.632.  The *Manual* summarizes

16  the preliminary approval criteria as follows:

17          Fairness calls for a comparative analysis of the treatment of the
        class members vis-à-vis each other and vis-à-vis similar individuals
18          with similar claims who are not in the class.  Reasonableness
        depends on an analysis of the class allegations and claims and the
19          responsiveness of the settlement to those claims.  Adequacy of the
        settlement involves a comparison of the relief granted to what class
20          members might have obtained without using the class action
        process.

21

22  *Id.* at § 21:62.

23      A.    **The Terms of the Proposed Settlement Are Fair and Within the Range of**
              **Reasonableness**
24

25          In determining whether a settlement is fair and reasonable, the court should consider

26  several factors, including the experience and views of counsel; whether the settlement is the

27  product of good faith negotiations conducted at arms' length; the amount offered in settlement;

28  and the risks, complexity and duration of further litigation.  *Roberts v. Heim*, Nos. C 84-8069

THE, C 87-6174 THE, C 88-3373 THE, 1991 WL 427888, at * 2 (N.D. Cal. Aug. 28, 1991). For the reasons set forth below, the Court should find that these factors weigh in favor of preliminary approval of the Settlement Agreement.

### 1.   The Settlement Is the Product of Experienced Counsels' Serious, Arms' Length, Informed Negotiations

Each lawyer representing the Plaintiff has had substantial experience in employment discrimination class actions.  *See* Dermody Decl., Ex. A; Klein Decl., Ex.  B; Finberg Decl., Ex. C.  Their assessment that the settlement is reasonable and fair should be given "significant weight."  *In re United Energy Corp. Solar Power Modules Tax Shelter Investments,* Nos. CV 87-3962KN(GX), CV 86-3538KN(GX), 1989 WL 73211, at *3 (C.D. Cal. March 9, 1989); *see also Boyd*, 45 F. Supp. at 622; *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980); *Linney*, 1997 W.L. 450064, at *5.

Moreover, as described in the Dermody Declaration ¶¶ 28-33, Plaintiff's counsel vigorously investigated the claims asserted against MS-GWMG by collecting information about MS-GWMG's practices from the Named Plaintiff and numerous unnamed Class Members. Plaintiff also received information from MS-GWMG related to the representation of African American and Latino Financial Advisors and Registered Financial Advisor Trainees at MS-GWMG, their retention rates, and their compensation.  Using that data, Plaintiff's counsels' statistical expert performed representation and compensation analyses, as well as a damages analysis.  Experts for MS-GWMG conducted similar analyses.  These expert calculations formed the basis for negotiations regarding the monetary terms of the settlement.  As a result of the complete and substantial investigation of the claims and the informal discovery that was conducted, the parties negotiated the proposed settlement with complete knowledge regarding the strengths and weaknesses of the case and the amounts necessary to compensate class members for the harm suffered.

Further, the settlement in this case resulted only after extensive arms' length settlement negotiations and under the supervision of experienced mediator Hunter Hughes.  *See* Dermody Decl. at ¶¶ 36-39.  The negotiations were protracted and the mediation itself required multiple

1   lengthy sessions.  In sum, the proposed settlement is the non-collusive product of the parties'

2   well-intentioned efforts to avoid protracted litigation.  All of these factors weigh in favor of

3   finding the settlement reasonable and in favor of its approval.

**2.**     **The Proposed Settlement Amount and the Allocation Process are Fair**
           **and Reasonable**

6          The determination of a "reasonable" settlement is not susceptible to a mathematical

7   equation yielding a particular sum.  Rather, settlements may fall within a range of reasonableness.

8   *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1078 (N.D. Cal. 2007) (Walker, J.);

9   4 *Newberg* § 11.26.

10         Given that the proposed Settlement Agreement creates a $16 million Settlement Fund for

11  approximately 1300 unnamed Class Members, the proposed Agreement provides a significant

12  recovery to the Class and easily falls within the range of reasonableness.

13         Likewise, the proposed plan of allocation, which has both a Claim Form Survey

14  Component and an Earnings Regression Analysis Component, takes into account several factors,

15  including weeks worked, extraordinary emotional distress and termination/constructive discharge

16  claims to ensure that the ultimate division of the settlement proceeds among class members is fair

17  and reasonable, while at the same time preserving the intended efficiencies of class action

18  litigation.  *See* Settlement Agreement, § VIII.D.

19         Under the weeks worked component, each Financial Advisor and Registered Financial

20  Advisor Trainee will receive one point for each week worked.  The Claim Form Survey

21  Component takes into account the Claimant's individual statements of race and/or color

22  discrimination, the Claimant's individual statements supporting an award of compensatory

23  damages, and whether the Claimant has been terminated or constructively discharged.  The

24  parties agree that the division of settlement proceeds that will be made with this allocation plan

25  will be fair and reasonable.

**3.**     **The Settlement's Terms Provide Meaningful Injunctive Relief**

27         As set forth above in detail, the Settlement Agreement provides significant and valuable

28  injunctive relief to the entire class, including the creation of a fair and transparent account

1    distribution system, increased efforts at diversity training, increased efforts to hire, retain and

2    develop African American and Latino Financial Advisors, as well as the appointment of two

3    Industrial Psychologists and a Diversity Monitor to develop and monitor the programs created by

4    the Settlement Agreement.

5                **4.    Liability Is Contested, and the Settlement Provides Reasonable
                         Compensation for Class Members' Damages in Light of the Risks of
6                        Proceeding through Class Certification, Summary Judgment, Trial
                         and Appeal**
7

8            Although the Plaintiff believe her claims have merit, she also recognizes that she would

9    face significant legal, factual, and procedural obstacles to recovering damages on her claims.

10   Defendant has available legal and factual grounds for defending this action.  MS-GWMG denies

11   that its treatment of its African American or Latino Financial Advisors or Registered Financial

12   Advisor Trainees is unlawful or discriminatory, and contest the propriety of class certification

13   here.  MS-GWMG would challenge Plaintiff's claims at each step of litigation including at

14   summary judgment.  Notwithstanding Plaintiff's risks and MS-GWMG's defenses, the overall

15   settlement commits Morgan Stanley to pay $16 million to compensate the class — a substantial

16   amount ensuring that the recoveries by the individual Class Members will be meaningful.  In light

17   of the strengths and weaknesses of the case, Plaintiff's counsel believe the settlement fits easily

18   within the range of reasonableness because it achieves significant benefits for the class in a case

19   where failure at trial is certainly possible.  Class Members will also receive settlement benefits

20   faster than they would receive awards obtained after trial and likely appeal.  By any measure, the

21   relief obtained is an excellent result for the Settlement Class.

22                **5.    Trial and Appeal of This Action Would Be Complex, Expensive and
                         Time Consuming, and Would Delay Recovery**
23

24           Other factors considered by Courts in approving a settlement are the complexity, expense,

25   and likely duration of the litigation.  *Roberts,* 1991 WL 427888, at *2; *Hanlon,* 150 F.3d at 1026;

26   *Rosenburg v. Int'l Business Mach. Corp.*, No. CV 06-00430 PJH, 2007 WL 2043855, at *2 (N.D.

27   Cal. July 12, 2007); *Glass v. UBS Fin. Serv., Inc*., No. C-06-4068 MMC, 2007 WL 221862, at *3

28

1   (N.D. Cal. January 26, 2007); *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir.

2   1977).

3       The factual and legal issues in this action are complex.  The trial of Plaintiff's class claims

4   (involving approximately 1300 class members) would require substantial preparation and

5   ultimately the presentation, at a minimum, of dozens of witnesses and numerous experts.  In

6   contrast to the delay that would result from trial and likely appeal if liability is found, the

7   proposed Settlement Agreement will yield a certain, substantial, and prompt recovery for the

8   Class both in monetary relief and injunctive relief.  Such a result will benefit the parties and the

9   court system.

10  **II.      Provisional Certification of the Class Is Appropriate**

11      To grant preliminary approval of this class action settlement, this Court should also make

12  a determination that the proposed Settlement Class satisfies Rule 23(a)'s requirements of

13  numerosity, commonality, typicality and adequacy of representation, and at least one of the

14  subsections of Rule 23(b).  *See* 4 *Newberg* § 11:27 (citing *In re Gen. Motors Corp. Pick-up Truck*

15  *Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768 (3rd Cir 1995)).  As discussed below, all the

16  requirements of certification for settlement purposes are met for this proposed Settlement Class.

17              **1.      Numerosity Is Satisfied**

18      The proposed Class is so numerous that "joinder of all members is impracticable."  Fed.

19  R. Civ. P. 23(a)(1).  Courts do not require evidence of the exact size of the class nor the identity

20  of class members to satisfy the numerosity requirement.  Instead, "A reasonable estimate of the

21  class size, based on common sense assumptions of numerosity, is sufficient." *L. H. v.*

22  *Schwarzenegger*, No. CIV. S-06-2042 LKK/GGH, 2007 WL 662463, at *10 n.2 (E.D.Cal.

23  Feb. 28, 2007) (citing *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 448 (N.D.

24  Cal. 1994)).  The proposed class of approximately 1300 African American and Latinos Financial

25  Advisors and Registered Financial Advisor Trainees plainly satisfies the numerosity requirement.

26  1 *Newberg* § 3.5 ("In light of prevailing precedent, the difficulty inherent in joining as few as 40

27  class members should raise a presumption that joinder is impracticable, and the plaintiff whose

28  class is that large or larger should meet the test of Rule 23(a)(1) on that fact alone.").

725261.1                                    -19-

## 2.     **Commonality Is Satisfied**

Rule 23(a)(2) requires that there be questions of law or fact common to the class.  The commonality requirement of Rule 23(a) examines the group characteristics of the class as a whole and seeks to determine whether the class shares common questions of fact or law.  It does not require that all questions of law or fact be common to every single member of the class; rather, at least one issue must be common to the claims of all the class members.  *Hanlon*, 150 F.3d at 1019; *Dukes v. Wal-Mart, Inc.*, 474 F.3d 1214, 1225 (9th Cir. 2007) (citing *Savino v. Computer Credit, Inc.*, 172 F.R.D. 346, 352 (E.D.N.Y. 1997), *aff'd*, 164 F.3d 81 (2d Cir. 1998)).  Courts do not treat commonality as a difficult hurdle, but construe the requirement "permissively" and require a "minimal" showing.  *Hanlon*, 150 F.3d at 1019-1020.

Plaintiff alleges numerous common issues of fact:  (1) uniform personnel and management structures across branch offices; (2) MS-GWMG's headquarters' extensive oversight of branch operations, (3) company-wide policies governing pay decisions, (4) a strong, centralized corporate culture; (5) consistent race and color-related disparities in the representation, retention and compensation of African American and Latino Financial Advisors and Registered Financial Advisor Trainees; and (6) racial stereotyping.  *Cf. Dukes*, 474 F.3d at 1225-26 (approving class certification where these same common issues were present).  In the instant case, all Class Members were subjected to the same company-wide compensation process, crafted and imposed by the highest-level management at MS-GWMG.  These policies and practices are uniform — all MS-GWMG Financial Advisors and Registered Financial Advisor Trainees are subject to the same compensation system.  Common evidence — including anecdotal evidence from Plaintiff and Class Members and expert statistical analysis — all establish common questions of fact.  *See Dukes*, 474 F.3d at 1225 ("It is well established that commonality may be established by raising an inference of class-wide discrimination through the use of statistical evidence.").  Plaintiff has collected enough evidence to raise at least one common issue of triable fact.  *See Ellis. v. Costco Wholesale Corp.*, 240 F.R.D. 627, 638 (N.D. Cal. 2007) (Patel, J.).  Common legal issues include whether MS-GWMG violated Section 1981, among

-20-

others.[3]  In the absence of class certification and settlement, each individual Settlement Class Member would be forced to litigate core common issues of law and fact.

### 3.     Typicality Is Satisfied

Rule 23 requires that the Named Plaintiff's claims be typical of those of the class.  "[T]he named plaintiff need not have suffered an identical wrong.  It is sufficient if his allegations are derived from the same remedial and legal theories."  *Murray v. Local 2620, Dist. Counsel 57, American Federation of State, County and Municipal Empl., AFL-CIO*, 192 F.R.D. 629, 635 (N.D. Cal. 2000)(Patel, J).  Under the rule's "permissive standards," representative claims are typical "if they are reasonably co-extensive with those of absent class members; they need not be substantially identical."  *Hanlon,* 150 F.3d at 1020; *Staton*, 327 F.3d at 957; *Dukes*, 474 F.3d at 1232 ("Some degree of individuality is to be expected in all cases, but that does not necessarily defeat typicality.").  The "commonality and typicality requirements of Rule 23(a) tend to merge." *General Tele. Co. of Sw. v. Falcon*, 457 U.S. 147, 157, n.13 (1982).  A finding of commonality will ordinarily satisfy the requirement of typicality as well.  *Barefield v. Chevron U.S.A., Inc.*, No. C 86-2427 THE, 1987 WL 65054, at *5 (N.D. Cal. 1987).

The Named Plaintiff in this case is a member of the Class she seeks to represent.  She has worked for MS-GWMG as a Financial Advisor and a Registered Financial Advisor Trainee.  The claims of all Class Members flow from the same factual, legal and remedial theories.  *Cf. Stender v. Lucky Stores, Inc.*, No. C 88-1467 MHP, 1990 WL 192734, at *3-5 (N.D. Cal. June 8, 1990); *Staton v. Boeing,* 327 F.3d 938, 957 (9th Cir. 2003) (no requirement that plaintiffs work in each job category for each type of discrimination claimed).  She was subjected to MS-GWMG's discriminatory compensation system and alleges that she and the Class Members suffered adverse treatment with respect to compensation.  Accordingly, the typicality requirement is satisfied.

---

[3] Common legal issues include:  (1) whether MS's policies or practices discriminate against African American and Latino Financial Advisors and Registered Financial Advisor Trainees; (2) whether MS's conduct constitutes illegal intentional race and/or color discrimination with respect to the making, performance, modification and termination of contracts; and (3) what injunctive relief is appropriate to remedy MS's discriminatory practices.

1

### 4.     **Adequacy Is Satisfied**

2

Rule 23(a)(4) requires that the named representative "will fairly and adequately protect

3

the interests of the class."  This requirement is satisfied where the class representative's claims

4

are sufficiently interrelated with and not antagonistic to the claims of the class.  *Hanlon*, 150 F.3d

5

at 1020.  The interests of the Class Members and the interests of the Named Plaintiff in this case

6

are the same—the elimination of race and color discrimination against African American and

7

Latino Financial Advisors and Registered Financial Advisor Trainees at MS-GWMG.  There is

8

no antagonism between the Named Plaintiff's claims and those of the Class she seeks to

9

represent.  Further, the Named Plaintiff has affirmed her willingness to undertake the

10

responsibilities of serving as class representative.  For these reasons, the adequacy requirement is

11

satisfied.

12

### 5.     **Certification of the Class Is Proper under Rule 23(b)**

13

Rule 23 requires that, in addition to the Rule 23(a) prerequisites, a proposed class must

14

also meet the definition of one of the Rule 23(b) categories.

15

### a.     **Final Certification Under 23(b)(2) is Appropriate**

16

Rule 23(b)(2) is an appropriate basis for certification when the defendant "has acted or

17

refused to act on grounds generally applicable to the class," thereby making appropriate final

18

injunctive relief or corresponding declaratory relief with respect to the class as a whole.  Fed. R.

19

Civ. P. 23(b)(2).  "Civil rights cases against parties charged with unlawful, class-based

20

discrimination are prime examples" of Rule 23(b)(2) classes.  *Amchem Prods. Inc. v. Windsor*,

21

521 U.S. 591, 614 (1997); *Barefield,* 1988 WL 188433, at *2.  Certification under Rule 23(b)(2)

22

is appropriate where, as here, meaningful declaratory and injunctive relief is sought.  Fed. R. Civ.

23

P. 23(b)(2); *Molski v. Gleich*, 318 F.3d 937, 949-50 (9th Cir. 2003); *Robinson v. Metro-North*

24

*Commuter R.R.*, 267 F.3d 147, 163-64 (2d Cir. 2001).

25

Certification under Rule 23(b)(2) is appropriate in this case because Plaintiff has alleged

26

that MS-GWMG has acted and refused to act on grounds generally applicable to the Class.

27

Plaintiff seeks declaratory and injunctive relief with respect to the Class as a whole.  Logic fully

28

supports the Class Representative's contentions that her request for injunctive and declaratory

1   relief predominate. *Dukes*, 474 F.3d at 1234-35 ("In cases involving discrimination, it is

2   especially likely that even those plaintiffs safe from immediate harm will be concerned about

3   protecting those class members that are suffering as they once did."); *see also Ellis*, 240 F.R.D. at

4   643 (holding that declarations satisfied the court that reasonable plaintiffs would bring a lawsuit

5   alleging sex discrimination to obtain injunctive relief even in the absence of monetary recovery).

6          Accordingly, certification under Rule 23(b)(2) is appropriate.

7                    **b.     Certification Under 23(b)(3) is Appropriate**

8          Certification under Rule 23(b)(3) will allow class members to opt out of the monetary-

9   relief aspect of the settlement and preserve their right to seek damages independently. *See*

10  *Brown v. Title Ticor Ins. Co.*, 982 F.2d 386, 392 (9th Cir. 1992). This approach protects class

11  members' due process rights, and is consistent with the Supreme Court's decision in *Ortiz v.*

12  *Fibreboard Corp.*, 527 U.S. 815 (1999), and the Ninth Circuit's decision in *Brown*, which explain

13  that due process requires an opportunity to opt out of significant monetary relief but not equitable

14  relief. *Ortiz*, 527 U.S. at 846–48; *Brown*, 982 F.2d at 392. Indeed, in *Molski v. Gleich*, the Ninth

15  Circuit recognized that certification under both Rule 23(b)(2) and Rule 23(b)(3) is appropriate in

16  cases like this one that involve substantial injunctive *and* monetary relief. *See Molski*, 318 F.3d.

17  at 951 n.16 (certification under both Rule 23(b)(2) and Rule 23(b)(3) is one way to address due

18  process concerns raised by the release of substantial damages claims).

19         Accordingly, the class action device proposed here "is superior to other available methods

20  for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Employing

21  the class device here will not only achieve economies of scale for the Settlement Class, but will

22  also conserve the resources of the judicial system and preserve public confidence in the integrity

23  of the system by avoiding the waste and delay of repetitive proceedings and prevent the

24  inconsistent adjudications of similar issues and claims. *See Hanlon*, 150 F.3d at 1023. There is

25  no other mechanism by which all of the putative Settlement Class members' claims will be as

26  fairly, adequately, and efficiently resolved as through a class action. Indeed, in employment

27  cases like this, the alternative to a class case is often no case at all due to employees'

28  understandable fear of retaliation. *Ste. Marie v. Eastern R.R. Assoc.*, 72 F.R.D. 443, 449 (S.D.

---

PLAINTIFFS' MPA ISO MOTION FOR ORDER GRANTING
PRELIM APP OF  PROPOSED SETTLEMENT
CASE NO. 06-3903 TEH

1   N.Y. 1976), *rev'd on other grounds*, 650 F.2d 395 (2d Cir. 1982) ("[t]he risks entailed in suing

2   one's employer are such that the few hardy souls who come forward should be permitted to speak

3   for others when the vocal ones are otherwise fully qualified.").  In addition, issues of

4   manageability relating to the trial of the action are no longer of consequence as a result of the

5   settlement.  *See Amchem*, 521 U.S. at 620 ("[c]onfronted with a request for settlement-only class

6   certification, a [trial] court need not inquire whether the case, if tried, would present intractable

7   management problems, for the proposal is that there be no trial.").

8   **III.**   **Plaintiff's Counsel Should Be Appointed as Class Counsel**

9       Rule 23(g), governing the standards and framework for appointing class counsel for a

10   certified class,[4] sets forth four criteria the district court must consider in evaluating the adequacy

11   of proposed counsel: (1) the work counsel has done in identifying or investigating potential

12   claims in the action; (2) counsel's experience in handling class actions, other complex litigation,

13   and claims of the type asserted in the action; (3) counsel's knowledge of the applicable law; and

14   (4) the resources counsel will commit to representing the class.  Fed. R. Civ. Proc. 23(g)(1)(C)(i).

15   The court may also consider any other matter pertinent to counsel's ability to fairly and

16   adequately represent the interests of the class.  Fed. R. Civ. Proc. 23(g)(1)(C)(ii).  The Advisory

17   Committee noted that "[n]o single factor should necessarily be determinative in a given case."

18   Fed. R. Civ. Pro. 23(g) advisory committee's note.

19       Information relevant to each of these criteria is set forth in the accompanying declarations

20   of the Named Plaintiff's counsel.  *See* Dermody Decl., Ex. A; Klein Decl., Ex. B; Finberg Decl.,

21   Ex. C.  As their declarations evidence, each lawyer has had substantial experience in employment

22   discrimination class actions and each is well-qualified to represent the interests of the Class.  The

23   Court should appoint  Named Plaintiff's Counsel, Lieff, Cabraser, Heimann & Bernstein; Outten

24   & Golden; and Altshuler Berzon, to represent the Settlement Class in this action.

25

26

27

28   _____
    [4] The adequacy of Plaintiff's counsel is no longer evaluated under Rule 23(a)(4), which is now
    limited to determining the adequacy of the class representative.

PLAINTIFFS' MPA ISO MOTION FOR ORDER GRANTING
                                            PRELIM APP OF  PROPOSED SETTLEMENT
                                                              CASE NO. 06-3903 TEH

1    **IV.    The Proposed Class Notice Is Appropriate**

2         **A.    The Proposed Class Notice Satisfies Due Process**

3         The content of the proposed Notice of Class Action Settlement, which is attached to the

4    proposed preliminary approval order as Exhibit 2, fully complies with due process and  Fed. R.

5    Civ. P. 23.  Pursuant to Rule 23(c)(2)(B), the notice must provide "the best notice practicable

6    under the circumstances, including individual notice to all members who can be identified

7    through reasonable effort.  The notice must concisely and clearly state in plain, easily understood

8    language: the nature of the action; the definition of the class certified; the class claims, issues, or

9    defenses; that a class member may enter an appearance through counsel if the member so desires;

10   that the court will exclude from the class any member who requests exclusion, stating when and

11   how members may elect to be excluded; and the binding effect of a class judgment on class

12   members under Rule 23(c)(3)."

13        The Notice proposed here satisfies each of these requirements.  The Notice also describes

14   the terms of the settlement, informs the class about the attorneys' fees terms of the agreement,

15   and provides specific information regarding the date, time, and place of the final approval

16   hearing.  Accordingly, the detailed information in the proposed Notice is more than adequate to

17   put Class Members on notice of the proposed settlement and is well within the requirements of

18   Rule 23(c)(2)(B).

19        **B.    The Notice Plan and Claims Process Are Appropriate**

20        The Settlement Agreement provides that MS-GWMG will provide the Claims

21   Administrator with the name, social security number and last known address of each Class

22   Member within 10 days of preliminary approval of this settlement.  *See* Settlement Agreement at

23   § IV.C.1.  Within 20 days after Preliminary Approval of the settlement, the Claims Administrator

24   will mail the Notice and a Claim Form to each Class Member in the form agreed upon by the

25   parties or such other form as approved by the Court.  *Id.* at § IV.C.2.  Class Members will have 45

26   days from the date Notice is mailed to the Class Members to object to the settlement by filing

27   their objection with the Court and serving copies of the objection on Class Counsel and counsel

28   for MS-GWMG.  *Id.* at § IV.C.4.  This is sufficient time to give Settlement Class Members a fair

PLAINTIFFS' MPA ISO MOTION FOR ORDER GRANTING
PRELIM APP OF  PROPOSED SETTLEMENT
CASE NO. 06-3903 TEH

1   opportunity to respond.  *Cf. Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993)

2   (approving notice sent 31 days before the deadline for objections and 45 days before the hearing).

3   For those Class Members who wish to opt-out of the settlement, their opt-out statement must be

4   received by Class Counsel and counsel for Morgan Stanley on or before 45 days after the Notice

5   is to be mailed to Class Members.  *Id.* at § IV.C.5.  Class Members will have a number of days to

6   be determined by the Court from the mailing of Notice to submit a Claim Form and release.  *See*

7   Settlement Agreement at § VIII.C.  Within a reasonable time after receipt of a Named Plaintiff or

8   Class Member release, the Claims Administrator will send the Claimant his or her award

9   payment.  *Id.* at § VIII.D.3.d.

10  **V.      The Proposed Scheduling Order; A Final Approval Hearing Should Be Scheduled**

11          The last step in the settlement approval process is the formal hearing, at which the Court

12  may hear all evidence and argument necessary to evaluate the settlement.  The parties propose the

13  following schedule for final approval:

| December 17, 2007 | Last day for the Claims Administrator to mail Notice and Claim form to Class Members. |
|---|---|
| January 31, 2008 | Last day for objections and comments in favor of the settlement. |
| January 31, 2008 | Last day to opt out. |
| February 15, 2008 | Last day for Class Members who file opt-outs to rescind their opt-outs. |
| February 15, 2008 | Last day for Class Members to submit a Claim Form. |
| February 25, 2008 | Motion for final approval and fee application due. |
| March 24, 2008 | Reply papers due. |
| March 31, 2008, 10:00 a.m. | Final approval hearing. |

1

## VI.   Conclusion

2          For all of the foregoing reasons, the parties respectfully request that the Court issue an

3   order:  (1) preliminarily approving the parties' class action settlement, (2) certifying a Settlement

4   Class, (3) appointing named Plaintiff's counsel to represent the Class, (4) approving and directing

5   distribution to the Class of Notice of Settlement and a Claim Form, and (5) setting a schedule for

6   the final approval process.

7
    Dated:  October 22, 2007                              Respectfully submitted,
8
                                                          LIEFF, CABRASER, HEIMANN &
9                                                         BERNSTEIN, LLP

10

11                                                        By:_____/s/ Kelly M. Dermody_____
                                                                        Kelly M. Dermody
12
                                                          Kelly M. Dermody (State Bar No. 171716)
13                                                        Heather H. Wong (State Bar No. 238546)
                                                          LIEFF, CABRASER, HEIMANN &
14                                                        BERNSTEIN, LLP
                                                          Embarcadero Center West
15                                                        275 Battery Street, 30th Floor
                                                          San Francisco, CA  94111-3339
16                                                        Telephone:  (415) 956-1000
                                                          Facsimile:  (415) 956-1008
17
                                                          Elizabeth A. Alexander (*pro hac vice*)
18                                                        LIEFF, CABRASER, HEIMANN &
                                                          BERNSTEIN, LLP
19                                                        150 Fourth Avenue, North, Suite 1650
                                                          Nashville, TN  37219-2423
20                                                        Telephone:  (615) 313-9000
                                                          Facsimile:  (615) 313-9965
21
                                                          Adam T. Klein
22                                                        Piper Hoffman (*pro hac vice*)
                                                          Justin M. Swartz (*pro hac vice*)
23                                                        OUTTEN & GOLDEN LLP
                                                          3 Park Avenue, 29th Floor
24                                                        New York, New York 10016
                                                          Telephone:  (212) 245-1000
25                                                        Facsimile:  (212) 977-4005

26

27

28

PLAINTIFFS' MPA ISO MOTION FOR ORDER GRANTING
PRELIM APP OF  PROPOSED SETTLEMENT
CASE NO. 06-3903 TEH

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

James M. Finberg (State Bar No. 114850)
ALTSHULER BERZON
177 Post Street, Ste. 300
San Francisco, CA  94108
Telephone:  (415) 421-7151
Facsimile:  (415) 362-8064

*Attorneys for Plaintiffs*

# EXHIBIT A

1  Kelly M. Dermody (State Bar No. 171716)
   Heather H. Wong (State Bar No. 238546)
2  LIEFF, CABRASER, HEIMANN &
   BERNSTEIN, LLP
3  275 Battery Street, 30th Floor
   San Francisco, CA  94111-3339
4  Telephone:  (415) 956-1000
   Facsimile:  (415) 956-1008
5  email: kdermody@lchb.com
   email: hwong@lchb.com
6
   Elizabeth A. Alexander (*pro hac vice*)
7  LIEFF, CABRASER, HEIMANN &
   BERNSTEIN, LLP
8  150 Fourth Avenue, North, Suite 1650
   Nashville, TN  37219-2423
9  Telephone:  (615) 313-9000
   Facsimile:  (615) 313-9965
10 email: ealexander@lchb.com

11

12 *Attorneys for the Plaintiffs*

13

14              UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
15          SAN FRANCISCO / OAKLAND DIVISION

16 DAISY JAFFE, DENISE WILLIAMS, and      Case No. C-06-3903 TEH
   MARGARET BENAY CURTIS-BAUER,
17 on behalf of themselves and all others    DECLARATION OF KELLY M. DERMODY
   similarly situated,                       IN SUPPORT OF MOTION FOR ORDER
18                                           GRANTING PRELIMINARY APPROVAL OF
         Plaintiffs,                         THE PROPOSED SETTLEMENT
19                                           AGREEMENT
         v.
20                                         Date:       November 26, 2007
   MORGAN STANLEY & CO.                    Time:       1:30 p.m.
21 INCORPORATED, f/k/a MORGAN             Courtroom:   12
   STANLEY DW INC.
22

23       Defendant.

24

25

26
         I, Kelly M. Dermody, declare:
27
              1.       I am a partner in the firm Lieff, Cabraser, Heimann & Bernstein, LLP, one
28

DECLARATION OF KELLY M. DERMODY ISO MOTION
FOR ORDER GRANTING PRELIM APP OF PROPOSED
SETTLEMENT AGREEMENT
CASE NO. 06-3903 TEH

1   of the firms serving as counsel for Plaintiff in this matter.  I make these statements based on

2   personal knowledge and would so testify if called as a witness.

3         2.      I am a member in good standing of the bars of the State of California; the

4   United States District Court for the Northern District of California; the United States District

5   Court for the Central District of California; the United States District Court for the District of

6   Colorado; and the United States Courts of Appeals for the Third, Seventh, and Ninth Circuits.

7         3.      This Declaration is submitted in support of the parties' Joint Motion for

8   Order Granting Preliminary Approval of the Proposed Settlement Agreement.

9

10                          **I. <u>Background and Experience</u>**

11

12        4.      I graduated *magna cum laude* from Harvard University in 1990, where I

13  majored in History.  I graduated from the University of California at Berkeley Boalt Hall School

14  of Law in 1993.

15        5.      Immediately after I graduated from law school, I clerked for the Honorable

16  John T. Nixon, Chief Judge of the United States District Court for the Middle District of

17  Tennessee.

18        6.      Since 1994, I have practiced with Lieff, Cabraser, Heimann & Bernstein,

19  LLP ("LCHB"), where I became a partner in June 1998.  At LCHB, I have focused on

20  representing plaintiffs in employment litigation (including discrimination and wage and hour

21  disputes) and consumer fraud cases.

22        7.      I, along with other attorneys from my firm and co-counsel, served as

23  plaintiffs' counsel in *Butler v. Home Depot*, Case No. C94-4335 SI (N.D. Cal.), a gender

24  discrimination class action on behalf of 25,000 women in Home Depot's West Coast Division.

25  After defeating the defendant's motion for summary judgment, the plaintiffs negotiated a

26  settlement involving comprehensive injunctive relief regarding hiring, promotions, compensation,

27  training, and evaluations, as well as payment of a common fund of $87.5 million.

28        8.      I served as one of plaintiffs' lead counsel in *Gonzalez v. Abercrombie &*

DECLARATION OF KELLY M. DERMODY ISO MOTION
FOR ORDER GRANTING PRELIM APP OF PROPOSED
SETTLEMENT AGREEMENT
CASE NO. 06-3903 TEH

1  *Fitch Stores, Inc.*, Case No. 03-2817 SI (N.D. Cal.), a nationwide race, color, and gender

2  discrimination class action that resulted in a $50 million settlement on behalf of African

3  American and Latino and female applicants and employees, with comprehensive injunctive relief

4  in the areas of hiring, job assignment, and compensation at stores nationwide.

5  9.  I served as plaintiffs' counsel in *Buttram v. United Parcel Service*, Civ. No.

6  C97-01590-MJJ (N.D. Cal.), a race discrimination class action brought on behalf of African-

7  American part-time hourly employees in the company's Northwest and Pacific Regions that

8  resulted in a settlement involving comprehensive injunctive relief regarding initial assignment

9  and promotions, as well as a common fund of $12.14 million.

10  10.  I was lead counsel in *Lyon v. TMP Worldwide*, Case No. 993096 (San

11  Francisco County Super. Ct.), a wage and hour class action that resulted in a $1.25 million

12  settlement on behalf of a class of approximately 140 California employees alleging that they had

13  been misclassified as exempt from California labor law overtime provisions.

14  11.  I served as plaintiffs' counsel in *Trotter v. Perdue Farms, Inc.*, Case No.

15  99-893 (RRM) (D. Del.), a collective and class action under the Fair Labor Standards Act, the

16  Employee Retirement Income Security Act of 1974, and state wage and hour laws.  The class

17  members were chicken processing employees challenging the company's failure to pay wages

18  and overtime, or provide pension credits, for off-the-clock work.  The case resolved for a

19  payment of $10 million.

20  12.  I was co-lead counsel in *Foster v. Great Atlantic and Pacific Tea Co., Inc.*

21  *d/b/a A&P*, Case No. 99 CV 3860 (CM) (S.D.N.Y.), an FLSA collective action that resulted in a

22  $3.05 million settlement on behalf of 855 opt-in plaintiffs who challenged the company's failure

23  to pay wages and overtime for off-the-clock work.

24  13.  I was co-lead counsel in *Senior v. Adecco USA, Inc. d/b/a Adecco, Inc.*

25  (San Francisco County Super. Ct. 2005); and *Hyatt v. Adecco USA, Inc. d/b/a Adecco, Inc.*

26  (Alameda County Super. Ct. 2005), two related class actions challenging a temporary

27  employment agency's failure to pay both its regular staff and its temporary staff earned vacation

28  wages.  The cases together resulted in settlements of over $3.8 million.

- 3 -

14.     I am co-lead counsel in *LaMarca v. Great Atlantic and Pacific Tea Company, Inc. d/b/a A&P*, Case No. 04601973 (Cahn) (County of N.Y. Sup. Ct.), a wage and hour class action on behalf of full-time employees denied overtime and forced to work off the clock in defendants' stores across New York State.

15.     I am co-lead counsel in *Amochaev v. Citigroup Global Markets, Inc., d/b/a Smith Barney*, Case No. C-05-1298 PJH (N.D. Cal.), a gender discrimination class action brought on behalf of national class of female financial advisors alleging discrimination in compensation and business opportunities.

16.     I am co-lead counsel in *Holloway v. Best Buy Co., Inc.*, Case No. C-05-5056 PJH (N.D. Cal.), a race and gender discrimination class action challenging hiring, initial job assignment, compensation and promotion practices at Best Buy stores nationwide.

17.     I am co-lead counsel in *Wynne v. McCormick & Schmick's Seafood Restaurants, Inc.*, Case No. C-06-3153 CW (N.D. Cal.), a race discrimination class action on behalf of a national class of African Americans alleging discrimination in hiring, initial job assignment, compensation and promotions.

18.     I have also successfully litigated a wide variety of complex federal and state civil matters during my professional career, including several consumer class actions.  Class action cases I have successfully prosecuted to judgment or settlement, in addition to the foregoing, include:  *Citigroup Loan Cases*, J.C.C.P. No. 4197 (San Francisco County Super. Ct.) (plaintiffs' co-liaison counsel in national consumer class action challenging alleged predatory mortgage lending practices that resulted in $263 million settlement); *Curry v. Fairbanks Capital Corp.*, Civil Action No. 03-10895-DPW (D. Mass) (plaintiffs' co-lead counsel in national consumer class action challenging alleged predatory mortgage servicing practices that resulted in $55.5 million settlement and business practice changes in the areas of customer service, payment processing, collections, lender placed insurance, and delinquent loan resolution); *Providian Credit Card Cases*, J.C.C.P. No. 4085 (San Francisco County Super. Ct.) (co-lead class counsel in national consumer class action against major credit card company that resulted in $105 million settlement); *Sutter Health Uninsured Pricing Cases*, Case No. JCCP 4388 (Sacramento Super.

727952.4

- 4 -

1  Ct.) (lead class counsel in consumer class action that resulted in over $275 million settlement and

2  comprehensive pricing and collections policy changes for uninsured patients across all Sutter

3  hospitals); *Catholic Healthcare West Cases*, Case No. JCCP 4453 (San Francisco County Super.

4  Ct.) (lead class counsel in consumer class action that resulted in over $423 million settlement and

5  pricing and collections policy changes for uninsured patients across all CHW hospitals).

6        19.     I am also involved as co-lead counsel in the following cases:  *In re*

7  *Ameriquest Mortgage Company Mortgage Lending Practices Litigation*, Case No. MDL 1715

8  (N.D.Ill.) (court-appointed plaintiffs' co-lead counsel in national consumer class action MDL

9  challenging mortgage lender's practice of imposing improper fees and charging improper interest

10  rates and pre-payment penalties on mortgage accounts); *Ricci v. Ameriquest Mortgage Company*,

11  Case No. 27-CV-05-2546 (Hennepin County, Minn. Dist. Ct.) (court-appointed plaintiffs' class

12  counsel in certified statewide consumer class action challenging mortgage lender's practice of

13  imposing improper fees and charging improper interest rates and pre-payment penalties on

14  mortgage accounts);  *In re Ocwen Federal Bank FSB Mortgage Servicing Litigation*, Case No.

15  MDL 1604 (N.D. Ill.) (court-appointed plaintiffs' co-lead counsel national consumer class action

16  MDL challenging mortgage servicer's practice of imposing improper fees and insurance on

17  mortgage accounts); *Schaffer v. Litton Loan Servicing, LP*, Case No. 05-7673-MMM (C.D. Cal.)

18  (plaintiffs' co-lead counsel in certified national consumer class action challenging mortgage

19  servicer's practice of imposing improper fees in violation of RESPA).

20        20.     In addition to being an active litigator, I have long been involved in many

21  educational and legal groups, including the ABA Labor and Employment Law Section where I

22  currently serve as the Vice-Chair of the Section's Annual Conference.  Previously I have served

23  as Co-Chair of the Section's Committee on Equal Opportunity in the Legal Profession, Co-Chair

24  of the Section's Equal Employment Opportunity Committee, and member of the Section's

25  Katrina Task Force.  I am currently a member of the Board of Directors of the Bar Association of

26  San Francisco, for which I previously served on the Executive Committee of BASF's Litigation

27  Section.  I am a member of the National Employment Lawyers' Association, the Consumer

28  Attorneys of California, and the Bay Area Lawyers for Individual Freedom.

21.     I have written articles for a variety of legal publications and conferences, including "Class Actions: Latest Developments in Litigating and Settling Employment Discrimination Class Actions" (American Bar Association Labor and Employment Section Equal Employment Opportunity Committee, Midwinter Meeting 2001); "A Road Map to Discovery in Employment Discrimination and Wage/Hour Class Actions" (with James M. Finberg) (Glasser Legal Works Seminar, 2000); "Employment Discrimination Class Actions in the Wake of *Allison v. Citgo Petroleum Corp.*," (American Bar Association Litigation Section Annual Meeting 2000); "Employment Discrimination Class Actions in the Wake of *Allison v. Citgo Petroleum Corp.* and Fed. R. Civ. P. 23(f)" (Federal Bar Association Convention, 1999); "Discovery in Employment Discrimination Class Actions" (with James Finberg) in *Litigation and Settlement of Complex Class Actions* (1998).

22.     I have been a presenter or moderator at numerous legal conferences, including: Moderator, *Religious Discrimination, Reasonable Accommodation, and Religious Practices in the Workplace* (ABA Labor and Employment Law Section Equal Employment Opportunity Committee, Midwinter Conference 2007); Panelist, *How Not to Take a Deposition* (BASF Program, July 2006); Moderator, *Evolving Concepts of Family, Including Domestic Partnerships, Same-Sex Marriages and Civil Unions and the Impact of these New Legal and Social Definitions of Family on Workplace Policies, Practices and Benefits* (ABA Labor and Employment Law Section Equal Employment Opportunity Committee, Midwinter Conference 2005); Presenter, *BASF Deposition Skills Workshop* (BASF Program, February 2004); Moderator, *Sexual Orientation Discrimination, Same-Sex Sexual Harassment and Transgender Discrimination* (ABA Annual Meeting, August 2003); Panelist, *Class Actions: Latest Developments in Litigating and Settling Employment Discrimination Class Actions* (ABA Labor and Employment Law Section Equal Employment Opportunity Committee, Midwinter Meeting 2001); Panelist, *Litigation and Settlement of Complex Class Actions* (Glasser Legal Works, September 2000, April 1998); Panelist, *Class Actions: The End Game - Trial or Settlement?  How to Bring a Class Action to a Successful Conclusion* (ABA Litigation Section Annual Meeting, April 2000); Panelist, *Basic Class Actions* (ABA EEO Committee Midwinter Meeting, March

- 6 -

2000); Panelist, *The Fourth National Conference for Women Law Firm Partners* (Business Development Associates, March 1999).  Moderator, *Equal Employment Opportunity Committee Program: "Pattern and Practice Enforcement and Trends" and "Reeves v. Sanderson Plumbing Products, Inc.: The Argument and the Aftermath"* (ABA Annual Meeting, July 2000); Moderator, *Recent Developments in the Trial of Class Actions* (ABA Section of Labor and Employment Law, Equal Employment Opportunity Committee, Midwinter Meeting, March 1999).

23.     In 2001, I taught Employment Law as an Adjunct Professor of Law at the Golden Gate University School of Law.

24.     I received a California Lawyer Attorney of the Year (CLAY) Award from the *California Lawyer* in 2007; was named one of California's "Top Women Litigators" by the *Daily Journal* in 2007; and was named as one of the *Daily Journal*'s "Top 20 Lawyers Under Age 40" in 2006.  I was a finalist for Trial Lawyer of the Year (2007) from the Public Justice Foundation, and for Consumer Attorney of the Year (2006) from Consumer Attorneys of California.  I also received the following awards:  Northern California Super Lawyer (2004, 2005, 2006, 2007); Lawyers' Committee for Civil Rights "Living the Dream Partner" (2005); President's Award, Phillips Exeter Academy (1999) (for admissions committee work dedicated to recruiting low-income applicants of color on the West Coast).

25.     LCHB, along with other Plaintiff's counsel, has done significant work in identifying and investigating the claims in this action.

26.     LCHB is committed to representing the Class in this matter, including devoting significant time and energy to ensuring that the monitoring and reporting requirements set forth in the Settlement Agreement are completed.

27.     Attached as Exhibit 1 to this Declaration is a true and correct copy of the firm resume for Lieff, Cabraser, Heimann & Bernstein, LLP.

## II. History of Litigation and Discovery

28.     Plaintiff's counsel were initially contacted by Plaintiff Daisy Jaffe

DECLARATION OF KELLY M. DERMODY ISO MOTION FOR ORDER GRANTING PRELIM APP OF PROPOSED SETTLEMENT AGREEMENT CASE NO. 06-3903 TEH

1   regarding claims of gender discrimination.  Ms. Jaffe subsequently filed an EEOC charge of

2   discrimination. After an extensive investigation, she filed a Class Action Complaint on June 22,

3   2006, asserting claims on behalf of a nationwide Class of female Financial Advisors employed by

4   MS-GWMG and a Subclass of all female Financial Advisors employed by MS-GWMG in

5   California.  The Complaint asserted claims for gender discrimination under Title VII, 42 U.S.C.

6   § 2000e, *et seq.*, and, with respect to California Subclass, the California Fair Employment and

7   Housing Act, Cal. Gov't Code § 12940 ("FEHA").  The Complaint also asserted non-class claims

8   of age discrimination on behalf of Ms. Jaffe individually under the Age Discrimination in

9   Employment Act of 1967, 29 U.S.C. § 621, *et seq.* and under California's FEHA. (Complaint at

10  ¶¶ 51-58.)

11          29.     On October 12, 2006, plaintiffs filed a First Amended Complaint adding

12  Plaintiff Denise Williams as a class representative and her claims of race discrimination under

13  Title VII, Michigan's Elliot-Larsen Civil Rights Act, and 42 U.S.C. § 1981.  The First Amended

14  Complaint also added a Subclass of female Financial Advisors who reside in Michigan under

15  Michigan's Elliot-Larsen Civil Rights Act, M.C.L.A. § 37.2101, *et seq.*

16          30.     Plaintiff's counsel continued to investigate claims of race discrimination

17  against African American and Latino Financial Advisors and Financial Advisor Trainees at

18  Morgan Stanley.  In January 2007, Ms. Williams also informed Morgan Stanley of her intention

19  to file a Second Amended Complaint to add allegations that the company engaged in class-wide

20  race discrimination.  MS-GWMG agreed to toll the race claims and stay the filing of the Second

21  Amended Complaint to pursue settlement discussions with Plaintiff Williams in hopes of

22  resolving the class-wide race claims.

23          31.     In connection with settlement discussions, MS-GWMG produced a

24  substantial number of documents relating to its compensation and employment practices.  In

25  addition, MS-GWMG provided Plaintiff's counsel with electronic data, which was extracted from

26  Morgan Stanley's Human Resources database, that contained comprehensive payroll (including

27  all wage information) and job history information for each person who held a registered Financial

28  Advisor Trainee or full Financial Advisor position at any time between October 12, 2002 and July

DECLARATION OF KELLY M. DERMODY ISO MOTION
FOR ORDER GRANTING PRELIM APP OF PROPOSED
SETTLEMENT AGREEMENT
CASE NO. 06-3903 TEH

11, 2007.  Finally, MS-GWMG provided Plaintiff's counsel with electronic payroll data in the form of monthly medicare wages for Financial Advisors and Financial Advisor Trainees for the same date range and detailed data on accounts and partnerships.

32.     Counsel engaged the services of the professional labor-economics firm Econsult to conduct an extensive analysis of all of the claims in this case, including whether African American and Latino Financial Advisors and Financial Advisor Trainees were systematically disadvantaged by policies and practices at Morgan Stanley relating to compensation and other terms and conditions of employment.

33.     This information, along with witness interviews and information regarding MS-GWMG policies, confirmed Plaintiff's understanding of the scope of systemic problems affecting African American and Latino Financial Advisors and Financial Advisor Trainees.

34.     Plaintiff Curtis-Bauer subsequently joined the case.  On August 2, 2007, Plaintiff filed a Second Amended Complaint adding Curtis-Bauer as a class representative.  *See* Second Amended Complaint at ¶ 19.  Ms. Curtis-Bauer and Ms. Williams collectively alleged, on behalf of themselves and others similarly situated, that Morgan Stanley discriminated against African American and Latino Financial Advisors and Registered Financial Advisor Trainees. Specifically, they alleged discrimination against African Americans and Latinos in compensation, account distributions, partnerships, business opportunities, and other terms and conditions of employment.

35.     Immediately prior to this filing, Daniel Hutchinson of my office and I have again spoken with Ms. Williams, and Heather Wong of my office has again spoken with Ms. Curtis-Bauer at my instruction.  Ms. Curtis-Bauer has informed us that she fully supports the settlement.  Ms. Williams has informed us that she intends to opt out so that she can file an individual lawsuit alleging the claims she has brought in the Second Amended Complaint as well as an age discrimination claim.

**Settlement Negotiations**

36.     The parties participated in negotiations with the assistance of an experienced mediator, Hunter Hughes, Esq. of Atlanta, Georgia.  Counsel for the parties are retained Mr. Hughes for his expertise in mediating many complex actions, including those involving race discrimination in employment, such as the class action against Abercrombie & Fitch (described above) litigated and settled in this District.  Mr. Hughes also has familiarity with MS-GWMG's practices through his work as a mediator in the *Augst-Johnson* action, the related gender discrimination case against MS-GWMG.

37.     The parties here had multiple face-to-face negotiating sessions in San Francisco, New York, and Charleston, South Carolina, in March, July and August  2007, as well as numerous discussions by telephone.  Under the supervision of the mediator, the parties' negotiations were conducted at arms' length.

38.     Before reaching a settlement, the parties conducted a thorough examination and investigation of the facts and law relating to Plaintiff's claims.  This investigation informed counsel regarding the strengths and weaknesses of their respective positions and provided them a full opportunity to assess the litigation risks presented in this case.  In August 2007, the parties reached a settlement in principle of their claims.

39.     Consistent with the Second Amended Complaint, the Settlement Class defined in the Settlement Agreement consists of all African Americans and Latinos who were employed as Financial Advisors or Registered Financial Advisor Trainees in the Global Wealth Management Group of Morgan Stanley & Co. Incorporated or its predecessor at any time between October 12, 2002 and the date of the preliminary approval of the settlement.

### III. Factual Record for Class Certification

40.     Plaintiff's counsels' investigation of the claims alleged in this matter allowed them to determine that there is a sufficient basis to move for settlement class certification under Rule 23 of the Federal Rules of Civil Procedure.  Those facts include:

41.     During the class period there were approximately 1300 African American

1    and Latino Financial Advisors and Registered Financial Advisor Trainees.  This number is

2    sufficient to establish that joinder is impracticable and that the numerosity requirement is satisfied

3    under Rule 23(a)(1).

4         42.    MS-GWMG has maintained uniform personnel and management structures

5    across branch offices, and exercises extensive control over branch operations, compensation, and

6    account distribution policies affecting Class members.

7         43.    Plaintiff's expert conducted statistical analyses of compensation data and

8    representation rates sufficient to demonstrate common patterns across the Class.

9         44.    Plaintiff Curtis-Bauer is an African American former Financial Advisor

10   who alleges discrimination in compensation on behalf of herself and a class of African American

11   Financial Advisors and Registered Financial Advisor Trainees.  Her allegations of harm are

12   typical of the class as a whole.

13        45.    As set forth above and in the Declarations of Adam Klein and James M.

14   Finberg, also filed herewith as Exhibits B and C in support of the Joint Motion for Order Granting

15   Preliminary Approval of the Proposed Settlement Agreement, the attorneys for the Representative

16   Plaintiff are qualified, experienced, and generally able to conduct the litigation.

17

18   **IV. <u>The Proposed Settlement is Fair and Reasonable and is in the Best Interest of the Class</u>**

19

20        46.    While Plaintiff is convinced that she has a compelling case, there is

21   substantial risk in proceeding to class certification and to trial.  Pretrial preparation would be

22   arduous and trial lengthy, involving dozens of witnesses nationwide.

23        47.    Even if Plaintiff was victorious at class certification, past summary

24   judgment, and through trial, the judgment would likely be appealed, further delaying the result

25   and increasing the cost of litigation.  Nor would a victory at a merits trial guarantee Plaintiff and

26   the Class Members any affirmative class-wide relief whatsoever.  Were the Plaintiff to prevail at

27   trial, the parties would likely enter into negotiations to determine the parameters of relief.

28   Ultimately, even an overwhelming court victory for Plaintiff would not ensure that the

DECLARATION OF KELLY M. DERMODY ISO MOTION
FOR ORDER GRANTING PRELIM APP OF PROPOSED
SETTLEMENT AGREEMENT
CASE NO. 06-3903 TEH

1  Defendant would agree to the substantial injunctive relief that is included in this Settlement

2  Agreement. Even if it did, such an agreement would likely only be achieved years from now.

3         48.    Given the significant risks at class certification, summary judgment, and

4  trial, and the likely appeal and inevitable delay of continued litigation, it is my opinion that the

5  proposed settlement is appropriate and in the best interests of the Class. Moreover, the proposed

6  Settlement Agreement provides substantial injunctive and monetary relief for the allegations of

7  systemic discrimination Plaintiff alleges. Based on my experience in employment discrimination

8  class action litigation, it is my opinion that this settlement is fair, adequate and reasonable, and is

9  in the best interest of the Class and the Named Plaintiff.

10        49.    I believe that the notice mandated in this case pursuant to the Settlement

11 Agreement is reasonably calculated to provide notice to the Class Members. It is my opinion that

12 the procedures and practices of the Claims Administrator as articulated in the Settlement

13 Agreement meet the due process requirements under Fed. R. Civ. Proc. 23(e).

14        50.    The parties have selected Settlement Services, Inc. in Tallahassee, Florida,

15 to act as the Claims Administrator. Settlement Services, Inc. has substantial experience and an

16 excellent reputation in providing notice and settlement administration services in class actions.

17

18     I declare under penalty of perjury under the laws of the United States that the foregoing is

19 true and correct. Executed this 22nd day of October 2007 in San Francisco, California.

20

21

22                            Kelly M. Dermody

23

24

25

26

27

28

- 12 -

# EXHIBIT A

# LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

*Embarcadero Center West*
*275 Battery Street, 30th Floor*
*San Francisco, CA  94111-3339*
*Telephone:  (415) 956-1000*
*Facsimile:  (415) 956-1008*

*780 Third Avenue*
*48th Floor*
*New York, NY  10017-2024*
*Telephone:  (212) 355-9500*
*Facsimile: (212) 355-9592*

*One Nashville Place*
*150 Fourth Avenue North, Suite 1650*
*Nashville, TN  37219-2415*
*Telephone:  (615) 313-9000*
*Facsimile:  (615) 313-9965*

*E-mail:  mail@lchb.com*
*Website:  www.lieffcabraser.com*

## FIRM PROFILE:

Lieff Cabraser Heimann & Bernstein, LLP, is a fifty-plus attorney, AV-rated law firm founded in 1972 with offices in San Francisco, New York and Nashville.  Lieff Cabraser has a diversified practice, successfully representing plaintiffs in the fields of personal injury and mass torts, securities fraud, employment discrimination and unlawful employment practices, product defect, antitrust, consumer protection, aviation, environmental and toxic exposure, and human rights.  Our clients include individuals, classes or groups of persons, businesses, and public and private entities.

Lieff Cabraser has served as court-appointed Plaintiffs' Lead or Class Counsel in state and federal coordinated, multi-district, and complex litigation throughout the United States. With co-counsel, we have represented clients across the globe in cases filed in American courts. We have litigated and resolved thousands of individual lawsuits and hundreds of class and group actions, including some of the most important civil cases in the United States over the last decade.

Lieff Cabraser is among the largest firms in the United States that only represent plaintiffs.  Described by *The American Lawyer* as "one of the nation's premier plaintiffs' firms," Lieff Cabraser enjoys a national reputation for professional integrity and the successful prosecution of our clients' claims. We possess sophisticated legal skills and the financial resources necessary for the handling of large, complex cases, and for litigating against some of the nation's largest corporations.  We take great pride in the leadership roles our firm plays in many of this country's major cases, including those resulting in landmark decisions and precedent-setting rulings.

In the 2006 edition of its annual list of the plaintiffs' law firms "doing the most to shape the law," *The National Law Journal* selected Lieff Cabraser as one of the nation's top plaintiffs' firms. Lieff Cabraser was also a member of *The National Law Journal*'s Plaintiffs' "Hot List" from 2003 through 2005.  We are one of only three plaintiffs' law firms in the nation to receive this award the last four years.

*CASE PROFILES:*

### A.   Personal Injury and Products Liability Litigation

Lieff Cabraser has obtained over $400 million in verdicts, judgments and settlements for our clients in individual personal injury and wrongful death lawsuits. Since 1995, and working with co-counsel, we have achieved verdicts, judgments and settlements in excess of $10 billion in product liability class action lawsuits.

We only represent plaintiffs. In many of these cases, we assisted our clients in persuading the corporate defendants to issue recalls or improve their safety procedures for the protection of all consumers and patients. Currently, we are prosecuting scores of lawsuits involving injuries and deaths from all types of negligent conduct, manufacturing errors and design defects. Our cases range from vehicle and aviation accidents to faulty medical devices. We also represent patients prescribed drugs with dangerous, undisclosed side effects and consumers sickened by contaminated food products.

Our successful personal injury and products liability cases, with the exception of aviation cases which are profiled separately, include:

1.   ***Individual Vehicle Injury Lawsuits.*** Lieff Cabraser has an active practice prosecuting claims for clients injured, or the families of loved ones who have died, by the wrongful conduct of other drivers or due to unsafe and defective vehicles, tires and other automotive equipment. We are representing clients in actions involving fatalities and serious injuries due to rollover accidents of fifteen passenger vans and sports utility vehicles. Plaintiffs allege that the vans and SUVs were defectively designed because they pose an unreasonable risk of rollover during foreseeable driving conditions. We also represent clients in many other vehicle cases including ones where defective cruise control switches resulted in fires, transmission defects that caused the vehicle to shifted suddenly from park into reverse and design defects with the Yamaha Rhino that have resulted in the vehicle rolling even during turns at low speeds on flat surfaces.

In March 2007, in *Mraz v. DaimlerChrysler*, No. BC 332487 (Cal. Supr. Ct.), we obtained a $54.4 million verdict, including $50 million in punitive damages, against DaimlerChrysler for intentionally failing to cure a known defect in millions of its vehicles that led to the death of Richard Mraz, a young father. Mr. Mraz suffered fatal head injuries when the 1992 Dodge Dakota pickup truck he had been driving at his work site ran him over after he exited the vehicle believing it was in park. The jury found that a defect in the Dodge Dakota's automatic transmission, called a park-to-reverse defect, played a substantial factor in Mr. Mraz's death and that DaimlerChrysler was negligent in the design of the vehicle for failing to warn of the defect and then for failing to adequately recall or retrofit the vehicle.

2.      ***Multi-State Tobacco Litigation***.  Lieff Cabraser represented the Attorneys' General of Massachusetts, Louisiana and Illinois, several additional states, and 18 cities and counties in California, in litigation against Philip Morris, R.J. Reynolds and other cigarette manufacturers. The suits were part of the landmark $206 billion settlement announced in November 1998 between the tobacco industry and the states' attorneys general.  The states, cities and counties sought both to recover the public costs of treating smoking-related diseases and require the tobacco industry to undertake extensive modifications of its marketing and promotion activities in order to reduce teenage smoking.  In California alone, Lieff Cabraser's clients were awarded an estimated $12.5 billion to be paid over the next 25 years.

3.      ***Fen-Phen ("Diet Drugs") Litigation.***  Lieff Cabraser represents individuals pursuing personal injury claims due to injuries from the "Fen-Phen" diet drugs fenfluramine (sold as Pondimin) and/or dexfenfluramine (sold as Redux).  We served as counsel for the plaintiff that filed the first nationwide class action lawsuit against the diet drug manufacturers alleging that they had failed to adequately warn physicians and consumers of risks associated with the drugs.  Since the recall was announced in 1997, Lieff Cabraser has represented over 400 persons in individual actions who have suffered heart and/or lung damage, most often consisting of cardiac valve damage and/or Primary Pulmonary Hypertension, after ingesting Pondimin or Redux.  In *In re Diet Drugs (Phentermine / Fenfluramine / Dexfenfluramine) Products Liability Litigation*, MDL No. 1203 (E.D. Pa.), the Court appointed Elizabeth J. Cabraser to the Plaintiffs' Management Committee which organized and directed the Fen-Phen diet drugs litigation filed across the nation in federal courts.  In August 2000, the Court approved a $4.75 billion settlement offering both medical monitoring relief for persons exposed to the drug and compensation for persons with qualifying damage.  Lieff Cabraser also served on the Plaintiffs' Executive Committee in the California Coordinated Proceedings in California state court, and as class counsel in the State of Washington certified medical monitoring action.

4.      ***In re ConAgra Peanut Butter Products Liability Litigation***, MDL No. 1845 (N.D. Ga.).  In September 2007, the federal court appointed Elizabeth Cabraser as Plaintiffs' Lead Counsel in the litigation arising out of the recall of Peter Pan and Great Value peanut butter.  Tens of thousands of consumers nationwide contracted *Salmonella* poisoning from eating contaminated peanut butter produced at a single ConAgra plant in Sylvester, Georgia.  In February 2007, the FDA confirmed the presence of *Salmonella* in opened jars of Peter Pan and Great Value peanut butter obtained from inflected persons.

5.      ***In re ReNu With MoistureLoc Contact Lens Solution Products Liability Litigation***, MDL No. 1785 (D. S.C.).  Lieff Cabraser partner Wendy R.

Fleishman serves on Plaintiffs' Executive Committee in litigation in
federal court arising out of Bausch & Lomb's recall in 2006 of its product
ReNu with MoistureLoc. Consumers nationwide allege that the contact
lens solution caused *Fusarium keratitis*, a rare and dangerous fungal eye
infection , as well as other serious eye infections because the solution
failed to disinfect and cleanse contact lenses, contrary to its claims.  Many
contact lens wearers were forced to undergo painful corneal transplant
surgery to save their vision; others have lost all or part of their vision
permanently.

6.      ***In re Guidant Implantable Defibrillators Products Liability Litigation***,
MDL No. 1708.  Lieff Cabraser serves on the Plaintiffs' Lead Counsel
Committee in litigation in federal court arising out of the recall of Guidant
cardiac defibrillators implanted in patients because of potential
malfunctions in the devices.  At the time of the recall, Guidant admitted it
was aware of 43 reports of device failures, and two patient deaths. Guidant
subsequently acknowledged that the actual rate of failure may be higher
than the reported rate and that the number of associated deaths may be
underreported, since implantable cardio-defibrillators are not routinely
evaluated after death.

7.      ***In re Vioxx Products Liability Litigation***, MDL No. 1657 (E.D.  La.).
Lieff Cabraser represents patients that suffered heart attacks or strokes,
and the families of loved ones who died, after having being prescribed the
arthritis and pain medication Vioxx.  In individual personal injury lawsuits
against Merck, the manufacturer of Vioxx, our clients allege that Merck
falsely promoted the safety of Vioxx and failed to disclose the full range
of the drug's dangerous side effects.  In April 2005, in the federal multi-
district litigation, the Court appointed Elizabeth J. Cabraser to the
Plaintiffs' Steering Committee, which has the responsibility of conducting
all pretrial discovery of Vioxx cases in Federal court and pursuing all
settlement options with Merck.  In August 2006, a federal jury in New
Orleans found unanimously that Merck had failed to warn doctors about
Vioxx's risks and was responsible for the heart attack suffered by retired
FBI agent, Gerald Barnett and awarded $51 million in damages.  Lieff
Cabraser was co-counsel in the *Barnett* case.  Lieff Cabraser attorneys
Don Arbitblit and Jennifer Gross participated in the trial, working closely
with attorneys Mark Robinson and Andy Birchfield.  The Court
subsequently vacated the jury award and ordered a new trial.  Lieff
Cabraser is continuing to work with co-counsel in the prosecution of the
Federal court Vioxx cases.

8.      ***In re Bextra/Celebrex Marketing Sales Practices and Products Liability
Litigation***, MDL 1699.  Lieff Cabraser serves as Plaintiffs' Liaison
Counsel to oversee and direct all personal injury and consumer litigation
now pending in Federal courts nationwide arising out of the sale and
marketing of the COX-2 inhibitors Bextra, Celebrex, and Parecoxib

manufactured by Pfizer, Inc and its predecessor companies Pharmacia Corporation and G.D. Searle, Inc.  In this ongoing litigation, over 2,500 individuals have brought personal injury claims, and hundreds more individuals and institutions allege that Bextra, Celebrex, and Percoxib were marketed deceptively.  In addition to serving as Liaison Counsel, Lieff Cabraser is also directly representing patients injured by Bextra, Celebrex, and Parecoxib.

9. ***Blood Factor VIII And Factor IX Litigation.***  Working with counsel in Asia, Europe, Central and South America and the Middle East, Lieff Cabraser represents hundreds of hemophiliacs worldwide, or their survivors and estates, who contracted HIV and/or Hepatitis C (HCV), and Americans with hemophilia who contracted HCV, from contaminated and defective blood factor products produced by American pharmaceutical companies.  In 2004, Lieff Cabraser was appointed Plaintiffs' Lead Counsel of the "second generation" Blood Factor MDL litigation presided over by Judge Grady in the Northern District of Illinois.  This groundbreaking litigation follows upon a two-month trial directed by Richard M. Heimann in 2003 in California state court on behalf of a person with hemophilia who is HIV-positive.

10. ***Sulzer Hip and Knee Implants Litigation.***  In December 2000, Sulzer Orthopedics, Inc., announced the recall of approximately 30,000 units of its Inter-Op Acetabular Shell Hip Implant, followed in May 2001 with a notification of failures of its Natural Knee II Tibial Baseplate Knee Implant.  In coordinated litigation in California state court, *In re Hip Replacement Cases*, JCCP 4165, Lieff Cabraser served as Court-appointed Plaintiffs' Liaison Counsel and Co-Lead Counsel.  In the federal litigation, *In re Sulzer Hip Prosthesis and Knee Prosthesis Liability Litigation*, MDL 1410, Lieff Cabraser played a significant role in negotiating a revised settlement with Sulzer valued at more than $1 billion. In May 2002, the Court granted final approval to the revised settlement.  Lieff Cabraser serves as Class Counsel for Subclass V of the settlement (class members with unrevised reprocessed Inter-Op shells).

11. ***In re Baycol Products Litigation***, MDL No. 1431 (D. Minn.).  Baycol was one of a group of drugs called statins, intended to reduce cholesterol.  In August 2001, Bayer A.G.  and Bayer  Corporation, the manufacturers of Baycol, withdrew the drug from the worldwide market based upon reports that Baycol was associated with serious side effects and linked to the deaths of over 100 patients worldwide.  In the federal multi-district litigation, Lieff Cabraser serves as a member of the Plaintiffs' Steering Committee (PSC) and the Executive Committee of the PSC.  In addition, Lieff Cabraser represented approximately 200 Baycol patients who have suffered injuries or family members of patients who died allegedly as a result of ingesting Baycol.  In these cases, our clients reached confidential favorable settlements with Bayer.

12.     ***In re Silicone Gel Breast Implants Products Liability Litigation***, MDL
        No. 926 (N.D. Ala.).  Lieff Cabraser serves on the Plaintiffs' Steering
        Committee and was one of five members of the negotiating committee
        which achieved a $4.25 billion global settlement with certain defendants
        of the action.  This was renegotiated in 1995, and is referred to as the
        Revised Settlement Program ("RSP").  Over 100,000 recipients have
        received initial payments, reimbursement for the explantation expenses
        and/or long term benefits.

13.     ***In re Telectronics Pacing Systems Inc., Accufix Atrial "J" Leads
        Products Liability Litigation***, MDL No. 1057 (S.D. Ohio).  Lieff Cabraser
        served on the court-appointed Plaintiffs' Steering Committee in a
        nationwide products liability action alleging that defendants placed into
        the stream of commerce defective pacemaker leads.  In April 1997, the
        district court re-certified a nationwide class of "J" Lead implantees with
        subclasses for the claims of medical monitoring, negligence and strict
        product liability.  A summary jury trial utilizing jury instructions and
        interrogatories designed by Lieff Cabraser occurred in February 1998.  A
        partial settlement was approved thereafter by the district court, but
        reversed by the Court of Appeals.  In March 2001, the district court
        approved a renewed settlement that included a $58 million fund to satisfy
        all past, present and future claims by patients for their medical care,
        injuries, or damages arising from the lead.

14.     ***In re Felbatol Products Liability Litigation,*** MDL No. 1048 (N.D. Cal.).
        Lieff Cabraser served as Co-Lead Class Counsel and Plaintiffs' Liaison
        Counsel in this nationwide litigation asserting medical monitoring,
        compensatory and punitive damages claims on behalf of 100,000 users of
        the anti-epilepsy drug Felbatol, who alleged present and potential injuries
        from its serious adverse effects, including liver failure and aplastic
        anemia.  The nationwide Plaintiff class was certified in 1995; certification
        was vacated for further findings by the Ninth Circuit in *Valentino v.
        Carter-Wallace*, 97 F.3d 1277 (9th Cir. 1996), which affirmed the viability
        of nationwide mass tort class actions.  In 1997, the litigation was settled
        favorably on behalf of all major injury claimants.

15.     ***In re Cordis Pacemaker Product Liability Litigation***, MDL No. 850 (S.D.
        Ohio).  Lieff Cabraser represented a certified nationwide class of Cordis
        pacemaker recipients on personal injury, emotional distress, fraud,
        equitable relief, and pacemaker explant compensation claims. In 1995,
        shortly before trial, Lieff Cabraser negotiated and obtained Court approval
        of a $21 million settlement of the action.

16.     ***In re Copley Pharmaceutical, Inc., "Albuterol" Products Liability
        Litigation***, MDL  No. 1013 (D. Wyo.).  Lieff Cabraser served on the
        Plaintiffs' Steering Committee in a class action lawsuit against Copley
        Pharmaceutical, which manufactured Albuterol, a bronchodilator

prescription pharmaceutical.  Albuterol was the subject of a nationwide recall in January 1994 after a microorganism was found to have contaminated the solution, allegedly causing numerous injuries including bronchial infections, pneumonia, respiratory distress and, in some cases, death.  In October 1994, the district court certified a nationwide class on liability issues.  *In re Copley Pharmaceutical*, 161 F.R.D.  456 (D. Wyo. 1995).  In November 1995, the district court approved a $150 million settlement of the litigation.

**B.**   **Securities and Investment Fraud**

1.   ***In re Scorpion Technologies, Inc. Securities Litigation I***, No. C-93-20333-EAI (N.D. Cal.); ***Dietrich v. Bauer***, No. C-95-7051-RWS (S.D.N.Y.); ***Claghorn v. Edsaco***, No. 98-3039-SI (N.D. Cal.).  Lieff Cabraser served as Co-Lead Counsel in class action suits arising out of an alleged fraudulent scheme by Scorpion Technologies, Inc., certain of its officers, accountants, underwriters and business affiliates to inflate the company's earnings through reporting fictitious sales.  In *Scorpion I*, the Court found plaintiffs had presented sufficient evidence of liability under Federal securities acts against the accounting firm Grant Thornton for the case to proceed to trial.  *In re Scorpion Techs.*, 1996 U.S. Dist. LEXIS 22294 (N.D. Cal. Mar. 27, 1996).  In 1988, the court approved a $5.5 million settlement with Grant Thornton.  In 2000, the Court approved a $950,000 settlement with Credit Suisse First Boston Corporation.  In April 2002, a federal jury in San Francisco, California returned a $170.7 million verdict against Edsaco Ltd.  The jury found that Edsaco aided Scorpion in setting up phony European companies as part of scheme in which Scorpion reported fictitious sales of its software to these companies, thereby inflating its earnings.  Included in the jury verdict, one of the largest verdicts in a securities fraud suit in the U.S. in 2002, was $165 million in punitive damages.  Richard M. Heimann conducted the trial for plaintiffs.

Following the *Edsaco* trial, the parties reached a settlement of the action on favorable monetary terms to the class, which included Edsaco's relinquishment of its right to appeal and the plaintiff's agreement to vacate the jury verdict.  On June 14, 2002, U.S. District Court Judge Susan Illston commented on Lieff Cabraser's representation:  "[C]ounsel for the plaintiffs did a very good job in a very tough situation of achieving an excellent recovery for the class here.  You were opposed by extremely capable lawyers.  It was an uphill battle.  There were some complicated questions, and then there was the tricky issue of actually collecting anything in the end.  I think based on the efforts that were made here that it was an excellent result for the class… [T]he recovery that was achieved for the class in this second trial is remarkable, almost a hundred percent."

2.    ***Merrill Lynch Fundamental Growth Fund and Merrill Lynch Global Value Fund, Inc., v. McKesson HBOC, Inc., et al.,*** No. 02-405792 (Cal. Supr. Ct.).  Lieff Cabraser served as counsel for two Merrill Lynch mutual funds in a private lawsuit filed alleging that a massive accounting fraud occurred at HBOC & Company ("HBOC") before and following its 1999 acquisition by McKesson Corporation ("McKesson").  The funds charged that defendants, including the former CFO of McKesson HBOC, the name McKesson adopted after acquiring HBOC, artificially inflated the price of securities in McKesson HBOC, through misrepresentations and omissions concerning the financial condition of HBOC, resulting in approximately $150 million in losses for plaintiffs.  In a significant discovery ruling in 2004, the California Court of Appeal held that defendants waived the attorney-client and work product privileges in regard to an audit committee report and interview memoranda prepared in anticipation of shareholder lawsuits by disclosing the information to the U.S. Attorney and SEC.  *McKesson HBOC, Inc. v. Supr. Court*, 115 Cal. App. 4th 1229 (2004). In October 2005, the parties entered into a settlement on favorable terms to Merrill Lynch Funds.

3.    ***Alaska State Department of Revenue, et al. v. America Online, Inc., et al.,*** No. 1JU-04-503 (Alaska Supr. Ct.).  In December 2006, a $50 million settlement was reached in a securities fraud action brought by the Alaska State Department of Revenue, Alaska State Pension Investment Board and Alaska Permanent Fund Corporation against defendants America Online, Inc. ("AOL"), Time Warner Inc. (formerly known as AOL Time Warner ("AOLTW")), Historic TW Inc.  When the action was filed, the Alaska Attorney General estimated the losses at $70 million.  The lawsuit, filed in 2004 in Alaska State Court, alleged that defendants misrepresented advertising revenues and growth of AOL and AOLTW along with the number of AOL subscribers, all of which was intended to, and did, artificially inflate the stock price of AOL and AOLTW to the detriment of Alaska State funds.

      The Alaska Department of Law retained Lieff Cabraser to lead the litigation efforts under its direction.  "We appreciate the diligence and expertise of our counsel in achieving an outstanding resolution of the case," said Mark Morones, spokesperson for the Department of Law, following announcement of the settlement.

4.    ***In re Qwest Communications International, Inc. Securities and "ERISA" Litigation (No. II),*** No. 06-cv-17880-REB-PAC (MDL No.1788) (D. Colo.).  We represent the New York State Common Retirement Fund, Fire and Police Pension Association of Colorado, Denver Employees' Retirement Plan, San Francisco Employees' Retirement System, and over thirty separate mutual funds in individual securities fraud actions filed in federal court against Qwest Communications International, Inc., Philip F. Anschutz, former co-

chairman of the Qwest board of directors and other senior executives at Qwest as well as Arthur Andersen LLP.  In each action, defendants are charged with significantly overstating Qwest's publicly-reported growth, revenues, earnings, and earnings per share from 1999 through 2002.  Defendants' unlawful conduct served to maintain Qwest's common share price at artificially high levels and enabled the individual defendants to sell Qwest common shares at inflated values.

5.     *In re Broadcom Corporation*, No. CV 06-3252-R (C.D. Cal.).  Lieff Cabraser serves as court-appointed Lead Counsel in a stockholders' derivative action against the board of directors of Broadcom Corporation.  The suit alleges defendants intentionally manipulated their stock option grant dates between 1997 and at least the end of 2002 in order to enrich themselves at the expense of Broadcom and Broadcom shareholders.  Defendants made it appear as if stock options were granted earlier than they actually were in order to maximize the value of the grant.  By making it seem as if stock option grants occurred on dates when Broadcom stock was trading at a comparatively low per share price, Broadcom executives were able to exercise their stock option grants at exercise prices that were lower than the fair market value of Broadcom stock on the day the options were actually granted.

6.     *In re Brooks Automation, Inc. Securities Litigation*, No. 06 CA 11068 (D. Mass.).  Lieff Cabraser serves as Court-Appointed Lead Counsel for Lead Plaintiff the Los Angeles County Employees Retirement Association in a class action lawsuit on behalf of all persons who purchased securities of Brooks Automation between July 25, 2001 and May 22, 2006.  Plaintiff charges that Brooks Automation, its senior corporate officers and directors violated federal securities laws by participating in a scheme to backdate Brooks Automation stock options over a six year period for the purpose of increasing the value of the stock options.

7.     *In re Cablevision Systems Corp. Shareholder Derivative Litig.*, No. 06-cv-4130-DGT-AKT (E.D.N.Y.).  Lieff Cabraser serves as Co-Lead Counsel in a stockholders' derivative action against the board of directors of Cablevision.  The suit alleges defendants intentionally manipulated their stock option grant dates between 1997 and 2002 in order to enrich themselves at the expense of Cableivision and Cablevision shareholders.  Defendants made it appear as if stock options were granted earlier than they actually were in order to maximize the value of the grant.  By making it seem as if stock option grants occurred on dates when Cablevision stock was trading at a comparatively low per share price, Cablevision executives were able to exercise their stock option grants at exercise prices that were lower than the fair market value of Cablevision stock on the day the options were actually granted.

8.   ***Albert, et al. v. Alex. Brown Management Services, Inc., et al.; Baker , et al. v. Alex. Brown Management Services, Inc., et al.*** (Del. Supr. Ct.). In May 2004, on behalf of investors in two investment funds controlled, managed and operated by Deutsche Bank and advised by DC Investment Partners, Lieff Cabraser filed lawsuits for alleged fraudulent conduct that resulted in an aggregate loss of hundreds of millions of dollars.  The suits name as defendants Deutsche Bank and its subsidiaries Alex Brown Management Services and Deutsche Bank Securities, members of the funds' management committee, as well as DC Investments Partners and two of its principles.  Among the plaintiff-investors are 70 high net worth individuals.

9.   ***Kofuku Bank Ltd.  and Namihaya Bank Ltd. v. Republic New York Securities Corp., et al.***, No. 00 CIV 3298 (S.D.N.Y.); and ***Kita Hyogo Shinyo-Kumiai v. Republic New York Securities Corp., et al.***, No. 00 CIV 4114 (S.D.N.Y.).  Lieff Cabraser represented Kofuku Bank, Namihaya Bank and Kita Hyogo Shinyo-Kumiai (a credit union) in individual lawsuits against, among others, Martin A. Armstrong and HSBC, Inc., the successor-in-interest to Republic New York Corporation, Republic New York Bank and Republic New York Securities Corporation for alleged violations of federal securities and racketeering laws.  Through a group of interconnected companies owned and controlled by Armstrong – the Princeton Companies – Armstrong and the Republic Companies promoted and sold promissory notes, known as the "Princeton Notes," to more than eighty of the largest companies and financial institutions in Japan.  Lieff Cabraser's lawsuits, as well as the lawsuits of dozens of other Princeton Note investors, alleged that the Princeton and Republic Companies made fraudulent misrepresentations and non-disclosures in connection with the promotion and sale of Princeton Notes, and that investors' moneys were commingled and misused to the benefit of Armstrong, the Princeton Companies and the Republic Companies.  In December 2001, the claims of our clients and those of the other Princeton Note investors were settled.  As part of the settlement, our clients recovered more than $50 million, which represented 100% of the value of their principal investments less money they received in interest or other payments.

10.   ***Lehman Brothers/First Alliance Mortgage Litigation***,  No. SA CV 01-971 (C.D. Cal.).  On June 16, 2003, a federal jury in California held Lehman Brothers, Inc., liable for knowingly assisting First Alliance Mortgage Corporation in committing fraud.  First Alliance was accused of misrepresenting the true cost of home loans and of charging borrowers as much as 24% in loan origination and other fees.  The jury found that First Alliance systematically defrauded borrowers, and that Lehman Brothers aided and abetted the fraudulent scheme.  The verdict showed that the community will hold Wall Street responsible for knowingly serving as a financial backer to abusive lenders.  Lieff Cabraser partner Hector D.

Geribon served as co-counsel in the trial for the plaintiffs. The Ninth Circuit Court of Appeals affirmed class wide liability against Lehman Brothers.

11.   ***Allocco, et al. v. Gardner, et al.***, No. GIC 806450 (Cal. Supr. Ct.). Lieff Cabraser represents Lawrence L. Garlick, the co-founder and former Chief Executive Officer of Remedy Corporation and 24 other former senior executives and directors of Remedy Corporation in a private (non-class) securities fraud lawsuit against Stephen P. Gardner, the former Chief Executive Officer of Peregrine Systems, Inc., John J. Moores, Peregrine's former Chairman of the Board, Matthew C. Gless, Peregrine's former Chief Financial Officer, Peregrine's accounting firm Arthur Andersen and certain entities that entered into fraudulent transactions with Peregrine. The lawsuit, filed in California state court, arises out of Peregrine's August 2001 acquisition of Remedy. Plaintiffs charge that they were induced to exchange their Remedy stock for Peregrine stock on the basis of false and misleading representations made by defendants. Within months of the Remedy acquisition, Peregrine began to reveal to the public that it had grossly overstated its revenue during the years 2000-2002, and eventually restated more than $500 million in revenues.

12.   ***In re National Century Financial Enterprises, Inc. Investment Litigation***, MDL 1565 (S.D. Ohio). Lieff Cabraser serves as Lead Counsel for the New York City Employees' Retirement System, Teachers' Retirement System for the City of New York, New York City Police Pension Fund, and New York City Fire Department Pension Fund in a securities fraud and breach of fiduciary duties lawsuit against Bank One, JPMorgan Chase Bank, Credit Suisse First Boston LLC, and additional defendants. The complaint charges that plaintiffs suffered $89 million in losses as a result of a massive Ponzi scheme orchestrated and implemented by National Century Financial Enterprises and defendants. Lieff Cabraser reached settlements with several of the defendants for the benefit of the Funds and continues to prosecute the case against the non-settling defendants.

13.   ***In re Network Associates, Inc. Securities Litigation***, No. C-99-1729-WHA (N.D. Cal.). Following a competitive bidding process, the Court appointed Lieff Cabraser as Lead Counsel for the Lead Plaintiff and the class of investors. The complaint alleged that Network Associates improperly accounted for acquisitions in order to inflate its stock price. In May 2001, the Court granted approval to a $30 million settlement.

In reviewing the *Network Associates* settlement, U.S. District Court Judge William H. Alsup observed, "[T]he class was well served at a good price by excellent counsel . . . We have class counsel who's one of the most foremost law firms in the country in both securities law and class actions.

And they have a very excellent reputation for the conduct of these kinds of cases and their experience and views . . ."

14.   ***In re California Micro Devices Securities Litigation***, No. C-94-2817-VRW (N.D. Cal.).  Lieff Cabraser served as Liaison Counsel for the Colorado Public Employees' Retirement Association and the California State Teachers' Retirement System, and the class they represented.  Prior to 2001, the Court approved $19 million in settlements.  In May 2001, the Court approved an additional settlement of $12 million, which, combined with the earlier settlements, provided class members an almost complete return on their losses.  The settlement with the company included multi-million dollar contributions by the former Chairman of the Board and Chief Executive Officer.

Commenting in 2001 on Lieff Cabraser's work in *Cal Micro Devices*, U.S. District Court Judge Vaughn R. Walker stated, "It is highly unusual for a class action in the securities area to recover anywhere close to the percentage of loss that has been recovered here, and counsel and the lead plaintiffs have done an admirable job in bringing about this most satisfactory conclusion of the litigation."  One year later, in a related proceeding and in response to the statement that the class had received nearly a 100% recovery, Judge Walker observed, "That's pretty remarkable.  In these cases, 25 cents on the dollar is considered to be a magnificent recovery, and this is [almost] a hundred percent."

15.   ***In re FPI/Agretech Securities Litigation***, MDL No. 763 (D. Haw., Real, J.).  Lieff Cabraser served as Lead Class Counsel on behalf of multiple classes of investors defrauded in a limited partnership investment scheme.  The Court approved $15 million in partial pretrial settlements.  At trial, the jury returned a $25 million verdict, which included $10 million in punitive damages plus costs, interest, and attorneys' fees, against non-settling defendant Arthur Young & Co. on securities and tort claims arising from its involvement in the fraud.  Richard M. Heimann served as Lead Trial Counsel in the class action trial.  On appeal, the compensatory damages judgment was affirmed and the case was remanded for retrial on punitive damages.  In 1994, the Court approved a $17 million class settlement with Ernst & Young.

16.   ***Informix/Illustra Securities Litigation***, No. C-97-1289-CRB (N.D. Cal.).  Lieff Cabraser represented Richard H.  Williams, the former Chief Executive Officer and President of Illustra Information Technologies, Inc. ("Illustra"), and a class of Illustra shareholders in a class action suit on behalf of all former Illustra securities holders who tendered their Illustra preferred or common stock, stock warrants or stock options in exchange for securities of Informix Corporation ("Informix") in connection with Informix's 1996 purchase of Illustra.  Pursuant to that acquisition, Illustra stockholders received Informix securities representing approximately 10%

of the value of the combined company.  The complaint alleged claims for common law fraud and violations of Federal securities law arising out of the acquisition.  In October 1999, U.S. District Judge Charles E. Breyer approved a global settlement of the litigation for $136 million, constituting one of the largest settlements ever involving a high technology company alleged to have committed securities fraud.  Our clients, the Illustra shareholders, received approximately 30% of the net settlement fund.

17.     ***In re Media Vision Technology Securities Litigation*,** No. CV-94-1015 (N.D. Cal.).  Lieff Cabraser serves as Co-Lead Counsel in a class action lawsuit which alleged that certain of Media Vision's officers, outside directors, accountants and underwriters engaged in a fraudulent scheme to inflate the company's earnings, and issued false and misleading public statements about the company's finances, earnings and profits.  By 1998, the Court had approved several partial settlements with many of Media Vision's officers and directors, accountants and underwriters which totaled $31 million.  The settlement proceeds have been distributed to eligible class members.  The evidence that Lieff Cabraser developed in the civil case led prosecutors to commence an investigation and ultimately file criminal charges against Media Vision's former Chief Executive Officer and Chief Financial Officer.  The civil action against Media Vision's CEO and CFO was stayed pending the criminal proceedings against them.  In the criminal proceedings, the CEO pled guilty on several counts, and the CFO was convicted at trial.  In October, 2003, the Court granted Plaintiffs' motions for summary judgment and entered a judgment in favor of the class against these two defendants in the amount of $188 million.

18.     ***Nguyen v. FundAmerica***, No. C-90-2090 MHP (N.D. Cal., Patel, J.), 1990 Fed. Sec. L. Rep. (CCH) ¶¶ 95,497, 95,498 (N.D. Cal. 1990).  Lieff Cabraser served as Plaintiffs' Class Counsel in this securities/RICO/tort action seeking an injunction against alleged unfair "pyramid" marketing practices and compensation to participants.  The District Court certified a nationwide class for injunctive relief and damages on a mandatory basis and enjoined fraudulent overseas transfers of assets.  The Bankruptcy Court permitted class proof of claims. Lieff Cabraser obtained dual District Court and Bankruptcy Court approval of settlements distributing over $13 million in FundAmerica assets to class members.

19.     ***In re First Capital Holdings Corp.  Financial Products Securities Litigation***, MDL No. 901 (C.D. Cal.).  Lieff Cabraser served as Co-Lead Counsel in a class action brought to recover damages sustained by policyholders of First Capital Life Insurance Company and Fidelity Bankers Life Insurance Company policyholders resulting from the insurance companies' allegedly fraudulent or reckless investment and financial practices, and the manipulation of the companies' financial statements.  This policyholder settlement generated over $1 billion in restored life insurance policies, and was approved by both federal and

state courts in parallel proceedings and then affirmed by the Ninth Circuit on appeal.

20.   ***In re Precious Metals Dealers/Safrabank Securities Litigation***, MDL No. 804 (C.D. Cal.)  Lieff Cabraser served as Lead Counsel for a class of purchasers who were allegedly fraudulently induced to purchase precious metal through similar high pressure sales pitches.  The case resulted in a $10 million settlement.

## C.   Employment Discrimination and Unfair Employment Practices

1.   ***Butler v. Home Depot***, No. C94-4335 SI (N.D. Cal.).  Lieff Cabraser and co-counsel represented a class of approximately 25,000 female employees and applicants for employment with Home Depot's West Coast Division who alleged gender discrimination in connection with hiring, promotions, pay, job assignment, and other terms and conditions of employment.  The class was certified in January 1995.  In January 1998, the court approved a $87.5 million settlement of the action that included comprehensive injunctive relief over the term of a five-year Consent Decree.  Under the terms of the settlement, Home modified its hiring, promotion, and compensation practices to ensure that interested and qualified women were hired for, and promoted to, sales and management positions.

On January 14, 1998, U.S. District Judge Susan Illston commented that the settlement provides "a very significant monetary payment to the class members for which I think they should be grateful to their counsel… Even more significant is the injunctive relief that's provided for . . ."  By 2003, the injunctive relief had created thousands of new job opportunities in sales and management positions at Home Depot, generating the equivalent of over approximately $100 million per year in wages for female employees.

In 2002, Judge Illston stated that the injunctive relief has been a "win/win . . . for everyone, because . . . the way the Decree has been implemented has been very successful and it is good for the company as well as the company's employees."

2.   ***In Re Farmers Insurance Exchange Claims Representatives' Overtime Pay Litigation,*** MDL No. 1439 (D. Or.).  Lieff Cabraser and co-counsel represent personal lines claims representatives of Farmers' Insurance Exchange seeking unpaid overtime.  In November 2003, after a three-week liability phase trial, the court held that Farmers' claims adjusters who handle auto and low level property claims are entitled to overtime. 300 F. Supp. 2d 1020 (2003).  The court further found that Farmers' actions were willful and were not taken in good faith, entitling the workers to liquidated damages.  In January and May 2005, the court entered judgments totaling $52.5 million against Farmers, the largest judgments

ever entered in as the result of the trial of a Fair Labor Standards Act ("FLSA") trial.  In October 2006, the Ninth Circuit Court of Appeals reversed the judgment for plaintiffs under the FLSA and certain state laws, and remanded the case for further proceedings under the laws of Minnesota, Oregon, and Colorado.

3.   ***Rosenburg, et al. v. IBM,*** No. C06-0430 JDC (N.D. Cal.).  In July 2007, the Court granted final approval to a $65 million settlement of a class action suit by current and former technical support workers for IBM seeking unpaid overtime.  The settlement constitutes a record amount in litigation seeking overtime compensation for employees in the computer industry.  Plaintiffs alleged that IBM illegally misclassified its employees who install or maintain computer hardware or software as "exempt" from the overtime pay requirements of federal and state labor laws.

4.   ***Satchell, et al. v. FedEx Express***, No. C 03-2659 SI; C 03-2878 SI (N.D. Cal.).   In 2007, the court approved a $54.9 million settlement of the race discrimination class action lawsuit by African American and Latino employees of FedEx Express.  The settlement requires FedEx to reform its promotion, discipline, and pay practices.  Under the settlement, FedEx will implement multiple steps to promote equal employment opportunities, including making its performance evaluation process less discretionary, discarding use of the "Basic Skills Test" as a prerequisite to promotion into certain desirable positions, and changing employment policies to demonstrate that its revised practices do not continue to foster racial discrimination.  The settlement, covering 20,000 hourly employees and operations managers who have worked in the western region of FedEx Express since October 1999, was approved by the Court in August 2007.

5.   ***Amochaev et al. v. Citigroup Global Markets, Inc., d/b/a Smith Barney***, No. C05-1298 PJH (N.D. Cal.).  Female Financial Advisors allege that Smith Barney discriminated against them in account distributions, business leads, referral business, partnership opportunities, sales support, and other terms of employment.  The suit is brought on behalf of a national class of all female Financial Advisors, employed at Smith Barney since August 30, 2003, and a California subclass of all female Financial Advisors employed at Smith Barney in California since June 25, 2003.  Lieff Cabraser serves as co-counsel for plaintiffs.

6.   ***Gonzalez et al. v. Abercrombie & Fitch Stores, Inc. et al.***, No. C03-2817 SI (N.D. Cal.).  In April 2005, the Court approved a settlement, valued at approximately $50 million, which requires the retail clothing giant Abercrombie & Fitch to provide monetary benefits of $40 million to the class of Latino, African American, Asian American and female applicants and employees who charged the company with discrimination.  The settlement also requires the company to institute a range of policies and programs to promote diversity among its workforce and to prevent

discrimination based on race or gender.  Lieff Cabraser serves as Lead Class Counsel and prosecuted the case with a number of co-counsel firms, including the Mexican American Legal Defense and Education Fund, the Asian Pacific American Legal Center and the NAACP Legal Defense and Educational Fund, Inc.  Implementation of the consent decree continues into 2011.

7.    ***Frank v. United Airlines, Inc.***, No. C-92-0692 MJJ (N.D. Cal.).  Lieff Cabraser and co-counsel obtained a $36.5 million settlement in February 2004 for a class of female flight attendants who were required to weigh less than comparable male flight attendants.

Former U.S. District Court Judge Charles B. Renfrew (ret.), who served as a mediator in the case, stated, "As a participant in the settlement negotiations, I am familiar with and know the reputation, experience and skills of lawyers involved.  They are dedicated, hardworking and able counsel who have represented their clients very effectively."  U.S. District Judge Martin J. Jenkins, in granting final approval to the settlement, found "that the results achieved here could be nothing less than described as exceptional," and that the settlement "was obtained through the efforts of outstanding counsel."

8.    ***Winnett, et al. v. Caterpillar, Inc.***, No. 3:06-cv-00235 (M.D. Tenn.). Lieff Cabraser serves as co-counsel representing retirees in a nationwide class action lawsuit against Caterpillar, Inc.  In October 2004 Caterpillar began charging monthly premiums despite longstanding contracts that promise free healthcare to certain participants and their spouses.  The lawsuit seeks to end these charges and restore the plaintiffs and similarly situated retirees to the position they would have been but for Caterpillar's contractual violations.  In July 2007, the Court granted the plaintiffs' class certification motion.

9.    ***Barnett v. Wal-Mart***, No. 01-2-24553-SNKT (Wash.); ***Gamble v. Wal-Mart***, No. 7121-01 (N.Y.).  Lieff Cabraser and co-counsel represent proposed classes of hourly wage earners at Wal-Mart in Washington and New York who allegedly have been forced to work "off-the-clock" (without pay).  Plaintiffs, current and former Wal Mart employees, allege that, in violation of state wage and hour laws, Wal-Mart forces employees to work through breaks and to work without pay after they have clocked out.  In October 2004, in the Washington Wal-Mart action, the Court certified a class of approximately 40,000 current and former Wal-Mart employees.

10.   ***Holloway, et al. v. Best Buy,*** No. C05-5036 PJH (N.D. Cal.).  Lieff Cabraser, with co-counsel, represents a proposed class of current and former employees of Best Buy in a federal class action civil rights lawsuit. Plaintiffs allege that Best Buy stores nationwide discriminate against

women and minorities, specifically African Americans and Latinos. These employees charge that they are paid less than white males, denied promotions, and assigned to less desirable positions.  The suit also alleges that Best Buy discriminates against women and minorities in hiring decisions.

11. ***Giannetto v. Computer Sciences Corporation***, 03-CV-8201 (C.D. Cal.). In one of the largest overtime pay dispute settlements ever in the information technology industry, the Court in July 2005 granted final approval to a $24 million settlement with Computer Sciences Corporation. Plaintiffs charged that the global conglomerate had a common practice of refusing to pay overtime compensation to its technical support workers involved in the installation and maintenance of computer hardware and software in violation of the Fair Labor Standards Act, California's Unfair Competition Law, and the wage and hour laws of 13 states.

12. ***Foster v. The Great Atlantic & Pacific Tea Company, Inc.  ("A&P")***, No. 99 Civ. 3860 (CM) (S.D.N.Y.).  Lieff Cabraser, along with co-counsel, represented approximately 870 current and former employees of New York area supermarkets suing under the Fair Labor Standards Act. The Opt-In Plaintiffs in the certified collective action sought unpaid overtime compensation resulting from Defendants' alleged failure to compensate employees for work performed "off-the-clock."  In May 2004, the Court approved a settlement providing $3.11 million to the Opt-In Plaintiffs.  In June 2004, current and former full-time hourly employees of The Great Atlantic & Pacific Tea Company filed a new lawsuit against defendants in New York state court.  The plaintiffs allege that defendants systematically failed to pay overtime wages and deleted hours worked from time records in violation of New York labor law.  In July 2007, the Court certified the class of thousands of cashiers, clerks, bakers, deli and other hourly-paid workers.

13. ***Goddard, et al. v. Longs Drug Stores Corporation, et al.***, No. RG04141291 (Cal. Supr. Ct.).  Store managers and assistant store managers of Longs Drugs charged that the company misclassified them as exempt from overtime wages.  Managers regularly worked in excess of 8 hours per day and 40 hours per week without compensation for their overtime hours.  Following mediation, in 2005, Longs Drugs agreed to settle the claims for a total of $11 million.  Over 1,000 current and former Longs Drugs managers and assistant managers were eligible for compensation under the settlement, over 98% of the class submitted claims.

14. ***Zuckman v. Allied Group***, No. 02-5800 SI (N.D. Cal.).  In September 2004, the Court approved a settlement with Allied Group and Nationwide Mutual Insurance Company of $8 million plus Allied/Nationwide's share of payroll taxes on amounts treated as wages, providing plaintiffs a 100%

recovery on their claims. Plaintiffs, claims representatives of Allied / Nationwide, alleged that the company misclassified them as exempt employees and failed to pay them and other claims representatives in California overtime wages for hours they worked in excess of eight hours or forty hours per week.  In approving the settlement, U.S. District Court Judge Susan Illston commended counsel for their "really good lawyering" and stated that they did "a splendid job on this" case.

15.     ***Trotter v. Perdue Farms, Inc.***, No. C 99-893-RRM (JJF) (MPT) (D. Del.).  Lieff Cabraser represented a class of chicken processing employees of Perdue Farms, Inc., one of the nation's largest poultry processors, for wage and hour violations.  The suit challenged Perdue's failure to compensate its assembly line employees for putting on, taking off, and cleaning protective and sanitary equipment in violation of the Fair Labor Standards Act, various state wage and hour laws, and the Employee Retirement Income Security Act.  Under a settlement approved by the Court in 2002, Perdue paid $10 million for wages lost by its chicken processing employees and attorneys' fees and costs.  The settlement was in addition to a $10 million settlement of a suit brought by the Department of Labor in the wake of Lieff Cabraser's lawsuit.

16.     ***Sandoval v. Mountain Center, Inc., et al.***  No. 03CC00280 (Cal. Supr. Ct.).  Cable installers in California charged that defendants owed them overtime wages, as well as damages for missed meal and rest breaks and reimbursement for expenses incurred on the job.  In 2005, the Court approved a $7.2 million settlement of the litigation, which was distributed to the cable installers who submitted claims.

17.     ***Gottlieb v. SBC Communications***, No. CV-00-04139 AHM (MANx) (C.D. Cal.).  With co-counsel, Lieff Cabraser represented current and former employees of SBC and Pacific Telesis Group ("PTG") who participated in AirTouch Stock Funds, which were at one time part of PTG's salaried and non-salaried savings plans.  After acquiring  PTG, SBC sold AirTouch, which PTG had owned, and caused the AirTouch Stock Funds that were included in the PTG employees' savings plans to be liquidated.  Plaintiffs alleged that in eliminating the AirTouch Stock Funds, and in allegedly failing to adequately communicate with employees about the liquidation, SBC breached its duties to 401k plan participants under the Employee Retirement Income Security Act.  In 2002, the Court granted final approval to a $10 million settlement.

18.     ***Thomas v. California State Automobile Association***, No. CH217752 (Cal. Supr. Ct.).  With co-counsel, Lieff Cabraser represented 1,200 current and former field claims adjusters who worked for the California State Automobile Association ("CSAA").  Plaintiffs alleged that CSAA improperly classified their employees as exempt, therefore denying them

overtime pay for overtime worked.  In May 2002, the Court approved an
$8 million settlement of the case.

19.   ***Church v. Consolidated Freightways***, No. C90-2290 DLJ (N.D. Cal.).
Lieff Cabraser was the Lead Court-appointed Class Counsel in this class
action on behalf of the exempt employees of Emery Air Freight, a freight
forwarding company acquired by Consolidated Freightways in 1989.  On
behalf of the employee class, Lieff Cabraser prosecuted claims for
violation of the Employee Retirement Income Security Act, the securities
laws, and the Age Discrimination in Employment Act.  The case settled in
1993 for $13.5 million.

20.   ***Buttram v. UPS, Inc.***, No. C-97-01590 MJJ (N.D. Cal.).  Lieff Cabraser
and several co-counsel represented a class of approximately 14,000
African-American part-time hourly employees of UPS's Pacific and
Northwest Regions alleging race discrimination in promotions and job
advancement.  In 1999, the Court approved a $12.14 million settlement of
the action.  Under the injunctive relief portion of the settlement, among
other things, Class Counsel continues to monitor the promotions of
African-American part-time hourly employees to part-time supervisor and
full-time package car driver.

21.   ***Lyon v. TMP Worldwide, Inc.***, No. 993096 (Cal. Supr. Ct.).  Lieff
Cabraser served as Class Counsel for a class of certain non-supervisory
employees in an advertising firm.  The settlement, approved in 2000,
provided almost a 100% recovery to class members.  The suit alleged that
TMP failed to pay overtime wages to these employees.

22.   ***Kahn v. Denny's***, No. BC177254 (Cal. Supr. Ct.).  Lieff Cabraser brought
a lawsuit alleging that Denny's failed to pay overtime wages to its General
Managers and Managers who worked at company-owned restaurants in
California.  The Court approved a $4 million settlement of the case in
2000.

23.   ***Giles v. Allstate***, JCCP Nos.  2984 and 2985.  Lieff Cabraser represented a
class of Allstate insurance agents seeking reimbursement of out-of-pocket
costs.  The action settled for approximately $40 million.

24.   ***Bogan v. Fleetwood Enterprises, Inc.***, No. CIV 00-0440-S-BLW (D.
Idaho).  Lieff Cabraser, along with co-counsel, represents a nationwide
class of women production associates who allegedly have been
discriminated against on the basis of sex with respect to promotions and
compensation, and who allegedly have been subjected to rampant sexual
harassment.  In 2002, the Court approved a settlement that included
comprehensive injunctive relief.

Lieff Cabraser attorneys have also had experience working on several other employment cases, including cases involving race, gender, and age discrimination, ERISA, breach of contract claims, and wage/hour claims. Lieff Cabraser attorneys frequently write amici briefs on cutting-edge legal issues involving employment law.  Lieff Cabraser is currently investigating charges of race, gender and/or age discrimination, and wage/hour violations against several companies.

In 2004, Kelly M. Dermody, who oversees the firm's employment law practice, was included by *The Recorder* in a list of the best employment lawyers in the San Francisco Bay Area, and has also been selected as a *Northern California Super Lawyer*.  In 2007, the Daily Journal recognized Ms. Dermody as one of the "Top Women Litigators in California," and she also received a California Lawyer Attorney of the Year (CLAY) Award from *California Lawyer* magazine.

### D.   Consumer Protection

1.   ***Sutter Health Uninsured Pricing Cases***, J.C.C.P. No. 4388.  Plaintiffs alleged that they and a Class of uninsured patients treated at Sutter hospitals were charged substantially more than patients with private or public insurance, and many times above the cost of providing their treatment.  In December 2006, the Court granted final approval to a comprehensive and groundbreaking settlement of the action.  As part of the settlement, Class members will be entitled to make a claim for refunds or deductions of between 25% to 45% from their prior hospital bills, at an estimated total value of $276 million.  For the next three years, Sutter will maintain discounted pricing policies for uninsureds that will make Sutter's pricing for uninsureds comparable to or better than the pricing for patients with private insurance.  In addition, Sutter agreed to maintain more compassionate collections policies that will protect uninsureds who fall behind in their payments.  Lieff Cabraser served as Lead Counsel in the coordinated action.

2.   ***Catholic Healthcare West Cases***, J.C.C.P. No. 4453.  Plaintiff alleged that Catholic Healthcare West ("CHW") charged uninsured patients excessive fees for treatment and services, at rates far higher than the rates charged to patients with private insurance or on Medicare.  In January 2007, the Court approved a settlement that provides discounts, refunds and other benefits for CHW patients valued at $423 million.  The settlement requires that CHW lower its charges and end price discrimination against all uninsured patients, maintain generous charity case policies allowing low-income uninsureds to receive free or heavily discounted care, and protect uninsured patients from unfair collections practices.  Lieff Cabraser served as Lead Counsel in the coordinated action.

3.   ***Ricci v. Ameriquest Mortgage Company***, No. 27-CV-05-2546 (Minn. District Court).  Lieff Cabraser serves as Plaintiffs' Lead Counsel for a certified class of Minnesota property owners who obtained mortgage loans from Ameriquest Mortgage Company.  Plaintiffs charge that Ameriquest

has engaged in a deceptive and unlawful business practices in violation of Minnesota law. Plaintiffs allege that Ameriquest trains its sales force to target economically vulnerable persons in a predatory lending scheme based on the sale of loans with illegal and undisclosed fees and terms.

4. ***R.M. Galicia v. Franklin; Franklin v. Scripps Health***, Case No. IC 859468 (San Diego Supr. Ct.). Lieff Cabraser serves as Lead Class Counsel in a certified class action lawsuit against the Scripps Health hospital system for overcharging uninsured patients for medical treatment. The class action originated in July 2006, when uninsured patient Phillip Franklin filed a class action cross-complaint against Scripps Health after Scripps sued Mr. Franklin through a collection agency. Mr. Franklin alleged that he, like all other uninsured patients of Scripps Health, was charged unreasonable and unconscionable rates for his medical treatment. In June 2007, the Court granted class certification on behalf of over 50,000 uninsured patients who were treated in Scripps' emergency department since 2002 and who challenge excessive prices for medical services.

5. ***Brazil v. Dell***, No. C-07-01700 RMW (N.D. Cal.). Lieff Cabraser serves as counsel for consumers that charge Dell has engaged in a scheme to deliberately cheat large numbers of consumers. The complaint charges that Dell advertises "limited time" specific-dollar discounts from expressly referenced former prices, but that the discounts are false because the reference prices are inflated beyond Dell's true regular prices. On August 3, 2007, U.S. District Court Judge Ronald M. Whyte Dell's motions to enforce a class action waiver clause and to compel arbitration. The Court found that the provisions in Dell's purchase agreement requiring disputes to be resolved through individual arbitration proceedings and prohibiting class actions are unconscionable under California law.

6. ***Schaffer v. Litton Loan Servicing, LP***, No. CV 05-07673 (C.D. Cal.). Plaintiffs, all homeowners with a mortgage loan serviced by Litton Loan Servicing, charge that Litton has engaged in a scheme by which it fails to accurately service its borrowers' loans, including misapplying or failing to apply payments made. In July 2007, the Court certified a nationwide class of borrowers who have claims against Litton for violation of 12 U.S.C. § 2605(d), a provision of the Real Estate Settlement Procedures Act. This provision creates a 60-day grace period following the transfer of servicing of a mortgage loan, and prohibits loan servicers from imposing late fees or otherwise treating as late any payment that was "received by the transferor servicer (rather than the transferee servicer who should properly receive payment) before the due date applicable to such payment." 12 U.S.C. § 2605(d).

7. ***In re Tri-State Crematory Litigation***, MDL No. 1467 (N.D. Ga.). In March 2004, Lieff Cabraser delivered opening statements and began

testimony in a class action by families whose loved ones were improperly cremated and desecrated by Tri-State Crematory in Noble, Georgia. The families also asserted claims against the funeral homes that delivered the decedents to Tri-State Crematory for failing to ensure that the crematory performed cremations in the manner required under the law and by human decency. One week into trial, settlements with the remaining funeral home defendants were reached and brought the settlement total to approximately $37 million. Trial on the class members' claims against the operators of crematory began in August 2004. Soon thereafter, these defendants entered into a $80 million settlement with plaintiffs. As part of the settlement, all buildings on the Tri-State property were razed. The property will remain in a trust so that it will be preserved in peace and dignity as a secluded memorial to those whose remains were mistreated, and to prevent crematory operations or other inappropriate activities from ever taking place there. Earlier in the litigation, the Court granted plaintiffs' motion for class certification in a published order. 215 F.R.D. 660 (2003).

8.   ***Morris v. AT&T Wireless Services,*** No. C-04-1997-MJP (W.D. Wash.). Lieff Cabraser served as class counsel for a nationwide settlement class of cell phone customers subjected to an end of billing cycle cancellation policy implemented by AT&T Wireless in 2003 and alleged to have breached customers' service agreements. In May 2006, the New Jersey Superior Court granted final approval to a class settlement that guarantees delivery to the class of $40 million in benefits. Class members received cash-equivalent calling cards automatically, and had the option of redeeming them for cash. Lieff Cabraser had been prosecuting the class claims in the Western District of Washington when a settlement in New Jersey state court was announced. Lieff Cabraser objected to that settlement as inadequate because it would have only provided $1.5 million in benefits without a cash option, and the court agreed, declining to approve it. Thereafter, Lieff Cabraser negotiated the new settlement providing $40 million to the class, and the settlement was approved.

9.   ***Estate of Holman, et al. v. Noble Energy, Inc.****,* No. 03 CV 9 (Dist. Ct., Weld County, Colorado). Lieff Cabraser served as Co-Lead Counsel for a class of royalty owners with mineral interests in Colorado. Plaintiffs alleged that Noble Energy and Patina, its predecessor company, underpaid Class members for natural gas production royalties in violation of state law. In June 2007, the Court granted preliminary approval to a $53 million settlement of the action. The settlement also provided for a significant improvement in the calculation of future royalty payments, which were estimated to benefit the Class an additional $50 million.

10.  ***Strugano v. Nextel Communications, Inc.,*** No. BC 288359 (Los Angeles Supr. Crt). In May 2006, the Los Angeles Superior Court granted final approval to a class action settlement on behalf of all California customers

of Nextel from January 1, 1999 through December 31, 2002, for compensation for the harm caused by Nextel's alleged unilateral (1) addition of a $1.15 monthly service fee and/or (2) change from second-by-second billing to minute-by-minute billing, which caused "overage" charges (*i.e.*, for exceeding their allotted cellular plan minutes). The total benefit conferred by the Settlement directly to Class Members was between approximately $13.5 million and $55.5 million, depending on which benefit Class Members selected. Class Counsel secured these benefits for a Class of approximately 308,000 customers with 1.1 million cell phone plans.

11.     ***Thompson, et al. v. WFS Financial, Inc.***, No. 3-02-0570 (M.D. Tenn.); ***Pakeman, et al. v. American Honda Finance Corporation***, No. 3-02-0490 (M.D. Tenn.); ***Herra v. Toyota Motor Credit Corporation***, No. CGC 03-419 230 (San Francisco Supr. Ct.). For the past five years, Lieff Cabraser with co-counsel litigated against several of the largest automobile finance companies in the country to compensate victims of – and stop future instances of – racial discrimination in the setting of interest rates in automobile finance contracts. The litigation led to substantial changes in the way Toyota Motor Credit Corporation ("TMCC"), American Honda Finance Corporation ("American Honda") and WFS Financial, Inc., sell automobile finance contracts, limiting the discrimination that can occur.

TMCC, American Honda and WFS Financial allow independent automobile dealers to add a discretionary markup (often several percentage points) to the objective, credit-based interest rates determined by the finance company. Plaintiffs charged that African-American and Latino customers paid more in finance charges than similarly situated non-minority customers due to the practice by TMCC, American Honda and WFS Financial of allowing dealers to increase, or "mark up," a customer's Annual Percentage Rate ("APR") on contracts. The discretionary markup amounts were not based on objective credit-worthiness information, but were wholly subjective. Statistical analyses showed that the discretionary markups had a disparate impact on African American and Latino customers.

In the nationwide class action litigation against TMCC, American Honda and WFS Financial, the respective parties entered into landmark settlements for African American and Latino consumers which collectively provided:

> • Cash or credit payments of up to $400 per class member.

> • Broad refinancing programs reducing rates charged to existing African-American and Latino customers whose

markups were 1% or more.  These benefits were valued at $1 billion in the WFS Financial case alone.

- New pre-approved offers of credit (that cannot be marked up) to 1.5 million African American and Latino consumers.

- Limits on discretionary markups on new loans of 1.75% to 2.50% (depending on the length of the loan).  This compression of the discretionary range substantially reduced the likelihood that any markups in the future will occur as the result of racial discrimination.

- New disclosures on all contracts explaining that the interest rate may be negotiable.

- Donations of $1.9 million to non-profit organizations involved in consumer education and assistance.

In approving the settlement in *Thompson v. WFS Financial,* the Court recognized the "innovative" and "remarkable settlement" achieved on behalf of the nationwide class.  In 2006 in *Herra v. Toyota Motor Credit Corporation,* the Court granted final approval to a nationwide class action settlement on behalf of all African-American and Hispanic customers of TMCC who entered into retail installment contracts that were assigned to TMCC from 1999 to 2006.  The monetary benefit to the class was estimated to be between $159 and $174 million.

12.   ***Providian Credit Card Cases***, No. JCCP 4085 (San Francisco Supr. Ct.).  Lieff Cabraser served as Co-Lead Counsel for a certified national Settlement Class of Providian credit cardholders who alleged that Providian had engaged in widespread misconduct by charging cardholders unlawful, excessive interest and late charges, and by promoting and selling to cardholders "add-on products" promising illusory benefits and services.  In November 2001, the Court granted final approval to a $105 million settlement of the case, which also required Providian to implement substantial changes in its business practices.  The $105 million settlement, combined with an earlier settlement by Providian with Federal and state agencies, represents the largest settlement ever by a U.S. credit card company in a consumer protection case.

13.   ***California Title Insurance Industry Litigation.***  Lieff Cabraser, in coordination with parallel litigation brought by the Attorney General, reached settlements in 2003 and 2004 with the leading title insurance companies in California, resulting in historic industry-wide changes to the practice of providing escrow services in real estate closings.  The settlements brought a total of $50 million in restitution to California consumers, including cash payments.  In the lawsuits, plaintiffs alleged,

among other things, that the title companies received interest payments on customer escrow funds that were never reimbursed to their customers. The defendant companies include Lawyers' Title, Commonwealth Land Title, Stewart Title of California, First American Title, Fidelity National Title, and Chicago Title.

14.     ***Kline v. The Progressive Corporation***, Circuit No. 02-L-6 (Circuit Court of the First Judicial Circuit, Johnson County, Illinois). Lieff Cabraser served as settlement class counsel in a nationwide consumer class action challenging Progressive Corporation's private passenger automobile insurance sales practices. Plaintiffs alleged that the Progressive Corporation wrongfully concealed from class members the availability of lower priced insurance for which they qualified. In 2002, the Court approved a settlement valued at approximately $450 million, which included both cash and equitable relief. The claims program, implemented upon a nationwide mail and publication notice program, was completed in 2003.

15.     ***Citigroup Loan Cases***, JCCP No. 4197 (San Francisco Supr. Ct.). In 2003, the Court approved a settlement that provided approximately $240 million in relief to former Associates' customers across America. Prior to its acquisition in November 2000, Associates First Financial, referred to as The Associates, was one of the nation's largest "subprime" lenders. Lieff Cabraser represented former customers of The Associates charging that the company added on mortgage loans unwanted and unnecessary insurance products and engaged in improper loan refinancing practices. Lieff Cabraser served as nationwide Plaintiffs' Co-Liaison Counsel.

16.     ***In re Ocwen Federal Bank FSB Mortgage Servicing Litigation***, MDL No. 1604 (Northern District of Illinois). Lieff Cabraser serves as Co-Lead Plaintiffs' Counsel in a nationwide class action against Ocwen Financial Corporation, Ocwen Federal Bank FSB, and their affiliates ("Ocwen"). This lawsuit arises out of charges against Ocwen of misconduct in servicing its customers' mortgage loans and in its provision of certain related services, including debt collection and foreclosure services.

17.     ***Curry v. Fairbanks Capital Corporation***, No. 03-10895-DPW (D. Mass.). In 2004, the Court approved a $55 million settlement of a class action lawsuit against Fairbanks Capital Corporation arising out of charges against Fairbanks of misconduct in servicing its customers' mortgage loans. The settlement also required substantial changes in Fairbanks' business practices and established a default resolution program to limit the imposition of fees and foreclosure proceedings against Fairbanks' customers. Lieff Cabraser served as nationwide Co-Lead Counsel for the homeowners.

18.     ***In re Synthroid Marketing Litigation***, MDL No. 1182 (N.D. Ill.).  Lieff
        Cabraser served as Co-Lead Counsel for the purchasers of the thyroid
        medication Synthroid in litigation against Knoll Pharmaceutical, the
        manufacturer of Synthroid.  The lawsuits charged that Knoll misled
        physicians and patients into keeping patients on Synthroid despite
        knowing that less costly, but equally effective drugs, were available.  In
        2000, the District Court gave final approval to a $87.4 million settlement
        with Knoll and its parent company, BASF Corporation, on behalf of a
        class of all consumers who purchased Synthroid at any time from 1990 to
        1999.  In 2001, the Court of Appeals upheld the order approving the
        settlement and remanded the case for further proceedings.  264 F. 3d 712
        (7th Circ. 2001).  The settlement proceeds were distributed in 2003.

19.     ***Reverse Mortgage Cases***, JCCP No. 4061 (San Mateo County Supr Ct.,
        Cal.).  Transamerica Corporation, through its subsidiary Transamerica
        Homefirst, Inc., sold "reverse mortgages" marketed under the trade name
        "Lifetime." The Lifetime reverse mortgages were sold exclusively to
        seniors, *i.e.*, persons 65 years or older.  Lieff Cabraser, with co-counsel,
        filed suit on behalf of seniors alleging that the terms of the reverse
        mortgages were unfair, and that borrowers were misled as to the loan
        terms, including the existence and amount of certain charges and fees.  In
        2003, the Court granted final approval to an $8 million settlement of the
        action.

20.     ***In re American Family Enterprises***, MDL No. 1235 (D.N.J.).  Lieff
        Cabraser served as co-lead counsel for a nationwide class of persons who
        received any sweepstakes materials sent under the name "American
        Family Publishers."  The class action lawsuit alleged that
        defendants deceived consumers into purchasing magazine subscriptions
        and merchandise in the belief that such purchases were necessary to win
        an American Family Publishers' sweepstakes prize or enhanced their
        chances of winning a sweepstakes prize.  In September 2000, the Court
        granted final approval of a $33 million settlement of the class action.  In
        April 2001, over 63,000 class members received refunds averaging over
        $500 each, representing 92% of their eligible purchases.  In addition,
        American Family Publishers agreed to make significant changes to the
        way it conducts the sweepstakes.

21.     ***In re Sears Automotive Center Consumer Litigation***, Civ. No. C-92-2227
        RHS (N.D. Cal.).  Lieff Cabraser served as Plaintiffs' Co-Lead Counsel
        for a certified nationwide class of Sears auto center customers for
        purposes of approval of a combined injunctive relief/refund settlement.
        As part of the  settlement, Sears distributed to class members merchandise
        coupons valued at $25 million.

22.     ***Roberts v. Bausch & Lomb***, Civ. No. 94-C-1144-W (N.D. Ala.).  Lieff
        Cabraser was designated as one of several Class Counsel in November

1994 in this nationwide consumer fraud class action involving deceptive marketing of contact lenses.  In 1996, the Court approved a settlement valued at $68 million ($34 million cash and $34 million in eye care products).

23.     ***In re Miracle Ear Consumer Litigation***, Civ. No. 94-1696 (4th Jud. Dist. Minn.).  Lieff Cabraser served as Co-Lead Class Counsel in a nationwide class action certified in late 1994 involving claims arising from misrepresentations regarding performance of a hearing aid device.  State courts in Minnesota and Alabama granted final approval to the nationwide settlement.

E.      **Antitrust/Trade Regulation/Intellectual Property**

1.     ***Microsoft Private Antitrust Litigation.***  Representing businesses and consumers, Lieff Cabraser prosecuted multiple private antitrust cases against Microsoft Corporation in state courts across the country, including Florida, New York, North Carolina, and Tennessee.  Plaintiffs alleged that Microsoft engaged in anticompetitive conduct and/or violated state deceptive and unfair business practices statutes to harm competition and monopolize the markets for Intel-compatible, personal computer operating system software, as well as word processing and spreadsheet software.  In August 2006, the New York Supreme Court granted final approval to a settlement that makes available up to $350 million in benefits for New York businesses and consumers.  In August 2004, the Court in the North Carolina action granted final approval to a settlement valued at over $89 million.  In June 2004, the Court in the Tennessee action granted final approval to a $64 million settlement.  In November 2003, in the Florida Microsoft litigation, the Court granted final approval to a $202 million settlement, one of the largest antitrust settlements in Florida history.  Lieff Cabraser served as Co-Lead Counsel in the New York, North Carolina and Tennessee cases, and held leadership roles in the Florida case.

2.     ***Natural Gas Antitrust Cases***, J.C.C.P. Nos. 4221, 4224, 4226 & 4228 (Cal. Supr. Ct.). In December 2006, the Court granted final approval to a $92 million partial settlement of a series of class action lawsuits brought by California business and residential consumers of natural gas against a group of natural gas suppliers, Coral Energy Resources, L.P.; Dynegy Inc. and affiliates; EnCana Corporation; WD Energy Services, Inc.; and The Williams Companies, Inc. and affiliates.  In June 2007, the Court granted final approval to another settlement with Reliant Energy Services, Inc., Duke Energy Trading and Marketing LLC, CMS Energy Resources Management Company, and Aquila Merchant Services, Inc., for an additional $67.39 million.

Plaintiffs charged defendants with manipulating the price of natural gas in California during the California energy crisis of 2000-2001 by a variety of

means, including falsely reporting the prices and quantities of natural gas transactions to trade publications, which compiled daily and monthly natural gas price indices; prearranged wash trading; and, in the case of Reliant, "churning" on the Enron Online electronic trading platform, which was facilitated by a secret netting agreement between Reliant and Enron.

The 2006-2007 settlements follow a landmark $1.5 billion settlement of class action litigation in 2003 against El Paso Natural Gas Co. for manipulating the market for natural gas pipeline transmission capacity into California.  Lieff Cabraser has served as Plaintiffs' Co-Lead Counsel in the *Natural Gas Antitrust Cases I-IV*.

3.  ***Wholesale Electricity Antitrust Cases I & II***, J.C.C.P. Nos. 4204 & 4205 (Cal. Supr. Ct.).  Lieff Cabraser served as co-lead counsel in the private class action litigation against Duke Energy Trading & Marketing Reliant Energy, and The Williams Companies for claims that the companies manipulated California's wholesale electricity markets during the California energy crisis of 2000-2001.  Extending the landmark victories for California residential and business consumers of electricity, in September 2004, plaintiffs reached  a $206 million settlement with Duke Energy Trading & Marketing, and in August 2005, plaintiffs reached a $460 million settlement with Reliant Energy, settling claims that the companies manipulated California's wholesale electricity markets during the California energy crisis of 2000-01.  Lieff Cabraser earlier entered into a settlement for over $400 million with The Williams Companies.

4.  ***In re TFT-LCD (Flat Panel) Antitrust Litigation,*** MDL No. 1827 (N.D. Cal.).  Representing direct purchasers of flat-panel TV screens and other products incorporating liquid crystal displays, Lieff Cabraser serves as one of two Interim Lead Counsel in nationwide class action litigation against the world's leading manufacturers of Thin Film Transistor Liquid Crystal Displays.  TFT-LCDs are used in flat-panel televisions as well as computer monitors, laptop computers, mobile phones, personal digital assistants and other devices.  The plaintiffs allege that from at least January 1, 1998 through December 31, 2005 defendants conspired to raise, fix and stabilize the prices of TFT-LCDs.

5.  ***Azizian v. Federated Department Stores,*** 3:03 CV 03359 SBA (N.D. Cal.).  In March 2005, the Court granted final approval to a settlement that Lieff Cabraser and co-counsel reached with numerous department store cosmetics manufacturers and retailers.  The settlement is valued at $175 million and includes significant injunctive relief, for the benefit of a nationwide class of consumers of department store cosmetics.  The complaint alleged the manufacturers and retailers violated antitrust law by engaging in anticompetitive practices to prevent discounting of department store cosmetics.

6.      *In re ATM Antitrust Litigation*, No. C-04-2676 (N.D. Cal.).  Lieff Cabraser represents a putative class of ATM users against a number of banks comprising the Star ATM Network, alleging that those banks conspired to fix the price of ATM interchange fees, thereby unlawfully inflating fees paid by ATM users in the network.

7.      *In re Static Random Access Memory (SRAM) Antitrust Litigation*, MDL No. 1819 (N.D. Cal.).  Lieff Cabraser serves as one of four members of the Steering Committee for indirect purchasers of SRAM, which is used for a variety of applications, including on the motherboards of computers, as well as in cellular telephones, other handheld devices, and game consoles.  In the nationwide class action, the plaintiffs allege that defendant manufacturers of SRAM conspired in restraint of trade to artificially raise, fix, maintain, and stabilize prices for SRAM, allocate markets for SRAM, and allocate production of SRAM.

8.      *In re Flash Memory Antitrust Litigation,* MDL No. 1852.  Lieff Cabraser is class counsel for purchasers of flash memory, which is commonly used in a variety of applications, including circuit boards, memory cards, digital cameras, USB storage devices, portable music players, mobile wireless technology, game consoles and personal computers.  Plaintiffs allege that they have been deprived of free and open competition, and that prices for flash memory sold by defendants have been fixed, raised, maintained and stabilized at artificially high levels throughout the United States.

9.      *In re Publication Paper Antitrust Litigation*, MDL No. 1631 (D. Conn.).  Lieff Cabraser serve as class counsel in this nationwide antitrust class action on behalf of printing companies.  Plaintiffs allege that the defendants, who are among the world's largest paper manufacturers, conspired illegally to fix the price of publication paper that is used to print magazines.

10.     *Spectrum Stores, Inc., et al.  v. Citgo Petroleum Corp.,* H-06-3569 (S.D. Tex.).  Lieff Cabraser serves as class counsel on behalf of direct purchasers of gasoline and other oil-based products from Citgo.  The plaintiffs allege antitrust damages for Citgo's participation in OPEC's oil cartel.

11.     *In re High Pressure Laminates Antitrust Litigation*, MDL No. 1368 (S.D.N.Y.).  Lieff Cabraser served as Trial Counsel on behalf of a class of direct purchasers of high pressure laminates.  The case in 2006 was tried to a jury verdict.  The case settled for over $40 million.

12.     *In re Buspirone Antitrust Litigation*, MDL No. 1413 (S.D.N.Y.).  In November 2003, Lieff Cabraser obtained a $90 million cash settlement for individual consumers, consumer organizations, and third party payors that purchased BuSpar, a drug prescribed to alleviate symptoms of anxiety.

Plaintiffs alleged that Bristol-Myers Squibb Co. (BMS), Danbury Pharmacal, Inc., Watson Pharmaceuticals, Inc. and Watson Pharma, Inc. entered into an unlawful agreement in restraint of trade under which BMS paid a potential generic manufacturer of BuSpar to drop its challenge to BMS' patent and refrain from entering the market.  Lieff Cabraser served as Plaintiffs' Co-Lead Counsel.

13.     *In re Lupron Marketing and Sales Practices Litigation,* MDL No. 1430 (D. Mass.).  In May 2005, the Court granted final approval to a settlement of a class action lawsuit by patients, insurance companies and health and welfare benefit plans that paid for Lupron, a prescription drug used to treat prostate cancer, endometriosis and precocious puberty.  The settlement requires the defendants, Abbott Laboratories, Takeda Pharmaceutical Company Limited, and TAP Pharmaceuticals, to pay $150 million, inclusive of costs and fees, to persons or entities who paid for Lupron from January 1, 1985 through March 31, 2005.  Plaintiffs charged that the defendants conspired to overstate the drug's average wholesale price ("AWP"), which resulted in plaintiffs paying more for Lupron than they should have paid.  Lieff Cabraser served as Co-Lead Plaintiffs' Counsel.

14.     *California Vitamin Cases*, J.C.C.P.  No. 4076 (Cal. Supr. Ct.).  Lieff Cabraser served as Co-Liaison Counsel and Co-Chairman of the Plaintiffs' Executive Committee on behalf of a class of California indirect vitamin purchasers in every level of the chain of distribution.  In January 2002, the Court granted final approval of a $96 million settlement with certain vitamin manufacturers in a class action alleging that these and other manufacturers engaged in price fixing of particular vitamins.  In December 2006, the Court granted final approval to over $8.8 million in additional settlements.

15.     *Ciprofloxacin Federal and State Antitrust Litigation*, MDL No. 1383 (E.D.N.Y.).  Lieff Cabraser serves as Co-Lead Counsel for consumers who purchased Cipro, the top selling antibiotic in the world.  Plaintiffs allege that Bayer Corporation, Barr Laboratories, two other generic drug companies, and other defendants entered into an unlawful agreement to keep a generic version of the drug off the market that allowed Bayer to sell Cipro at inflated prices.  Lieff Cabraser also represents purchasers of Cipro in a class action lawsuit filed in California state court.  In July 2004, the California Court of Appeal upheld the trial court's grant of class certification of an antitrust and unfair competition action against defendants.

16.     *Pharmaceutical Cases I, II, and III*, J.C.C.P. Nos. 2969, 2971 & 2972 (Cal. Supr. Ct.).  Lieff Cabraser served as Co-Lead and Co-Liaison Counsel representing a certified class of indirect purchasers (consumers) on claims against the major pharmaceutical manufacturers for violations of the Cartwright Act and the Unfair Competition Act.  The class alleged

that defendants unlawfully fixed discriminatory prices on prescription drugs to retail pharmacists in comparison with the prices charged to certain favored purchasers, including HMOs and mail order houses.  In April 1999, the Court approved a settlement providing $148 million in free, brand-name prescription drugs to health agencies that serve California's poor and uninsured.  In October 2001, the Court approved a settlement with the remaining defendants in the case, which provided an additional $23 million in free, brand-name prescription drugs to these agencies.

17.  ***Coalition for Elders' Independence, Inc. v. Biovail Corporation,*** No. CV023320 (Cal. Supr. Ct.).  Lieff Cabraser serves as Co-Lead Counsel for class of consumers who purchased the drug Adalat, also known as Nifedipine.  Plaintiffs allege that two generic manufacturers of Adalat entered into an agreement to allocate the dosages markets for generic Adalat, thereby substantially reducing competition and unlawfully inflating prices on both generic and brand-name Adalat, in violation of state antitrust laws.

18.  ***In re Electrical Carbon Products Antitrust Litigation***, MDL No. 1514 (D.N.J.).  Lieff Cabraser represents the City and County of San Francisco and a class of direct purchasers of carbon brushes and carbon collectors on claims that producers fixed the price of carbon brushes and carbon collectors in violation of the Sherman Act.

19.  ***Electrical Carbon Products Cases***, J.C.C.P.  No. 4294 (San Francisco Supr. Court).  Lieff Cabraser represents the City and County of San Francisco and a class of indirect purchasers of carbon brushes and carbon collectors on claims that producers fixed the price of carbon brushes and carbon collectors in violation of the Cartwright Act and the Unfair Competition Law.  Lieff Cabraser also represents the People of the State of California in claims arising from the Unfair Competition Law.

20.  ***In re Compact Disc Antitrust Litigation***, MDL No. 1216 (C.D. Cal.).  Lieff Cabraser served as Co-Lead Counsel for the direct purchasers of compact discs on claims that the producers fixed the price of CDs in violation of the federal antitrust laws.

21.  ***In re Carpet Antitrust Litigation***, MDL No. 1075 (N.D. Ga.).  Lieff Cabraser served as Class Counsel and a member of the trial team for a class of direct purchasers of twenty-ounce level loop polypropylene carpet.  Plaintiffs, distributors of polypropylene carpet, alleged that Defendants, seven manufacturers of polypropylene carpet, conspired to fix the prices of polypropylene carpet by agreeing to eliminate discounts and charge inflated prices on the carpet.  In 2001, the Court approved a $50 million settlement of the case.

22.     ***In re Lasik/PRK Antitrust Litigation***, No. CV 772894 (Cal. Supr. Ct.).
        Lieff Cabraser served as a member of Plaintiffs' Executive Committee in
        class actions brought on behalf of persons who underwent Lasik/PRK eye
        surgery.  Plaintiffs alleged that defendants, the manufacturers of the laser
        system used for the laser vision correction surgery, manipulated fees
        charged to ophthalmologists and others who performed the surgery, and
        that the overcharges were passed onto consumers who paid for laser vision
        correction surgery.  In December 2001, the Court approved a $12.5
        million settlement of the litigation.

23.     ***In re Toys 'R' Us Antitrust Litigation***, MDL No. 1211 (E.D.N.Y.).  Lieff
        Cabraser served as Co-Lead Counsel representing a class of direct
        purchasers (consumers) who alleged that Toys 'R' Us conspired with the
        major toy manufacturers to boycott certain discount retailers in order to
        restrict competition and inflate toy prices.  In February 2000, the Court
        approved a settlement of cash and product of over $56 million.

24.     ***In re Travel Agency Commission Antitrust Litigation***, MDL No. 1058
        (D. Minn.). Lieff Cabraser served as Co-Lead Counsel for a certified class
        of U.S.  travel agents on claims against the major U.S.  air carriers, who
        allegedly violated the federal antitrust laws by fixing the commissions
        paid to travel agents.  In 1997, the Court approved an $82 million
        settlement.

25.     ***Sanitary Paper Cases I & II***, J.C.C.P. Nos. 4019 & 4027 (Cal. Supr. Ct.).
        Lieff Cabraser served as Liaison Counsel on behalf of indirect purchasers
        of commercial paper products.  Plaintiffs alleged that from 1993 to 2000
        Defendants fixed the price of commercial tissue, toilet paper, toilet seat
        covers, and other commercial paper products in violation of the Cartwright
        Act and Unfair Competition Act.  In February 2001, the Court approved a
        $3 million settlement of the case.

26.     ***Schwartz v. National Football League***, No. 97-CV-5184 (E.D. Pa.).  Lieff
        Cabraser served as counsel for individuals who purchased the "NFL
        Sunday Ticket" package of private satellite transmissions in litigation
        against the National Football League for allegedly violating the Sherman
        Act by limiting the distribution of television broadcasts of NFL games by
        satellite transmission to one package.  In August 2001, the Court approved
        of a class action settlement that included: (1) the requirement that
        defendants provide an additional weekly satellite television package
        known as Single Sunday Ticket for the 2001 NFL football season, under
        certain circumstances for one more season, and at the defendants'
        discretion thereafter; (2) a $7.5 million settlement fund to be distributed to
        class members; (3) merchandise coupons entitling class members to
        discounts at the NFL's Internet store which the parties value at
        approximately $3 million; and (4) $2.3 million to pay for administering
        the settlement fund and notifying class members.

27.     ***In re Commercial Explosives Antitrust Litigation***, MDL No. 1093 (D. Utah).  Lieff Cabraser served as Class Counsel on behalf of direct purchasers of explosives used in mining operations.  In 1998, the Court approved a $77 million settlement of the litigation.

28.     ***In re California Indirect-Purchaser X-Ray Antitrust Litigation***, No. 960886 (Cal. Supr. Ct.).  Lieff Cabraser served as Class Counsel on behalf of indirect purchasers (consumers) of medical x-ray film who alleged violations of the Cartwright and Unfair Competition Acts.  In 1998, the Court approved a $3.75 million settlement of the litigation.

29.     ***In re Brand Name Prescription Drugs***, MDL No. 997 (N.D. Ill.).  Lieff Cabraser served as Class Counsel for a class of tens of thousands of retail pharmacies against the leading pharmaceutical manufacturers and wholesalers of brand name prescription drugs for alleged price-fixing from 1989 to 1995 in violation of the federal antitrust laws.  Class Plaintiffs charged that defendants engaged in price discrimination against retail pharmacies by denying them discounts provided to hospitals, health maintenance organizations, and nursing homes.  In 1996 and 1998, the Court approved settlements with certain manufacturers totaling $723 million.

30.     ***In re K-Dur Prescription Drug Antitrust Litigation***, MDL No. 1419.  Lieff Cabraser serves as Class Counsel on behalf of indirect purchasers of K-Dur, a potassium supplement often prescribed in conjunction with high blood pressure medication.  K-Dur is the fourth most frequently prescribed drug to seniors.  The complaint alleges the defendants illegally agreed not to compete in the sale of K-Dur which prevented any generic version of K-Dur from coming onto the market.

31.     ***In re Flat Glass Antitrust Litigation***, MDL 1200 (W.D. Pa.).  Lieff Cabraser served as Class Counsel on behalf of a class of direct purchasers of flat glass.

32.     ***In re Linerboard Antitrust Litigation***, MDL 1261 (E.D. Pa.).  Lieff Cabraser served as Class Counsel on behalf of a class of direct purchasers of linerboard.  The court recently approved a settlement totaling $202 million.

33.     ***Carbon Fiber Cases I, II, III***, J.C.C.P. Nos. 4212, 4216 & 4222 (Cal. Supr. Ct.).  Lieff Cabraser served as Co-Liaison Counsel on behalf of indirect purchasers of carbon fiber.  Plaintiffs alleged that defendants illegally conspired to raise prices of carbon fiber.  Settlements have been reached with all of the defendants.

34.     ***Methionine Cases I and II***, J.C.C.P. Nos. 4090 & 4096 (Cal. Supr. Ct.).  Lieff Cabraser served as Co-Lead Counsel on behalf of indirect purchasers

of methionine, an amino acid used primarily as a poultry and swine feed additive to enhance growth and production.  Plaintiffs alleged that the companies illegally conspired to raise methionine prices to super-competitive levels.  The case settled.

35.  ***McIntosh v. Monsanto***, No. 4:01CV65RSW (E.D. Mo.).  Lieff Cabraser served as Co-Lead Counsel in a class action lawsuit against Monsanto Company and others alleging that a conspiracy to fix prices on genetically modified Roundup Ready soybean seeds and Yieldgard corn seeds.  The case settled.

36.  ***Tortola Restaurants, L.P. v. Minnesota Mining and Manufacturing***, No. 314281 (Cal. Supr. Ct)  Lieff Cabraser served as Co-Lead Counsel on behalf of indirect purchasers of Scotch-brand invisible and transparent tape.  Plaintiffs alleged that defendant 3M conspired with certain retailers to monopolize the sale of Scotch-brand tape in California.  This case has been resolved as part of a nationwide settlement that Lieff Cabraser negotiated, along with co-counsel.

## F.  Non-Personal Injury Defective Products

1.  ***Richison v. American Cemwood Corp.***, No. 005532 (San Joaquin Supr. Ct., Cal.).  Lieff Cabraser served as Co-lead Class Counsel for an estimated nationwide class of 30,000 owners of homes and other structures on which defective Cemwood Shakes were installed.  In November 2003, the Court granted final approval to a $75 million Phase 2 settlement in the American Cemwood roofing shakes national class action litigation.  This amount was in addition to a $65 million partial settlement approved by the Court in May 2000, and brought the litigation to a conclusion.  The claims period runs through 2015.

2.  ***Williams v. Weyerhaeuser***, No. 995787 (San Francisco Supr. Ct.).  Lieff Cabraser served as Class Counsel on behalf of a nationwide class of hundreds of thousands or millions of owners of homes and other structures with defective Weyerhaeuser hardboard siding.  A California-wide class was certified for all purposes in February 1999, and withstood writ review by both the California Court of Appeal and Supreme Court of California.  In 2000, the Court granted final approval to a nationwide settlement of the case which provides class members with compensation for their damaged siding, based on the cost of replacing or, in some instances, repairing, damaged siding.  The settlement has no cap, and requires Weyerhaeuser to pay all timely, qualified claims over a nine year period.  The claims program is underway and paying claims.

3.  ***Foothill/DeAnza Community College District v. Northwest Pipe Company***, No. C-00-20749 (N.D. Cal.).  In June 2004, the court approved the creation of a settlement fund of up to $14.5 million for property

owners nationwide with Poz-Lok fire sprinkler piping that fails.  Since 1990, Poz-Lok pipes and pipe fittings were sold in the U.S.  as part of fire suppression systems for use in residential and commercial buildings.  After leaks in Poz-Lok pipes caused damage to its DeAnza Campus Center building, Foothill/DeAnza Community College District in California retained Lieff Cabraser to file a class action lawsuit against the manufacturers of Poz-Lok.  The college district charged that Poz-Lok pipe had manufacturing and design defects that resulted in the premature corrosion and failure of the product.  Under the settlement, owners whose Poz-Lok pipes are leaking today, or over the next 15 years, may file a claim for compensation.

4.    ***Toshiba Laptop Screen Flicker Settlement.***  Lieff Cabraser negotiated a settlement with Toshiba America Information Systems, Inc. ("TAIS") to provide relief for owners of certain Toshiba Satellite 1800 Series, Satellite Pro 4600 and Tecra 8100 personal notebook computers whose screens flickered, dimmed or went blank due to an issue with the FL Inverter Board component.  Under the terms of the Settlement, owners of affected computers who paid to have the FL Inverter issue repaired by either TAIS or an authorized TAIS service provider recovered the cost of that repair, up to $300 for the Satellite 1800 Series and the Satellite Pro 4600 personal computers, or $400 for the Tecra 8100 personal computers.  TAIS also agreed to extend the affected computers' warranties for the FL Inverter issue by 18 months.

5.    ***ABS Pipe Litigation***, JCCP No. 3126 (Contra Costa County Supr. Ct., Cal.).  Lieff Cabraser served as Lead Class Counsel on behalf of property owners whose ABS plumbing pipe was allegedly defective and caused property damage by leaking.  Six separate class actions were filed in California against five different ABS pipe manufacturers, numerous developers of homes containing the ABS pipe, as well as the resin supplier and the entity charged with ensuring the integrity of the product.  Between 1998 and 2001, we achieved 12 separate settlements in the class actions and related individual lawsuits for approximately $78 million.

Commenting on the work of Lieff Cabraser and co-counsel in the case, California Superior Court (now appellate) Judge Mark B. Simons stated on May 14, 1998: "The attorneys who were involved in the resolution of the case certainly entered the case with impressive reputations and did nothing in the course of their work on this case to diminish these reputations, but underlined, in my opinion, how well deserved those reputations are."

6.    ***McManus, et al. v. Fleetwood Enterprises, Inc.***, No. SA-99-CA-464-FB (W.D. Tex.).  Lieff Cabraser served as Class Counsel on behalf of original owners of 1994-2000 model year Fleetwood Class A and Class C motor homes.  In 2003, the Court approved a settlement that resolved lawsuits

pending in Texas and California about braking while towing with 1994 Fleetwood Class A and Class C motor homes.  The lawsuits alleged that Fleetwood misrepresented the towing capabilities of new motor homes it sold, and claimed that Fleetwood should have told buyers that a supplemental braking system is needed to stop safely while towing heavy items, such as a vehicle or trailer.  The settlement paid $250 to people who bought a supplemental braking system for Fleetwood motor homes that they bought new.

7. ***Cox v. Shell***, No. 18,844 (Obion County Chancery Ct., Tenn.).  Lieff Cabraser served as Class Counsel on behalf of a nationwide class of approximately 6 million owners of property equipped with defective polybutylene plumbing systems and yard service lines.  In November 1995, the Court approved a settlement involving an initial commitment by Defendants of $950 million in compensation for past and future expenses incurred as a result of pipe leaks, and to provide replacement pipes to eligible claimants.  The settlement claims program will continue past 2010, under the continuing supervision of the trial court.

8. ***Naef v. Masonite***, No. CV-94-4033 (Mobile County Circuit Ct., Ala.).  Lieff Cabraser Heimann & Bernstein served as Class Counsel on behalf of a nationwide Class of an estimated 4 million homeowners with allegedly defective hardboard siding manufactured and sold by Masonite Corporation, a subsidiary of International Paper, on their homes.  The Class was certified in November 1995, and the Alabama Supreme Court twice denied extraordinary writs seeking to decertify the Class, including in *Ex Parte Masonite*, 681 So. 2d 1068 (Ala. 1996).  A month-long jury trial in 1996 established the factual predicate that Masonite hardboard siding was defective under the laws of most states.  The case settled on the eve of a second Class-wide trial, and in January 1998, the Court approved a Class Settlement.  Under the Settlement, Class members with failing Masonite hardboard siding installed and incorporated in their property between January 1, 1980 and January 15, 1998 can make claims through 2008 and have their homes evaluated by independent inspectors.  Class members with qualifying damage to their siding recover damages associated with the siding.  To date, the Settlement has paid out over $750 million to homeowners across the country, and claims continue to be made and paid.

9. ***Lundell v. Dell***, No. C05-03970 (N.D. Cal.).  Lieff Cabraser served as Lead Class Counsel for consumers who experienced power problems with the Dell Inspiron 5150 notebook.  In December 2006, the Court granted final approval to a settlement of the class action which extended the one-year limited warranty on the notebook for a set of repairs related to the power system.  In addition, class members that paid Dell or a third party for repair of the power system of their notebook were entitled to a 100% cash refund from Dell.

10.     ***Kan v. Toshiba American Information Systems***, No. BC327273 (Los
        Angeles Super. Ct.).  Lieff Cabraser served as Co-Lead Counsel for a class
        of all end-user persons or entities who purchased or otherwise acquired in
        the United States, for their own use and not for resale, a new Toshiba
        Satellite Pro 6100 Series notebook.  Consumers alleged a series of defects
        were present in the notebook.  In 2006, the Court approved a settlement
        that extended the warranty for all Satellite Pro 6100 notebooks, provided
        cash compensation for certain repairs, and reimbursed class members for
        certain out-of-warranty repair expenses.

11.     ***In re Louisiana-Pacific Inner-Seal Siding Litigation***, No. C-95-879-JO
        (D. Or.).  Lieff Cabraser served as Co-Lead Class Counsel on behalf of a
        nationwide class of homeowners with defective exterior siding on their
        homes.  Plaintiffs asserted claims for breach of warranty, fraud,
        negligence, and violation of consumer protection statutes.  On April 26,
        1996, U.S. District Judge Robert E. Jones entered an Order, Final
        Judgment and Decree granting final approval to a nationwide settlement
        requiring Louisiana-Pacific to provide funding up to $475 million to pay
        for inspection of homes and repair and replacement of failing siding over
        the next seven years.

12.     ***In re Intel Pentium Processor Litigation***, No. CV 745729 (Santa Clara
        Supr. Ct., Cal.).  Lieff Cabraser served as one of two court appointed
        Co-Lead Class Counsel, and negotiated a settlement, approved by the
        Court in June 1995, involving both injunctive relief and damages having
        an economic value of approximately $1 billion.  The chip replacement
        program has been implemented, and is ongoing.

13.     ***Gross v. Mobil***, No. C 95-1237-SI (N.D. Cal.).  Lieff Cabraser served as
        Plaintiffs' Class Counsel in this nationwide action involving an estimated
        2,500 aircraft engine owners whose engines were affected by Mobil AV-1,
        an aircraft engine oil.  Plaintiffs alleged claims for strict liability,
        negligence, misrepresentation, violation of consumer protection statutes,
        and for injunctive relief.  Plaintiffs obtained a preliminary injunction
        requiring Defendant Mobil Corporation to provide notice to all potential
        class members of the risks associated with past use of Defendants' aircraft
        engine oil.  In addition, Plaintiffs negotiated a proposed Settlement,
        granted final approval by the Court in November 1995, valued at over
        $12.5 million, under which all Class Members were eligible to participate
        in an engine inspection and repair program, and receive compensation for
        past repairs and for the loss of use of their aircraft associated with damage
        caused by Mobil AV-1.

14.     ***In re General Motors Corp. Pick-Up Fuel Tank Products Liability
        Litigation***, MDL No. 961.  Lieff Cabraser served as court-appointed Co-
        Lead Counsel representing a class of 4.7 million plaintiffs who owned
        1973-1987 GM C/K pickup trucks with allegedly defective gas tanks.  The

Consolidated Complaint asserted claims under the Lanham Act, the Magnuson-Moss Act, state consumer protection statutes, and common law.  In 1995, the Third Circuit vacated the District Court settlement approval order and remanded the matter to the District Court for further proceedings.  In July 1996, a new nationwide class action was certified for purposes of an enhanced settlement program valued at a minimum of $600 million, plus funding for independent fuel system safety research projects.  Final approval was granted in November 1996.

15.   *Hanlon v. Chrysler Corp.*, No. C-95-2010-CAL (N.D. Cal.).  In 1995, the district court approved a $200+ million settlement enforcing Chrysler's comprehensive minivan rear latch replacement program, and to correct alleged safety problems with Chrysler's pre-1995 designs.  As part of the settlement, Chrysler agreed to replace the rear latches with redesigned latches.  The settlement was affirmed on appeal by the Ninth Circuit in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (1998).

## G.   Environmental and Toxic Exposures

1.   *In re Unocal Refinery Litigation*, No. C 94-04141 (Cal. Supr. Ct.).  Lieff Cabraser served as one of two Co-Lead Class Counsel and on the Plaintiffs' Steering Committee in this action against Union Oil Company of California ("Unocal") arising from a series of toxic releases from Unocal's San Francisco refinery in Rodeo, California.  The action was settled in 1997 on behalf of approximately 10,000 individuals for $80 million.

2.   *Kentucky Coal Sludge Litigation.*  On October 11, 2000, near Inez, Kentucky, a coal waste storage facility ruptured, spilling 300 million gallons of coal sludge (a wet mixture produced by the treatment and cleaning of coal) into waterways in the region and contaminating hundreds of properties.  This was one of the worst environmental disasters in the Southeastern United States.  With co-counsel, Lieff Cabraser represented over 400 clients in property damage claims, including claims for diminution in the value of their homes and properties.  In April 2003, the parties reached a confidential settlement agreement on favorable terms to the plaintiffs.

3.   *Toms River Childhood Cancer Incidents*.  With co-counsel, Lieff Cabraser represented 69 families in Toms River, New Jersey, each with a child having cancer, that claimed the cancers were caused by environmental contamination in the Toms River area.  Commencing in 1998, the parties – the 69 families, Ciba Specialty Chemicals, Union Carbide and United Water Resources, Inc., a water distributor in the area – participated in an unique alternative dispute resolution process, which lead to a fair and efficient consideration of the factual and scientific issues in

the matter.  In December 2001, under the supervision of a mediator, a confidential settlement favorable to the families was reached.

4. ***In re Exxon Valdez Oil Spill Litigation*** (District of Alaska/Alaska Supr. Ct.).  The Exxon Valdez ran aground in March of 1989, spilling 11 million gallons of oil into Prince William Sound.  Lieff Cabraser served as one of the court-appointed Plaintiffs' Class Counsel.  The class consisted of 32,000 fisherman, Alaska natives, landowners and others whose livelihoods were gravely affected by the disaster.  In addition, Lieff served on the Class Trial Team in 1994.  A class action jury trial was held in federal court in 1994.  That jury awarded $5 billion in punitive damages to the plaintiff class.  The punitive damages award has been on repeated appeal by the Exxon Corporation ever since.  In 2001, the Ninth Circuit Court of Appeals ruled that the original $5 billion punitive damages verdict was excessive.  In 2002, U.S. District Court Judge H. Russell Holland reinstated the award at $4 billion.  Judge Holland stated that, "Exxon officials knew that carrying huge volumes of crude oil through Prince William sound was a dangerous business, yet they knowingly permitted a relapsed alcoholic to direct the operation of the Exxon Valdez through Prince William Sound."  In 2003, the Ninth Circuit again directed Judge Holland to reconsider the punitive damages award under United States Supreme Court punitive damages guidelines.  In January 2004, Judge Holland issued his order finding that Supreme Court authority did not change the Court's earlier analysis.  In December 2006, the Ninth Circuit Court of Appeals issued its ruling, setting the punitive damages award at $2.5 billion.  The case remains on appeal.

5. ***West v. G&H Seed Co., Aventis CropSciences USA, LLP, et al.***, No. 99-C-4984-A (La. State Ct).  With co-counsel, Lieff Cabraser represented a class of 1,500 Louisiana crawfish farmers.  The farmers sued Bayer CropScience LP claiming the pesticide ICON killed their crawfish and caused economic ruin.  In 2004, the Court granted approved a $45 million settlement.  The settlement was reached after the parties had presented nearly a month's worth of evidence at trial, and were on the verge of making closing arguments to the jury.

6. ***Craft v. Vanderbilt University***, Civ. No. 3-94-0090 (M.D. Tenn.).  Lieff Cabraser served as Lead Counsel of a certified class of over 800 pregnant women and their children who were intentionally fed radioactive iron without their consent while receiving prenatal care at defendant Vanderbilt's hospital in the 1940's.  The facts surrounding the administration of radioactive iron to the pregnant women and their children *in utero* came to light as a result of Energy Secretary Hazel O'Leary's 1993 disclosures of government sponsored human radiation experimentation during the Cold War.  Defendants' attempts to dismiss the claims and decertify the class were unsuccessful.  The case was settled

in July 1998 for a total of $10.3 million and a formal apology from Vanderbilt.

7.   ***In re GCC Richmond Works Cases***, J.C.C.P. No. 2906.  Lieff Cabraser served as Co-Liaison Counsel and Lead Class Counsel in coordinated litigation arising out of the release of a massive toxic sulfuric acid cloud which injured an estimated 50,000 residents of Richmond, California on July 26, 1993.  The Coordination Trial Court granted final approval to a $180 million class settlement for exposed residents.

8.   ***In re Sacramento River Spill Cases I and II***, J.C.C.P. Nos. 2617 & 2620 (Cal. Supr. Ct.).  Lieff Cabraser served as Court-appointed Plaintiffs' Liaison Counsel, Lead Class Counsel, and chaired the Plaintiffs' Litigation Committee in an action arising out of a July 14, 1991 Southern Pacific train derailment and toxic spill near Dunsmuir, California.  Settlement proceeds of approximately $16 million were distributed pursuant to Court approval of a plan of allocation to four certified plaintiff classes:  personal injury, business loss, property damage/diminution, and evacuation.

## H.   <u>Aviation Law</u>

1.   ***In re Air Crash near Athens, Greece on August 14, 2005,*** MDL No. 1773.  On August 14, 2005, a Boeing 737 operating as Helios Airways flight 522 crashed north of Athens, Greece, resulting in the deaths of all passengers and crew.  The aircraft was heading from Larnaca, Cyprus to Athens International Airport when ground controllers lost contact with the pilots, who had radioed in to report problems with the air conditioning system.  Press reports about the official investigation indicate that a single switch for the pressurization system on the plane was not properly set by the pilots, and eventually both were rendered unconscious, along with most of the passengers and cabin crew.  Lieff Cabraser represents the families of several victims, and filed complaints alleging that a series of design defects in the Boeing 737-300 contributed to the pilots' failure to understand the nature of the problems they were facing.  Foremost among those defects was a confusing pressurization warning "horn" which uses the same sound that alerts pilots to improper takeoff and landing configurations.  The Judicial Panel on Multidistrict Litigation granted Lieff Cabraser's motion to consolidate all Helios cases before the U.S. District Court for the Northern District of Illinois in Chicago, where the headquarters of The Boeing Company are located and where Lieff Cabraser filed its clients' cases.

2.   ***Barbosa Garcia et al. v. Excelaire Service, Inc., and Honeywell International, Inc.***, No. CV 06-5964 (E.D. N.Y.).  Lieff Cabraser, with co-counsel, represents over twenty families whose loved ones died in the Gol Airlines Flight 1907 crash.  On September 29, 2006, a brand-new

Boeing 737-800 operated by Brazilian air carrier Gol plunged into the Amazon jungle after colliding with a smaller plane owned by the American company Excelaire Service, Inc.  None of the 149 passengers and six crew members on board the Gol flight survived the accident.  The complaint charges that the pilots of the ExcelAire jet were flying at an incorrect altitude at the time of the collision, failed to operate the jet's transponder and radio equipment properly, and failed to maintain communication with Brazilian air traffic control in violation of international civil aviation standards. If the pilots of the ExcelAire aircraft had followed these standards, plaintiffs charge that the collision would not have occurred.  At the time of the collision, the ExcelAire aircraft's transponder manufactured by Honeywell was not functioning. A transponder transmits a plane's altitude and operates its automatic anti-collision system.  The complaint charges that Honeywell shares responsibility for the tragedy because it defectively designed the transponder on the ExcelAire jet, and failed to warn of dangers resulting from foreseeable uses of the transponder.

3.   ***In re Air Crash at Lexington, Kentucky, August 27, 2006***, No. 07 CV 006 (E.D. Ky.).  A Bombardier CRJ-100 commuter plane operated by Comair, Inc., a subsidiary of Delta Air Lines, crashed on August 27, 2006 shortly after takeoff at Blue Grass Airport in Lexington, Kentucky, killing 47 passengers and two crew members.  The aircraft attempted to take off from the wrong runway.  Lieff Cabraser and co-counsel represent families of passengers who died on the flight.

4.   ***Crash of West Caribbean Airways Flight 708.***  On August 16, 2005, a McDonnell Douglas MD-82 operated by West Caribbean Airways lost engine power and crashed near La Cucharita, Venezuela, during a flight from Panama City to Fort de France, Martinique.  Martinique is a province of France.  A large number of the victims' families retained French attorneys to represent them.  In light of Lieff Cabraser's work on the Flash Air case (see below), those French attorneys asked Lieff Cabraser to advise them on the substance of U.S. laws which may be applicable to a claim against The Boeing Company (successor to McDonnell Douglas) or Pratty & Whitney, the manufacturer of the aircraft's engines.  Lieff Cabraser now serves in that advisory capacity.

5.   ***Crash of Manhattan Tourist Helicopter.***  On June 14, 2005 a Bell 206 helicopter operated by Helicopter Flight Services, Inc. fell into the East River shortly after taking off for a tourist flight over New York City.  The pilot and six passengers were immersed upside-down in the water as the helicopter overturned.  Lieff Cabraser represents a passenger on the helicopter.

6.   ***Crash of "Legend" Aircraft in Tucson, AZ.***  On November 19, 2005, a single engine "Turbine Legend" kit plane operated by its owner crashed

shortly after takeoff from a private airstrip in Tucson, Arizona, killing both the owner/pilot and a passenger.  Lieff Cabraser represents the widow of the passenger.  Witnesses report that the aircraft left the narrow runway during the takeoff roll and although the pilot managed to get the plane airborne, it rolled to the left and crashed.  Lieff Cabraser is investigating the liability of the pilot and others, including the manufacturer of the kit and the operator of the airport from which the plane took off.  The runway was 16 feet narrower than the minimum width recommended by the Federal Aviation Administration.

7.   ***Crash of Air Algerie Boeing 737.***  Together with French co-counsel, Lieff Cabraser represents the families of several passengers who died in the March 6, 2003 crash of a Boeing 737 airplane operated by Air Algerie.  The aircraft crashed soon after takeoff from the Algerian city of Tamanrasset, after one of the engines failed.  All but one of the 97 passengers were killed, along with six crew members.

8.   ***Crash of Flash Air Boeing 737***.  On January 3, 2004, all 148 passengers and crew were killed when a Flash Airlines Boeing 737 plunged into the Red Sea off the coast of Egypt, after the pilots encountered a malfunction in the flight control system.  Most of the passengers were from France and were vacationing at the seaside resort of Sharm el Sheikh.  After the families retained French attorneys to represent them, those French attorneys conducted several rounds of interviews of U.S. law firms with the intention of engaging one of those firms to file an action in the United States against Boeing, which manufactured the aircraft in the United States.  Lieff Cabraser was selected to be that firm, and filed complaints in federal court in Los Angeles on behalf of the families of more than 120 victims. Although the U.S. District Court ruled that the case could be more conveniently tried in France, the plaintiffs have contested the jurisdiction of the French court over the case against Boeing.  If the French courts rule against jurisdiction, the case in the United States will be reactivated.  Otherwise, Lieff Cabraser will act as consultants to the French attorneys on technical issues and questions of U.S.  law.

9.   ***Tower Collision of U.S. Army Blackhawk Helicopter.***  Lieff Cabraser represents the family of a pilot who died in the November 29, 2004 crash of a U.S. Army Black Hawk Helicopter.  The Black Hawk was flying during the early morning hours at an altitude of approximately 500 feet when it hit cables supporting a 1,700 foot-tall television tower, and subsequently crashed 30 miles south of Waco, Texas, killing both pilots and five passengers, all in active Army service.  The tower warning lights required by FCC regulations were inoperative, and the aviation and weather experts retained by Lieff Cabraser will testify that had the lights been operating as they should have, the helicopter's pilots would have been warned away from the tower before they hit the cable.  LCHB will be filing an action shortly.

10. ***Crash of China Eastern Airlines Bombardier CRJ200.*** Lieff Cabraser represents families of over 30 passengers who died in the November 21, 2004, crash of China Yunnan Airlines Flight 5210. The plane, a Bombardier CRJ-200 built in Canada with engines from a General Electric plant in Massachusetts, was headed for Shanghai with 47 passengers and six crew members when it crashed into a lake, seconds after taking off from Baotou, Inner Mongolia. The lawsuit filed by Lieff Cabraser in the Los Angeles Superior Court alleges that the crash was the result of a combination of pilot error and defects in the aircraft and its engines. The defendants' attempt to transfer the case to the federal court failed when Lieff Cabraser's motion to remand was granted by that court. The case is now pending in the Los Angeles Superior Court.

11. ***Crash of Macedonian Presidential Aircraft.*** Lieff Cabraser represents the families of 8 victims of the February 26, 2004 crash of a Beech King Air 200 in Bosnia-Herzegovina. The crash killed the President of Macedonia, Boris Trajkovski, and a number of his advisors and cabinet members.

12. ***Crash of Mandala Airlines Flight 91.*** On September 5, 2005, a Boeing 737 operating as Mandala Flight 091 crashed immediately after takeoff form the airport in Medan, Indonesia, killing 101 of the 117 people on board, as well as 44 people on the ground. Lieff Cabraser represents a number of injured persons and families of deceased victims.

13. ***Aeroflot-Russian International Airlines Airbus Disaster.*** Lieff Cabraser represented the families of passengers who were on Aeroflot-Russian International Airlines Flight SU593 that crashed in Siberia on March 23, 1994. The plane was in route from Moscow to Hong Kong. All passengers on board died. According to a transcript of the cockpit voice recorder, the pilot's two children entered the cockpit during the flight and took turns flying the plane. The autopilot apparently was inadvertently turned off during this time, and the pilot was unable to remove his son from the captain's seat in time to avert the plane's fatal dive. Lieff Cabraser, alongside French co-counsel, filed suit in France, where Airbus, the plane's manufacturer, was headquartered. All the families Lieff Cabraser represented obtained substantial economic recoveries in settlement of the action.

14. ***United Airlines Boeing 747 Disaster***, MDL No. 807 (N.D. Cal.). Lieff Cabraser served as Plaintiffs' Liaison Counsel on behalf of the passengers and families of passengers injured and killed in the United Airlines Boeing 747 cargo door catastrophe near Honolulu, Hawaii on February 24, 1989. Lieff Cabraser organized the litigation of the case, which included claims brought against United Airlines and The Boeing Company. Among our work, we developed a statistical system for settling the passengers' and families' damages claims with certain defendants, and coordinated the

prosecution of successful individual damages trials for wrongful death against the non-settling defendants.

15. ***German Air Force Lockheed F-104 Star Fighter Litigation:*** In the late 1960s and extending into the early 1970s, the United States sold F-104 Star Fighter jets to the German Air Force that were manufactured by Lockheed Aircraft Corporation in California. Although the F-104 Star Fighter was designed for high-altitude fighter combat, it was used in Germany and other European countries for low-level bombing and attack training missions. Consequently, the aircraft had an extremely high crash rate, with over 300 pilots killed. Commencing in 1971, the law firm of Belli Ashe Ellison Choulos & Lieff filed hundreds of lawsuits for wrongful death and other claims on behalf of the widows and surviving children of the pilots. Robert Lieff continued to prosecute the cases after the formation of our firm. In 1974, the lawsuits were settled with Lockheed on terms favorable to the plaintiffs. This litigation helped establish the principle that citizens of foreign countries could assert claims in United States courts, and obtain substantial recoveries, against an American manufacturer based upon airplane accidents or crashes occurring outside of the United States.

## I.   <u>International and Human Rights Litigation</u>

1. ***Holocaust Cases***. Lieff Cabraser is one of the leading firms that prosecuted claims by Holocaust survivors and the heirs of Holocaust survivors and victims against banks and private manufacturers and other corporations who enslaved and/or looted the assets of Jews and other minority groups persecuted by the Nazi Regime during the Second World War era. We serve as Settlement Class Counsel in the case against the Swiss banks that the Court approved a U.S. $1.25 billion settlement in July 2000. Lieff Cabraser donated its attorneys' fees in the Swiss Banks case, in the amount of $1.5 million, to endow a Human Rights clinical chair at Columbia University Law School. We were also active in slave labor and property litigation against German and Austrian defendants, and Nazi-era banking litigation against French banks. In connection therewith, Lieff Cabraser participated in multi-national negotiations that led to Executive Agreements establishing an additional approximately U.S. $5 billion in funds for survivors and victims of Nazi persecution. Our website provides links to the websites of settlement and claims administrators in these cases.

Commenting on the work of Lieff Cabraser and co-counsel in the litigation against private German corporations, entitled *In re Holocaust Era German Industry, Bank & Insurance Litigation* (MDL No. 1337), U.S. District Court Judge William G. Bassler stated on November 13, 2002:

Up until this litigation, as far as I can tell, perhaps with some minor exceptions, the claims of slave and forced labor fell on deaf ears.  You can say what you want to say about class actions and about attorneys, but the fact of the matter is, there was no attention to this very, very large group of people by Germany, or by German industry until these cases were filed.  .  .  .   What has been accomplished here with the efforts of the plaintiffs' attorneys and defense counsel is quite incredible.  .  .  I want to thank counsel for the assistance in bringing us to where we are today.  Cases don't get settled just by litigants.  It can only be settled by competent, patient attorneys.

2.   ***Cruz v. U.S., Estados Unidos Mexicanos, Wells Fargo Bank, et al.***, No. 01-0892-CRB (N.D. Cal.).  In April 2001, Lieff Cabraser filed a class action on behalf of contract workers (known as "Braceros") who came from Mexico to the United States pursuant to bilateral agreements from 1942 through 1949 to aid American farms and industries hurt by employee shortages.  The agreements provided that ten percent of the Braceros' wages would be withheld from them and transferred via United States and Mexican banks to savings accounts for each Bracero.  Plaintiffs claim they were never reimbursed for the portion of their wages placed in the forced savings accounts.  In June 2005, U.S. District Court Judge Charles Breyer denied motions to dismiss filed by Mexico and the Mexican banks charged with illegally withholding the savings funds from the Braceros in an extensive opinion, permitting the case to go forward against the Mexican defendants.  The case is pending on appeal in the Ninth Circuit Court.

3.   ***The Presbyterian Church of Sudan v. Talisman Energy and Republic of Sudan***, No. 01 CV 9882 (S.D. N.Y.). With co-counsel, Lieff Cabraser represents the Presbyterian Church of Sudan and current and former residents of southern Sudan who allege that that they were victims of genocide, crimes against humanity and other violations of international law by Talisman Energy, Inc. ("Talisman"), the largest independent Canadian oil producer, and the Sudanese government.  Plaintiffs charge that in the late 1990s through 2003, Talisman and Sudan participated in a joint military strategy of ethnic cleansing against non-Muslim in order to create a buffer zone for the exploitation of oil reserves in the Western Upper Nile region of the nation.   In meetings with government officials, plaintiffs charge that Talisman mapped out areas it intended to explore, and the parties would then discuss how to "dispose of" the civilians living in those areas.  Talisman allegedly was aware that the result of these decisions was to cause genocide and war crimes as government military forces destroyed villages and killed, maimed, raped and tortured civilians

of ethnic and religious minority backgrounds.  The case is presently on appeal.

4.   ***Ali, et al. v. Rumsfeld,*** No. 05-C-1201 (N.D. Ill.) On March 1, 2005, Lieff Cabraser joined the ACLU and Human Rights First in representing seven individuals who claim that they were tortured by American military forces when they were held in U.S. Army detention facilities in Iraq and Afghanistan.  Numerous Defense Department reports have found that torture was "widespread."  The suit alleges that Defense Secretary Donald Rumsfeld and high-ranking military commanders were responsible for authorizing torture or failing to stop torture after they learned of it.  A former Rear Admiral and former Brigadier General also serve as co-counsel.  The consolidated case is pending in the U.S. District Court in Washington, D.C.

**FIRM BIOGRAPHY:**

   **PARTNERS**

   ***ELIZABETH J. CABRASER***, born Oakland, California, June 23, 1952.  Admitted to practice in California,1978; California Supreme Court,1978; U.S. Supreme Court, 1996; U.S. District Court, Northern District of California, 1978; Eastern District of California, 1979; Central District of California and Southern District of California, 1992; U.S. Court of Appeals, Second Circuit, 2000; Third Circuit, 1994; Fifth Circuit, 1992; Sixth Circuit, 1992; Seventh Circuit, 2001; Ninth Circuit, 1979; Tenth Circuit, 1992; Eleventh Circuit, 1992; U.S. Tax Court, 1979; U.S. District Court, District of Hawaii, 1986.  *Education*:  Boalt Hall School of Law, University of California (J.D., 1978); University of California at Berkeley (A.B., 1975).  *Awards and Honors*:  "Lawdragon 500 Leading Plaintiffs' Lawyers," *Lawdragon*, Winter 2007;  "Top Women Litigators in California," *The San Francisco* and *Los Angeles Daily Journal,* 2007; *Distinguished Leadership Award*, Legal Community Against Violence, 2006; "One Hundred Most Influential Lawyers in America," *The National Law Journal*, 2006, 2000 and 1997; "Top 75 Women Litigators," *California Daily Journal*, 2005-2006; Women of Achievement, Legal Momentum (formerly the NOW Legal Defense & Education Fund), 2006; "Best Lawyer," *Best Lawyers in America*, 2006; "Top 100 Lawyers," *California Daily Journal*, 2002-2007; "Top 30 Securities Litigator," *California Daily Journal*, 2005; "Top 100 and Top 50 Female Northern California Super Lawyer," *Law & Politics*, 2005-2006; "Northern California Super Lawyer," *Law & Politics*, 2004-2007; "Top 50 Women Litigators," *California Daily Journal*, 2004; *Citation Award*, University of California, Berkeley Boalt Hall, 2003; "Top 30 Women Litigators," *California Daily Journal*, 2002; *Distinguished Jurisprudence Award*, Anti-Defamation League, 2002; "Top Ten Women Litigators," *The National Law Journal,* 2001; "California Law Business Top 100 Lawyers," *California Daily Journal*, 2000-1998; *Matthew O. Tobriner Public Service Award*, Legal Aid Society, 2000; *Presidential Award of Merit*, Consumer Attorneys of California, 1998; "Fifty Most Influential Women Lawyers," *The National Law Journal,* 1998; "Lawyers of the Year," *California Lawyer*, 1998; *Public Justice Achievement Award*, Trial Lawyers for Public Justice, 1997.  *Publications*:  "The Manageable

Nationwide Class: A Choice-of-Law Legacy of *Phillips Petroleum Co. v. Shutts,*" *University of Missouri- Kansas City Law Review,* Volume 74, Number 3, Spring 2006; Co-Author with Fabrice N. Vincent, "Class Actions Fairness Act of 2005," *California Litigation,* Vol. 18, No. 3 (2005); Editor in Chief, *California Class Actions Practice and Procedures* (2003);  Co-Author, "Decisions Interpreting California's Rules of Class Action Procedure," *Survey of State Class Action Law*, updated and re-published in 5 *Newberg on Class Actions* (ABA 2001-2004); Co-Author, "Mass But Not (Necessarily) Class: Emerging Aggregation Alternatives Under the Federal Rules," ABA 8th Annual National Institute on Class Actions, New York (Oct. 15, 2004), New Orleans (Oct. 29, 2004); Co-Author, "2004 ABA Toxicology Monograph-California State Law," (January 2004); "Current Issues Involving Rule 12(b)(6) and Rule 9(b)," in *Civil Practice and Litigation Techniques in Federal and State Courts* (ALI-ABA Course of Study 2004); "New Developments in Mass Torts and Class Actions: 'Issues' Certification The Mass Torts Top Ten of 2003; Rule 23's New Provision and Action Trial Plans; And the FJC 'New Plain Language' Class Notice," in *Civil Practice and Litigation Techniques in Federal and State Courts* (ALI-ABA Course of Study, February 2004); "Human Rights Violations as Mass Torts: Compensation as a Proxy for Justice in the United States Civil Litigation System"; Coordinating Editor and Co-Author of California section of the ABA State Class Action Survey (2001-02); "Unfinished Business:  Reaching the Due Process Limits of Punitive Damages in Tobacco Litigation Through Unitary Classwide Adjudication," 36 *Wake Forest Law Review* 979 (Winter 2001); "Symposium: Enforcing the Social Contract through Representative Litigation," 33 *Connecticut Law Review* 1239 (Summer 2001); "Equity for the Victims, Equity for the Transgressor: The Classwide Treatment of Punitive Damages Claims," 74 *Tulane Law Review* 2005 (June 2000); "Class Action Trends and Developments After *Amchem* and *Ortiz*," in *Civil Practice and Litigation Techniques in Federal and State Courts* (ALI-ABA Course of Study 1999); Contributor/Editor, *Moore's Federal Practice* (1999); "Life After *Amchem*:  The Class Struggle Continues," 31 *Loyola Law Review* 373 (1998); "Recent Developments in Nationwide Products Liability Litigation:  The Phenomenon of Non-Injury Products Cases, the Impact of *Amchem* and the Trend Toward State Court Adjudication," *Products Liability* (ABA February 1998); Contributor/Editor, *California Causes of Action* (1998); "Beyond Bifurcation:  Multi-Phase Structure in Mass Tort Class Actions," *Class Actions & Derivative Suits* (Spring 1997); "The Road Not Taken:  Thoughts on the Fifth Circuit's Decertification of the *Castano* Class," SB24 ALI-ABA 433 (1996); "Getting the Word Out:  Pre-Certification Notice to Class Members Under Rule 23(d)(2)," *Class Actions & Derivative Suits Newsletter* (October 1995); "Mass Tort Class Action Settlements," 24 *CTLA Forum* 11 (Jan./Feb. 1994); "Do You Know the Way from San Jose?  The Evolution of Environmental and Toxic Nuisance Class Actions," *Class Actions & Derivative Suits* (Spring 1994); "An *Oracle* of Change? Realizing the Potential of Emerging Fee Award Methodologies for Enhancing The Role and Control of Investors in Derivative and Class Action Suits," *Principles of Corporate Governance* (ALI October 1994); "How To Streamline Complex Litigation:  Tailor a Case Management Order to Your Controversy," 21 *The Brief* 12 (ABA/TIPS Summer 1992); "The Applicability of the Fraud-On-The-Market Theory to 'Undeveloped' Markets:  When Fraud Creates the Market, 12 *Class Action Reports* 402 (1989); "The Applicability of the Fraud-On-The-Market Theory to 'Undeveloped' Markets:  When Fraud Creates the Market," 12 *Class Action Reports* 402 (1989); "Mandatory Certification of Settlement Classes," 10 *Class Action Reports* 151 (1987); Co-author with Alexandra L. Foote and Fabrice N. Vincent, "Ethics and Admissibility: Failure to Disclose Conflicts of Interest in and/or Funding of Scientific Studies and/or Data May Warrant Evidentiary Exclusions,"

*Mealey's December Emerging Drugs Reporter* (December 2002); Co-author with Fabrice N. Vincent, "The Shareholder Strikes Back: Varied Approaches to Civil Litigation Claims Are Available to Help Make Shareholders Whole," *Mealey's Emerging Securities Litigation Reporter* (September 2002). *Member*:  American Law Institute, Council; American Bar Association (Past Co-Chair, Committee on Mass Torts; Committee on Class Actions and Derivative Suits; Tort and Insurance Practice Section (TIPS); Past Vice-Chair, Rules & Procedures Committee, Contributor, Civil Procedure & Evidence News Letter; Business Law Section, Corporate & Litigation Group); Federal Bar Association, Northern District of California Chapter; Bar Association of San Francisco (Past President, Securities Litigation Section; Board of Directors, 1997-1998; Past Member, Judiciary Committee); Advisor, American Law Institute International Jurisdiction and Judgments and Aggregate Litigation Projects; California Constitution Revision Commission, 1993-1996; National Center for State Courts Mass Tort Conference Planning Committee; Northern District of California Civil Justice Reform Act (CJRA) Advisory Committee, and Advisory Committee on Professional Conduct; Lawyer-Delegate, Ninth Circuit Judicial Conference, 1992-1995; American Bar Association (Litigation Section and Committee on Class Actions and Derivative Suits; Co-Chair, Committee on Mass Torts); Consumer Attorneys of California (CAOC); Trial Lawyers for Public Justice (TLPJ); Bar Association of the Fifth Federal Circuit; Fight for Justice Campaign; (California State Liaison, Women Trial Lawyers Caucus); California Women Lawyers; Lawyers Club of San Francisco; Queen's Bench; Association of Business Trial Lawyers; Bay Area Lawyers for Individual Freedom; ABA National Institute on Class Actions (Organizer/ Participant, 1997-2000).

**RICHARD M. HEIMANN**, born Miami, Florida, August 23, 1948.  Admitted to practice in Pennsylvania, 1972; District of Columbia, 1974; California, U.S. District Court, Northern District of California and U.S. Court of Appeals, Ninth Circuit, 1975; U.S. Supreme Court, 1980; U.S. Court of Appeals, Second Circuit, 1980; U.S. District Court, District of Hawaii, 1986. *Education*:  Georgetown University (J.D., 1972); *Georgetown Law Journal*, 1971-72; University of Florida (B.S.B.A., with honors, 1969).  *Employment*:  Mr. Heimann served as Deputy District Attorney and Acting Assistant District Attorney for Tulare County, California, and as an Assistant Public Defender in Philadelphia, Pennsylvania, 1972-74.  As a private civil law attorney, Mr. Heimann has tried over 30 civil jury cases, including complex cases such as the successful *FPI/Agretech* and *Edsaco* securities class action trials.  In April 2002 in the *Edsaco* case, a federal jury in San Francisco, California returned a $170.7 million verdict against Edsaco Ltd., which included $165 million in punitive damages.  *Member*:  State Bar of California; Bar Association of San Francisco.  *Awards and Honors:* "Northern California Super Lawyers," *Law & Politics*, 2004 - 2007.

**WILLIAM BERNSTEIN**, born York, Pennsylvania, July 5, 1950.  Admitted to practice in California, 1975; U.S. Court of Appeals, Ninth Circuit, 1975; U.S. District Court, Northern District of California, 1975; New York and U.S. Supreme Court, 1985; U.S. District Court, Central and Eastern Districts of California, 1991; U.S. District Court, Southern District of California, 1992.  *Education*:  University of San Francisco (J.D., 1975); *San Francisco Law Review*, 1974-75; University of Pennsylvania (B.A., general honors, 1975).  *Community Service*:  Adjunct Professor of Law, University of San Francisco, Settlement Law (2006-Present); Judge Pro Tem for San Francisco Superior Court, 2000-present; Marin Municipal Court, 1984; Discovery Referee for the Marin Superior Court, 1984-89; Arbitrator for the Superior Court of

Marin, 1984-1990. *Publications/Presentations*: "The Rise and Fall of Enron's One-To-Many Trading Platform" (American Bar Association Antitrust Law Section, Annual Spring Meeting, 2005); Co-author with Donald C. Arbitblit, "Effective Use of Class Action Procedures in California Toxic Tort Litigation", 3 *Hastings West-Northwest Journal of Environmental Law and Policy*, No. 3 (Spring 1996). *Member*: State Bar of California; State Bar of New York; Marin County Bar Association (Admin. of Justice Committee, 1988); Bar Association of San Francisco. *Awards and Honors*: *Who's Who Legal*, 2007; Northern California Super Lawyers, *Law & Politics*, *2004 – 2007*; *Unsung Hero* Award, Appleseed, 2006.

**JOSEPH R. SAVERI**, born San Francisco, California, August 18, 1962. Admitted to practice in California, 1987; U.S. District Court, Northern District of California; U.S. District Court, Central District of California; U.S. District Court, Southern District of California; U.S. Court of Appeals, First Circuit; U.S. Court of Appeals, Second Circuit; U.S. Court of Appeals, Seventh Circuit; U.S. Court of Appeals, Eighth Circuit; U.S. Court of Appeals, Ninth Circuit; U.S. Supreme Court. *Education*: University of Virginia (J.D., 1987); University of California at Berkeley (B.A., 1984). *Publications and Presentations*: "Dagher: An Admirable Exercise in Restraint," Competition: The Journal of the Antitrust and Unfair Competition Law Section of the State Bar of California, Vol. 15, No. 2 (Fall/Winter 2006); Panelist, *Soaring Prices for Prescription Drugs: Just Rewards for Innovations or Antitrust Violations?*, University of San Francisco Law Review (November 13, 2004); *California Antitrust & Unfair Competition Law 3d* (Antitrust and Unfair Competition Law Section of the State Bar of California 2003); Panelist, Fordham Conference on Electronic Discovery, Discovery Subcommittee of Advisory Committee on the Rules of Civil Procedure; Contributing Author, *California Class Actions Practice and Procedure (*Elizabeth J. Cabraser editor in chief, 2003); "RICO Update," 22 *Review of Securities and Commodities Regulation*, No. 18 (Oct. 25, 1989). *Member*: Faculty Member, Sedona Conference on Antitrust Law and Litigation, 2006; Northern District of California's Civil Rules and Practice Committee; Bar Association of San Francisco; State Bar of California; Italian American Bar Association; Lawyers Club of San Francisco. *Awards and Honors*: "Northern California Super Lawyers," *Law & Politics*, 2006 & 2007.

**DONALD C. ARBITBLIT**, born Jersey City, New Jersey, May 5, 1951. Admitted to practice in Vermont, 1979; California and U.S. District Court, Northern District of California, 1986. *Education*: Boalt Hall School of Law, University of California (J.D., 1979); Order of the Coif; Tufts University (B.S., *magna cum laude*, 1974). *Publications*: Co-Author with Wendy Fleishman, "The Risky Business of Off-Label Use," *Trial* (March 2005); "Comment on *Joiner*: Decision on the *Daubert* Test of Admissibility of Expert Testimony," 6 *Mealey's Emerging Toxic Torts*, No. 18 (December 1997); Co-author with William Bernstein, "Effective Use of Class Action Procedures in California Toxic Tort Litigation," 3 *Hastings West-Northwest Journal of Environmental Law and Policy*, No. 3 (Spring 1996); "The Plight of American Citizens Injured by Transboundary River Pollution," 8 *Ecology Law Quarterly*, No. 2 (1979). *Appointments*: Member of the Federal Court-appointed Science Executive Committee, and Chair of the Epidemiology/Clinical Trials Subcommittee, In re Vioxx Products Liability Litigation, MDL No. 1657 (E.D. La.); Member of the Federal Court-appointed Science and Expert Witness Committees in *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation*, MDL No. 1203 (E.D. Pa.), *In re Baycol Products Litigation*, MDL No. 1431 (D. Minn.) and *Rezulin Products Liability Litigation*, MDL No. 1348 (S.D.N.Y.). *Member*: Bar

Association of San Francisco; State Bar of California. *Awards and Honors:* "Northern California Super Lawyers," *Law & Politics*, 2004-07.

**STEVEN E. FINEMAN,** born Los Angeles, California, February 13, 1963. Managing Partner. Admitted to practice in California, 1989; U.S. District Court, Northern, Eastern and Central Districts of California and U.S. Court of Appeals, Ninth Circuit, 1995; U.S. Court of Appeals, Fifth Circuit, 1996; New York, U.S. District Court, Eastern and Southern Districts of New York, U.S. Court of Appeals, Second Circuit and U.S. Supreme Court, 1997; District of Columbia, 1997. *Education*: University of California, Hastings College of the Law (J.D., 1988); University of California, San Diego (B.A., 1985); Stirling University, Scotland (English Literature and Political Science, 1983-84). *Honors/Appointments*: "New York Super Lawyers," *Law & Politics*, 2006-2007; "The New York Area's Best Lawyers," *Best Lawyers in America* (published by *American Lawyer Media*), 2005-2007; "40 under 40", *The National Law Journal*, 2002, selected as one of the country's most successful litigators under the age of 40; Editorial Board, "Bill of Particulars, A Review of Developments in New York State Trial Law," New York State Trial Lawyers Institute, Quarterly (June 2005-present); Trial Lawyers for Public Justice, Executive Committee Member (July 2006-present), Board of Directors (July 2002-present); Board of Trustees, Civil Justice Foundation (January 2004-present) Executive Committee (July 2006-present), Co-Chair & Class Action Preservation Project (July 2005-present); Board of Directors, New York State Trial Lawyers Association (July 2001-July 2004); Plaintiff Toxic Tort Advisory Council, Lexis/Nexis, Mealey's Publications and Conferences Group (January 2002-2005). *Publications/Presentations*: Stanford University Law School and The Centre for Socio-Legal Studies, Oxford University, Panel Member, *The Globalization of Class Actions* (December 13 and 14, 2007, Oxford, England); "Bill of Particulars, A Review of Developments in New York State Trial Law," *Federal Court Jurisdiction: Getting to Federal Court By Choice or Removal* (Winter 2007); Stanford University Law School, Guest Lecturer for Professor Deborah Hensler's course on Complex Litigation, *Foreign Claimants in U.S. Courts* (April 17, 2007, Stanford, California); American Constitution Society for Law and Policy, 2006 National Convention, Panel Member, *Finding the Balance: Federal Preemption of State Law* (June 16, 2006, Washington, D.C.); Lieff, Cabraser, Heimann & Bernstein, LLP, Global Justice Forum, Conference Moderator and Panel Member on securities litigation (May 19, 2006, Paris, France); Stanford University Law School, Guest Lecturer for Professor Deborah Hensler's course on Complex Litigation, *Foreign Claimants in U.S. Court* (April 25, 2006, Stanford, California); Lieff, Cabraser, Heimann & Bernstein, LLP, Global Justice Forum, Conference Moderator and Speaker and Papers, *The Basics of Federal Multidistrict Litigation: How Disbursed Claims are Centralized in U.S. Practice and Basic Principles of Securities Actions for Institutional Investors* (May 20, 2005, London, England); New York State Trial Lawyers Institute, Federal Practice for State Practioners, Speaker and Paper, *Federal Multidistrict Litigation Practice*, (March 30, 2005, New York, New York), published in "Bill of Particulars, A Review of Developments in New York State Trial Law" (Spring 2005); Stanford University Law School, The Stanford Center on Conflict and Negotiation, Interdisciplinary Seminar on Conflict and Dispute Resolution, Guest Lecturer, *In Search of "Global Settlements": Resolving Class Actions and Mass Torts with Finality* (March 16, 2004, Stanford, California); Lexis/Nexis, Mealey's Publications and Conferences Group, Wall Street Forum: Mass Tort Litigation, Co-Chair of Event (July 15, 2003, New York, New York); Northstar Conferences, The Class Action Litigation Summit, Panel Member on Class Actions in the Securities Industry, and Paper, *Practical Considerations for Investors' Counsel - Getting the Case* (June 27, 2003, Washington, D.C.); The Manhattan

Institute, Center for Legal Policy, Forum Commentator on Presentation by John H.  Beisner, "Magnet Courts: If You Build Them, Claims Will Come" (April 22, 2003, New York, New York); Stanford University Law School, Guest Lecturer for Professor Deborah Hensler's Courses on Complex Litigation ("Selecting The Forum For a Complex Case -- Strategic Choices Between Federal And State Jurisdictions") and Alternative Dispute Resolution ("ADR In Mass Tort Litigation") (March 4, 2003, Stanford, California); American Bar Association, Tort and Insurance Practice Section, Emerging Issues Committee, Member of Focus Group on Emerging Issues in Tort and Insurance Practice (coordinated event with New York University Law School and University of Connecticut Law School, August 27, 2002, New York, New York); Duke University and University of Geneva, *Debates Over Group Litigation in Comparative Perspective*, Panel Member on Mass Torts and Products Liability (July 21-22, 2000, Geneva, Switzerland); *New York Law Journal*, Article, *Consumer Protection Class Actions Have Important Position, Applying New York's Statutory Scheme* (November 23, 1998); Leader Publications, *Litigation Strategist*, "Fen-Phen" Articles, *The Admissibility of Scientific Evidence in Fen-Phen Litigation* and *Daubert Developments: Something for Plaintiffs, Defense Counsel* (June 1998, New York, New York); The Defense Research Institute and Trial Lawyer Association, Toxic Torts and Environmental Law Seminar, Article and Lecture, *A Plaintiffs' Counsels' Perspective: What's the Next Horizon?* (April 30, 1998, New York, New York); Lexis/Nexis, Mealey's Publications and Conference Group, Mealey's Tobacco Conference: Settlement and Beyond 1998, Article and Lecture, *The Expanding Litigation* (February 21, 1998, Washington, D.C.); New York State Bar Association, Expert Testimony in Federal Court After Daubert and New Federal Rule 26, Article and Lecture, *Breast Implant Litigation: Plaintiffs' Perspective on the Daubert Principles* (May 23, 1997, New York, New York).  *Member*: American Bar Association; New York Bar Association; California Bar Association; District of Columbia Bar Association; Public Justice Foundation, Board of Directors (July 2002-present); Executive Committee (July 2006-present); Co-Chair, Class Action Preservation Project ( July 2005-present); Secretary (July 2007-present); Association of the Bar of the City of New York; Fight for Justice Campaign; New York State Trial Lawyers Association; Trial Lawyers For Public Justice; Association of Trial Lawyers of America; Human Rights First; American Constitution Society for Law and Policy; Supreme Court Historical Society.

> **ROBERT J. NELSON**, born New York, New York, October 20, 1960; admitted practice in California, 1987; U.S. District Court, Central District of California, 1987; U.S. District Court, Northern District of California, 1988; U.S. Court of Appeals, Ninth Circuit, 1988; U.S. Court of Appeals, Sixth Circuit, 1995; District of Columbia, 1998; New York, 1999; U.S. District Court, Eastern District of New York, Southern District of New York, 2001.  *Education*:  N.Y.U.  School of Law (J.D., 1987): Order of the Coif, Articles Editor, *New York University Law Review,* Root-Tilden Scholarship Program; Cornell University (A.B., *cum laude* 1982): Member, Phi Beta Kappa, College Scholar Honors Program; London School of Economics (General Course, 1980-81): Graded First.  *Employment:*  Law Clerk to Judge Stephen Reinhardt, U.S. Court of Appeals, Ninth Circuit, 1987-88; Assistant Federal Public Defender, Northern District of California, 1988-93; Legal Research and Writing Instructor, University of California-Hastings College of the Law, 1989-91 (Part-time position).  *Publications:* Contributing Author, *California Class Actions Practice and Procedures (*Elizabeth J. Cabraser editor in chief, 2003); "The Importance of Privilege Logs," *The Practical Litigator*, Vol.  II, No. 2 (March 2000)(ALI-ABA Publication); "To Infer or Not to Infer a Discriminatory Purpose:  Rethinking Equal Protection Doctrine,"

61 *New York University Law Review* 334 (1986).  *Member:*  State Bar of California; Bar of the District of Columbia; State Bar of New York; Bar Association of San Francisco; Fight for Justice Campaign; American Bar Association.  *Awards and Honors:* "Northern California Super Lawyers," *Law & Politics*, 2004 - 2007.

**KELLY M. DERMODY**, born Ithaca, New York, June 16, 1967.  Admitted to practice in California, 1994; U.S. District Court, Northern District of California, 1995; U.S. Court of Appeals for the Third Circuit (2001); U.S. Court of Appeals for the Seventh Circuit (2006); U.S. Court of Appeals for the Ninth Circuit (2007); U.S. District Court of Colorado (2007).  *Education*:  Boalt Hall School of Law, University of California, Berkeley (J.D. 1993); Moot Court Executive Board (1992-1993); Articles Editor, *Industrial Relations Law Journal/Berkeley Journal of Employment and Labor Law* (1991-1992); Harvard University (A.B. *magna cum laude*, 1990), Senior Class Ames Memorial Public Service Award.  *Employment*:  Law Clerk to Chief Judge John T. Nixon, U.S. District Court, Middle District of Tennessee, 1993-1994; Adjunct Professor of Law, Golden Gate University School of Law, Employment Law (Spring 2001).  *Awards:*  "Trial Lawyer of the Year Finalist," Public Justice Foundation, 2007; "Top Women Litigators in California," *The San Francisco* and *Los Angeles Daily Journal,* 2007; "California Lawyer Attorney of the Year (CLAY) Award," California Lawyer, 2007; "Lawdragon 500 Leading Plaintiffs' Lawyers," *Lawdragon*, Winter 2007; Consumer Attorney of the Year Finalist, Consumer Attorneys of California, 2006; *Daily Journal* Magazine: Named as one of California's "Top 20 Lawyers Under 40" (2006); Northern California Super Lawyer, *Law & Politics*, 2004 – 2007; "Top 100 Super Lawyers" and "Top 50 Female Super Lawyers" Awards, *Law & Politics*, 2007; "Trial Lawyer of the Year Finalist," Public Justice Forum, 2007; "Living the Dream Partner," Lawyers Committee for Civil Rights of the San Francisco Bay Area, 2005.  *Publications/Presentations*:  "Class Actions: Latest Developments in Litigating and Settling Employment Discrimination Class Actions" (American Bar Association Labor and Employment Section Equal Opportunity Committee, Mid-Year Meeting, 2001); Co-Author with James M. Finberg, "A Road Map to Discovery in Employment Discrimination and Wage/Hour Class Actions" (Glasser Legal Works Seminar, 2000); "Employment Discrimination Class Actions in the Wake of *Allison v. Citgo Petroleum Corp.*" (American Bar Association Litigation Section Annual Meeting, 2000); "Employment Discrimination Class Actions in the Wake of *Allison v. Citgo Petroleum Corp*. and Fed. R. Civ. P. 23(f)" (Federal Bar Association Convention, 1999); Co-Author with James M. Finberg, "Discovery in Employment Discrimination Class Actions," in *Litigation and Settlement of Complex Class Actions* (Glasser Legal Works 1998).  *Member*:  American Bar Association, Labor and Employment Law Section Annual Conference (Vice-Chair, 2007-present), Committee on Equal Opportunity in the Legal Profession (Co-Chair, 2006-2007); American Bar Association Labor and Employment Law Section Equal Employment Opportunity Committee (Co-Chair, 2003-present; Midwinter Meeting Planning Committee, 2000-2006); ABA Labor and Employment Law Section Katrina Task Force (Member, 2005-2007); Bar Association of San Francisco (Board of Directors, 2005-present; Litigation Section, Executive Committee, 2002-2005); Lawyers' Committee for Civil Rights of the San Francisco Bay Area (Board of Directors, 1998-2005; Secretary, 1999-2003; Co-Chair, 2003-2005); National Center for Lesbian Rights (Board of Directors, 2002-present; Board Co-Chair, 2005-2006); Pride Law Fund (Board of Directors, 1995-2002; Secretary, 1995-1997; Chairperson, 1997-2002); Equal Rights Advocates (Litigation Committee, 2000-

2002); State Bar of California; Consumer Attorneys of California; National Employment Lawyers' Association; Bay Area Lawyers for Individual Freedom.

**JONATHAN D. SELBIN**, born Baton Rouge, Louisiana, May 11, 1967.  Admitted to practice in California, 1994; New York, 2001; District of Columbia, 1999; U.S. Court of Appeals, Fifth Circuit, 1994; U.S. District Court, Northern District of California, 1995; U.S. District Court, Central District of California, 1997; U.S. District Court, Southern District of New York, 2001.  *Education*:  Harvard Law School (J.D., *magna cum laude*, 1993); University of Michigan (B.A., *summa cum laude*, 1989).  *Employment:*  Law Clerk to Judge Marilyn Hall Patel, U.S. District Court, Northern District of California, 1993-95.  *Awards and Honors*: "New York Super Lawyers," *Law & Politics*, 2006.  *Publications*:  Contributing Author, *California Class Actions Practice and Procedures (*Elizabeth J. Cabraser editor-in-chief, 2003); "Bashers Beware:  The Continuing Constitutionality of Hate Crimes Statutes After R.A.V.," 72 *Oregon Law Review* 157 (Spring, 1993).  *Member*:  State Bar of California; State Bar of New York; Bar of the District of Columbia; American Bar Association; New York State Trial Lawyers Association.

**BARRY R. HIMMELSTEIN**, born Philadelphia, Pennsylvania, March 14, 1958.  Admitted to bar, 1992, California; U.S. District Court, Northern District of California, 1992.  *Education*:  Hastings College of the Law (J.D., *magna cum laude*, 1991); Note and Articles Editor, *Hastings Law Journal* (1990-91); University of Michigan at Ann Arbor (B.G.S., with distinction, 1982).  *Publications*: Contributing Author, *California Class Actions Practice and Procedures (*Elizabeth J. Cabraser editor in chief, 2003).  *Employment*:  Law Clerk to Judge Charles A. Legge, U.S. District Court, Northern District of California, 1991-92.  *Member*:  State Bar of California; Bar Association of San Francisco.

**MICHELE C. JACKSON**, born Redwood City, California, January 17, 1954.  Admitted to bar, 1979, California; U.S. District Court, Northern District of California, 1979; United States Supreme Court, 1988; U.S. Court of Appeals, Ninth Circuit, 1981; U.S. District Court, Central District of California, 1985; U.S. Court of Appeals, Fifth Circuit, 1989.  *Education*:  University of San Francisco School of Law (J.D., *cum laude*, 1979); Stanford University (B.A., with honors, 1976).  *Employment*:  Judicial Extern to Justice Wiley W. Manuel, California Supreme Court, Summer 1977.  *Publications and Panels*:  Panelist, "Antitrust Dispute Resolution in Complex Business Torts and Antitrust Cases:  Is There Really a Class Arbitration?" (April 2007), American Bar Association Antitrust Law Spring Meeting; Panelist, "Settlement and Mediation of Unfair Competition Disputes" (May, 2006) and other panels, State Bar of California Antitrust and Unfair Competition Section; Author, *Recent Judicial Opinions On Class And Multi-Party Arbitration In Antitrust And Consumer Cases, And Principles Underlying Those Opinions* (February 2007), American Bar Association; Chapter Co-Author with Marc Seltzer, *"State Antitrust Law and Intellectual Property"* in *California Antitrust & Unfair Competition Law* (Third), Vol. 1: Antitrust*;* Author, *Asserted Defenses to a §17200 Class Action Based on Korea Supply -- The Interplay With Indirect Purchaser Litigation* (2005) American Bar Association; Contributing Author, *California Class Actions Practice and Procedure (*2003).  *Awards and Honors*: Northern California Super Lawyer, *Law & Politics*, 2007; Recipient of State Bar Board of Governors Award.  *Appointments*: Officer, Advisor and Executive Committee Member, State Bar of California Antitrust and Unfair Competition Section (terms September, 2001-2007).

*Member*:  American Bar Association; State Bar of California; Bar Association of San Francisco; McAuliffe Law Honor Society.

**MICHAEL W. SOBOL**, born Mt. Kisco, New York, October 5, 1961.  Admitted to practice in Massachusetts, 1989; California, 1998; United States District Court, District of Massachusetts, 1990; U.S. District Court, Northern District of California, 2001.  *Education*: Boston University (J.D., 1989); Hobart College (B.A., *cum laude*, 1983).  *Employment*:  Lecturer in Law, Boston University School of Law, 1995-1997.  *Member*:  State Bar of California; Bar Association of San Francisco.

**FABRICE N. VINCENT**, born Paris, France, June 15, 1966.  Admitted to practice in California, 1992; U.S. District Court, Northern District of California, Central District of California, Eastern District of California, Ninth Circuit Court of Appeals, 1992.  *Education*: Cornell Law School (J.D., *cum laude*, 1992); University of California at Berkeley (B.A., 1989).  *Publications:* Co-Author with Elizabeth J. Cabraser, "Class Actions Fairness Act of 2005," *California Litigation,* Vol. 18, No. 3 (2005); Co-Editor, *California Class Actions Practice and Procedures* (2003-06); Co-Author, "Ethics and Admissibility: Failure to Disclose Conflicts of Interest in and/or Funding of Scientific Studies and/or Data May Warrant Evidentiary Exclusions," *Mealey's December Emerging Drugs Reporter* (December 2002); Co-author, "The Shareholder Strikes Back: Varied Approaches to Civil Litigation Claims Are Available to Help Make Shareholders Whole," *Mealey's Emerging Securities Litigation Reporter* (September 2002); Co-Author, "Decisions Interpreting California's Rules of Class Action Procedure," *Survey of State Class Action Law* (ABA 2000-06), updated and re-published in 5 *Newberg on Class Actions* (2001-06); Coordinating Editor and Co-Author of California section of the ABA State Class Action Survey (2001-06); Co-Editor-In-Chief, *Fen-Phen Litigation Strategist* (Leader Publications 1998-2000) and author of "Off-Label Drug Promotion Permitted" (Oct. 1999); Co-Author, "The Future of Prescription Drug Products Liability Litigation in a Changing Marketplace," and "Six Courts Certify Medical Monitoring Claims for Class Treatment," 29 *Forum* 4 (Consumer Attorneys of California 1999); Co-Author, *Class Certification of Medical Monitoring Claims in Mass Tort Product Liability Litigation* (ALI-ABA Course of Study 1999); Co-Author, "How Class Proofs of Claim in Bankruptcy Can Help in Medical Monitoring Cases," (Leader Publications 1999); Co-Author, Introduction, "Sanctioning Discovery Abuses in the Federal Court," (LRP Publications 2000); "With Final Approval, Diet Drug Class Action Settlement Avoids Problems That Doomed Asbestos Pact," (Leader Publications 2000).  *Awards & Honors:* Northern California Super Lawyer, *Law & Politics*, 2006 – 2007.  *Member*:  State Bar of California; Bar Association of San Francisco; American Bar Association; Fight for Justice Campaign; Association of Business Trial Lawyers.

**DAVID S. STELLINGS**, born New Jersey, April 23, 1968.  Admitted to practice in New York, 1994; New Jersey; 1994; U.S. District Court, Southern District of New York, 1994.  *Education*: New York University School of Law (J.D., 1993); Editor, *Journal of International Law and Politics;* Cornell University (B.A., *cum laude*, 1990).  *Member*:  State Bar of New York; State Bar of New Jersey; Bar Association of the City of New York; New York State Bar Association; American Bar Association.

**ERIC B. FASTIFF,** born San Francisco, California.  Admitted to practice in California, 1996; District of Columbia, 1997; U.S. Court of Appeals for the Ninth Circuit, U.S. District Courts for the Northern, Southern, Eastern, and Central Districts of California, District of

Columbia; U.S. Court of Federal ClaiMs. *Education*:  Cornell Law School (J.D., 1995); Editor-in-Chief, *Cornell International Law Journal;* London School of Economics (M.Sc. (Econ.), 1991); Tufts University (B.A., *cum laude, magno cum honore in thesi*, 1990).  *Employment*: Law Clerk to Hon. James T. Turner, U.S. Court of Federal Claims, 1995-1996.  *Publications*: Co-Editor, *California Class Actions Practice and Procedures* (Elizabeth J. Cabraser, Editor-in-Chief, 2003-2006); Coordinating Editor and Co-Author of California section of the *ABA State Class Action Survey* (2003-06); Author, "US Generic Drug Litigation Update," 1 *Journal of Generic Medicines* 212 (2004);  Author, "The Proposed Hague Convention on the Recognition and Enforcement of Civil and Commercial Judgments:  A Solution to Butch Reynolds's Jurisdiction and Enforcement Problems," 28 *Cornell International Law Journal* 469 (1995). *Member*:  State Bar of California; District of Columbia Bar Association; Bar Association of San Francisco; Bar of the U.S. Court of Federal Claims; Editorial Board Member, *Journal of Generic Medicines*, 2003-present.

**WENDY FLEISHMAN**, born Philadelphia, Pennsylvania, 1954.  Admitted to practice in Pennsylvania, 1977; New York, 1992.  *Education*: University of Pennsylvania (Post-Baccalaureate Pre-Med, 1982); Temple University (J.D., 1977); Sarah Lawrence College (B.A., 1974).  *Employment*:  Skadden, Arps, Slate, Meagher & Flom LLP in New York (Counsel in the Mass Torts and Complex Litigation Department), 1993-2001; Fox, Rothschild O'Brien & Frankel (partner), 1988-93 (tried more than thirty civil, criminal, employment and jury trials, and AAA arbitrations, including toxic tort, medical malpractice and serious injury and wrongful death cases); Ballard Spahr Andrews & Ingersoll (associate), 1984-88 (tried more than thirty jury trials on behalf of the defense and the plaintiffs in civil personal injury and tort actions as well as employment- and construction-related matters); Assistant District Attorney in Philadelphia, 1977-84 (in charge of and tried major homicide and sex crime cases).  *Awards and Honors*: "New York Super Lawyers," *Law & Politics*, 2006-2007.  *Publications*: Editor, Brown & Fleishman, "Proving and Defending Damage Claims: A Fifty-State Guide," (2007); Co-Author with Donald C. Arbitblit, "The Risky Business of Off-Label Use," *Trial* (March 2005); Co-Author, "From the Defense Perspective," in *Scientific Evidence*, Chapter 6, (Aspen Law Pub, 1999); American Bar Association, Editor, *Trial Techniques Newsletter*, Tort and Insurance Practices Section, 1995-96; and 1993-94.  *Appointments:*  Mealey's Drug & Medical Device Litigation Conference, Co-Chair (2007); Executive Committee *In re ReNu MoistureLoc Product Liability Litigation, MDL*; *In re Guidant Product Liability Litigation*, *Discovery*; *In re Baycol MDL Litigation* – Co Chair Science Committee; *In re Vioxx MDL Litigation* – Pricing Committee.  *Member*:  New York State Trial Lawyers Association (Board of Directors, 2004-Present); Association of the Bar of the City of New York (Judiciary Committee, 2004-Present); American Bar Association (2000, Affair Chair, ABA Annual Meeting, Torts & Insurance Practices Section, NYC; 1997, Chair, Trial Techniques Committee, Tort & Insurance Practices; 1996, Chair Elect, Trial Techniques Committee, Tort & Insurance Practices); Pennsylvania Bar Association (Committee on Legal Ethics and Professionalism, 1993-Present; Committee on Attorney Advertising, 1993-Present; Vice-Chair, Task Force on Attorney Advertising, 1991-92); State Bar of New York, Federal Bar Association; Member, Gender and Race Bias Task Force of the Second Circuit, 1994-present; Deputy Counsel, Governor Cuomo's Screening Committee for New York State Judicial Candidates, 1993-94; New York State Trial Lawyers Association; New York Women's Bar Association; Association of the Bar of the City of New York (Product Liability Committee, 2007-present); New York County Lawyers; Fight for Justice Campaign;

NYTLA; PATLA; Philadelphia Bar Association (Member of Committee on Professionalism 1991-92).

**PAULINA DO AMARAL**, born New York, New York, February 1966.  Admitted to practice in New York, 1997; California, 1998; U.S. Court of Appeals, Ninth Circuit, 1999; U.S. District Court, Southern District of New York, 2004; U.S. District Court, Western District of Michigan, 2004; U.S. District Court, Eastern District of Michigan, 2007.  *Education*:  University of California Hastings College of Law (J.D., 1996); Executive Editor, *Hastings Constitutional Law Quarterly*; National Moot Court Competition Team, 1995; Moot Court Executive Board; University of Rochester (B.A., 1988).  *Employment*: Law Clerk to Chief Judge Richard Alan Enslen, U.S. District Court, Western District of Michigan, 1996-98.  *Member*:  Association of the Bar of the City of New York, (2007-2010, Committee on the Judiciary); American Bar Association; State Bar of New York; State Bar of California; Bar Association of San Francisco; American Trial Lawyers Association; New York State Trial Lawyers Association.

**HECTOR D. GERIBON**, born Montevideo, Uruguay, November 5, 1966.  Admitted to practice in New Jersey and New York, 1997; California, 1999; U.S. District Court, District of New Jersey, 1997; U.S. Court of Appeals for the Ninth Circuit, U.S. District Courts for the Northern and Central Districts of California, 1999; U.S. Court of Appeals, Third Circuit, 2001; U.S. District Court, Southern District of New York, 2003; U.S. District Court, Eastern District of New York, 2006; U.S. District Court, Colorado, 2006.  *Education*:  Brooklyn Law School (J.D., 1996); Moot Court Honor Society; American Jurisprudence Award for Health Law; Recipient, Edward V. Sparer Public Interest Law Fellowship; St. John's University, (B.S., Dean's List, 1988).  *Employment*: Law Clerk to Judge Manuel L. Real, U.S. District Court, Central District of California, 1997-98; Judicial Extern to Chief Judge Peter C. Dorsey, U.S. District Court, District of Connecticut, 1995.  *Member*:  State Bar of New York; Bar Association of the City of New York, American Bar Association, Hispanic National Bar Association.

**KATHRYN E. BARNETT**, born Chapel Hill, North Carolina, October 23, 1967. Admitted to practice in Tennessee, 1992; U.S. District Court, Middle District of Tennessee, 1997; U.S.  6th Circuit, 2000; U.S. District Court, Western District of Tennessee, 2001; U.S. 11th Circuit, 2003; U.S. District Court, Eastern District of Tennessee, 2005.  *Education*: Vanderbilt University School of Law (J.D., 1992); American Jurisprudence Awards: Torts I and Jurisprudence; Davidson College (B.A., with Honors in Philosophy, 1989), Dean Rusk Grant for International Studies.  *Awards & Honors:* "Best of the Bar," *Nashville Business Journal* (2003, 2005-2007); Mid-South Super Lawyer, *Law & Politics*, 2006-2007; "Best Lawyers in Tennessee," *Business Tennessee,* (2006-2007).  *Litigation Experience*: Ms. Barnett has tried over 15 civil and criminal trials, including complex and class action cases, as well as catastrophic personal injury cases.  In 2000, Ms. Barnett obtained a verdict of nearly $6 million on behalf of parents whose unborn fetus died tragically due to medical malpractice.  In March, 2004 and in August, 2004 Ms. Barnett served as co-lead trial counsel in the class action lawsuit of *In re Tri-State Crematory Litigation*, Multi-District Litigation Docket No. 1467.  The case was settled during the second week of trial.  The settlements in the Tri-State litigation exceed $40 million. *Employment*:  Judicial Intern to Judge John T. Nixon, U.S. District Court, Middle District of Tennessee, Fall 1990; Assistant Public Defender, Davidson County, Tennessee, Sept.  1991-Dec. 1995.  *Publications/Presentations*: "Civil Procedure and Evidence Update," Tennessee Trial Lawyers (Oct. and Nov. 2006); "Pre-Trial Skills: Thinking on Your Feet," National Business

Institute (Nov. 2006), "Trial Practice Institute," Nashville Bar Association (Sept. 2005); "State Law Class Actions," American Bar Association, Business Law Section (April 2005); "Power Windows Can Kill," *Trial* (April 2005); "Auto Defect Cases," Tennessee Trial Lawyers (Feb. 2005); "Limiting the Harmful Testimony of Experts on the Law," *Trial* (Jan. 2001); "Letting Focus Groups Work for You," *Trial* (April 1999); "Knocking Out Opposing Experts," Tennessee Trial Lawyers (October and November, 2004), Nashville Bar Association (July, 2004); "Trial Practice Tips: Powerful Trial Strategies for the Absolute Litigator," Nashville Bar Association (April, 2004); "Damages," Tennessee Trial Lawyers (Oct. and Nov. 2003); "Trying the Wrongful Death Case in Tennessee," National Business Institute (Aug. 2003); "Advanced Personal Injury," National Business Institute (July 2003); "Mass Torts," Tennessee Bar Association (July 2002); "Superior Depositions Strategies in Civil Trial Practice," National Business Institute (Jan. 2002, Dec. 1999); "Lawsuits Against the Nursing Home Industry," Tennessee Trial Lawyers (Feb. 2000); "How to Prepare for Mediation and other Practice Tips," Nashville Bar Association (Oct. 2000); "Tennessee Expert Witness," Lorman Education Services (July 2000); "Using Focus Groups to Get the Settlement or Verdict Your Client Deserves," Tennessee Trial Lawyers (Feb. 1999). *Member*: Tennessee Trial Lawyers (Secretary, 2007; Board of Governors, 2002-2005; Chair Continuing Legal Education Committee 2004-05); Nashville Bar Foundation (Fellow); Tennessee Justice Center, Inc. (Board of Directors, 2002-05, Secretary-Treasurer, 2003-04); Nashville Lawyer's Association for Women (President, 2004-05; President-elect 2003-04; Director, 2002-03; Treasurer, 2000-02; Board, 1998-present); Davidson County, Tennessee Metropolitan Board of Equalization, 2000-04; Harry Phillips American Inn of Courts (Executive Committee, 2004-05; Member, 2004 - 2008, 1997-99); Nashville Bar Association; Tennessee Bar Association; American Association of Trial Lawyers.

**JOY A. KRUSE**, born Buffalo, New York, February 24, 1955. Admitted to practice in Washington, D.C., 1984; California; U.S. Supreme Court; U.S. Courts of Appeals for the District of Columbia, Ninth, and Federal Circuits; U.S. District Courts for the Northern and Eastern Districts of California, 1989. *Education*: Harvard Law School (J.D., 1984); Wellesley College (B.A., 1977). *Employment*: Assistant Federal Public Defender, Northern District of California, 1992-96; Public Defender Service, Washington D.C., 1984-89. *Member*: Phi Beta Kappa; State Bar of California; Bar Association of San Francisco.

**CARYN BECKER**, born Johannesburg, South Africa, January 10, 1973. Admitted to practice in California, 1998; U.S. District Court, Northern District of California, U.S. District Court, Central District of California; U.S. Court of Appeals, Ninth Circuit, 1999. *Education*: Duke Law School (J.D., with honors, 1998); Technical Editor, *Law and Contemporary Problems*; Articles Editor, *Duke Journal of Gender Law & Policy*; Phi Beta Kappa; University of California at Berkeley (B.A., with high honors, 1995). *Publications*: Contributing Author, *California Class Actions Practice and Procedures (*Elizabeth J. Cabraser editor in chief, 2003). *Member*: American Bar Association; State Bar of California; Bar Association of San Francisco.

**STEPHEN H. CASSIDY**, born Pittsburgh, Pennsylvania, May 14, 1964. Admitted to practice in California, 1989; U.S. District Court, Northern District of California and U.S. Court of Appeals, Ninth Circuit, 1997. *Education*: Hastings College of the Law (J.D., *magna cum laude*, 1989); Associate Managing Editor, *Hastings International and Comparative Law Review*, 1988-89; Order of the Coif; Member, Thurston Society; Recipient, American Jurisprudence Awards for Real Property, Evidence and American Legal History; Georgetown University

(B.S.F.S., 1986). *Employment*: Law Clerk to Magistrate-Judge Joan S. Brennan, U.S. District, Northern District of California, 1989-90; Motions Attorney, U.S. Court of Appeals, Ninth Circuit, 1992-94, 1996-97. *Publications/Presentations*:  "Internet Marketing for Plaintiffs' Firms," CAOC Conference (May 2004); "Enhancing the Role of Law Firm Marketing Departments," LexisNexis Law Firm Marketers' Roundtable (November 2003); Contributing Author, *California Class Actions Practice and Procedures (*Elizabeth J. Cabraser editor in chief, 2003); Co-Author, "Decisions Interpreting California's Rules of Class Action Procedure," in *Survey of State Class Action Law* (ABA 2001); "The Newest Member of the Nuclear Club: Pakistan's Drive for a Nuclear Weapon's Capability," 12 *Hastings Int'l & Comp. L. Rev.* 679 (1989). *Member*:  State Bar of California; Bar Association of San Francisco; American Bar Association (Litigation Section); Trial Lawyers for Public Justice; Fight for Justice Campaign; Consumer Attorneys of California.

*RACHEL GEMAN*, born Northampton, Massachusetts, August 7, 1971.  Admitted to practice in New York, 1998; Southern and Eastern Districts of New York, 1999; U.S. District Court, Eastern District of Michigan, 2005; U.S. District Court of Colorado, 2007.  *Education*: Columbia University School of Law (J.D. 1997); Stone Scholar; Equal Justice America Fellow; Human Rights Fellow; Editor, *Columbia Journal of Law and Social Problems*; Harvard University (A.B. *cum laude* 1993).  *Employment*: Adjunct Professor, New York Law School; Special Advisor, United States Mission to the United Nations, 2000; Law Clerk to Judge Constance Baker Motley, U.S. District Court, Southern District of New York, 1997-98.  *Awards and Honors*:  *Distinguished Honor Award*, United States Department of State, 2001. *Publications/Presentations*: "The New York Employee Advocate," Co-Editor, 2005-Present (Volumes 12 and forward); "Evidence and Jury Instructions in FLSA Actions," Georgetown Law Center/ACL-ABA (2007); "Crucial Events in the 'Life' of an FLSA Collective Action: Filing Considerations and the Two-step 'Similarly-Situated' Analysis," National Employment Lawyers Association, Annual Convention (2006) (Author & Panelist); "Time is Money, Except When It's Not: Compensable Time and the FLSA,"  National Employment Lawyers Association, Impact Litigation Conference (2005) (Author & Panelist); "Electronic Discovery," Federal Judicial Center & Institute of Judicial Administration, Workshop on Employment Law for Federal Judges (2005) (Panelist); "Image-Based Discrimination and the BFOQ Defense," *EEO Today* (Vol. 9, Issue 1, Fall 2004) (Author); "Fair Labor Standards Act Overtime Exemptions: Proposed Regulatory Changes," *New York State Bar Association Labor and Employment Newsletter* (Spring 2004) (Author);  "Current Topics in Fair Labor Standards Act Litigation," Conference, Association of the Bar of the City of New York (2003, Chair & Panelist); "Workforce Without Borders," ABA Section of Labor & Employment Law, EEOC 2003 Midwinter Meeting (Moderator).  *Member*: Board Member, National Employment Lawyers' Association/New York; American Bar Association, Sections of Labor and Employment Law, EEO Committee (Plaintiffs' Vice Chair).

*BRUCE W. LEPPLA*, born Oakland, California, September 6, 1949.  Admitted to practice in California, 1976; U.S. District Court, Northern District of California; U.S. District Court, Central District of California, 2007; U.S. Court of Appeals, Ninth Circuit, 1976; New York, 1978. *Education*:  Boalt Hall School of Law, University of California (J.D., 1975); M.G. Reade Scholarship Prize, Boalt Hall School of Law; University of California, Berkeley (M.A., Economics, with honors, 1974); Yale University (B.A., *magna cum laude*, Highest Honors in Economics, 1971). *Employment*:  California Bankers Insurance Services Inc. (CEO, President

and General Counsel), 1998-2000; Redwood Bank (CEO, President and General Counsel), 1986-98; Lasky, Haas, Cohler & Munter, 1980-82; Brobeck, Phleger & Harrison, 1980; Davis, Polk & Wardwell, 1976-80. *Teaching Positions*: Lecturer, California Bankers Association General Counsel Seminars, Lending Documentation, Financial Institutions Litigation and similar topics, 1994-97; Lecturer, University of California at Berkeley, Haas School of Business, Real Estate Law and Finance, 1993-96. *Publications*: "Stay in the Class or Opt-Out? Institutional Investors Are Increasingly Opting-Out of Securities Class Litigation," Securities Litigation Report, Vol. 3 No. 8, September 2006, West Legalworks; reprinted by permission of the author in Wall Street Lawyer, October 2006, Vol. 10. No. 10, West Legalworks; "Selected Waiver: Recent Developments in the Ninth Circuit and California", Part 1; Elizabeth J. Cabraser, Joy A. Kruse and Bruce W. Leppla; Securities Litigation Report, May 2005, vol. 1, no.9. pp. 1, 3 – 7; "Selected Waiver: Recent Developments in the Ninth Circuit and California", Part 2; Elizabeth J. Cabraser, Joy A. Kruse and Bruce W. Leppla; Securities Litigation Report, June 2005, vol. 1, no. 10. pp. 1, 3 – 9; Author or co-author of 11 different U.S. and International patents in electronic commerce and commercial product design, including "A Method for Storing and Retrieving Digital Data Transmissions," United States Patent No. 5,659,746, issued August 19, 1997; Author, "Securities Powers for Community Banks," *California Bankers Association Legislative Journal* (Nov. 1987). *Member*: Wall Street Lawyer, a Thompson West publication (Editorial Board); State Bar of California; State Bar of New York; Yale University Alumni Board of Directors (Director, 2001-present); California Bankers Association (Director, 1996-98); California State Small Business Development Board, 1989-1997; University of California at Berkeley, Boalt Hall Alumni Board of Directors, 1993-96; Leadership Council, San Francisco Chamber of Commerce, 1990-1992; Community Reinvestment Institute (Founding Director, 1989-1990).

     **SCOTT P. NEALEY**, born Champaign, Illinois, July 28, 1966. Admitted to practice in California, 1997; U.S. District Court, Northern District of California, 1998; U.S. District Court, Eastern District of California, 1998; U.S. Court of Appeals, Ninth Circuit, 1999; U.S. District Court, Central District of California, 2000. *Education*: Boalt Hall School of Law, University of California (J.D., 1996); University of California at Berkeley (B.A., 1988). *Employment*: Law Clerk to Chief Justice Joseph R. Weisberger, Supreme Court of Rhode Island, 1996-97. *Publications*: Contributing Author, *California Class Actions Practice and Procedures (*Elizabeth J. Cabraser editor in chief, 2003). *Member*: Bar Association of San Francisco; State Bar of California.

     **ELIZABETH A. ALEXANDER,** born Morristown, Tennessee, October 4, 1971. Admitted to practice in Tennessee, 1998; U.S. Court of Appeals, Sixth Circuit, 2001; U.S. District Court, Middle District of Tennessee, 2000; U.S. District Court, Eastern District of Tennessee, 2002. *Education*: Vanderbilt University Law School (J.D., 1998); President, Criminal Law Association; Moot Court Board Member; Vanderbilt University Honor Committee; Hollins College (B.A., 1993). *Honors & Awards*: "Lawdragon 500 New Stars" and "Lawdragon 3000 Leading Plaintiffs' Lawyers in America," *Lawdragon* magazine, 2006-2007. *Publications*: *ABA Survey of State Class Action Law* (2003-2007), Tennessee section; "Consumer Class Actions Against Financial Institutions," Lorman Education Services, July 2004. *Prior Employment*: Associate, Dodson, Parker, Dinkins & Behm (2002-03); Associate, Wyatt, Tarrant & Combs (2000-2002); Law Clerk, Honorable Thomas A. Higgins, U.S. District Court for the Middle District of Tennessee (1998-2000). *Member*: State Bar of Tennessee;

Tennessee Bar Association; Nashville Bar Association (Board of Directors, Young Lawyers Division); American Bar Association; Lawyers' Association for Women (2003-2005); American Bar Association Labor and Employment Law Section Equal Employment Opportunity Committee, Co-Chair, Basics Committee (2005-2006); Chair of Internal Marketing and Mentoring Committee (2006-2007); National Employment Lawyers' Association.

     ***DANIEL E. BARENBAUM,*** born Boston, Massachusetts.  Admitted to practice in California, 2000; U.S. Court of Appeals for the Ninth Circuit, U.S.; District Court for the Northern District of California; U.S. District Court for the Central District of California; U.S. District Court for the Southern District of California.  *Education*:  Emory School of Law (J.D., 2000); Goizueta Business School, Emory University (M.B.A., 2000, Award:  Most Outstanding Academic Accomplishment); Tufts University (B.A., 1994).  *Publications*: "Delineating Covered Class Actions Under SLUSA," Securities Litigation Report, December-January 2005; Contributing Author, *California Class Actions Practice and Procedures* (Elizabeth J. Cabraser editor-in-chief, 2003); Co-Author, *Class Certification of Medical Monitoring Claims in Mass Tort Product Liability Litigation* (ALI-ABA Course of Study, 1999).  *Member*: State Bar of California; Bar Association of San Francisco.

     ***DANIEL P. CHIPLOCK***, born Albany, New York.  Admitted to practice in New York, 2001; U.S. District Court, Southern District of New York, 2001; U.S. District Court, Eastern District of New York, 2001.  *Education*:  Stanford Law School (J.D., 2000); Article Review Board, *Stanford Environmental Law Journal*; Recipient, Keck Award for Public Service; Columbia University (B.A., *summa cum laude*, 1994); Phi Beta Kappa.  *Member*:  State Bar of New York; American Association for Justice; Fight for Justice Campaign; Public Justice.

     ***MARK P. CHALOS***, born New York, New York, September 3, 1973.  Admitted to practice in Tennessee, 1998; U.S. Court of Appeals, Sixth Circuit, 1998; U.S. District Court, Middle District of Tennessee, 2000; U.S. District Court, Western District of Tennessee, 2002; U.S. District Court, Eastern District of Tennessee, 2006; U.S. District Court, Northern District of Florida, 2006; U.S. District Court, Northern District of California, 2007.  *Education*:  Emory University School of Law (J.D., 1998); Dean's List; Award for Highest Grade, Admiralty Law; Research Editor, *Emory International Law Review*; Phi Delta Phi Legal Fraternity; Vanderbilt University (B.A., 1995).  *Publications, Presentations, Appointments*:  "The End of Meaningful Punitive Damages," *Nashville Bar Journal*, November 2001; "Is Civility Dead?" *Nashville Bar Journal*, October 2003; "The FCC: The Constitution, Censorship, and a Celebrity Breast," Nashville Bar Journal, April 2005.  *Member*: American Bar Association; Fight for Justice Campaign; Tennessee Bar Association; Board of Directors, Tennessee Trial Lawyers Association; Nashville Bar Association; Past-Chair, ABA YLD Criminal & Juvenile Justice Committee; American Bar Association Tort Trial and Insurance Practice Section Professionalism Committee YLD liaison; Board of Directors, Nashville Bar Association YLD; Chair, Nashville Bar Association YLD Continuing Legal Education; *Nashville Bar Journal*, Editorial Board; Member, Harry Phillips American Inn of Court (2002-2004); Grant Review Panelist, Metropolitan Nashville Arts Commission; Founding Member, Young Professionals Program, Frist Center for the Visual Arts; President, Kappa Chapter of Kappa Sigma Fraternity Alumni Association.

**NICHOLAS R. DIAMAND**, born London, England.  Admitted to practice in New York, 2003; U.S. District Court, Southern, Eastern, Northern, and Western Districts of New York; US. Court of Appeals, Seventh Circuit.  *Education*:  Columbia University School of Law (LL.M., Stone Scholar, 2002); College of Law, London, England (C.P.E.; L.P.C.; Commendation, 1997); Columbia University (B.A., *magna cum laude,* 1992).  *Employment*: Solicitor, Herbert Smith, London (1999-2001); Law Clerk to the Honorable Edward R.  Korman, Chief Judge, U.S. District Court, Eastern District of New York (2002-03).  *Publications/Presentations:* Contributing Author, *California Class Actions Practice and Procedure* (Elizabeth J. Cabraser, Editor-in-Chief), 2006; Panelist, "Obstacles to Access to Justice in Pharmaceutical Cases," *Pharmaceutical Regulation and Product Liability*, British Institute of International and Comparative Law, April 21, 2006; Panelist, "Pre-Trial Discovery in the United States," Union Internationale des Avocats, Winter Seminar, February 2006; Columnist, *The New York Employee Advocate*, NELA/NY, February 2006-present.  *Member*:  New York City Bar Association, Trial Lawyers for Public Justice, American Society of International Law, Law Society of England and Wales.

## OF COUNSEL

**ROBERT L. LIEFF**, born Bridgeport, Connecticut, September 29, 1936.  Admitted to practice in California, 1966; U.S. District Court, Northern District of California and U.S. Court of Appeals, Ninth Circuit, 1969; U.S. Supreme Court, 1969; U.S. Court of Appeals, Seventh Circuit, 1972; U.S. Tax Court, 1974; U.S. District Court, District of Hawaii, 1986.  *Education*: Columbia University (M.B.A., 1962; J.D., 1962); Cornell University; University of Bridgeport (B.A., 1958).  Member, Columbia Law School Dean's Council; Member, Columbia Law School Board of Visitors (1992-present); Member, Columbia Law School Center on Corporate Governance Advisory Board (2004).  *Member*:  Bar Association of San Francisco; State Bar of California (Member: Committee on Rules of Court, 1971-74; Special Committee on Multiple Litigation and Class Actions, 1972-73); American Bar Association (Section on Corporation, Banking and Business Law); Lawyers Club of San Francisco; San Francisco Trial Lawyers Association; California Trial Lawyers Association; Consumer Attorneys of California; Fight for Justice Campaign.  *Awards and Honors*:  "Northern California Super Lawyers," *Law & Politics*, 2005 - 2007.

**MORRIS A. RATNER**, born San Jose, California, November 13, 1966.  Admitted to practice in California, 1991; District of Columbia, 1999; New York, 2000; U.S. District Court, Northern, Central and Southern Districts of California; and U.S. Court of Appeals, Second, Third, Sixth and Ninth Circuits.  *Education*:  Harvard University (J.D., 1991); Stanford University (B.A., with distinction, 1988); Phi Beta Kappa.  *Publications*:  Contributing Author, *California Class Actions Practice and Procedures (*Elizabeth J. Cabraser editor in chief, 2003); "Factors Impacting the Selection and Positioning of Human Rights Class Actions in United States Courts:  A Practical Overview," 58 *New York University Annual Survey of American Law* 623 (2003); "The Settlement of Nazi-Era Litigation Through the Executive and Judicial Branches," 20 *Berkeley Journal of International Law* 212 (No. 1, March 2002).  *Member*:  State Bar of California; State Bar of New York; Bar of the District of Columbia; Bar Association of San Francisco.

**WILLIAM B. HIRSCH**, born Los Angeles, California, May 19, 1951.  Admitted to practice in California, 1983; U.S. District Court, Northern District of California; U.S. District Court, District of Hawaii, 1991.  Education: Harvard University ( J.D., 1983); Princeton University (M.A., 1975); University of California at Santa Cruz (B.A., with highest honors, 1973).  Awards and Honors: Trial Lawyer of the Year, Trial Lawyers for Public Justice, 1995.  Publications: "Justice Delayed: Seven Years Later & No End In Sight," in The Exxon Valdez Disaster: Readings on a Modern Social Problem (Kendall & Hunt Pub. Co. 1996).  Member: Bar Association of San Francisco; State Bar of California; Trial Lawyers for Public Justice; The Association of Trial Lawyers of America; ACLU of Northern California (Steering Committee, 1993-94).

## ASSOCIATES

**REBECCA BEDWELL-COLL**, born Ridgewood, New Jersey, May 27, 1971.  Admitted to practice in California, 1996; U.S. District Court, Northern District of California, 1996; U.S. District Court, Central District of California, 1996; District of Columbia, 2007.  *Education*: Boalt Hall School of Law, University of California, Berkeley, (J.D., 1996); University of Michigan, Ann Arbor, (B.A. 1993).

**NANCY CHUNG**, born Los Angeles, February 21, 1972.  Admitted to practice in California, 2003; U.S. Court of Appeals for the Ninth Circuit, 2003; U.S. District Court, Northern District of California, 2007.  Education:  Hasting College of Law (J.D., 2002); University of California, Santa Cruz (B.A., Language Studies, 1995).  Prior Employment: International Labor Organization, Geneva, Switzerland (2000-2001); Peace Corps Volunteer, Romania (1995-1997).  Member:  Bar Association of San Francisco.  Languages:  French, Romanian and Korean.

**CHRISTOPHER E. COLEMAN**, born Mobile, Alabama, March 30, 1971.  Admitted to practice in Georgia, 2005.  *Education:*  Northwestern University School of Law (J.D., *cum laude*, 2003); Order of the Coif; Associate Editor, *Northwestern University Law Review* (2002-2003); John Paul Stevens Public Interest Fellowship (2002); Northwestern University (M.A., History, 2000); University of Virginia (M.A., English, 1995); Vanderbilt University (B.A., *magna cum laude*, 1993).  *Publications & Presentations:* Contributing Author, "California Class Actions Practice and Procedures" (Elizabeth J. Cabraser, Editor-in-Chief, 2006); "Decades-Old Murder Case Needs Review," Op-Ed, *Chicago Sun-Times*, February 2, 2003; Co-Author, "Social Movements and Social Change Litigation: Synergy in the Montgomery Bus Protest," *Law and Social Inquiry* (Fall 2005); "Fingerprints and False Confessions: The William Heirens Case," Conference Presentation, Conference on False Confessions, Center on Wrongful Convictions, Northwestern University, Chicago, Illinois, March 2002.  *Prior Employment:* Judicial Clerkship, Honorable Joan Humphrey Lefkow, U.S. District Court, Northern District of Illinois, 2003-2005.  Leadership Council for Metropolitan Open Communities (Chicago, Illinois, 2002); Central Alabama Fair Housing Center (Montgomery, Alabama, 1997-1998).  *Member*: American Bar Association; Tennessee Bar Association; Tennessee Trial Lawyers Association; Lawyers Association for Women; Nashville Bar Association YLD (Board of Directors); American Constitution Society, Nashville Lawyers' Chapter (Board of Directors).

**NIMISH R. DESAI**, born Coventry, England, June 25, 1980. Admitted to practice in California, 2006; US District Court; Northern District of California, 2007. *Education*: Boalt Hall School of Law, University of California, Berkeley (J.D., 2006), Finalist and Best Brief, McBaine Moot Court Competition (2006), Moot Court Best Brief Award (2004); University of Texas, Austin, (B.S. & B.A., High Honors, 2002). *Prior Employment*: Extern, Sierra Club Environmental Law Program, 2004; Researcher, Public Citizen, 2003; Center for Energy and Environmental Resources, 2001-2002. *Publications*: "American Chemistry Council v. Johnson: Community Right to Know, But About What? D.C. Circuit Takes Restrictive View of EPCRA," 33 *Ecology L.Q.* 583 (Winter 2006); "Lessons Learned and Unlearned: A Case Study of Medical Malpractice Award Caps in Texas," *The Subcontinental*, (Winter 2004, Vol. 1, Issue 4, pp. 81-87); "Separation of Fine Particulate Matter Emitted from Gasoline and Diesel Vehicles Using Chemical Mass Balancing Techniques", *Environmental Science Technology*, (2003; 37(17) pp. 3904-3909). *Member*: State Bar of California; Bar Association of San Francisco; Consumer Attorneys of California. *Languages*: Gujarati (conversational).

**ALLISON S. ELGART**, born Manhasset, New York, January 27, 1978. Admitted to practice in California, 2006; New York, 2007. *Education*: Harvard Law School (J.D., 2005), Editor-in-Chief, *Harvard Civil Rights-Civil Liberties Law Review*, Vol. 40; Student Attorney, Harvard Legal Aid Bureau, (2003-2005); Brown University (B.A., *magna cum laude* 2000). *Prior Employment*: Law Clerk to Judge Robert P. Patterson, Jr., U.S. District Court, Southern District of N.Y., 2005-2006; Health Advocacy Fellow, Medicare Rights Center, (2000-2002). *Publications*: "Hamdi v. Rumsfeld: Due Process Requires That Detainees Receive Notice and Opportunity to Contest Basis for Detention," 40 Harv. C.R-C.L. L. Rev. 239 (2005). *Member*: American Bar Association; Bar Association of San Francisco; Consumer Attorneys of California; State Bar of California.

**HEATHER A. FOSTER**, born Washington, D.C., October 2, 1970. Admitted to practice in California in 1996; U.S. District Court, Northern District of California, 1996. *Education*: University of the Pacific, McGeorge School of Law (J.D., 1996); Moot Court Honors Board, 1995-96; Trial Advocacy Honors 1996; Boston College (B.A., 1992). *Employment*: Adjunct Professor, San Francisco State University – College of Extended Learning, Paralegal and LNC program (Fall 2000 – Spring 2001). *Publications*: Co-Author, *Class Certification of Medical Monitoring Claims in Mass Tort Product Liability Litigation* (ALI-ABA Course of Study, 1999). *Member*: American Association for Justice; American Bar Association (Litigation Section); Association of Legal Administrators; Bar Association of San Francisco; Legal Assistant Management Association; Phi Alpha Delta; State Bar of California (Volunteer Legal Services Program: Liaison for the Summer Associate Public Service Program – Homeless Advocacy Program, 2002; Teachers in the Schools Program, 2002; Pro Bono Attorney – Family Law Clinic, 1999); Trail Lawyers for Public Justice.

**DAVID P. GOLD**, born New York, New York, December 29, 1967. Admitted to practice in New York, 2004; District of Colorado, 2006; Court of Appeals, Second Circuit, 2007. *Education*: Columbia Law School (J.D., 2002), James Kent Scholar, Articles Editor, *Columbia Law Review*; University of Pennsylvania (Ph.D., 2002), William Penn Fellow; Brown University (A.B., *magna cum laude,* 1990). *Employment*: Law Clerk to Honorable Stephen Reinhardt, U.S. Court of Appeals, Ninth Circuit, 2002-03. *Publications*: "Wildlife Protection and Public Welfare Doctrine," 27 *Colum. J. Envtl. L.* 633 (2002); "A Hitherto Unknown Sanskrit Work Concerning

Mādhava's Power Series for Sine and Cosine," 42 *Historia Scientiarum* 49 (1991). *Member:* State Bar of New York, Southern District of New York, Eastern District of New York; District of Colorado.

**JENNIFER GROSS**, born Sleepy Hollow, New York, July 1, 1969. Admitted to practice in California, 1994; U.S. District Court, Central District of California, 1994. *Education:* RAND Graduate School (M. Phil., 1997); University of Southern California (J.D., 1994); Emory University (B.A., 1991). *Publications:* Co-Author, *Intelligence, Surveillance, and Reconnaissance Force Mix Study: Final Report* (RAND 2003); Co-Author, *Asbestos Litigation Costs and Compensation: An Interim Report* (RAND 2002); Co-Author, *Asbestos Litigation in the U.S.: A New Look at an Old Issue* (RAND 2001); Co-Author, *Class Action Dilemmas: Pursuing Public Goals for Private Gain* (RAND, 2000); Co-Author, *Potential Vulnerabilities of U.S. Air Force Information Systems* (RAND, 1999); Co-Author, "Preliminary Results of the RAND Study of Class Action Litigation," (RAND, 1997). *Member:* State Bar of California.

**DANIEL M. HUTCHINSON**, born Oakland, California, May 25, 1977. Admitted to practice in California, 2005; U.S. Court of Appeals for the Ninth Circuit, 2005; U.S. District Court, Northern District of California, 2005. *Education:* Boalt Hall School of Law, University of California, Berkeley (J.D., 2005), Senior Articles Editor, *African-American Law & Policy Report*, Prosser Prizes in Constitutional Law and Employment Law; University of California, Berkeley Extension (Multiple Subject Teaching Credential, 2002); Brown University (B.A., 1999), Mellon Minority Fellowship (1997-1999). *Employment:* Judicial Extern to the Hon. Martin J. Jenkins, U.S. District Court, Northern District of California, 2004; Law Clerk, Lewis & Feinberg, P.C., 2003-2004; Teacher, Oakland Unified School District, 1999-2002. *Member:* State Bar of California; National Bar Association.

**ANDREW S. KINGSDALE**, born Boston, Massachusetts, November 4, 1974. Admitted to practice in Massachusetts, 2007; New York, 2007. *Education:* Temple University School of Law (J.D. 2006); Temple Journal of Science Technology and Environmental Law; Dartmouth College (B.A. 1996).

**KENT L. KLAUDT,** born Jamestown, North Dakota, September 6, 1968. Admitted to practice in California, 1996; U.S. District Court, Northern District of California, 1997; U.S. District Court, Eastern District of California, 1998; U.S. District Court, Central District of California, 2007. *Education:* University of Minnesota Law School (J.D., 1996); Outside Articles Editor, *Journal of Law & Inequality: A Journal of Theory & Practice*; National Association of Public Interest Law (Summer Fellowship, 1995); University of Minnesota (B.A., 1991). *Prior Employment:* BlueDog, Olson & Small, PLLP, 1995-96; Cartwright & Alexander, LLP, 1996-2001; The Cartwright Law Firm, Inc., 2001-2004. *Publications:* "Hungary After the Revolution: Privatization, Economic Ideology, and the False Promise of the Free Market," *13 Law & Inequality: A Journal of Theory & Practice* 301. *Member:* American Trial Lawyers Association; Consumer Attorneys of California; Trial Lawyers for Public Justice; San Francisco Trial Lawyers Association; National Lawyers Guild.

**KRISTEN E. LAW**, born Parkersburg, West Virginia, April 3, 1974. Admitted to practice in California, 2002. *Education:* Boalt Hall School of Law, University of California, Berkeley (J.D. 2002); Executive Editor, *Ecology Law Quarterly*; Moot Court Advocacy Award;

Moot Court Board; Hopi Appellate Clinic; Ohio Wesleyan University (B.A., *summa cum laude,* 1995); Presidential Scholar. *Member*:  Phi Beta Kappa; State Bar of California.

    ***SHARON M. LEE***, born Richmond, B.C., Canada, January 19, 1975.  Admitted to practice in New York 2002; U.S. District Court, Southern District of New York, 2003; U.S. District Court, Eastern District of New York, 2003; Washington State, 2005.  *Education*:  St. John's University School of Law, (J.D. 2001); *New York International Law Review*, Notes & Comments Editor, 2000-2001; St.  John's University, (M.A. 1998); St. John's University, (B.A. 1997).  *Employment*: Milberg Weiss & Bershad, LLP, 2003-2007.  *Member*:  American Bar Association; Washington State Bar Association.

    ***ANNIKA K. MARTIN***, born New York, New York, September 13, 1979.  Admitted to practice in New York, 2005; U.S. District Court, Southern District of New York, 2005.  *Education:* Law Center, University of Southern California (J.D., 2004); Review of Law & Women's Studies; Jessup Moot Court; Medill School of Journalism, Northwestern University (B.S.J., 2001); Stockholm University (Political Science, 1999).  *Publications*: "Stick a Toothbrush Down Your Throat: An Analysis of the Potential Liability of Pro-Eating Disorder Websites," *Texas Journal of Women & the Law* (Volume 14 Issue 2, Spring 2005); "Welcome to Law School," monthly column on www.vault.com (2001-2004).  *Awards and Honors*: 2005 Wiley W. Manuel Award for Pro Bono Legal Services awarded by the State Bar of California for voluntary provision of legal services to the poor.  *Member*: New York State Bar Association (General Practice Section and Young Lawyers Section); Swedish American Bar Association; American Association for Justice; New York State Trial Lawyers Association; New York County Lawyer's Association.  *Languages*: Swedish (fluent); French (DFA1-certified in Business French); Spanish (conversational).

    ***SHARMILA L. MURTHY***, Smithtown, New York, February 4, 1977.  Admitted to practice in New York, 2005; Tennessee, 2004; U.S. District Court, Middle District of Tennessee, 2004; U.S. Court of Appeals for the Sixth Circuit (2004).  *Education*: Harvard Law School, (J.D., *cum luade* 2003);  Harvard Legal Aid Bureau, (2001-2003); South Asian Law Students Association, (2000-2003); International Law Journal, (2000); Reginald Lewis Summer Fellowship, (2001); Kennedy School of Government, Harvard University, (M.P.A., 2003); Cornell University, (B.S. *with honors* 1997).  *Awards*: Tennessee Alliance for Legal Services New Advocate of the Year, 2006; Nashville Bar Journal Article of the Year, 2006; Skadden Fellowship, 2004; Betty Allebach Award for Public Service at Harvard Legal Aid Bureau, 2003; Kennedy Scholarship at JFK School of Government, 1999; U.S.  Fulbright Award, 1998-1999.  *Publications*: "Lost in Translation?" Interpreters in the Courts," *The Nashville Bar Journal* (2006 ); "SEWA's  Rural  Savings and Credit Program in Gujarat, India," *Kennedy School Review: Student Perspectives 2000*.  *Employment*: Law clerk to Judge Martha Craig Daughtrey, U.S. Court of Appeals for the Sixth Circuit, 2003-2004.  Skadden Fellow and Staff Attorney at Legal Aid Society of Middle Tennessee and the Cumberlands, 2004 – 2007.  *Member*: Nashville Bar Association; Tennessee Bar Association; Lawyers Association for Women; Inn of Court; American Constitution Society; Tennessee Immigrants and Refugee Rights Coalition; Harvard Legal Aid Bureau Alumni Advisory Board.

    ***JAHAN C. SAGAFI***, born Philadelphia, Pennsylvania, December 26, 1971.  Admitted to practice in California, 2003.  *Education*:  Harvard Law School (J.D., 2001); Senior Editor,

*Harvard Civil Rights-Civil Liberties Law Review*, (1999-2001); President, Board of Student Advisers; Harvard College (B.A., *magna cum laude*, 1994). *Employment*: Law Clerk to Judge William W. Schwarzer, U.S. District Court, Northern District of California, 2001-02. *Member*: State Bar of California (Litigation Section Executive Committee); National Employment Lawyers' Association; Association of Trial Lawyers of America; Consumer Attorneys of California; American Bar Association; Bar Association of San Francisco; Fight for Justice Campaign.

**DANIEL E. SELTZ**, born Alexandria, Virginia, April 24, 1974. Admitted to practice in New York, 2004; U.S. District Court, Southern District of New York; Eastern District of New York. *Education*: New York University School of Law (J.D., 2003); *Review of Law and Social Change*, Managing Editor; Hiroshima University (Fulbright Fellow, 1997-98); Brown University (B.A., *magna cum laude*, Phi Beta Kappa, 1997). *Employment*: Law Clerk to Honorable John T. Nixon, U.S. District Court, Middle District of Tennessee, 2003-04. *Publications*: "Remembering the War and the Atomic Bombs: New Museums, New Approaches," in *Memory and the Impact of Political Transformation in Public Space* (Duke University Press, 2004), originally published in *Radical History Review*, Vol. 75 (1998); "Issue Advocacy in the 1998 Congressional Elections," with Jonathan S. Krasno (Urban Institute, 2001); *Buying Time: Television Advertising in the 1998 Congressional Elections*, with Jonathan S. Krasno (Brennan Center for Justice, 2000); "Going Negative," in *Playing Hardball*, with Kenneth Goldstein, Jonathan S. Krasno and Lee Bradford (Prentice-Hall, 2000). *Member*: American Association for Justice; State Bar of New York.

**JENNA M. WHITMAN**, born Palo Alto, California, December 29, 1972. Admitted to practice in California, 2001; U.S. District Court, Northern District of California, 2002; U.S. Court of Appeals, Ninth Circuit, 2002. *Education*: Georgetown University Law Center (J.D., 2001); *Journal of Gender and the Law*, Symposium Committee; Yale College (B.A., with distinction in American Studies, 1995). *Employment*: Law Clerk to U.S. Attorney's Office, Economic Crimes Unit (2000-2001); Howard, Rice, Nemerovski, Canady, Falk & Rabin, P.C. (2001-2004). *Member*: American Bar Association; Bar Association of San Francisco; California Bar Association; Bay Area Lawyers for Individual Freedom; Board Member, AIDS Legal Referral Panel.

**BARBRA L. WILLIAMS,** born Bellflower, California, July 10, 1974. Admitted to practice in California, 2007; U.S. District Court, Northern District of California, 2007; U.S. District Court, Central District of California, 2007; U.S. Court of Appeals, Ninth Circuit, 2007. *Education:* University of California, Hastings College of the Law, (J.D., 2006, Concentration in Civil Litigation); Notes Editor, *Hastings Race & Poverty Law Journal;* UC Hastings Civil Justice Clinic, Individual Wage & Hour Representation; UC Hastings Admissions Policy Committee; Teaching Assistant, Legal Writing & Research; National Black Law Students Association (Sub-Regional Director); Hastings Black Law Students Association (Co-President); University of California, Irvine (B.A., 1997). *Member:* State Bar of California; American Bar Association (Labor & Employment Section); National Bar Association; California Association of Black Lawyers; Bar Association of San Francisco; Charles Houston Bar Association.

**HEATHER H. WONG**, born San Diego, California, July 5, 1978. Admitted to practice in California, 2005; U.S. Court of Appeals, Ninth Circuit, 2005; U.S. District Court,

Central District of California, 2005;  U.S. District Court, Northern District of California, 2006; U.S. District Court, District of Colorado, 2006.  *Education:*  University of San Francisco (J.D. & M.B.A., 2005); Beta Gamma Sigma Honor Society (2005); Technical Editor, *Maritime Law Journal*; University of California, Berkeley (B.A., 2000).  *Member*: State Bar of California; Bar Association of San Francisco; American Bar Association;  Consumer Attorneys of California; Association of Business Trial Lawyers.

Notice on the Firm's AV Rating:  AV is a registered certification mark of Reed Elsevier Properties, Inc., used in accordance with the Martindale-Hubbell certification procedures, standards and policies.  Martindale-Hubbell is the facilitator of a peer review process that rates lawyers.  Ratings reflect the confidential opinions of members of the Bar and the Judiciary. Martindale-Hubbell Ratings fall into two categories – legal ability and general ethical standards.

# EXHIBIT B

1  Kelly M. Dermody (State Bar No. 171716)
   Heather H. Wong (State Bar No. 238546)
2  LIEFF, CABRASER, HEIMANN &
   BERNSTEIN, LLP
3  275 Battery Street, 30th Floor
   San Francisco, CA  94111-3339
4  Telephone:  (415) 956-1000
   Facsimile:  (415) 956-1008
5  email: kdermody@lchb.com
   email: hwong@lchb.com

6  Elizabeth A. Alexander (*pro hac vice*)
   LIEFF, CABRASER, HEIMANN &
7  BERNSTEIN, LLP
   150 Fourth Avenue, North, Suite 1650
8  Nashville, TN  37219-2423
   Telephone:  (615) 313-9000
9  Facsimile:  (615) 313-9965
   email: ealexander@lchb.com

10

11

12  *Attorneys for the Plaintiffs*

13                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF CALIFORNIA
14                    SAN FRANCISCO / OAKLAND DIVISION

15

16  DAISY JAFFE, DENISE WILLIAMS, and       Case No. C-06-3903 TEH
    MARGARET BENAY CURTIS-BAUER,
17  on behalf of themselves and all others   DECLARATION OF ADAM T. KLEIN IN
    similarly situated,                      SUPPORT OF MOTION FOR ORDER
18                                           GRANTING PRELIMINARY APPROVAL OF
                Plaintiffs,                  THE PROPOSED SETTLEMENT
19                                           AGREEMENT
                v.
20
    MORGAN STANLEY & CO.
21  INCORPORATED, f/k/a MORGAN
    STANLEY DW INC.
22
23              Defendant.

24

25

26        I, Adam T. Klein, declare:

27        1.      I am a partner in the firm of Outten & Golden LLP ("O&G"), co-counsel for the

28  Plaintiffs in the above-captioned proposed class action.  I make these statements based on

                                    - 1 -

733709.1

1   personal knowledge and would so testify if called as a witness at trial.

2        2.      This Declaration is submitted in support of Plaintiffs' Motion for Preliminary

3   Approval of Class Action Settlement.

4                **BACKGROUND AND EXPERIENCE OF CO-LEAD COUNSEL**

5        3.      I received my undergraduate degree from the School of Industrial and Labor

6   Relations at Cornell University in 1987, and my law degree from Hofstra University in 1990.  I

7   was admitted to the New York bar in 1991.

8        4.      My legal practice is limited to the prosecution of class action and impact litigation

9   of employment discrimination and wage and hour claims.  I presently serve as lead or co-lead

10  plaintiffs' counsel in a variety of statutory-discrimination class actions in addition to this action,

11  including cases against Smith Barney and Gristede's; I was co-lead plaintiffs' class counsel in a

12  now settled "glass ceiling" gender discrimination class action against MetLife, based on

13  discrimination in promotions and compensation.  This list is not exhaustive.  I also serve as lead

14  or co-lead plaintiffs' counsel on a number of wage and hour class and collective actions.

15       5.      I am a member of the National Employment Lawyers Association (NELA), served

16  on the Executive Board of its New York Affiliate (NELA/NY) from 2000 to 2006, and am the

17  former co-chair of the Class Action Committee of NELA.  I served on the Executive Board of the

18  Employee Rights Section of the American Trial Lawyers Association.  I am a member of the

19  American Bar Association, where I served as the Plaintiffs' Co-Chair of the Committee on

20  Technology and Federal Law Clerks Training Program, and am a member of the Committee on

21  Employee Rights and Responsibilities of the Section of Labor and Employment Law and the

22  Class Action and Derivative Suits Committee of the Section of Litigation.  I am the plaintiffs' co-

23  chair of the largest Committee within the ABA's Labor and Employment Section – the Equal

24  Employment Opportunity Committee.  I am also a member of the Federal Bar Council, a Fellow

25  of the American Bar Foundation, and a member of the Advisory Board of the Labor and

26  Employment Law Program of Cornell University's ILR School.  I am the chair of Outten &

27  Golden's class action practice group.

28       6.      I am admitted in New York and in the federal Second, Ninth, and Eleventh

                                          - 2 -

733709.1

Circuits and the Southern, Eastern, and Western Districts of New York.

7.      I have written articles for a variety of legal publications and have had articles printed and distributed in several publications, including *The Employee Rights and Employment Policy Journal* and *Employee Rights Quarterly.* I have also prepared materials for numerous American Bar Association and National Employment Lawyers Association (NELA) programs. In addition to authoring articles on a variety of employment and litigation-related subjects, I have lectured on employment law matters at meetings, conferences, and MCLE programs sponsored by the American Bar Association, the National Employment Lawyers Association, NELA New York, the New York County Lawyers' Association, the New York City Bar Association, the American Conference Institute, Cornell University's Labor and Employment Law Program, the Human Resources Executive Conference, the Law Education Institute, the Practicing Law Institute, the American Inns of Court, Georgetown University Law Center, New York University School of Law, the Federal Judicial Center, the Federal Bar Council, the Training Program for Regional Solicitor's Office of the U.S. Department of Labor, Snowmass National CLE Conference, the NAACP Legal Defense and Education Fund, Inc., and at the Second Circuit Staff Attorney Training Seminar. I have also testified before the Equal Employment Opportunity Commission.

8.      O&G has the resources and ability to prosecute this case and will continue to properly represent the interests of the class.

9.      Attached to this Declaration as Exhibit A is a O&G's firm resume.

I declare, under penalty of perjury, under the laws of the State of New York that the foregoing is true and correct. Executed this 22th day of October, 2007 at New York, New York.

_____*/s/ Adam T. Klein*_____
ADAM T. KLEIN

733709.1

# EXHIBIT A
# TO EXHIBIT B



| | |
|---|---|
| 3 Park Avenue | Four Landmark Square |
| 29th Floor | Suite 201 |
| New York, NY 10016 | Stamford, CT 06901 |
| 212-245-1000 | 203-363-7888 |

*www.outtengolden.com*

**OUTTEN & GOLDEN LLP** is one of the preeminent law firms representing employees -- "Advocates for Workplace Fairness." The firm's credo is "Excellence and Integrity Above All Else."

O&G focuses on advising and representing individuals in employment, partnership, and related matters. The firm advises individuals on employment and severance agreements; it also handles compensation and benefits issues, including bonuses, commissions, stock and option awards, and family/medical leaves. The firm represents employees with a wide variety of claims, including claims of discrimination and harassment based on sex, sexual orientation, gender identity and expression, race, disability, national origin, religion, and age, as well as retaliation, whistleblower, and contract claims. The firm also handles class and collective wage-and-hour and discrimination cases.

O&G represents clients in administrative proceedings (such as EEOC and Department of Labor), arbitrations (e.g., NYSE, NASD, and American Arbitration Association), and cases in federal and state trial and appellate courts. Before beginning proceedings, the firm often negotiates with employer representatives; it also helps clients help themselves by developing and implementing negotiation tactics and strategies. O&G has substantial experience mediating employment disputes.

The firm's seven Practice Groups are Executives & Professionals, Securities & Financial Services Industry, Sexual Harassment, Disability & Family Responsibilities, LGBT Workplace Rights, Discrimination & Retaliation, and Class Actions.

**Wayne N. Outten**, O&G's managing partner, has represented thousands of employees since 1979. He was named one of the top lawyers in New York by SuperLawyers, one of the "500 Leading Plaintiffs' Lawyers in America" and the "500 Leading Lawyers in America" by Lawdragon, one of "The Best Lawyers in New York" by New York Magazine, one of the "Nation's Best Litigators in Employment Law" by the National Law Journal, and one of the world's Leading Labor & Employment Lawyers by Euromoney Publications, and has been listed in The Best Lawyers in America since 1993. He co-authored The Rights of Employees and Union Members and has written dozens of articles and chapters and given hundreds of presentations on employment law. He was a founding director of the National Employment Lawyers Association, founder and president of its New York affiliate (16 years), and co-founder of Workplace Fairness. He served on the founding Board of the College of Labor & Employment Lawyers, serves on the Council of the ABA Labor & Employment Law Section, and has held many other bar positions.

**Anne Golden** has practiced law since 1979 and has represented employees in trials, appeals, mediations, arbitrations, and negotiations since 1985 in every aspect of employment law. She has appeared as a speaker or panelist on many employment law programs, prepares a periodic digest of employment cases, and co-hosts a monthly seminar for NELA/NY members. Several of her cases have established important principles in the field of employment law. She is a member of the Executive Board and an officer of the National Employment Lawyers Association/New York. She has been listed in "The Best Lawyers in New York" by New York Magazine and The Best Lawyers in America, and has been named in SuperLawyers.

**Adam T. Klein** has represented employees in a full range of employment cases since 1991. A noted authority on class action litigation, he has written numerous articles and is a frequent speaker on class-based statutory discrimination and wage and hour claims. He is a past officer of the National Employment Lawyers

Association/New York and co-chairs several committees of the American Bar Association's Labor & Employment Law Section.

**Laurence S. Moy** has been practicing law since 1985 and is Co-Chair of the firm's Securities and Financial Services Industry practice group. He has extensive experience in arbitration before the NASD and NYSE, as well as trials and other litigation before federal and state courts concerning employment and commercial disputes. He is the author of numerous publications, including "Preparing for Arbitration: A Plaintiff Lawyer's View" in the book <u>How ADR Works</u>. He has been listed in <u>The Best Lawyers in America</u> and has been named in SuperLawyers.

**Gary Phelan,** head of O&G's Connecticut office, practices in Connecticut and New York. He has represented employees since 1989 in all aspects of employment law, including discrimination, wage and hour, and health benefits. He was named one of <u>The Best Lawyers in America</u> as well as a SuperLawyer and co-authored a leading treatise, <u>Disability Discrimination in the Workplace</u>. He has written and lectured on many employment-related topics and has been an adjunct professor at the Quinnipiac University School of Law. He is on the Executive Board of the National Employment Lawyers Association, served as co-chair of its disability rights committee, and served as President of the Connecticut Employment Lawyers Association.

**Kathleen Peratis** has practiced employment, civil rights, and labor law, representing individuals and classes, since 1969. She has written many books and articles on employment issues. She has served as head of the women's rights divisions of the American Civil Liberties Union and of Human Rights Watch and as president of the New York Civil Liberties Union.

**Piper Hoffman** joined O&G in February 2002 after a federal clerkship and after litigating at the Animal Legal Defense Fund. She has advocated for women's rights, prisoners of conscience, abuse victims, and the homeless. She earned her B.A. *magna cum laude* from Brown University in 1994 and her J.D. *cum laude* from Harvard Law School in 1999.

**Justin M. Swartz** received his J.D. with honors from DePaul University in 1998. He has litigated class, multi-plaintiff, and individual cases against public and private employers and has represented employees in alternative dispute resolution procedures. He joined O&G in December 2003.



**Allegra L. Fishel** has represented plaintiffs in civil rights and employment matters since 1986. She has been active in professional organizations related to employee rights, serving as an officer of the National Employment Lawyers Association/New York and as co-chair of the Individual Rights and Responsibilities Committee of the NYSBA's Labor and Employment Law Section. Ms. Fishel lectures frequently on employment law topics.

**Jack A. Raisner** has practiced employment law since 1985. He authored the <u>Pregnancy Discrimination and Parental Leave Handbook</u> (2000), as well as many chapters, articles, and columns on employment topics. He is a tenured Professor of Law at the Tobin College of Business, St. John's University.

**Lewis M. Steel** has practiced since 1963, primarily in the fields of employment, civil rights, labor, and criminal law. He has tried and argued cases nationally, including in the U.S. Supreme Court. His successful employment discrimination class actions have established important legal rights for employees. He has been listed in <u>The Best Lawyers in America</u> since 1991.

**Wendi S. Lazar** has been practicing law since 1993 in many areas of employment law, with a focus on executive employment agreements, non-competition and severance agreements, and multinational employment issues. She also advises clients and attorneys concerning employment-related immigration law. Ms. Lazar's clients are predominantly in the financial services, advertising, entertainment, and new media industries. She has written numerous articles on employment and immigration law and appears frequently on panels in her areas of expertise.

**Nantiya Ruan** has practiced employment law since completing a federal judicial clerkship in 1999-2000. She also has experience as a social worker with a Master's in social work, reflecting her commitment to social justice issues.

**Deborah L. McKenna** has represented plaintiffs in a wide variety of employment matters since 1996. Throughout her legal career, she has been active in the Young Lawyers' Section of the Connecticut Bar Association, and she is a frequent panelist on employment law issues and participates in numerous women's rights organizations in Connecticut.

**René S. Roupinian** has practiced employment law since 1995. She represents employees in class and multi-plaintiff suits under the federal Worker Adjustment and Retraining Notification (WARN) Act. She received her B.A. from the University of Michigan and her J.D. from Michigan State University College of Law.



**Rachel Bien** came to O&G in October 2006 after a clerkship on the U.S. Court of Appeals for the Ninth Circuit. She earned her B.A. from Brown University in 2000 and her J.D. *cum laude* from Brooklyn Law School in 2005, where she also received an Edward V. Sparer Public Interest Law Fellowship.

**Cara E. Greene** joined O&G in August 2005. She received her B.A. from Gordon College in 2000 and her J.D. from Fordham University School of Law in 2005.

**Mark R. Humowiecki** joined O&G in September 2004 after a federal clerkship and a Skadden Fellowship focusing on workers' rights at the Legal Aid Society. He earned his B.A. *magna cum laude* in 1994 from Yale University and his J.D. in 2001 from Yale Law School.

**Carmelyn P. Malalis** joined O&G in February 2004 after clerking in the Southern District of New York and working at Sullivan & Cromwell LLP. She received her B.A. from Yale University in 1996 and her J.D. from Northeastern University School of Law in 2001.

**Stephanie M. Marnin** joined the Connecticut office of O&G in 2006. She earned her B.A. in 1992 and her M.A. in 1994 from the University at Albany, SUNY, and her J.D. from the University of Connecticut School of Law in 2006.

**Tammy Marzigliano** joined O&G in April 2004 after practicing employment law with Gary Phelan, LLC in West Hartford, Connecticut. Tammy received her B.A. from Hofstra University and her J.D. *magna cum laude* from Quinnipiac University School of Law in 2001. She is admitted to practice in Connecticut and New York.

**Ossai Miazad** joined O&G in July 2007. She received her B.A. from Vassar College in 1998. Since receiving her J.D. with honors from the American University Washington College of Law in 2004, she has represented plaintiffs in civil rights and employment matters.

**ReNika C. Moore** came to O&G in October 2004 after a federal clerkship in the Southern District of New York. She earned her A.B. *cum laude* from Harvard-Radcliffe in 1999 and her J.D. from Harvard Law School in 2003.

**Linda A. Neilan** joined O&G in September 2002 after a federal clerkship. She received her B.S. magna cum laude from the University of Scranton in 1994, her M.A. from San Francisco State University in 1999, and her J.D. with honors from Rutgers School of Law-Newark in 2001.

**Tara Lai Quinlan** joined O&G in August 2006 after a clerkship with the United States Court of Appeals for the Second Circuit. She received her B.A. from the University of California, Berkeley, in 1998, and her J.D. from Northeastern University School of Law in 2004.

**Anjana Samant** joined O&G in July 2004 after a federal judicial clerkship with the Honorable Martha Vazquez, Chief District Judge in the District of New Mexico. She received her B.A. from Cornell University in 1997 and her J.D. from New York University School of Law in 2001, where she also completed a research and teaching fellowship in constitutional law as the 2001-2002 Derrick A. Bell Fellow.

**EXHIBIT C**

James M. Finberg (SBN 114850)
Eve H. Cervantez (SBN 164709)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jfinberg@altshulerberzon.com
Email: ecervantez@altshulerberzon.com

Kelly M. Dermody (SBN 171716)
Heather H. Wong (SBN 238546)
LIEFF, CABRASER, HEIMANN &
   BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
Email: kdermody@lchb.com
Email: hwong@lchb.com

Adam T. Klein (*pro hac vice*)
Piper Hoffman (*pro hac vice*)
Justin Schwartz (*pro hac vice*)
OUTTEN & GOLDEN LLP
3 Park Avenue, 29th Floor
New York, NY 10016
Telephone: (212) 245-1000
Facsimile: (212) 977-4005
Email: atk@outtengolden.com
Email: ph@outtengolden.com
Email: jms@outtengolden.com

*Attorneys for the Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAISY JAFFE, DENISE WILLIAMS, and MARGARET BENAY CURTIS-BAUER, on behalf of themselves and all others similarly situated,<br>Plaintiffs,<br><br>v.<br><br>MORGAN STANLEY DW, INC.,<br><br>Defendant. | Case No. C 06-3903 TEH<br><br>**CLASS ACTION**<br><br>DECLARATION OF JAMES M. FINBERG IN SUPPORT OF MOTION FOR ORDER GRANTING PRELIMINARY APPROVAL OF THE PROPOSED SETTLEMENT AGREEMENT<br><br>Date: November 26, 2007<br>Time: 1:30 p.m.<br>Courtroom: 12 |

1    I, James M. Finberg, declare as follows:

2        1.    I am a partner with Altshuler Berzon LLP, one of the firms serving as counsel for

3    the Plaintiffs. I am a member in good standing of the bar of the State of California, as well as the

4    U.S. District Courts in California. I make these statements based on personal knowledge, or

5    information from colleagues with whom I worked on this matter.

6        2.    This Declaration is submitted in support of Plaintiff Curtis-Bauer's Motion for an

7    Order Granting Preliminary Approval of the Proposed Settlement Agreement.

8                            **My Background And Experience**

9        3.    I received a Bachelor of Arts degree, with honors in history and environmental

10   studies, from Brown University in 1980. I received a Juris Doctor degree from the University of

11   Chicago Law School in 1983. At the University of Chicago Law School, I was the Executive

12   Editor of the *University of Chicago Law Review.*

13       4.    From Fall 1983 through Summer 1984, I served as a law clerk to the Honorable

14   Charles L. Levin, a Justice of the Supreme Court of the State of Michigan.

15       5.    Since 2005, I have been selected by Best Lawyers in America as one of the best

16   lawyers in America in the field of law and employment law. I am a fellow of the American

17   College of Labor and Employment Lawyers. Since 2004, I have been designated by San

18   Francisco Magazine as a Northern California "Super Lawyer," including being listed as one of the

19   top 100 attorneys in Northern California since 2005. In 2003, I was selected by The Recorder

20   legal newspaper (based on a survey of judges, arbitrators, mediators, and lawyers in the field) as

21   the top plaintiffs' securities litigator in the San Francisco Bay Area. In 2004, I was selected by

22   The Recorder legal newspaper as one of the top plaintiffs' employment litigators in the San

23   Francisco Bay Area. In 2006, I was selected by The Daily Journal as one of the Top 100 lawyers

24   in California.

25       6.    In 2005, I served as the President of the Bar Association of San Francisco. From

26   2000-2001, I served as Co-Chair of the delegation of Lawyer Representatives from the Northern

27   District of California to the Ninth Circuit Judicial Conference. From 1997-1998, I served as co-

28   chair of the Lawyers' Committee for Civil Rights of the San Francisco Bay Area.

DECLARATION OF JAMES M. FINBERG
CASE NO. 06-3903 TEH

1       7.     I am a co-author of "Statistical and Other Expert Proof," in *Employment*

2  *Discrimination Law* (4th ed., Lindemann and Grossman). I also edited the 2000 and 2002

3  Cumulative Supplements to Chapter 39, "Statistical Proof," of that treatise (3d ed.). I was an

4  editor of *Securities Litigation Report* (Glasser Legal Works, 2004-2006) and a contributor to

5  *Wage and Hour Laws: A State-by-State Survey* (BNA, 2004) and to *Fair Labor Standards Act*:

6  2004 Cumulative Supplement (BNA, 2004).

7       8.     In addition, I am author or co-author of the following articles, among others: Co-

8  Author with Peter E. Leckman, "Holding Customers Who Assist Securities Fraud Accountable

9  Under State Law," *Securities Litigation Report* (Vol. 3, No. 5, May 2006); Author, "State Law

10  Wage/Hour Class Actions: Alive And Well In Federal Court," ABA Labor and Employment

11  Section 2005; Co-Author with Melissa Matheny, "A Developing Consensus: The PSLRA's

12  'Basis' Requirement Does Not Require the Disclosure of Confidential Sources in a Complaint,"

13  *Securities Litigation Report* (Vol. 2, No. 1, July/August 2005) (Glasser Legal Works). Co-Author

14  with Chimène I. Keitner, "New Overtime Regulations Require Heightened Vigilance," *San*

15  *Francisco Attorney Magazine*, Spring 2004; Co-Author with Chimène I. Keitner, "Summary of

16  Proposed DOL Regulations Re FLSA Overtime Exemptions" (2003) (American Bar Association -

17  Labor and Employment Law, Federal Labor Standards Legislation Committee Annual Report);

18  "Title VII's Remedial Scheme: Employment Discrimination Class Actions at the Crossroads,"

19  *San Francisco Attorney* (August/September 2002); "Certification of Employment Discrimination

20  Actions After The Passage of the 1991 Civil Rights Act: (b)(2) or Not (b)(2), That Is The

21  Question," *Class Actions & Derivative Suits*, Vol. 10 (March 2000); Co-Author with Joshua P.

22  Davis, "Allison v. Citgo Petroleum Corp.- A Noble Retreat," *Class Actions & Derivative Suits*,

23  Vol. 9, No. 1 (Winter 1999); Co-Author with Kelly Dermody, "Discovery in Employment

24  Discrimination Class Actions," in *Litigation and Settlement of Complex Class Actions* (Glasser

25  Legal Works 1998); Co-Author with Melanie M. Piech, "The Impact of the Private Securities

26  Litigation Reform Act: Unintended Consequences," *Securities Reform Act Litigation Reporter*,

27  Vol. 6, No. 3 (Dec. 1998); Co-Author with Karen Jo Koonan, "The Importance of Anecdotal

28  Testimony to the Jury Trial of a Title VII Class Action: Lessons from Butler v. Home Depot,"

DECLARATION OF JAMES M. FINBERG
CASE NO. 06-3903 TEH

1   *Class Actions & Derivative Suits*, Vol. 8, No. 3 (Summer 1998); "Northern District of California

2   Requires Internet Posting of Pleadings And Key Briefs In Securities Actions," *Securities Reform*

3   *Act Litigation Reporter* (1997); "Class Actions: Useful Devices That Promote Judicial Economy

4   And Provide Access to Justice," 41 *New York Law School Law Review* 353 (1997); Co-Author

5   with Melvin R. Goldman, "Deposing Expert Witnesses" in *Taking Depositions* (ABA) (1989);

6   Co-Author with George C. Weickhardt, "New Push For Chemical Weapons," *Bulletin of the*

7   *Atomic Scientist* (Nov. 1986); Comment, "The General Mining Law and The Doctrine of Pedis

8   Possessio: The Case For Congressional Action," 49 *University of Chicago Law Review* 1027

9   (1982).

10       **9.**       During my approximately 23 years of practice, I have served as an attorney in

11   many complex class actions.  I have represented plaintiff classes in class actions on dozens of

12   occasions, and I have served as the principal, or lead, attorney representing a plaintiff class in

13   well over a dozen cases, including the following:  *Butler v. Home Depot*, No. C94 4335 SI (N.D.

14   Cal.) (settlement of $87.5 million, plus comprehensive injunctive relief, in gender discrimination

15   case in 1998); *Rosenburg v. Int'l Bus. Machines Corp.*, No. CV 06-00430 PJH (N.D. Cal.) ($65

16   million settlement of wage and hour class and collective action in 2007); *Satchell v. Federal*

17   *Express Corp.*, C03-2659 SI; C03-2878 SI (N.D. Cal.) (settlement of $55 million, plus

18   comprehensive injunctive relief, of race and national origin discrimination claims in 2007); *Frank*

19   *v. United Airlines*, No. C92 0692 MJJ (N.D. Cal.) ($36.5 million gender discrimination settlement

20   in 2004); *Giannetto v. CSC Corp.*, No. CV 03-8201 (C.D. Cal.) ($24 million settlement of wage

21   and hour case in 2005); *Gerlach v. Wells Fargo & Co.*, No. 05-00585 CW (N.D. Cal.) ($12.8

22   million settlement of wage and hour class and collective action in 2007); *Trotter v. Perdue*

23   *Farms*, Case No. 99 893 (RRM) (D. Del.) ($10 million settlement in wage and hour case in

24   2002); *Thomas v. CSAA*, No. CH217752 (Alameda County Sup. Ct.) ($8 million settlement of

25   insurance claim adjuster overtime case in 2002); *Gottlieb, et al v. SBC Communications, et al.*,

26   No. CV-00-4139 AHM (C.D. Cal.) ($10 million ERISA settlement in 2002); *Buttram v. UPS*, No.

27   97-1590 MJJ (N.D. Cal.) ($12.2 million settlement, plus comprehensive injunctive relief, of race

28   discrimination action, in 1999); *Church v. Consolidated Freightways, Inc.*, 1993 WL149840

DECLARATION OF JAMES M. FINBERG
CASE NO. 06-3903 TEH

1   (N.D. Cal.) ($13.5 million settlement in age discrimination case in 1993); *In re California Micro*

2   *Devices Sec. Litig.*, C 94 2817 VRW (N.D. Cal.) ($26 million in settlements – approximately

3   100% of losses); *In re Network Associates, Inc. Sec. Litig.*, C 99 1729 WHA (N.D. Cal.) ($30

4   million settlement in 2001); *In re Mediavision Tech. Sec. Litig.*, C 94 1015 EFL (N.D. Cal.)

5   (settlements and judgments totaling $218 million).

6        10.   In September 2003, I served as one of three primary trial counsel representing

7   plaintiffs in a three-week class and collective action liability phase trial involving approximately

8   2,700 insurance claims adjustors in *In Re: Farmers Insurance Exchange Claims Representatives'*

9   *Overtime Pay Litigation*, No. MDL Docket No. 1439 (D. Or.).  On November 6, 2003, Judge

10  Robert E. Jones ruled in favor of the auto and low-level adjustors.  The Court found that Farmers

11  had acted willfully in violating the FLSA, and that the auto and low-level property adjustors were

12  entitled to liquidated damages as well as actual damages.  During 2004 and 2005, I and

13  colleagues tried the damages phase of that case.  Judgments totaling approximately $52.5 million

14  were entered for plaintiffs in 2005.  On March 30, 2007, a three-judge panel of the Ninth Circuit

15  affirmed in part, reversed in part, and remanded to the District Court.  *In re Farmers Ins. Exch.,*

16  *Claims Reps. Overtime Pay Litig.*, 481 F.3d 1119 (9th Cir.).

17       11.   Attached as Exhibit A is a true and correct copy of the firm resume of Altshuler

18  Berzon LLP.

19                     **Fair, Reasonable, And Adequate Settlement**

20       12.   I attended three face-to-face mediation sessions in this action, presided over by an

21  experienced mediator, Hunter Hughes.  The first mediation session I attended was in March,

22  2007. I also participated in several telephone conferences and e-mail exchanges regarding the

23  negotiation of the terms of the Consent Decree.  The proposed settlement was negotiated at arms'

24  length.

25       13.   I believe the injunctive relief and monetary relief in this proposed settlement is

26  fair, reasonable, and adequate, when balancing the strengths of the class's claims with the risks,

27  costs, and delay attendant in ongoing litigation.  I base my opinions regarding the fairness,

28  reasonableness, and adequacy of the proposed settlement on my analysis of the statistics relevant

DECLARATION OF JAMES M. FINBERG
CASE NO. 06-3903 TEH

1    to Plaintifs' claims, my participation in the mediation discussions, the injuncitve and monetary

2    relief provided in the proposed settlement, and my experience prosecuting other large

3    employment discrimination class actions.

4

5         I declare under penalty of perjury, under the laws of the United States, that the foregoing

6    is true and correct.  Executed this $\underline{22}$ day of October, 2007 at San Francisco, California.

7

8                                                    James M. Finberg

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JAMES M. FINBERG
CASE NO. 06-3903 TEH

Exhibit A

**ALTSHULER BERZON LLP**

ATTORNEYS AT LAW

177 POST STREET, SUITE 300

SAN FRANCISCO, CALIFORNIA 94108

(415) 421-7151

FAX (415) 362-8064

www.altshulerberzon.com

FRED H. ALTSHULER
STEPHEN P. BERZON
EVE H. CERVANTEZ
BARBARA J. CHISHOLM
JEFFREY B. DEMAIN
REBEKAH B. EVENSON
JAMES M. FINBERG
EILEEN B. GOLDSMITH
LAURA P. JURAN
SCOTT A. KRONLAND
PETER E. LECKMAN
DANIELLE E. LEONARD
STACEY M. LEYTON
LINDA LYE
PETER D. NUSSBAUM
KATHERINE M. POLLOCK
DANIEL T. PURTELL
MICHAEL RUBIN
REBECCA SMULLIN
PEDER J. THOREEN
JONATHAN WEISSGLASS

JAMIE L. CROOK
FELLOW

### *Summer 2007*

Altshuler Berzon LLP is a San Francisco litigation firm that specializes in labor and employment, environmental, constitutional, campaign and election, and civil rights law. Although most of our cases are in federal and state courts in California, we appear regularly in courts throughout the country and before administrative agencies such as the National Labor Relations Board.

In past years, the firm's lawyers have won major victories in the cases described below. Citations to published decisions follow at the end of this resume.

## LABOR AND EMPLOYMENT

\* *UAW v. Johnson Controls* (Supreme Court): Prohibited employers from adopting "fetal protection" policies that discriminate against female workers in violation of Title VII.

\* *UAW v. Brock* (Supreme Court): Compelled the Department of Labor to restore $200 million in wrongfully withheld Trade Act benefits to thousands of unemployed autoworkers and steelworkers.

\* *Bower v. Bunker Hill Co.*: Restored, after a six-week jury trial, tens of millions of dollars of retiree health insurance benefits that had been terminated following the shutdown of Idaho's largest private employer.

\* *UAW v. Kiddoo*: Required California to resume paying unemployment compensation to almost 400,000 unemployed workers following a budgetary impasse between the Legislature and the Governor.

\* *Does I et al. v. The Gap, Inc., et al.*: Negotiated $20 million settlement and innovative workplace monitoring program in anti-sweatshop class action on behalf of 30,000 Chinese and other foreign workers against Saipan garment factories and retailers for alleged violations of RICO, Alien Tort Claims Act, FLSA, and federal common law.

42

* ***Satchell v. FedEx Express***: Obtained a consent decree providing $55 million in monetary relief to two classes of African American and Latino employees of FedEx Express, as well as comprehensive injunctive relief against discriminatory employment practices, including reducing managerial discretion in promotions, compensation and discipline, and prohibiting the use of a promotion test that had an adverse impact on minority employees.

* ***Pulaski v. Calif. Occupational Safety and Health Standards Board***: Successfully defended the nation's first safety standard on ergonomics against an industry challenge, and invalidated exemptions that would have prevented that standard from applying to most California workplaces.

* ***Chamber of Commerce v. Lockyer***: Obtained Ninth Circuit *en banc* decision rejecting First Amendment and federal preemption challenges to a California law that prohibits employers from using state funds to influence employees about union organizing.

* ***SkyWest Pilots ALPA Organizing Committee v. SkyWest Airlines, Inc.***: Obtained a temporary restraining order and a preliminary injunction prohibiting an airline from interfering with its pilots' rights to organize and to free expression under the Railway Labor Act.

* ***UFCW Local 751 v. Brown Shoe Group, Inc.*** (Supreme Court): Established union standing to sue employers that violate the WARN Act's statutory notice requirements.

* ***State Building & Constr. Trades v. Aubry***: Struck down, as a usurpation of legislative authority, administrative regulations that would have lowered by 20 percent the prevailing wage rate paid to construction workers on public projects.

* ***Bell v. Farmers Ins. Exchange (Bell III)***: Obtained appellate decision upholding the largest overtime pay jury verdict in history, in class action on behalf of insurance company claims representatives who were misclassified as exempt under California's wage and hour law, and subsequently negotiated a settlement in excess of $200 million for class members.

* ***The Hess Collection Winery v. California Agricultural Relations Bd.***: Successfully defended against constitutional challenge a California statute providing for the binding resolution of disputes between agricultural employers and their union-represented employees arising from their failure to agree on an initial labor contract, thereby guarantying that agricultural workers will obtain an initial contract.

* ***Gentry v. Superior Court***: Obtained California Supreme Court ruling that employers generally may not prohibit workers from pursuing statutory claims on a classwide or collective basis.

* ***Employee Staffing Services, Inc. v. Aubry***: Defeated an employee-leasing company's ERISA preemption challenge to California's workers' compensation laws.

* ***NLRB v. Town & Country Electric, Inc.*** (Supreme Court): Protected paid union organizers from discriminatory discharge or refusal to hire under the NLRA.

* ***Long Beach City Employees v. City of Long Beach***: Overturned on state constitutional grounds a city policy requiring public employees to submit to polygraph examinations.

* ***Kaiser Aluminum and Chemical Corp.***: Obtained a ruling that a national aluminum manufacturer violated the NLRA by unlawfully locking out 3,000 of its employees and must pay them approximately $175 million in back wages – the highest backpay award in the history of the NLRA.

* ***Bay Area Laundry Workers v. Ferbar*** (Supreme Court): Established longer statute of limitations for suits against employers who withdraw from multi-employer pension plans.

* ***Associated Builders and Contractors v. Nunn; ACTA v. Smith***: Defeated federal court preemption challenges to a regulation raising the minimum wage rates for California apprentices.

* ***Capers v. Nunn***: Obtained decision upholding a California Apprenticeship Council ruling that precluded non-union apprenticeship program from operating outside its approved geographic area.

* ***Amaral v. Cintas Corp.***: Won $1.4 million summary judgment in a class action challenging a nationwide laundry company's systematic underpayment of its workers, defeating state law preemption and federal due process challenges to a local living wage ordinance.

* ***Rosenburg v. Int'l Business Machines Corp.***: Obtained a $65 million settlement in a class action brought on behalf of IBM information technology specialists for failure to pay overtime compensation.

* ***Frazier v. Citicorp Investment Services***: Obtained class action settlement for full backpay on behalf of securities brokers who alleged that their employer violated California and New York law by enforcing a corporate fine-based disciplinary policy.

* ***Air Line Pilots Ass'n, Int'l v. Emery Worldwide Airlines, Inc.***: Obtained an eight-figure settlement of breach of contract claim on behalf of airline pilots who were permanently furloughed when their employer ceased flight operations.

* ***SEIU Local 24/7 v. Professional Technical Security Services, Inc.***: Obtained settlement under state wage and hour laws providing payments to hundreds of low-wage workers as reimbursement for uniform cleaning expenses.

* ***State Building and Construction Trades Council v. Rea***: Obtained decision holding that a developer's receipt of state low income housing tax credits to subsidize a construction project requires the construction workers on the project to be paid prevailing wages.

* *Vega v. Contract Cleaning Maintenance, Inc.*: Obtained class action settlements on behalf of low-wage janitors and maintenance workers who were misclassified as independent contractors, providing double overtime, reimbursement of allegedly unlawful paycheck deductions and statutory interest.

* *Burlington Northern Santa Fe Ry. Co. v. Int'l Bhd. of Teamsters Local 174*: Obtained a unanimous en banc court of appeals decision overturning prior decisions that had severely weakened the protection afforded by the Norris-LaGuardia Act to union economic action.

* *Southern California Edison Co. v. Public Utilities Comm'n*: Obtained decision upholding the authority of the Public Utilities Commission to order utilities to require the payment of prevailing wages to construction workers on energy utility construction projects.

* *Reigh v. Calif. Unemployment Insurance Appeals Bd.*: Obtained the right to unemployment compensation for workers in non-safety-sensitive jobs who were discharged after refusing to take, or failing, a random drug test.

* *Akau v. Tel-A-Com Hawaii*: Upheld, against an employer's ERISA preemption challenge, Hawaii's Dislocated Workers Act, which provided supplemental unemployment compensation benefits to workers adversely affected by plant closings.

* *AFL-CIO v. Marshall*: Required payment of an additional 26 weeks of extended unemployment compensation benefits, worth billions of dollars, to unemployed workers nationwide.

* *IBEW v. Eichleay*: Enforced a multi-million dollar arbitration award against an employer that tried to evade its contract obligations through a non-union alter ego.

* *Cremin v. Merrill Lynch*: Settled nationwide sex discrimination class action on behalf of women brokers, resulting in establishment of novel claims procedure and agreement by brokerage firm no longer to compel any employees to arbitrate statutory discrimination claims.

* *Armendariz v. Foundation Health Psychcare Svcs.*: Obtained a ruling from the California Supreme Court that employers cannot require their employees, as a condition of employment, to resolve employment claims through arbitration, where the arbitration agreement does not provide for specific procedural protections.

* *Local 1564 v. City of Clovis*: Struck down a local "right to work" law enacted by a New Mexico city.

* *Washington Service Contractors Coalition v. District of Columbia*: Successfully defended against a federal preemption challenge a local displaced worker ordinance that requires new service contractors to retain the employees of their predecessors.

* ***Gerlach v. Wells Fargo & Co.***: Obtained a $12.8 million settlement in a class action brought against Wells Fargo for misclassifying employees given the title "business consultants" as exempt from overtime.

* ***Patel v. Sugen***: Obtained a nearly $2 million settlement in a class action challenge to a pharmaceutical company's refusal to pay contractually-mandated severance pay and bonuses to employees upon sale of the company, representing complete recovery of all monies owed plus ten percent interest.

* ***Figueroa v. Guess?, Inc.***: Obtained a million dollar settlement of a wage and overtime class action on behalf of Los Angeles garment workers.

* ***EQR/Legacy Partners***: Obtained settlement in administrative action of $1.6 million in back wages to construction workers who were not paid the prevailing wage required on public works projects.

* ***Californians for Safe and Competitive Dump Truck Transportation v. Mendonca***: Defeated an industry challenge to the application of California's prevailing wage law to motor carriers after the enactment of trucking deregulation.

* ***Martens v. Smith Barney***: Settled a nationwide sex discrimination class action on behalf of women brokerage employees, resulting in a novel claims procedure allowing for potentially tens of millions of dollars in damages.

* ***Gerke v. Waterhouse Securities***: Obtained a $3.3 million overtime settlement on behalf of 1,800 employees of a discount brokerage firm who were not paid for half-hour lunch periods during which they were expected to work.

* ***California Hospital Ass'n v. Henning***: Overcame a federal statutory challenge to a California law requiring payment of accrued vacation pay to workers upon cessation of employment.

* ***Fry v. Air Line Pilots Ass'n***: Defeated an attempt to hold a union liable under RICO and state tort law for ostracism allegedly directed against strikebreakers.

* ***AFL-CIO v. Employment Development Department***: Compelled California to continue to pay unemployment compensation benefits to hundreds of thousands of claimants per year pending evidentiary hearings on their continued eligibility.

* ***IBEW Locals 595 and 6 v. LIS Electric***: Won a private attorney general action, after a multi-week trial, against a construction contractor and its president for failing to pay workers prevailing wages on public works projects.

* ***International Longshore and Warehouse Union Local 142 v. Hawaiian Waikiki Beach Hotel***: Obtained an order requiring the corporate parent of a hotel in receivership to arbitrate claims for millions of dollars in accrued vacation and severance pay owed to the hotel's employees.

* ***SEIU v. County of San Bernardino***: Obtained an injunction prohibiting one of the nation's largest counties from depriving its employees of their right to discuss union issues at work.

* ***Retlaw Broadcasting Co. v. NLRB***: Successfully defended on appeal the NLRB's decision that an employer unlawfully implemented a contract proposal allowing it to bypass the union and negotiate directly with its individual employees.

* ***CPS Chem. Co. v. NLRB***: Confirmed an employer's continuing duty to bargain with the local union that represents its employees, notwithstanding that union's affiliation with a national union.

* ***Bishop v. Air Line Pilots Ass'n***: Defeated a challenge to a nationwide collective bargaining agreement that had been approved by a majority of the bargaining unit employees in a secret ballot election.

* ***Does I Thru XXIII v. Advanced Textile Corp.***: Established the right of workers to sue under fictitious names and withhold their identities from their employers, where they reasonably fear that disclosure of their identities will result in severe retaliation.

* ***San Joaquin Regional Transit Dist.***: Obtained an arbitration award stopping a transit district from contracting out numerous jobs held by union-represented workers.

* ***United Public Workers v. Yogi***: Invalidated a state public employee wage freeze that conflicted with the state constitutional right to organize for the purpose of collective bargaining.

* ***Passantino v. Johnson & Johnson Consumer Products, Inc.***: Successfully defended on appeal a multi-million dollar jury award in an employment discrimination action under federal and state law.

* ***Driscoll v. Oracle***: Negotiated $12.7 million settlement in nationwide overtime case under FLSA and state law on behalf of internet sales representatives.

* ***UAW Local 2244 and New United Motor Manufacturing, Inc.***: Obtained an arbitration award in excess of a million dollars for violation of a contractual provision requiring an employer to pay wage premiums to employees who start their shifts before 6:00 a.m.

* ***ATU Local 1292 and Alameda County Transit District***: Obtained an arbitration award prohibiting a public transit district from using a lease arrangement to evade contractual restrictions on outsourcing bargaining unit jobs.

**\* California Federation of Interpreters v. Region 1 Court Interpreter Employment Relations Committee; California Federation of Interpreters v. Region 2 Court Interpreter Employment Relations Committee; California Federation of Interpreters v. Region 4 Court Interpreter Employment Relations Committee**: Obtained arbitration awards requiring Superior Courts to pay mileage compensation to court interpreters and holding that the Courts acted illegally by giving interpreting assignments to independent contractors.

**\* Int'l Bhd. of Electrical Workers Local 551 v. WSB Electric**: Enjoined a contractor and its officers from continuing to commit unfair business practices by underpaying workers on public works projects, leading to the debarment of the contractor from bidding on public works projects for three years.

**\* Associated Builders and Contractors**: Obtained an NLRB decision that an association of non-union construction contractors violated the NLRA by filing and prosecuting a lawsuit challenging a union program to recapture jobs for union workers.

**\* St. Thomas - St. John Hotel & Tourism Ass'n v. Gov't of the U.S. Virgin Islands**: Defeated an NLRA preemption challenge to a Virgin Islands statute that protects employees from termination without cause.

**\* Simo v. Union of Needletrades, Industrial & Textile Employees**: Successfully defended a labor union's use of the "garment industry proviso" to § 8(e) of the NLRA.

**\* Patterson v. Heartland Industrial Partners, LLP; Adcock v. United Auto Workers**: Obtained federal district court decisions that an agreement under which an employer agrees to remain neutral in union organizing campaigns in return for the union's agreement to limitations on such campaigns does not violate Section 302 of the Taft-Hartley Act or RICO.

**\* Heartland Industrial Partners, LLP and the United Steelworkers of America, AFL-CIO**: Obtained an NLRB decision upholding a neutrality and card-check organizing agreement under Section 8(e) of the NLRA.

**\* Advocate Health Care Network v. Service Employees Int'l Union**: Obtained dismissal of defamation, commercial disparagement, unfair trade practices, and maintenance claims arising from union's support for community campaign to change hospital chain's practice of overcharging uninsured patients.

**\* In re Opinion of Bill Lockyer, Attorney General (State Allocation Board)**: Obtained interpretation from the California Attorney General requiring school districts to utilize competitive bidding laws to award public school construction projects, thereby insuring that union contractors have an opportunity to bid on such work.

* *In re Santa Ana Transit Village*: Obtained a California administrative ruling that a transfer of property for a redevelopment project at so-called "fair reuse value" is not equivalent to a transfer at the "fair market price," and therefore California construction workers who perform work on such projects must be paid prevailing wages.

* *Wagner v. Professional Engineers in California Gov't*: Established that the appropriate remedy for legal deficiencies in a union's annual fair share fee notice is for the union to correct and re-issue the notice, not to refund fees previously collected.

* *Granite Rock Co. v. Int'l Bhd. of Teamsters*: Obtained federal district court order dismissing employer's unprecedented attempt to expand Section 301 of the LMRA to include tort theories for interference with contract by international union.

* *Bricklayers and Allied Craftworkers Local 3 v. Northern California Mason Contractors Multiemployer Bargaining Ass'n*: Obtained an arbitration award upholding a union's right to allocate annual economic increases under a collective bargaining agreement between wages and fringe benefits.

* *Mendoza-Barrera v. San Andreas HVAC, Inc.*: Obtained a stipulated judgment of more than $200,000 for four sheet metal workers whose employer failed to pay them the prevailing wage on public works projects.

* *Santa Ana Transit Village*: Obtained an administrative decision from the State of California's Department of Industrial Relations that workers on redevelopment projects involving transfers of public property for "fair resuse value" are entitled to be paid prevailing wages.

## ENVIRONMENT AND PUBLIC HEALTH

* *Orff v. United States* (Supreme Court): Obtained ruling (based on arguments in merits brief filed on behalf of environmental organizations) rejecting challenge brought by agribusiness interests to the federal government's reduction of contractual water allocations to a local water district for the purpose of protecting threatened salmon and smelt.

* *United Steelworkers of America v. California Dep't of Forestry and Fire Protection*: Obtained a decision holding that the California Department of Forestry's approval of a plan to log vast portions of California's redwood forests violated the California Forest Practice Act's requirements for a sustainable yield plan.

* *NRDC v. Patterson*: Obtained a court ruling that the U.S. Bureau of Reclamation illegally dried up California's second longest river by diverting excessive amounts of water for agricultural and other uses, and subsequently negotiated settlement providing for restoration of the river.

* *California Healthcare Ass'n v. California Dep't of Health Svcs.*: Defeated a hospital industry challenge to a California health regulation requiring minimum nurse-to-patient staffing ratios.

* *Les v. Reilly*: Required the Environmental Protection Agency strictly to apply the Delaney Clause's prohibition against cancer-causing substances in processed foods.

* *Public Citizen v. Dep't of Transportation*: Obtained a Ninth Circuit ruling (later overturned by the Supreme Court) blocking for several years the federal government's decision to allow Mexico-domiciled trucks to travel throughout the United States without an Environmental Impact Statement and a Clean Air Act conformity analysis.

* *California v. Browner*: Obtained a consent decree, in a challenge to EPA's systematic failure to enforce federal food safety laws, that required dozens of cancer-causing pesticides to be removed from the food supply.

* *NRDC v. Price Pfister*: Compelled major faucet manufacturers to eliminate lead from drinking water faucets pursuant to Proposition 65, the California Toxics Initiative.

* *NRDC v. The Reclamation Bd. of the Resources Agency of the State of California*: Obtained a writ of mandate overturning a state administrative agency's approval of an extensive development project on top of a major levee in the Sacramento River Delta, for violating regulations governing flood control levees.

* *Sunshine Canyon*: Successfully advocated in land use proceedings, on behalf of a coalition of environmental, labor, and community organizations, for stringent environmental conditions to be placed on a large solid waste landfill in Los Angeles County.

* *NRDC v. EPA*: Settled Clean Air Act case requiring warning labels on processed foods manufactured with methyl bromide, an ozone-depleting substance.

* *NRDC v. EPA*: Compelled the Environmental Protection Agency to stop holding "closed-door" meetings with industry representatives before setting pesticide health and safety standards.

* *NRDC v. Whitman*: Forced EPA to reassess the safety of some of the nation's most dangerous pesticides to protect children, farmworkers, and consumers.

* *NRDC v. Smith Kline*: Required reductions in lead content of calcium dietary supplements.

* *EDF & NRDC v. Sta-Rite*: Successfully challenged the widespread use of lead in submersible water pumps under the California Toxics Initiative.

* *Tosco Corp. v. Communities for a Better Environment*: Defeated a declaratory judgment action brought by an oil company to preclude environmental organizations from seeking penalties for its discharges of dioxin.

* *AFL-CIO v. Deukmejian*: Required the Governor of California to expand tenfold the list of carcinogenic chemicals included within the California Toxics Initiative.

* *California Labor Federation v. Cal. OSHA*: Preserved the California Toxics Initiative against an OSHA preemption attack.

* *AFL-CIO v. Deukmejian*: Overturned a regulation exempting food, drugs and cosmetics from the California Toxics Initiative.

* *NRDC v. OEHHA*: Forced state environmental agency to withdraw "records retention" policy that had required agency scientists to destroy data and documents that were inconsistent with final agency position.

* *AFL-CIO v. Gorsuch*: Overturned an EPA moratorium on public disclosure of industry pesticide health and safety studies.

* *NRDC v. Wilson*: Required the Governor of California timely to determine whether to expand the list of reproductive toxicants included within the California Toxics Initiative to include five dozen chemicals identified as reproductive toxicants by U.S. EPA.

* *NRDC v. Badger Meters, Inc.*: Required manufacturers of water meters that leach lead into residential drinking water to shift to a low lead emitting alloy.

* *NRDC v. Safeway, Inc.*: Required large grocery retailers to achieve a substantial reduction in diesel truck emissions around their grocery distribution centers, which are located primarily in low-income areas.

* *Environmental Law Foundation v. Crystal Geyser Water Co.*: Required manufacturers to eliminate unlawfully high levels of arsenic, trihalomethanes, and heterotrophic bacteria from bottled drinking water.

* *City and County of San Francisco v. United States Tobacco Co.*: Required warnings to be provided to consumers regarding the health dangers of smokeless tobacco products.

* *Environmental Law Foundation v. Ironite Products Co.*: Obtained a consent judgment banning the continued sale in California of a fertilizer manufactured from hazardous waste that contained excessive levels of arsenic and lead.

* *In re St. Lukes Hospital Merger*: Persuaded the California Attorney General to conduct a review of the terms of a proposed merger of two hospitals, including the extent to which the merger would serve or disserve the needs of the affected communities.

## FREE SPEECH

* *Conant v. McCaffrey*: Obtained a permanent injunction under the First Amendment prohibiting the federal government from revoking or threatening to revoke the prescription drug licenses of California physicians on the basis of their confidential communications with their seriously ill patients regarding medical marijuana.

* ***Walker v. Air Line Pilots Ass'n***: Obtained a jury verdict following a ten-week trial upholding the right of the Air Line Pilots Association to engage in free speech activities promoting solidarity among strikers.

* ***Eller Media Co. v. City of Oakland***: Defeated efforts by billboard and alcohol industry to overturn City of Oakland ordinance prohibiting billboards advertising alcoholic beverages in residential neighborhoods and in proximity to schools and playgrounds.

* ***SEIU v. City of Houston***: Obtained a preliminary injunction under the First Amendment against the enforcement of Houston ordinances that restrict parades, public gatherings in public parks, and the use of sound amplification equipment.

* ***Connelly v. No On 128, the Hayden Initiative***: Enforced a California law requiring state initiative campaign advertisements to identify industry campaign contributors.

* ***Crawford v. Int'l Union of Rubber Workers Local 703***: Obtained reversal of a six-figure jury verdict against union and picketers who had exercised free speech right to disparage strikebreakers.

* ***Buyukmihci v. Regents***: Obtained a permanent injunction protecting the free speech rights of a professor of veterinary medicine whom the University of California had tried to fire because of his animal rights views.

* ***Furukawa Farms v. CRLA***: Successfully defended a statewide poverty law office against a suit brought by agricultural growers to block its advocacy on behalf of farm workers.

* ***Auvil v. CBS 60 Minutes***: Obtained dismissal of a class action product defamation suit brought by Washington apple growers against the Natural Resources Defense Council for having publicized the public health hazards of the growth regulator Alar.

* ***Coors v. Wallace***: Defeated an antitrust suit brought by Adolph Coors Company against the organizers of a nationwide consumer boycott of Coors beer.

* ***Evergreen Oil Co. v. Communities for a Better Environment***: Obtained the dismissal under California's anti-SLAPP statute of an oil company's defamation action against a non-profit environmental advocacy group.

* ***Tosco Corp. v. Communities for a Better Environment***: Obtained dismissal for lack of federal jurisdiction of an oil company's federal court defamation action against an environmental group that had engaged in free speech about air pollution issues.

* ***POSCO v. Contra Costa Building & Construction Trades Council***: Defeated an antitrust suit brought against various labor unions for engaging in environmental lobbying and litigation.

\* ***Schavrien v. Lynch***: Obtained dismissal, under California's anti-SLAPP law, of a suit against the former President of the California Public Utilities Commission brought by an executive of an energy company regulated by the Commission, for publicly exposing the executive's attendance at a campaign fundraising event in support of the spouse of a Commissioner.

\* ***Knox v. Westly***: Defeated preliminary injunction motion brought several days before statewide election to prohibit union from spending union dues and fees to oppose anti-worker ballot initiatives.

\* ***Mosqueda v. CCPOA***: Defeated a libel action brought by prison warden against correctional officers union for statements made in support of litigation initiated by a union officer.

\* ***Western Growers Ass'n v. UFW***: Obtained dismissal under California's anti-SLAPP statute of an "unfair business practices" action brought by a growers' association against a union for its free speech activities.

\* ***Allied Pilots Ass'n v. San Francisco***: Obtained an injunction allowing pilots to handbill and picket at San Francisco International Airport.

\* ***Bruce Church, Inc. v. UFW***: Overturned on First Amendment and statutory grounds a $10 million judgment against the United Farm Workers for engaging in allegedly improper boycott activity.

\* ***Guess?, Inc. v. UNITE***: Obtained dismissal under California's anti-SLAPP statute of complaint alleging union had unlawfully supported picketing and litigation activity directed against employer's workplace practices.

\* ***UFW v. Dutra Farms***: Obtained judgments against 18 growers and growers' association prohibiting them from illegally financing "employee committee" to defeat union organizing drives.

\* ***Steam Press Holdings, Inc. v. Hawaii Teamsters, Local 996***: Established that federal labor law precludes an employer from obtaining damages under state defamation law for economic losses resulting from a strike.

## CAMPAIGN AND ELECTION

\* ***AFL-CIO v. Eu***: Invalidated a proposed initiative requiring a new federal constitutional convention on the ground that it violated Article V of the U.S. Constitution.

\* ***Common Cause v. Jones***: Obtained a court order requiring the replacement of pre-scored punch card voting machines in California prior to the 2004 Presidential election.

* *Fleischman v. Protect Our City*: Obtained, and successfully defended in the Arizona Supreme Court, an injunction removing an anti-immigrant initiative from the November 2006 Phoenix ballot on the ground that the city law granting initiative supporters the right to supplement signatures after the filing deadline is preempted by state law.

* *Hawaii State AFL-CIO v. Yoshina*: Overturned on state election law grounds Hawaii's decision to ignore abstentions in determining whether the required percentage of votes was cast in favor of a ballot measure calling for a new state constitutional convention.

* *Central California Farmers Ass'n v. Eu*: Defeated on state constitutional grounds an attempt by agribusiness to remove a comprehensive environmental protection initiative from the California ballot.

* *Cardona v. Oakland Unified School District*: Upheld the City of Oakland's right to delay redistricting on basis of the 1990 census until the census was adjusted to correct for the disproportionate undercount of minorities.

* *Bennett v. Yoshina*: Successfully defended against a federal court due process challenge the Hawaii electorate's vote to refuse to hold a new state constitutional convention.

* *Barry v. Nishioka*: Obtained a writ of mandate ordering election officials to place candidates on ballot despite apparent noncompliance with nomination petition formalities.

* *Edrington v. Floyd*: Successfully defended City of Oakland's wording of ballot question and ballot analysis for "just cause" eviction initiative against challenge by landlords.

## IMMIGRATION

* *AFL-CIO v. Chertoff*: Obtained a nationwide temporary restraining order against a Department of Homeland Security regulation that would turn Social Security Administration "no-match" letters into an immigration-enforcement tool without authorization from Congress.

* *Catholic Social Services/Ayuda/Immigrant Assistance Project v. Reno*: Obtained the right to apply for legalization under the Immigration Reform and Control Act for hundreds of thousands of undocumented aliens who were prevented from applying because of unlawful INS regulations; and negotiated temporary work authorization for approximately three million aliens potentially eligible for legalization under the Immigration Reform and Control Act.

* *Calif. Rural Legal Assistance v. Legal Services Corp.*: Overturned a regulation prohibiting the provision of federally-funded legal services to a nationwide class of several million aliens who had been legalized through the amnesty process.

* *SEIU Local 535 v. Thornburgh*: Compelled the Immigration and Naturalization Service to rescind a regulation that deprived temporary nonimmigrant workers of the right to strike.

* ***Patel v. Quality Inn South / EEOC v. Tortilleria "La Mejor"***: Through a series of cases, established the eligibility of undocumented immigrant workers for the full remedial protections of the Fair Labor Standards Act and Title VII of the 1964 Civil Rights Act.

* ***Lopez-Alvarado v. Ashcroft***: Obtained Ninth Circuit reversal of Board of Immigration Appeal's decision ordering deportation of an immigrant family that had lived in the United States for more than ten years.

* ***Int'l Union of Bricklayers and Allied Craftsmen v. Meese***: Obtained decision prohibiting government and employers from using non-immigrant business (B-1) visas to circumvent the requirement that temporary, non-immigrant, foreign workers not undercut the prevailing wage.

### MISCELLANEOUS

* ***Blessing v. Freestone*** (Supreme Court): Preserved the availability of 42 U.S.C. § 1983 in cases seeking enforcement of federal statutory rights.

* ***Kashmiri v. Regents***: Won a $33.8 million class action judgment against the University of California for improperly charging fee increases to tens of thousands of undergraduate, graduate and professional students, and obtained a preliminary injunction prohibiting the University from charging professional students an additional $15 million in fees.

* ***Anderson v. Regents***: Obtained an $11 million recovery in a Contracts Clause class action challenging the University of California's refusal to fund thousands of university professors' merit salary increases.

* ***Eklund v. Byron Union School District***: Established the right of public school teachers to use games, role-playing, and other methods considered to be best pedagogical practices to teach about the history, culture and religion of Islam as part of a secular program of education in a world history class.

* ***People v. Horton***: Obtained a California Supreme Court death penalty reversal on the direct appeal of a capital case.

* ***Horton v. Mayle***: Obtained a Ninth Circuit *habeas corpus* remand of former death penalty defendant's murder conviction due to the prosecutor's failure to disclose potentially exculpatory evidence, and obtained reversal of the conviction after district court evidentiary hearing.

* ***California Labor Federation v. Cal. OSHA***: Invalidated, on state constitutional grounds, California Budget Act restrictions on the state's payment of public interest attorneys' fees.

* ***NAACP v. Davis***: Reinstated statutory requirement that California Highway Patrol collect racial profiling data, despite gubernatorial funding veto.

* ***Jane Doe v. Reddy***: Obtained $11 million settlement in human trafficking case on behalf of young Indian women who were unlawfully brought into the United States and forced to provide sex and free labor.

* ***Gardner v. Schwartzenegger***: Obtained restraining order and preliminary injunction against enforcement of a state statute that would have permitted incarceration of non-violent drug offenders, contrary to California Proposition 36, which mandated probation and drug treatment.

* ***Hamilton v. Great Expectations***: Negotiated an $8.5 million settlement of a statewide class action against a video dating service that had electronically eavesdropped on confidential membership interviews.

* ***In re Sealed Case***: Obtained a $13.2 million settlement of a False Claims Act case and two related wrongful termination cases on behalf of a husband and wife who were terminated after disclosing extensive fraud committed by their government contractor employer.

* ***In re Gulf USA Corporation and Pintlar Corporation***: Preserved millions of dollars of retiree medical benefits in a major bankruptcy proceeding on behalf of thousands of retired Idaho mine and smelter workers.

* ***Utility Consumers' Action Network v. Sears/California Federal Bank/Household Credit Service/ Texaco Credit Card Services/Capital One***: Obtained settlements in a series of consumer privacy class actions against financial institutions and credit card companies prohibiting unauthorized dissemination of personal account information to third party telemarketers.

* ***IBEW Local 595 v. Aubry***: Enjoined the Department of Industrial Relations from spending taxpayer funds to implement a new methodology that would drastically cut prevailing wage rates, where the Legislature had refused to appropriate funds for that purpose.

* ***Davidson v. County of Sonoma***: Obtained a substantial settlement on behalf of a law enforcement officer injured as a result of his employer's mock hostage training exercise in which he was seized and threatened at gunpoint.

* ***Jensen v. Kaiser Permanente***: Obtained the recision of an HMO's cost-cutting policy requiring staff psychiatrists to prescribe psychotropic medications for patients they have not examined.

* ***Welfare Rights Org. v. Crisan***: Established an evidentiary privilege for communications between applicants for public benefits and their lay representatives, including union representatives.

* ***County of Alameda v. Aubry***: Enjoined California from reducing the prevailing wage in the construction industry by 20 percent where the agency had failed to comply with APA rulemaking requirements.

**\* *California State Building and Construction Trades Council v. Duncan*:** Enjoined the expenditure of state funds on administrative rulemaking proceedings that would have lowered the minimum wage for apprentices throughout California, on the ground that the Governor lacked the authority to item-veto the Legislature's decision not to fund such proceedings.

**\* *Rogers v. Governing Bd. of the Sacramento City Unified Sch. Dist.*:** Obtained a writ of mandate and a permanent injunction under the California Charter Schools Act prohibiting a school board from converting an existing public high school into a charter school without the approval of a majority of the school's teachers and requiring the school district to open a new non-charter public high school upon a showing of community support.

**\* *California Court Reporters Ass'n v. Judicial Council*:** Struck down rules that would have allowed replacement of official court reporters with audiotape recordings in California Superior Courts, and obtained an injunction against expenditures of taxpayer funds in furtherance of such rules.

**\* *Olney v. Pringle*:** Negotiated a settlement prohibiting state legislators from paying large retroactive salary increases to select staff in violation of the State Constitution.

**\* *Gary W. v. State of Louisiana; La Raza Unida v. Volpe*:** Required Louisiana and California to pay federal court civil rights attorney's fee awards despite refusal of State Legislatures to appropriate the monies.

Our firm has also consulted on federal legislation involving reform of the nation's pesticide food safety laws and immigration laws, violence at abortion clinics, protection from ERISA preemption of state apprenticeship and prevailing wage laws, and on state legislation involving unemployment insurance, prevailing wages, the provision of health insurance for uninsured workers, protection of the right to strike, apprenticeship, rights of public employees, nursing home reform, and other areas of importance to labor unions and workers.

## CURRENT CASES

Our docket currently includes:

\* A federal court action seeking a nation-wide injunction against a Department of Homeland Security regulation that would turn Social Security Administration "no-match" letters into an immigration-enforcement tool without authorization from Congress.

\* A federal court lawsuit seeking to enjoin an Arizona statute that usurps the federal government's authority to regulate the employment of immigrants.

\* A challenge under the Fourteenth Amendment and federal and state civil rights laws to discrimination against low income minority communities in public transportation funding.

* A First Amendment challenge to Houston ordinances that restrict parades, public gatherings in public parks, and the use of sound amplification equipment.

* A constitutional challenge to a California statute that attempts to undermine a voter-approved initiative that mandates drug treatment and probation, instead of incarceration, for non-violent drug offenders.

* Representation of a labor coalition to defend a San Francisco ordinance that requires employers to make contributions for their employees' health care, against a federal court preemption challenge brought by a coalition of employers.

* An appeal from a $17 million jury verdict against a labor union for defamation and trade libel resulting from a postcard advising prospective hospital patients of a labor dispute between the union and a laundry supplier to the hospitals.

* The defense before the California Supreme Court of a trial court decision holding that the California Department of Forestry's approval of a plan to log vast portions of California's redwood forests violated the California Forest Practice Act's requirements for a sustainable yield plan.

* A state court environmental challenge to the government's failure to consider the possible future impacts of global warming on a massive construction project on levees in the Sacramento – San Joaquin River Delta.

* The defense on appeal of a $33.8 million class action judgment against the University of California for improperly charging fee increases to tens of thousands of undergraduate, graduate and professional students, and litigation of a separate Superior Court class action challenge to fee increases in subsequent years of thousands of dollars per student.

* A federal court class action alleging that national electronics retailer Best Buy discriminates against women and minorities in its hiring, promotion and compensation practices.

* Federal court class actions alleging that two national financial services firms systematically discriminate against their Latino and African American women brokers.

* The defense to a petition for a writ of *certiorari* in the U.S. Supreme Court that seeks to overturn a Ninth Circuit *en banc* decision rejecting First Amendment and federal preemption challenges to a California law that prohibits employers from using state funds to influence employees about union organizing.

* A due process challenge to the State of California's right to re-try a criminal defendant, in a 24-year old murder case, where the State's delays in certifying the record and withholding evidence caused prejudice to defendant's ability effectively to defend himself.

* A *qui tam* case against the world's largest for-profit university alleging it falsely certified compliance with a provision of the federal Higher Education Act that prohibits payment of recruiters based upon the number of students they enroll.

* A *qui tam* case against a nationwide industrial laundry company alleging it falsely represented that it would pay, and was paying, its employees the wages and benefits required by the Service Contract Act.

* A federal court lawsuit on behalf of environmental and labor groups to block the Bush administration's attempt to allow Mexico-domiciled trucks to travel throughout the United States without complying with the specific congressional prerequisites governing such action.

* A federal court lawsuit on behalf of pilots to prohibit their employer from interfering with their rights to organize and to free expression under the Railway Labor Act and from funding a company union.

* The defense on appeal of a class-action judgment in excess of $1.4 million against an employer that systematically underpaid its workers in violation of the City of Hayward's living wage ordinance.

* Representation of a coalition of environmental and labor organizations in an administrative proceeding seeking to add PFOA, a substance found in Teflon, to the list of chemicals in California that are known to cause cancer and reproductive harm.

* A Hawaii federal court class action challenging the termination of retiree health insurance benefits of hundreds of former sugar and pineapple plantation workers.

* A class action challenging an employer's systematic underpayment of its workers in violation of the Los Angeles living wage ordinance.

* A lawsuit seeking to establish that the California law that requires workers to be paid prevailing wages on public construction projects applies to projects undertaken by charter cities.

* A federal court class action alleging that the McCormick & Schmick's restaurant chain discriminates against African-Americans in its hiring and job assignment practices.

* Class action challenges, proceeding separately in federal court and AAA arbitration, to a nationwide industrial laundry company's policy of classifying its drivers as exempt from the overtime requirements of federal and state wage-and-hour laws.

* A California Supreme Court challenge to the validity of an employer's prohibition of worker class action lawsuits as a condition of employment.

* A class action in Illinois federal court on behalf of hundreds of low-wage janitors and maintenance workers who were misclassified as independent contractors and denied statutory overtime.

* A California Supreme Court *amicus* brief on behalf of the AFL-CIO and the SEIU in an appeal of a lower court decision holding that labor unions may not bring representative actions on behalf of their members under the California Private Attorneys General Act and the California Unfair Competition Law.

* A state law privacy class action challenging a bank's practice of selling confidential consumer information to third-party marketing companies.

* A nationwide federal class action challenging a global security company's failure to compensate employees for security briefings they are required to attend before the start of their shifts.

* A nationwide FLSA, ERISA, and state law overtime class action challenging an insurance company's treatment of its claims representatives as exempt "administrators."

* The defense on appeal of a decision holding that a developer's receipt of state low income housing tax credits requires the construction workers on the project to be paid prevailing wages.

* Court challenges to several pharmaceutical companies' failure to pay overtime compensation to their sales representatives.

* A California consumer class action against a bank that misleadingly offers lines of credit without disclosing hidden costs and credit impacts.

* The defense on appeal in the Fourth and Sixth Circuits of two federal court decisions holding that an agreement under which an employer agrees to remain neutral in union organizing campaigns in return for the union's agreement to limitations on such campaigns does not violate Section 302 of the Taft-Hartley Act or RICO.

* A California Supreme Court appeal concerning whether plaintiffs seeking private attorney general fees are required to demonstrate, as a condition of fee eligibility, that they made a reasonable effort to settle their dispute with defendants before filing their complaint.

* A Ninth Circuit appeal from a district court summary judgment ruling applying Texas law to deny a class challenge by California employees to their misclassification by their employer as independent contractors.

* A California Court of Appeal *amicus* brief on behalf of federations of law enforcement and firefighters' unions defending against a constitutional challenge the California law requiring that impasses in labor disputes between public employers and such unions proceed to interest arbitration.

* The defense on appeal of federal district court order dismissing employer's unprecedented attempt to expand Section 301 of the LMRA to include tort theories for interference with contract by an international union.

* An administrative challenge to the termination of a 20-year career attorney employed by the State of California, who had an exemplary record and was recognized as one of the state's experts in wage and hour law, but was discharged for, *inter alia*, his public comments regarding agency policy.

* An arbitration challenge to an employer's policy of terminating ill or injured employees, in violation of its collective bargaining agreement.

* A challenge brought against food retailers under Proposition 65, the California Toxics Initiative, concerning the presence of lead in balsamic vinegar.

* The defense of a union's collection of "fair share fees" from non-members against a challenge by the anti-union National Right to Work Foundation.

We also represent many local unions and apprenticeship programs on general matters, including litigation, negotiations, arbitrations and advice. In addition, we represent many workers in individual employment matters, we represent public agencies in selected constitutional cases, we provide counsel on First Amendment issues to the Public Health Institute's Technical Assistance Legal Center (TALC), we defend public interest groups against SLAPP suits, and we represent law firms and public interest organizations on statutory and common fund attorneys' fees matters.

### ALTSHULER BERZON LLP'S ATTORNEYS

The following is a brief description of the firm's attorneys:

**Fred H. Altshuler** is a graduate of Stanford University and University of Chicago Law School, where he was Articles Editor of the University of Chicago Law Review. He served as a law clerk to Judge John C. Godbold of the United States Court of Appeals for the Fifth Circuit. From 1969 to 1973, he was a Directing Attorney for California Rural Legal Assistance, working on farmworker issues throughout California. From 1975 to 1978, he practiced with the San Francisco law firm of Howard, Prim, Rice, Nemerovski, Canady & Pollak. During the Watergate controversy in 1974, he was Counsel to the Impeachment Inquiry staff of the U.S. House of Representatives Judiciary Committee. He is a Fellow of the American Bar Foundation, has served on the Boards of Directors of the Bar Association of San Francisco, the Lawyers Club of San Francisco and California Rural Legal Assistance, and is Co-Chair of the Bar Association of San Francisco's Amicus Curiae Committee. He also serves on the Boards of Directors of the Coro Foundation, Public Advocates, and the Planning Association for the Richmond. He was a delegate at the 1996 Democratic National Convention, and in 2004 he was California State Counsel for the Kerry/Edwards Campaign. Mr. Altshuler is listed in "The Best Lawyers in America" for administrative law.

**Stephen P. Berzon** is a graduate of Cornell University and Harvard Law School. He served as a law clerk to Judge Alvin B. Rubin of the United States District Court for the Eastern District of Louisiana. He was formerly the Legal Director of the Children's Defense Fund, a public interest organization in Washington, D.C. He has also practiced with the Legal Aid Society of Alameda County and the National Housing and Economic Development Law Project of the law school at the University of California at Berkeley (Boalt Hall). He is a Fellow of the American Bar Foundation and has served as Chair of the City of Berkeley Police Review Commission. He serves on the Boards of Directors of the American Constitution Society and the AFL-CIO Lawyers Coordinating Committee, and is a member of the Executive Committee of the Northern District of California Chapter of the Federal Bar Association. He received the Voting Rights Award from the ACLU of Southern California in 2002. He is listed in "The Best Lawyers in America" for labor and employment law, and in San Francisco Magazine's Northern California "Super Lawyers" in the appellate practice area. He lectures frequently on litigation and legislative matters.

**Eve H. Cervantez** is a graduate of Washington University and Harvard Law School, where she was an editor of the Harvard Law Review. She served as a law clerk to Judge Charles A. Legge of the United States District Court for the Northern District of California. She was formerly a staff attorney at the Prison Law Office, working to assure humane conditions of confinement for state prison inmates, and a partner at Lieff, Cabraser, Heimann & Bernstein, LLP. She is a chapter contributor to *Employment Discrimination Law* (BNA, 2002 Cumulative Supplement), *Wage and Hour Laws, A State-by-State Survey* (BNA, 2006 Supplement) and *The Fair Labor Standards Act* (BNA, 2006 Supplement), and is the author of "When Should You Bring State Law Wage and Hour Claims in Addition to, or Instead of, FLSA Claims," The Employee Advocate (Summer/Fall 2003). She also lectures regularly on wage and hour law and employment discrimination law.

**Barbara J. Chisholm** is a graduate of Swarthmore College and Howard University School of Law, where she was the Submissions and Symposium Editor of the Howard Law Journal. She served as a law clerk to Judge Emmet G. Sullivan of the United States District Court for the District of Columbia. She worked in the Russian Far East for five years, where she was the founder and director of the Russian Far East branch of ISAR, an organization working on environmental and human rights issues. She currently serves as an advisor to the organization. She also serves as a member of the Executive Committee of the Labor and Employment Section of the California State Bar. She also currently serves as the Program Co-Chair for the Bay Area Lawyer Chapter of the American Constitution Society, and as a member of the Boards of Directors of Pacific Environment and the AIDS Legal Referral Panel.

**Jamie L. Crook**, the Altshuler Berzon LLP/NRDC Joint Fellow for 2007-08, is a graduate of Brown University and the law school at the University of California at Berkeley (Boalt Hall), where she was Book Reviews and Essays Editor for the California Law Review, Notes and Comments Editor for the Berkeley Journal of African-American Law and Policy, and Articles Editor for the Berkeley Journal of International Law. She served as a law clerk to Judge Richard A. Paez of the United States Court of Appeals for the Ninth Circuit.

**Jeffrey B. Demain** is a graduate of Brandeis University (B.A.), the University of California, Irvine (M.A.), where he was a National Science Foundation Fellow, and the law school at the University of California at Berkeley (Boalt Hall), where he was a member of the Industrial Relations Law Journal. He served as a law clerk to Chief Judge James R. Browning of the United States Court of Appeals for the Ninth Circuit. From 1992 through 1999, he was a contributing editor of *Construction Organizing – An Organizing and Contract Enforcement Guide*, published by the George Meany Center for Labor Studies, Inc. From 1999 through 2002, he was a member of the Executive Committee of the Labor and Employment Section of the California State Bar. He is the author of "Recent Developments in Fair Share Fee Law," California Public Employee Relations Journal No. 167 (August 2004). He is listed in "The Best Lawyers in America" for labor and employment law. He also lectures regularly on developments in labor and employment law.

**Rebekah B. Evenson** is a graduate of Barnard College and Yale Law School. She served as a law clerk to Judge Betty Fletcher of the United States Court of Appeals for the Ninth Circuit and was a Skadden Fellow with the Lawyers' Committee for Civil Rights of the San Francisco Bay Area.

**James M. Finberg** is a graduate of Brown University and the University of Chicago Law School, where he was Executive Editor of the University of Chicago Law Review. He served as a law clerk to Justice Charles Levin of the Michigan Supreme Court. From 1992 through 2006, he was a partner at Lieff, Cabraser, Heimann & Bernstein, LLP. In 2005, he served as President of the Bar Association of San Francisco. From 2000 through 2001, he served as Co-Chair of the delegation of lawyer representatives from the Northern District of California to the Ninth Circuit Judicial Conference. From 1997 through 1998, he served as Co-Chair of the Lawyers' Committee for Civil Rights of the San Francisco Bay Area. He is a fellow of the American College of Labor and Employment Lawyers. He is the author, or co-author, of numerous articles and book chapters on various topics of employment law and securities law. Mr. Finberg was selected by the California Daily Journal in 2006 as one of the Top 100 Lawyers in California, and is listed by San Francisco Magazine as one of the Top 100 "Super Lawyers" in Northern California. He is also listed in "The Best Lawyers in America" for labor and employment Law.

**Eileen B. Goldsmith** is a graduate of Brown University and Yale Law School, where she was a Notes Editor for the Yale Law Journal. She served as a law clerk to Judge Marsha S. Berzon of the United States Court of Appeals for the Ninth Circuit. She also served as a Co-Chair of the Labor Law Committee of the National Employment Lawyers Association.

**Laura P. Juran** is a graduate of Northwestern University and Stanford Law School, where she was a Symposium Editor of the Stanford Law Review. She served as a law clerk to Judge Ann Aldrich of the United States District Court for the Northern District of Ohio. She is a member of the Editorial Board of Bender's California Labor & Employment Bulletin, and is a Supervising Attorney for the Workers' Rights Clinic of the San Francisco Legal Aid Society – Employment Law Center. She was appointed by the San Francisco Board of Supervisors to serve on the City's Sweatfree Procurement Advisory Group, and she currently is the Vice Chair of that body. She also currently serves as the Program Co-Chair for the Bay Area Lawyer Chapter of the American Constitution Society.

**Scott A. Kronland** is a graduate of Cornell University, where he was Editor-In-Chief of The Cornell Daily Sun, and the law school at the University of California at Berkeley (Boalt Hall), where he was a member of the California Law Review. He served as a law clerk to Judge James R. Browning of the United States Court of Appeals for the Ninth Circuit. He is also currently a member of the Executive Committee of the Labor and Employment Section of the Bar Association of San Francisco, and he regularly lectures on labor and legislative topics.

**Peter E. Leckman** is a graduate of Wesleyan University and the law school at the University of California at Berkeley (Boalt Hall), where he was a member of the California Law Review. He served as a law clerk to Judge Diane P. Wood of the United States Court of Appeals for the Seventh Circuit.

**Danielle E. Leonard** is a graduate of Harvard College and Harvard Law School, where she was a Senior Editor of the Harvard Environmental Law Review. She served as a law clerk to Judge Emmet G. Sullivan of the United States District Court for the District of Columbia and was a trial attorney in the Honors Program of the United States Department of Justice, Civil Rights Division, Voting Section.

**Stacey M. Leyton** is a graduate of Stanford University and Stanford Law School, where she was a Symposium Editor of the Stanford Law Review. She served as a law clerk to Justice Stephen Breyer of the United States Supreme Court, Judge Stephen Reinhardt of the United States Court of Appeals for the Ninth Circuit, and Judge Susan Illston of the United States District Court for the Northern District of California. She is a member of the Board of Directors of the Public Interest Clearinghouse.

**Linda Lye** is a graduate of Yale University and the law school at the University of California at Berkeley (Boalt Hall), where she was a member of the California Law Review and the Berkeley Journal of Employment and Labor Law. She served as a law clerk to Justice Ruth Bader Ginsburg of the United States Supreme Court and Judge Guido Calabresi of the United States Court of Appeals for the Second Circuit. She is a member of both the Board of Directors and the Legal Committee of the ACLU of Northern California, and is Co-President of the Board of Directors of the Berkeley Law Foundation.

**Peter D. Nussbaum** is a graduate of Cornell University and Harvard Law School, where he was Articles Editor of the Harvard Law Review. He served as a law clerk to Judge Irving R. Kaufman of the United States Court of Appeals for the Second Circuit and was a Fulbright Scholar at the London School of Economics. Prior to entering private practice in 1974, he worked for various legal services programs, including the Center for Social Welfare, Policy and Law at Columbia University Law School. He has served as a lawyer representative and Executive Committee Member of the Ninth Circuit Judicial Conference and is a member of the ABA Committee on Practice and Procedure under the NLRA. He has served as chair of the Democratic Party of Contra Costa County and as a member of the Democratic Party's State Executive Committee. He is listed in "The Best Lawyers in America" for labor and employment law. He also lectures frequently on labor topics before the ABA and other organizations.

**Katherine M. Pollock** is a graduate of Harvard University and Yale Law School, where she was Senior Editor of the Yale Law Journal and Articles Editor of the Yale Journal of Law and Feminism. She served as a law clerk to Judge Reginald Lindsay of the United States District Court for the District of Massachusetts.

**Daniel T. Purtell** is a graduate of Stanford University and Stanford Law School. He served as a law clerk to Judge Harry Pregerson of the United States Court of Appeals for the Ninth Circuit. He is a contributing editor of *The Developing Labor Law*, and was a member of the Editorial Board of Bender's California Labor & Employment Bulletin from 2002 to 2005. He also lectures frequently on issues of labor and employment law, particularly regarding ethical issues that arise in representing individuals and labor unions.

**Michael Rubin** is a graduate of Brandeis University and the Georgetown University Law Center, where he was an Editor of the Georgetown Law Journal. He served as a law clerk to Justice William J. Brennan, Jr. of the United States Supreme Court, Chief Judge James R. Browning of the United States Court of Appeals for the Ninth Circuit and Judge Charles B. Renfrew of the United States District Court for the Northern District of California. In 2002, he was named a "California Lawyer of the Year" by California Lawyer Magazine, and in 2003 he was a co-recipient of the "Trial Lawyer of the Year Award" from the Trial Lawyers for Public Justice for his role in the Marianas sweatshop litigation. He is listed in "The Best Lawyers in America" for labor and employment law, and San Francisco Magazine named him among its 2005 Northern California "Super Lawyers" in the appellate practice area. Mr. Rubin is listed by Lawdragon Magazine as one of the "Lawdragon 500 Leading Litigators in America," and as one of the "Lawdragon 500 Leading Plaintiffs' Lawyers in America." Mr. Rubin regularly lectures on developments in California and federal employment law and other topics.

**Rebecca Smullin** is a graduate of Yale University (B.A.), the Kennedy School of Government at Harvard University (M.P.A.), and Yale Law School. She served as a law clerk to Judge Marsha S. Berzon of the United States Court of Appeals for the Ninth Circuit.

**Peder J. Thoreen** is a graduate of Pomona College and Yale Law School, where he was a Senior Editor of the Yale Law and Policy Review. He served as a law clerk to Judge Harry Pregerson of the United States Court of Appeals for the Ninth Circuit and Judge Dean Pregerson of the United States District Court for the Central District of California.

**Jonathan Weissglass** is a graduate of Yale College and Yale Law School, where he was an Articles Editor of the Yale Law Journal and a student director of the Poverty Clinic. He served as a law clerk to Chief Judge Myron H. Thompson of the United States District Court for the Middle District of Alabama, and was a Karpatkin Fellow with the national legal department of the American Civil Liberties Union in New York. He received the Voting Rights Award from the ACLU of Southern California in 2002.

## CITATIONS TO PUBLISHED DECISIONS

The firm's attorneys have participated in the following Supreme Court cases, as counsel for either a party or an amicus: *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. ___, 127 S. Ct. 2339 (2007); *Orff v. United States*, 545 U.S. 596 (2005); *Dep't of Transportation v. Public*

*Citizen*, 541 U.S. 752 (2004); *BE&K Construction Co. v. NLRB*, 536 U.S. 516 (2002);
*Hoffman Plastic Compounds v. NLRB*, 535 U.S. 137 (2002); *EEOC v. Waffle House*, 534 U.S.
279 (2001); *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001); *Lujan v. G & G Fire
Sprinklers, Inc.*, 532 U.S. 189 (2001); *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001);
*Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999); *Murphy Bros., Inc. v. Michetti Pipe
Stringing, Inc.*, 526 U.S. 344 (1999); *Nat'l Fed'n of Federal Employees, Local 1309 v. Dep't of
the Interior*, 526 U.S. 86 (1999); *Wright v. Universal Maritime Svc. Corp.*, 525 U.S. 70 (1998);
*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus. v. Ellerth*, 524 U.S.
742 (1998); *Textron Lycoming Reciprocating Engine Division, Avco Corp. v. UAW*, 523 U.S.
653 (1998); *Allentown Mack Sales and Service, Inc. v. N.L.R.B.*, 522 U.S. 359 (1998); *Bay
Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp.*, 522 U.S. 192 (1997);
*Blessing v. Freestone*, 520 U.S. 329 (1997); *Calif. Dep't of Industrial Relations v. Dillingham
Construction, Inc.*, 519 U.S. 316 (1997); *Walters v. Metropolitan Educ. Enterprises*, 519 U.S.
202 (1997); *Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781 (1996); *United Food & Com.
Workers v. Brown Group*, 517 U.S. 544 (1996); *NLRB v. Town & Country Elec., Inc.*, 516 U.S.
85 (1995); *McKennon v. Nashville Banner*, 513 U.S. 352 (1995); *Hawaiian Airlines v. Norris*,
512 U.S. 246 (1994); *Livadas v. Bradshaw*, 512 U.S. 107 (1994); *NLRB v. Health Care &
Retirement Corp.*, 511 U.S. 571 (1994); *ABF Freight System Inc. v. NLRB*, 510 U.S. 317
(1994); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Reno v. Catholic
Social Services*, 509 U.S. 43 (1993); *District of Columbia v. Greater Washington Bd. of Trade*,
506 U.S. 125 (1992); *Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992); *Gade v.
Natl. Solid Waste Management Ass'n*, 505 U.S. 85 (1992); *I.N.S. v. National Center for
Immigrants' Rights*, 502 U.S. 183 (1991); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S.
20 (1991); *UAW v. Johnson Controls, Inc.*, 499 U.S. 187 (1991); *ALPA v. O'Neill*, 499 U.S. 65
(1991); *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991); *United States v.
Kokinda*, 497 U.S. 720 (1990); *Keller v. State Bar of Calif.*, 496 U.S. 1 (1990); *NLRB v. Curtin
Matheson*, 494 U.S. 775 (1989); *Guidry v. Sheetmetal Workers*, 493 U.S. 365 (1989);
*Breininger v. Sheetmetal Workers Int'l Ass'n*, 493 U.S. 67 (1989); *Webster v. Reproductive
Health Services*, 492 U.S. 490 (1989); *Bd. of Trustees of SUNY v. Fox*, 492 U.S. 469 (1989);
*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989); *Frisby v. Schultz*, 487 U.S. 474 (1988);
*Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399 (1988); *Edward J. Debartolo Corp. v.
Florida Gulf Coast Bldg.*, 485 U.S. 568 (1988); *Board of Airport Commissioners v. Jews for
Jesus, Inc.*, 482 U.S. 569 (1987); *Caterpillar, Inc. v. Williams*, 482 U.S. 386 (1987); *Fall River
Dying & Finishing Corp. v. NLRB*, 482 U.S. 27 (1987); *Fort Halifax Packing Co. v. Coyne*,
482 U.S. 1 (1987); *Atchison, Topeka & Santa Fe Ry. v. Buell*, 480 U.S. 557 (1987); *Calif.
Federal Savings & Loan Ass'n v. Guerra*, 479 U.S. 1312 (1987); *Baker v. General Motors
Corp.*, 478 U.S. 21 (1986); *Int'l Union, UAW v. Brock*, 477 U.S. 274 (1986); *Meritor Savings
Bank v. Vinson*, 477 U.S. 57 (1986); *NLRB v. Financial Institution Employees*, 475 U.S. 192
(1986); *Pacific Gas & Electric Co. v. Public Utilities Comm.*, 475 U.S. 1 (1986); *Pattern
Makers' League v. NLRB*, 473 U.S. 95 (1985); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986
(1984); *Ellis v. Broth. of Ry. Airline & S.S. Clerks*, 466 U.S. 435 (1984); *Arizona Governing
Committee v. Norris*, 463 U.S. 1073 (1983); *Shaw v. Delta Airlines*, 463 U.S. 85 (1983);
*Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669 (1983); *Bush v. Lucas*,
462 U.S. 367 (1983); *Connick v. Myers*, 461 U.S. 138 (1983); *Knight v. Minnesota Community
College Faculty*, 460 U.S. 1048 (1983); *Bowen v. United States Postal Service*, 459 U.S. 212
(1983); *Bd. of Educ. v. Pico*, 457 U.S. 853 (1982); *Heffron v. ISKCON*, 452 U.S. 640 (1981);
*Donovan v. Dewey*, 452 U.S. 594 (1981); *NLRB v. Retail Stores Employees Union*, 447 U.S.
607 (1980); *Pruneyard Shopping Center v. Robins*, 447 U.S. 74 (1980); *Whirlpool Corp. v.*

*Marshall*, 445 U.S. 1 (1980); *Babbitt v. United Farmworkers Union*, 442 U.S. 289 (1979); *Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979); *N.Y. Telephone Co. v. N.Y. Labor Dep't*, 440 U.S. 519 (1979); *Hisquierdo v. Hisquierdo*, 439 U.S. 572 (1979); and *City of Los Angeles v. Manhart*, 435 U.S. 702 (1978).

The firm's attorneys have also participated in the following cases in the federal Courts of Appeals: *In re Farmers Ins. Exchange Claims Representatives' Overtime Pay Litigation*, 481 F.3d 1119 (9th Cir. 2007); *Chamber of Commerce v. Lockyer*, 463 F.3d 1076 (9th Cir. 2006) (*en banc*); *United States v. Afshari*, 446 F.3d 915 (9th Cir. 2006), *cert. denied sub nom Rahmani v. United States*, 551 U.S. ___, 127 S. Ct. 930 (2007); *Eklund v. Byron Union School District*, 154 Fed. Appx. 648, 2005 WL 3086580 (9th Cir. 2005); *Recon Refractory & Constr. Inc. v. NLRB*, 424 F.3d 980 (9th Cir. 2005); *Horton v. Mayle*, 408 F.3d 570 (9th Cir. 2005); *Cummings v. Connell*, 402 F.3d 936 (9th Cir. 2005); *Lopez-Alvarado v. Ashcroft*, 381 F.3d 847 (9th Cir. 2004); *Assoc. Builders & Contractors v. Nunn*, 356 F.3d 979 (9th Cir. 2004), *cert. denied*, 543 U.S. 814 (2004); *Wagner v. Professional Engineers in California Gov't*, 354 F.3d 1036 (9th Cir. 2004); *Harik v. California Teachers Ass'n*, 326 F.3d 1042 (9th Cir.), *cert. denied sub nom Sheffield v. Aceves*, 540 U.S. 965 (2003); *Deutsch v. Turner Corp.*, 324 F.3d 692 (9th Cir. 2003); *Simo v. Union of Needletrades, Industrial & Textile Employees*, 322 F.3d 602 (9th Cir.), *cert. denied*, 540 U.S. 873 (2003); *Public Citizen v. Dep't of Transportation*, 316 F.3d 1002 (9th Cir. 2003), *rev'd*, 541 U.S. 752 (2004); *Cummings v. Connell*, 316 F.3d 886 (9th Cir.), *cert. denied*, 539 U.S. 927 (2003); *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002), *aff'g Conant v. McCaffrey*, 2000 WL 1281174 (N.D. Cal. 2000), 172 F.R.D. 681 (N.D. Cal. 1997), *cert. denied sub nom Walters v. Conant*, 540 U.S. 946 (2003); *Immigrant Assistance Project v. INS*, 306 F.3d 842 (9th Cir. 2002); *Steam Press Holdings, Inc. v. Hawaii Teamsters and Allied Workers Union, Local 996*, 302 F.3d 998 (9th Cir. 2002); *Wininger v. Boyden*, 301 F.3d 1115 (9th Cir. 2002); *Prescott v. County of El Dorado*, 298 F.3d 844 (9th Cir. 2002), *cert. denied*, 537 U.S. 1188 (2003); *Casumpang v. Int'l Longshoremen's Local 142*, 269 F.3d 1042 (9th Cir. 2001), *later proceeding Casumpang v. Int'l Longshore & Warehouse Union, Local 142*, 361 F.Supp.2d 1195 (D. Hawaii 2005); *Foster v. Mahdesian*, 268 F.3d 689 (9th Cir. 2001), *cert. denied*, 535 U.S. 1112 (2002); *BE&K Construction Co. v. NLRB*, 246 F.3d 619 (6th Cir. 2001), *rev'd*, 536 U.S. 516 (2002); *Petrochem Insulation v. NLRB*, 240 F.3d 26 (D.C. Cir.), *cert. denied*, 534 U.S. 992 (2001); *Tosco Corp. v. Communities for a Better Environment*, 236 F.3d 495 (9th Cir. 2001); *Hoffman Plastic Compounds, Inc. v. NLRB*, 208 F.3d 229 (D.C. Cir. 2000), *aff'd*, 237 F.3d 639 (D.C. Cir. 2001) (*en banc*), *rev'd*, 535 U.S. 137 (2002); *Catholic Social Services v. INS*, 232 F.3d 1139 (9th Cir. 2000) (*en banc*); *St. Thomas-St. John Hotel & Tourism Ass'n v. Gov't of the U.S. Virgin Islands*, 218 F.3d 232 (3rd Cir. 2000); *Does I through XXIII v. Advanced Textile Corp.*, 214 F.3d 1058 (9th Cir. 2000); *Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493 (9th Cir. 2000); *Burlington Northern Santa Fe Ry. Co. v. Int'l Bhd. of Teamsters Local 174*, 203 F.3d 703 (9th Cir. 2000) (*en banc*); *Aramark Corp. v. NLRB*, 179 F.3d 872 (10th Cir. 1999) (*en banc*); *U.S. Airways, Inc. v. Nat'l Mediation Bd.*, 177 F.2d 985 (D.C. Cir. 1999); *Retlaw Broadcasting Co. v. NLRB*, 172 F.3d 660 (9th Cir. 1999); *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 170 F.3d 1 (1st Cir. 1999); *CPS Chem. Co. v. NLRB*, 160 F.3d 150 (3d Cir. 1998); *G&G Sprinklers, Inc. v. Bradshaw*, 156 F.3d 893 (9th Cir. 1998), *vacated and remanded*, 526 U.S. 1061 (1999), *on remand*, 204 F.3d 941 (9th Cir. 2000), *rev'd*, 532 U.S. 189 (2001); *Californians v. Mendonca*, 152 F.3d 1184 (9th Cir. 1998); *Tahara v. Matson Terminals, Inc.*, 152 F.3d 929, 1998 WL 405855, 1998 U.S.App. LEXIS 15412 (9th Cir. 1998) (mem. disp.); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998); *Duffield v. Robertson Stephens & Co.*, 144 F.3d

1182 (9th Cir. 1998); *Bennett v. Yoshina*, 140 F.3d 1218 (9th Cir. 1998); *McNealy v. Caterpillar, Inc.*, 139 F.3d 1113 (7th Cir. 1998); *San Antonio Comm. Hosp. v. S. Cal. Dist. Council of Carpenters*, 137 F.3d 1090 (9th Cir. 1997); *McClatchy Newspapers, Inc. v. NLRB*, 131 F.3d 1026 (D.C. Cir. 1998); *Montero v. INS*, 124 F.3d 381 (2d Cir. 1997); *ConAgra v. NLRB*, 117 F.3d 1435 (D.C. Cir. 1997); *Pryner v. Tractor Supply Co., Inc.*, 109 F.3d 354 (7th Cir. 1997); *Assoc. Builders & Contrs., Inc. v. Local 302, IBEW*, 109 F.3d 1353 (9th Cir. 1997); *Beverly Enterprises-Pennsylvania, Inc. v. District 1199C*, 90 F.3d 93 (3rd Cir. 1996); *Fry v. ALPA*, 88 F.3d 831 (10th Cir. 1996); *WSB Electric, Inc. v. Curry*, 88 F.3d 788 (9th Cir. 1996); *United Ass'n of Journeymen & Apprentices v. Reno*, 73 F.3d 1134 (D.C. Cir. 1996); *Chamber of Commerce v. Bragdon*, 64 F.3d 497 (9th Cir. 1995); *Washington Service Contractors v. District of Columbia*, 54 F.3d 811 (D.C. Cir. 1995); *Legalization Assistance Project v. INS*, 50 F.3d 789 (9th Cir.1995); *Maui Trucking v. Gen. Contractors Labor Ass'n*, 37 F.3d 436 (9th Cir. 1994); *Electromation, Inc. v. NLRB*, 35 F.3d 1148 (7th Cir. 1993); *Cannon v. Edgar*, 33 F.3d 880 (7th Cir. 1994); *USS-POSCO Industries v. Contra Costa Bldg. & Constr. Trades Council*, 31 F.3d 800 (9th Cir. 1994); *Wedges/Ledges, Inc. v. City of Phoenix*, 24 F.3d 56 (9th Cir. 1994); *Combined Management Inc. v. Superintendent of Insurance*, 22 F.3d 1 (1st Cir. 1994); *Employee Staffing Services, Inc. v. Aubry*, 20 F.3d 1038 (9th Cir. 1994); *Perales v. Thornburgh*, 4 F.3d 99 (2d Cir. 1992); *American Dental Ass'n v. Martin*, 984 F.2d 823 (7th Cir. 1993); *United Ass'n of Journeymen v. Barr*, 981 F.2d 1269 (D.C. Cir. 1992), *vacating* 768 F.Supp. 375 (D.D.C. 1991); *Les v. Reilly*, 968 F.2d 985 (9th Cir. 1992); *Shelby Cty. Health Care Corp. v. AFSCME Local 1733*, 967 F.2d 1091 (6th Cir. 1992); *Elec. Jt. Apprenticeship Comm. v. MacDonald*, 949 F.2d 270 (9th Cir. 1991); *Kidwell v. Transportation Communication Int'l Union*, 946 F.2d 283 (4th Cir. 1991); *Int'l Broth. of Electrical Workers v. Eichleay Corp.*, 944 F.2d 1047 (3rd Cir. 1991); *Colorado-Ute Elec. Ass'n v. NLRB*, 939 F.2d 1392 (10th Cir. 1991); *California Rural Legal Assistance v. Legal Service Corp.*, 937 F.2d 465, 917 F.2d 1171 (9th Cir. 1991); *Toledo Typographical Union No. 63 v. NLRB*, 907 F.2d 1220 (D.C. Cir. 1990); *Indianapolis Power & Light Co. v. NLRB*, 898 F.2d 524 (7th Cir. 1990); *U.S. Postal Service v. APWU*, 893 F.2d 1117 (9th Cir. 1990); *Hydrostorage v. Northern California Boilermakers*, 891 F.2d 719 (9th Cir. 1989); *News/Sun Sentinel Co. v. NLRB*, 890 F.2d 430 (D.C. Cir. 1989); *National Posters, Inc. v. NLRB*, 885 F.2d 175 (4th Cir. 1989); *NLRB v. Parents and Friends of the Specialized Learning Center*, 879 F.2d 1442 (7th Cir. 1989); *In re Thornburgh*, 869 F.2d 1503 (D.C. Cir. 1989); *Stache v. Int'l Union of Bricklayers*, 852 F.2d 1231 (9th Cir. 1988); *Patel v. Quality Inn South*, 846 F.2d 700 (11th Cir. 1988); *NLRB v. Ashkenazy Property Management Corp.*, 817 F.2d 75 (9th Cir. 1987); *UAW v. Brock*, 816 F.2d 761 (D.C. Cir. 1987); *Local 512, Warehouse and Office Workers' Union v. NLRB (Felbro)*, 795 F.2d 705 (9th Cir. 1986); *IBEW, Local 387 v. NLRB (Arizona Public Service Co.)*, 788 F.2d 1412 (9th Cir. 1986); *AFSCME v. State of Washington*, 770 F.2d 1401 (9th Cir. 1985); *Calif. Hospital Ass'n v. Henning*, 770 F.2d 856 (9th Cir. 1985); *White v. City of Richmond*, 713 F.2d 458 (9th Cir. 1983); *Hawaiian Telephone Co. v. Hawaii Dep't of Labor & Industrial Relations*, 691 F.2d 905 (9th Cir. 1982), 614 F.2d 1197 (9th Cir. 1980); *Spain v. Mountanos*, 690 F.2d 742 (9th Cir. 1982); *Gary W. v. State of La.*, 622 F.2d 804 (5th Cir. 1980); and *Gates v. Collier*, 616 F.2d 1268 (5th Cir. 1980).

In the federal District Courts, the firm's cases have included the following: *Int'l Longshore & Warehouse Union, Local 142 v. C. Brewer & Co.*, ___ F.Supp.2d ___, 2007 WL 2175370 (D. Hawaii 2007); *SkyWest Pilots ALPA Org. Comm. v. SkyWest Airlines, Inc.*, 2007 WL 1848678, 182 L.R.R.M. 2485 (N.D. Cal. 2007); *Adams v. Inter-Con Security Systems, Inc.*, 242 F.R.D. 530, 2007 WL 1089694 (N.D. Cal. 2007); *Chao v. Allied Pilots Ass'n*, 2007 WL 518586, 181

L.R.R.M. 2578 (N.D. Tex. 2007); *Adcock v. United Auto Workers*, 2006 WL 3257044, 180 L.R.R.M. 3291 (W.D.N.C. 2006); *Knox v. Westly*, 2006 WL 2374763, 180 L.R.R.M. 3170 (E.D. Cal. 2006), *earlier proceeding*, 2005 WL 3031622 (E..D. Cal. 2005), *subsequent proceedings*, 2007 WL 516263, 181 L.R.R.M. 2501 (E.D. Cal. 2007), 2006 WL 3147683 (E.C. Cal. 2006); *Vega v. Contract Cleaning Maintenance*, 2006 WL 1554383, 11 Wage & Hour Cas.2d 1121 (N.D. Ill. 2006); *Patterson v. Heartland Industrial Partners, LLP*, 428 F.Supp.2d 714 (N.D. Ohio 2006), *earlier proceeding*, 225 F.R.D. 204 (N.D. Ohio 2004); *Darensburg v. Metropolitan Transportation Comm'n*, 2006 WL 167657 (N.D.Cal. 2006); *NRDC v. Rodgers*, 381 F.Supp.2d 1212 (E.D.Cal. 2005), *motion for reconsideration denied*, 2005 WL 2466067 (E.D. Cal. 2005), *earlier proceeding*, 2005 WL 1388671 (E.D. Cal. 2005); *Rachford v. Air Line Pilots Ass'n, Int'l*, 375 F.Supp.2d 908 (N.D. Cal. 2005), *later proceeding*, 2006 WL 927742 (N.D. Cal. 2006); *Casumpang v. Int'l Longshore & Warehouse Union, Local 142*, 361 F.Supp.2d 1195 (D. Hawaii 2005), *subsequent proceeding*, 411 F.Supp.2d 1201 (D. Hawaii 2005); *Patel v. Sugen, Inc.*, 354 F.Supp.2d 1098 (N.D. Cal. 2005); *In re Farmers Ins. Exchange Claims Representatives' Overtime Pay Litigation*, 300 F.Supp.2d 1020 (D. Ore. 2003), *amended*, 336 F.Supp.2d 1077 (D.Ore. 2004), *aff'd in part and rev'd in part, and remanded*, 466 F.3d 853 (9th Cir. 2006); *Cummings v. Connell*, 281 F.Supp.2d 1187 (E.D. Cal. 2003), *rev'd*, 402 F.3d 936 (9th Cir. 2005), *later proceeding*, 2006 WL 1716160, 180 L.R.R.M. 2159 (E.D. Cal. 2006); *SEIU Local 87 et al. v. SEIU Local 1877*, 230 F.Supp.2d 1099 (N.D. Cal. 2002); *Does I v. Gap, Inc.*, 2002 WL 1000068, 1000073 (D.N.M.I. 2002); *Chamber of Commerce v. Lockyer*, 225 F.Supp.2d 1199 (C.D.Cal. 2002), *rev'd*, 463 F.3d 1076 (9th Cir. 2006) (*en banc*); *Common Cause v. Jones*, 213 F.Supp.2d 1110, 213 F.Supp.2d 1116 (C.D. Cal. 2002); *Catholic Social Services v. Ashcroft*, 206 F.R.D. 654 (E.D. Cal. 2002); *In re World War II Era Japanese Forced Labor Litigation*, 164 F.Supp.2d 1153 (N.D. Cal. 2001), 114 F.Supp. 939 (N.D. Cal. 2000); *Does I v. Advance Textile Corp.*, 2001 WL 1842389 (D.N.M.I. 2001); *NRDC v. Whitman*, 53 E.R.C. 1673, 2001 WL 1221774 (N.D. Cal.), *later proceeding*, 2001 WL 1456783 (N.D. Cal. 2001), *appeal dism. sub nom NRDC v. EPA*, 35 Fed.Appx. 590, 2002 WL 1042092 (9th Cir. 2002); *CF&I Steel, L.P. v. Bay Area Rapid Transit District*, 2000 WL 1375277 (N.D. Cal. 2000); *Chadwick v. IBEW*, 2000 WL 1006373 (N.D. Cal. 2000); *Friedman v. Cal. State Employees Ass'n*, 2000 U.S. Dist. LEXIS 7049, 163 L.R.R.M. 2924 (E.D. Cal. 2000); *Foster v. Garcy*, 1999 U.S. Dist. LEXIS 21876, 140 Lab. Cas. (CCH) ¶ 58,914 (N.D. Cal. 1999); *Tosco v. Communities for a Better Environment*, 41 F.Supp.2d 1061 (C.D. Cal. 1999); *Eller Media Co. v. City of Oakland*, 1998 U.S.Dist. LEXIS 18616, 13319 (N.D. Cal. 1998); *Bishop v. Air Line Pilots Ass'n*, 159 L.R.R.M. 2005, 1998 U.S.Dist. LEXIS 11948 (N.D. Cal. 1998), *aff'd mem.*, 2000 US App. LEXIS 3270 (9th Cir. March 1, 2000); *Martens v. Smith Barney, Inc.*, 181 F.R.D. 243, 1998 U.S.Dist. LEXIS 9226, 77 FEP Cas. (BNA) 532 (S.D.N.Y. 1998); *Catholic Social Services v. Reno*, 1998 U.S.Dist. LEXIS 10429, 10430, 10431 (E.D. Cal. 1998); *Sims v. Alameda-Contra Costa Transit Dist.*, 2 F.Supp.2d 1253 (N.D. Cal. 1998); *Cremin v. Merrill Lynch*, 957 F.Supp. 1460 (N.D. Ill. 1997); *McLendon v. Continental Group, Inc.*, 872 F.Supp. 142 (D.N.J. 1994); *Ford v. New United Motors Mfg., Inc.*, 857 F.Supp. 707 (N.D. Cal. 1994); *Alameda Newspapers, Inc. v. City of Oakland*, 860 F.Supp. 1428 (N.D. Cal. 1994); *Sneede v. Coye*, 856 F.Supp. 526 (N.D. Cal. 1994); *In re Gulf USA Corp.*, 171 Bankr. 379 (D. Id. 1994); *Auvil v. CBS, 60 Minutes*, 800 F.Supp. 928 (E.D. Wash. 1992); *Cardona v. Oakland Unified School District*, 785 F.Supp. 837 (N.D. Cal. 1992); *Assoc. Builders & Contrs. v. BACA*, 769 F.Supp. 1537 (N.D. Cal. 1991); *EEOC v. Tortilleria "La Mejor,"* 758 F.Supp. 585 (E.D. Cal. 1991); *Akau v. Tel-A-Com Hawaii, Inc.*, 1990 Dist. LEXIS 4647 (D. Hawaii 1990); *Puzz v. U.S. Dep't of the Interior*, 1989 Dist. LEXIS 16649 (N.D. Cal 1989); *Local 3 v. Masonry & Tile Contractors Ass'n*, 136 L.R.R.M. 2319 (D. Nev. 1990); *Calif. ex rel. Van de Kamp v. Reilly*,

750 F.Supp. 433 (E.D. Cal. 1990); *Local 1564 v. City of Clovis*, 735 F.Supp. 999 (D.N.M. 1990); *Immigrant Assistance Project v. INS*, 709 F.Supp. 998 (W.D. Wash. 1989) *aff'd*, 976 F.2d 1198 (9th Cir. 1993), *vacated and remanded*, 510 U.S. 594 (1993); *Ayuda, Inc. v. Barr*, 687 F.Supp. 650 (D.D.C. 1988), *rev'd in part*, 880 F.2d 1325 (D.C. Cir. 1989), *vacated and remanded*, 498 U.S. 1117 (1991), *on remand*, 948 F.2d 742 (D.D.C. 1991), 700 F.Supp 49 (D.D.C. 1988), 744 F.Supp 21 (D.D.C. 1990), *stayed*, 919 F.2d 153 (D.C. Cir. 1990), *rev'd*, 948 F.2d 742 (D.C. Cir. 1991), *vacated and remanded*, 509 U.S. 916 (1993), *on remand*, 7 F.3d 246 (D.C. Cir. 1993), *pet. for rehearing denied*, 14 F.3d 61 (D.C. Cir.), *cert. denied*, 513 U.S. 815 (1994); *Bower v. Bunker Hill Company*, 675 F.Supp. 1263, 675 F.Supp. 1254, 114 F.R.D. 587 (E.D. Wash. 1986), 689 F.Supp. 1032 (E.D. Wash. 1985); *Int'l Union of Bricklayers and Allied Craftsmen v. Meese*, 616 F.Supp. 1387 (N.D. Cal. 1985); *Adolph Coors Co. v. Sickler*, 608 F.Supp. 1417 (C.D. Cal. 1985); *Int'l Union, UAW v. Donovan*, 570 F.Supp. 210 (D.D.C. 1983), *rev'd*, 746 F.2d 855 (D.C. Cir. 1984), *cert. denied*, 474 U.S. 825 (1985); *Int'l Union, UAW v. Donovan*, 568 F.Supp. 1047 (D.D.C. 1983), *rev'd*, 746 F.2d 839 (D.C. Cir. 1984), *rev'd sub nom Int'l Union, UAW v. Brock*, 477 U.S. 274 (1986), *on remand*, 816 F.2d 761 (D.C. Cir. 1987); *Int'l Union, UAW v. Donovan*, 554 F.Supp. 1172 (D.D.C. 1983); *La Raza Unida v. Volpe*, 545 F.Supp. 36 (N.D. Cal. 1982); and *AFL-CIO v. Marshall*, 494 F.Supp. 971 (D.D.C. 1980).

The firm has also participated in the following state Supreme Court cases, among others: *Gentry v. Superior Court*, ___ Cal.4th ___, 2007 WL 2445122 (Aug. 30, 2007); *Fleischman v. Protect Our City*, 214 Ariz. 406, 153 P.3d 1035 (2007); *Tahara v. Matson Terminals, Inc.*, 111 Hawaii 16, 136 P.3d 904 (2006); *Reynolds v. Bement*, 36 Cal.4th 1075 (2005); *City of Long Beach v. Dep't of Industrial Relations*, 34 Cal.4th 942 (2004), *vacating* 110 Cal.App.4th 636, 1 Cal.Rptr.3d 837 (2003); *AFL-CIO v. Hood*, 885 So.2d 373 (Fla. 2004); *Intel Corp. v. Hamidi*, 30 Cal.4th 1342 (2003); *Viner v. Sweet*, 30 Cal.4th 1232 (2003); *Hamilton v. Maryland Casualty Co.*, 27 Cal.4th 718 (2002); *Golden Gateway Center v. Golden Gateway Tenants Assoc.*, 26 Cal.4th 1013 (2001); *Gerawan Farming, Inc. v. Lyons*, 24 Cal.4th 468 (2000); *Armendariz v. Foundation Health Psychcare Svcs.*, 24 Cal.4th 83 (2000); *Morillion v. Royal Packing Co.*, 22 Cal.4th 575 (2000); *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 243 (1999); *Hawaii State AFL-CIO v. Yoshina*, 935 P.2d 89 (Haw. 1997); *Masonry & Tile Contractors Ass'n v. Jolley, Urga & Wirth*, 941 P.2d 486 (Nev. 1997); *People ex rel. Lundgren v. Superior Court (American Standard)*, 14 Cal.4th 294 (1996); *AFL-CIO v. Unemployment Insurance Appeals Board*, 13 Cal.4th 1017 (1996), *rev'g* 38 Cal.App.4th 1205 (1995); *People v. Horton*, 11 Cal.4th 1068 (1996); *Southern Calif. Chapter of Assoc. Builders & Contractors Inc. v. Calif. Apprenticeship Council*, 4 Cal.4th 422 (1992); *In re Horton*, 54 Cal.3d 82 (1991); *Cumero v. Public Employment Relations Board*, 49 Cal.3d 575 (1989); *Keller v. State Bar*, 47 Cal.3d 1152 (1989); *DeTomaso v. Pan American World Airways*, 43 Cal.3d 517 (1987); *County of Los Angeles v. State of Calif.*, 43 Cal.3d 46 (1987); *Long Beach City Employees Ass'n v. City of Long Beach*, 41 Cal.3d 937 (1986); *Regents of the University of Calif. v. Public Employment Relations Board*, 41 Cal.3d 601 (1986); *San Jose Teachers Ass'n v. Superior Court*, 38 Cal.3d 839 (1985); *AFL-CIO v. Eu*, 36 Cal.3d 687 (1984); *Legislature of the State of Calif. v. Deukmejian*, 34 Cal.3d 658 (1983); *San Mateo City School Dist. v. Public Employment Relations Bd.*, 33 Cal.3d 850 (1983); *Welfare Rights Org. v. Crisan*, 33 Cal.3d 766 (1983); *Serrano v. Unruh*, 32 Cal.3d 621 (1982); *Mandel v. Myers*, 29 Cal.3d 531 (1981); *Pacific Legal Foundation v. Unemployment Insurance Appeals Bd.*, 29 Cal.3d 101 (1981); *Sears Roebuck & Co. v. San Diego County District Council of Carpenters*, 25 Cal.3d 317 (1979); *Robins v. Pruneyard Shopping Center*, 23 Cal.3d 899 (1979).

The firm has also participated in the following cases in the state Courts of Appeal: *Sheet Metal Workers Int'l Ass'n, Local Union No. 104 v. Rea*, ___ Cal.App.4th ___, 2007 WL 2164055 (July 30, 2007); *Aguiar v. Cintas Corp. No. 2*, 144 Cal.App.4th 121 (2006); *Southern California Edison Co. v. Public Utilities Comm'n*, 140 Cal.App.4th 1085 (2006); *The Hess Collection Winery v. California Agricultural Relations Bd.*, 140 Cal.App.4th 1584 (2006); *Du Charme v. Int'l Bhd. of Electrical Workers, Local 45*, 110 Cal.App.4th 107 (2003); *SEIU v. Superior Court*, 89 Cal.App.4th 1390 (2001); *Bell v. Farmers Ins. Exchange*, 87 Cal.App.4th 805 (2001), *cert. denied*, 534 U.S. 1041 (2001); *later proceeding*, 115 Cal.App.4th 715 (2004), *later proceeding*, 135 Cal.App.4th 1138 (2006), *later proceeding*, 137 Cal.App.4th 835 (2006); *United Farm Workers v. Dutra Farms*, 83 Cal.App.4th 1146 (2000); *Western Crop Protection Assoc. v. Davis*, 80 Cal.App.4th 741, *modified*, 81 Cal.App.4th 190c (2000); *Pulaski v. California Occupational Safety and Health Standards Board*, 75 Cal.App.4th 1315 (1999); *IBEW Local 595 v. Superior Court*, 54 Cal.App.4th 1291 (1997); *IBEW v. Aubry*, 41 Cal.App.4th 1632 (1996); *Calif. Court Reporters Ass'n v. Judicial Council of Calif.*, 39 Cal.App.4th 15 (1995), 59 Cal.App.4th 959 (1997); *L.A. County Court Reporters Ass'n v. Superior Court*, 31 Cal.App.4th 403 (1995); *Smith v. Superior Court (Degnan)*, 31 Cal.App.4th 205 (1994); *AFL-CIO v. Unemployment Insurance Appeals Board*, 23 Cal.App.4th 51 (1994); *Calif. Labor Federation v. Calif. Safety and Health Standards Board*, 5 Cal.App.4th 985 (1991), 221 Cal.App.3d 1547 (1990); *Jerabek v. Public Employment Relations Bd.*, 2 Cal.App.4th 1298 (1991); *Zambrano v. Oakland Unified School Dist.*, 229 Cal.App.3d 802 (1991); *Rust v. Vallejo*, 215 Cal.App.3d 771 (1989); *AFL-CIO v. Deukmejian*, 212 Cal.App.3d 425 (1989); *Wallace v. Consumers Cooperative, Inc.*, 170 Cal.App.3d 836 (1985); *Filipino Accountants Ass'n, Inc. v. State Board of Accountancy*, 155 Cal.App.3d 1023 (1984); *Brown v. Superior Court*, 137 Cal.App.3d 778 (1982); *Serrano v. Priest*, 131 Cal.App.3d 188 (1982); and *AFL-CIO v. Employment Development Dep't*, 88 Cal.App.3d 811 (1979).

# EXHIBIT A