IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DAISY JAFFE, et al.,

                Plaintiffs,

v.

MORGAN STANLEY & CO., INC.,

                Defendant.

NO. C 06-3903 TEH

ORDER SEEKING FURTHER BRIEFING AND SUBMISSIONS ON JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND PROVISIONAL CERTIFICATION OF SETTLEMENT CLASS, AND VACATING HEARING DATE

This matter came before the Court on December 3, 2007 on the Parties' Joint Motion for Preliminary Approval of Class Action Settlement, Provisional Certification of Settlement Class, Approval and Distribution of Notice of Settlement, and Approval of a Schedule for the Final Settlement Approval Process.

When parties seek certification of a settlement class and approval of a class settlement agreement, this Court is responsible for ensuring fairness to all members of the purported class. Heightened judicial scrutiny is appropriate where the parties reach a settlement before class certification. 4 NEWBERG ON CLASS ACTIONS ("NEWBERG") § 11.27 at 51 (heightened judicial scrutiny appropriate where settlement before class certification); MANUAL FOR COMPLEX LITIGATION, FOURTH §§ 21.13, 21.612 (same). First, the Court must assess whether a class exists, and "pay 'undiluted, even heightened, attention' to class certification requirements . . . ." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003)(citation omitted). "Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." *Id., quoting Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997). Second, this Court must carefully consider "'whether a proposed settlement is fundamentally fair, adequate, and reasonable,' recognizing that '[i]t is the settlement taken as

a whole, rather than the individual component parts, that must be examined for overall fairness....'" *Id.*, *quoting Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1026 (9th Cir. 1998).

At the start of the hearing on the parties' Joint Motion, the Court outlined some of its concerns with certification of the provisional settlement class and preliminary approval of the settlement. Some of those concerns were assuaged at the hearing; some were not. This Order surveys those issues and seeks further briefing or supplemental submissions in support of the settlement.

**Provisional Certification of a Settlement Class**

Ms. Curtis-Bauer lacks many of the indicia upon which courts typically rely to determine that a named plaintiff will vigorously and adequately represent the class. Although a plaintiff's claims are not *atypical* merely because they include non-class claims, *Satchell v. FedEx Exp.*, 2006 WL 3507913, *1 (N.D. Cal. December 5, 2006), *In re Activision Sec. Litigation*, 621 F.Supp. 415, 434 (N.D. Cal.1985), class members provided with special "incentives" in a settlement agreement "may be more concerned with maximizing those incentives than with judging the adequacy of the settlement as it applies to class members at large." *Staton,* 327 F.3d at 975. The significant disparity between a typical class member's monetary award and the $150,000 in additional payments Ms. Curtis-Bauer is slated to receive in combined incentive payments and settlement of non-class claims[1] does not necessarily create a conflict between her interests and those of the class. However, it does deprive the Court of an important indicator that her interests are aligned with those of the class.

Moreover, "class members who have actively participated in the litigation are the ones likely to be most aware of the dynamic at the negotiating table, the strength of the class

---

[1] At the hearing, Plaintiffs' counsel stated that Ms. Curtis-Bauer was releasing racial harassment claims in addition to the class claims in exchange for the non-class claim settlement of $125,000, and mentioned details not set out in the Second Amended Complaint or the parties' briefing. Plaintiff is invited to submit a declaration further detailing the nature of her non-class claims to further satisfy the Court that the additional settlement is a release of genuine claims above and beyond the class claims.

2

1 claims, and the costs of pursuing the litigation." *Staton*, 327 F.3d at 977.   But Ms. Curtis-
2 Bauer has not been participating all along.  She submitted evidence, in the form of her
3 declaration, that she became actively involved in the suit in "July, 2007" – presumably at
4 least a few days before the settlement was publicly announced on August 2, 2007.  There is
5 no requirement that the class representative, rather than class counsel, negotiate the terms of
6 a settlement, and the Court's decision about whether Ms. Curtis-Bauer is an adequate
7 representative will not turn on the number of days, weeks, or months before the settlement
8 that she joined the litigation.  *Cf. Staton*, 327 F.3d at 959 ("The class members are not at the
9 table; class counsel and counsel for the defendants are.")  But here, the Court cannot point to
10 any extended involvement in the litigation by Ms. Curtis-Bauer to establish her adequacy.
11 Accordingly, the Court is forced to look elsewhere for assurance that she has been an
12 engaged representative since joining the case and vigorously represents the interests of the
13 class.

14       The Court still lacks adequate information to make a determination whether the
15 adequacy certification requirement has been met.  *See generally* 4 NEWBERG § 11.27, *quoting*
16 *In re General Motors Corp. Pick-up Truck Fuel Tank Products Liability Litigation*, 55 F.3d
17 768, 792 (3rd Cir. 1995);  MANUAL FOR COMPLEX LITIGATION, FOURTH § 22.921 at 450.
18 The Court therefore requests supplemental briefing from the parties only  about how it can
19 judge Ms. Curtis-Bauer's adequacy as a representative under the conditions presented here –
20 where Ms. Curtis-Bauer is receiving a significant additional payment in the form of
21 settlement of her non-class claims, and she is relatively new to the suit.  The Court also
22 invites, but does not require, declarations describing the substance of Ms. Curtis-Bauer's
23 involvement in the litigation and review of the settlement, or any other evidence that can
24 show her adequacy as a representative (see also n.1 *supra*).

25       The Court rejects Objectors' other arguments on the propriety of provisional
26 settlement class certification.  There has been no showing that Ms. Curtis-Bauer is an
27 unsuitable class representative for Latinos. In race discrimination suits, "courts appear
28 willing to allow one plaintiff to represent another or several minority or affected groups . . .

1 when the several groups are similarly situated with respect to the discrimination issues in the
2 pleadings." 8 NEWBERG § 24.54.  In *Gaines v. Boston Herald, Inc.*, 998 F.Supp. 91 (D.Mass.
3 1998), for example, an African-American plaintiff could represent both African-American
4 and Spanish-surnamed applicants because "evidence in this case suggests that all non-white
5 applicants without friends and relatives at the Herald were excluded by the same hiring
6 practices and decisions. The defendant's nepotistic hiring system made no meaningful
7 distinction, either in its motivation or its effect, between members of different minority
8 groups." *Id.* at 112-113. Another court noted that "if a class representative can present
9 evidence that she has been discriminated against in the same general fashion as the class
10 members, no more [is] necessary to satisfy the typicality requirement of Rule 23(a)." *Tennie*
11 *v. City of N.Y. Dept. of Social Services of N.Y. City Human Resources Admin.* 1987 WL
12 6156, *3 (S.D.N.Y. 1987); *see also Leonard v. Southtec, LLC,* 2005 WL 2177013, *11 (M.D.
13 Tenn. September 8, 2005)(African-American can represent African-Americans and Latinos
14 where there is "a common injury of discriminatory treatment and a common interest in
15 ending the alleged discriminatory treatment").

16   Here, Plaintiffs allege that unitary practices and policies of distributing accounts (and,
17 consequently, compensation, business opportunity, and opportunities for advancement)
18 applied to African-Americans and Latinos.  They allege that they affected African-
19 Americans and Latinos the same way:  Plaintiffs' statistical analyses of "compensation data
20 and representation rates" demonstrated "common patterns across the class."   Dermody Decl.
21 ¶ 43.  Although Objectors argue on "information and belief" that African-Americans have
22 lower representation rates, lower compensation, and higher rates of attrition than Latinos,
23 they have not suggested that those differences are related to different discriminatory practices
24 (and not, as one objector suggested, to some other characteristic, such as language ability).
25 Rule 23(a)(3)'s typicality requirement can be satisfied even if class members are "denied
26 promotion or promoted at different rates," provided that "the discrimination they allegedly
27 suffered occurred through an alleged common practice."  474 F.3d at 1232.
28

4

The cases on which the Objectors rely all involve genuine potential conflicts between class members. In *Bartleson v. Dean Witter & Co.*, 86 F.R.D. 657, 669 (E.D. Pa. 1980), the white plaintiff alleged that she suffered from race discrimination because she was denied the benefits of an integrated workplace – an experience of discrimination fundamentally different from the discrimination that minority class members themselves allegedly suffered. The court in *Payne v. Travenol Laboratories, Inc.*, 673 F.2d 798 (5th Cir. 1982) refused to allow a black woman to represent black males because the two groups had antagonistic interests – they were literally competing for the same material handler jobs, which had previously been assigned to men. There is no discernable conflict based on race here.

Objectors have not shown how there could be a genuine conflict of interest between financial advisors and trainees of various levels of production and tenure, such that they should be represented by additional individuals. Nor have they shown that Ms. Curtis-Bauer's lack of personal knowledge about Morgan Stanley's practices today prevents her from adequately representing the class; the Plaintiffs are not litigating or settling on the basis of her personal knowledge alone.

**Fairness of the Settlement**

The "universally applied standard" for evaluating a settlement under Rule 23 is whether the settlement is "fundamentally fair, adequate and reasonable." *In re Immune Response Securities Litigation,* 497 F. Supp. 2d 1166, 1169 (S.D. Cal. 2007), *quoting Officers for Justice v. Civil Service Commission of the City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). The court should grant preliminary approval if the settlement "appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval." *Young v. Polo Retail, LLC,* 2006 WL 3050861 at *5 (N.D. Cal. October 25, 2006)(Walker, J.) The issue is not whether the settlement "could be better," but whether it is fair, reasonable, and adequate

5

and free from collusion.[2]  *Hanlon*, 150 F.3d at 1027.  "[S]ettlements that take place prior to formal class certification require a higher standard of fairness."  *Molski v. Gleich,* 318 F.3d 937, 953 (9th Cir. 2003).

A disproportionately large payment to a named plaintiff can raise serious concerns about the fairness and adequacy of a settlement.  *Staton*, 327 F.3d at 975, 977.  However, although the Court is troubled by the high total payments to Ms. Curtis-Bauer, approval of those payments is not before the Court at this time, and it does appear that there are other factors the Court can review to determine if the settlement as a whole is fair.[3]

The parties present the injunctive relief as the centerpiece of the settlement.  In light of the additional information provided at the hearing, the Court is satisfied that the injunctive relief package is not simply a "carbon copy" of the relief Morgan-Stanley has already agreed to in the *Augst-Johnson* settlement.  The programmatic relief set out in sections VII.B, VII.C, VII.D.2.d, VII.E and VII.G appears to represent a genuine expansion rather than a dilution of relief already ordered in *Augst-Johnson.*  Counsel clarified that the industrial psychologists and diversity monitor provided for in the settlement will be devoting additional time, analysis, and resources to addressing race issues, and not displacing relief already agreed to in *Augst-Johnson*.

---

[2] As the Court stated at the hearing, the Court finds no collusion. The Objectors intimated that the parties expanded the class definition at the last moment in exchange for the *Jaffe* plaintiffs' acquiescence in 2007 settlement of a parallel gender discrimination lawsuit against Morgan Stanley, *Augst-Johnson v. Morgan Stanley & Co.*, United States District Court for the District of Columbia Case No. 06-1142. However, Plaintiff Williams filed an EEOC charge alleging "pattern and practice" discrimination against "female and minority" financial advisors in November, 2006, and the *Jaffe* plaintiffs entered into a tolling agreement with Morgan Stanley in January, 2007. Moreover, mediator Hunter Hughes submitted a detailed statement confirming that the negotiation of this settlement was at arm's length.

[3] The Court rejects Objectors' vague arguments that inclusion of Latinos in the settlement makes it unfair. Objectors correctly pointed out that the inclusion of Latinos in the class might undermine the ability of African-Americans to show their dissatisfaction with the settlement if the number of African Americans in the class is in fact low – the Court could not know, for example, whether the 20 African-American objectors represent 1% or 50% of the African-American class members. However, Plaintiffs' counsel represented at the hearing that African Americans make up approximately half of the class. The parties allege that all class members are affected by the targeted practice in the same manner. The Settlement Agreement distributes monetary relief primarily according to length of service, and the programmatic relief is not necessarily "one size fits all," as the industrial psychologists are free to make recommendations tailored to recruitment, retention, and nondiscrimination of African-Americans and Latinos separately.

6

The value of injunctive relief is, however, notoriously difficult to judge. The plaintiffs described the monetary value of the programmatic relief first as $7.5 million for both cases, then as "millions of dollars" for "diversity initiatives that are aimed squarely at the class members in this case." Pappas Decl. ¶ 12. At the hearing, counsel for Morgan Stanley stated that the estimated dollar value of the programmatic relief includes the estimated amounts Morgan Stanley plans to spend on programs in response to recommendations made by the industrial psychologists pursuant to their analyses. The Court cannot identify anything in the Settlement Agreement that obliges Morgan Stanley to follow those recommendations, however. The Court could greatly benefit from the submission of additional evidence about the value of the programmatic relief, whether from additional experts, individuals at Morgan Stanley who can discuss in greater detail how they arrived at the estimated value, or some other source.

The Settlement Agreement also provides for a fund of approximately $16,000,000, which, after deductions for class counsel work done prior to approval ($800,000), fees for five years' worth of monitoring ($750,000), notice and claims expenses (less than $50,000), and service and individual payments to Curtis-Bauer ($25,000 and $125,000, respectively) leaves well over $14,000,000 to be divided among class members who make claims.

The Objectors have offered no analogous cases which show this monetary relief is plainly inadequate or unfair.[4] Before a liability finding, "a settlement likely will be less favorable to plaintiffs, and can provide only a fraction of the relief that would be appropriate post-liability." *Martens,* 181 F.R.D. at 265. Moreover, the settlement approval process is not supposed to be "turned into a trial or rehearsal for trial on the merits," and the settlement "is not to be judged against a hypothetical or speculative measure of what might have been

---

[4] Objectors argue – without support by reference to authority or by declaration – that the settlement in *Chemin v. Meriel Lynch* was similar and resulted in a $225 million dollar settlement to 900 class members. However, that settlement established a claims procedure under which some claimants in fact recovered nothing. *See Chemin v. Meriel Lynch Pierce, Feiner & Smith, Inc.,* 328 F. Supp. 2d 865, 867 (N.D. Ill. 2004); 454 F. Supp. 2d 554 (N.D. Ill 2006)(confirming arbitration award). *Martens v. Smith Barney, Inc.*, 181 F.R.D. 243, 261 (S.D. N.Y. 1998) involved a similar dispute resolution process. Those settlements do not, therefore, parallel this one, where each class member will be entitled to a monetary settlement without the risks attendant in proving Morgan Stanley's liability for race discrimination.

7

achieved by the negotiators." *Officers for Justice,* 688 F.2d at 625.  Nonetheless, courts do look to whether the parties have given some explanation for a discount.

The briefing submitted in advance of the hearing gave the Court no benchmark with which to judge the adequacy of the monetary relief.  At the hearing, however, Plaintiff's counsel suggested that at some point, Plaintiffs estimated the value of the claims were they to prevail at trial at $36,000,000 – making the $16,000,000 award a healthy 43% of the possible recovery.   The Court invites the Plaintiffs to submit some evidence in support of this statement, whether by declaration of counsel, a retained expert, or some other means, which will help the Court review the fairness of the monetary award.

Finally, at the hearing, the Court raised concerns about two portions of the formula for the claim form component of class member compensation set out in the Settlement Agreement (specifically the portions which provide a Special Master will determine the amount of each award based in part on "(i) individual contribution to prosecution of the action" and "(iv) the release of individual claims that go beyond the scope of the settled class claims." Settlement Agreement VIII.D.2, at 40).  At the hearing, the parties indicated that this formula was included in the Settlement Agreement in error, and that the parties intended to use the formula set out in Plaintiff's brief in support of their motion and the class notice.  That formula assigns points for the number of weeks each claimant was employed during the class period, extraordinary emotional distress, and termination or constructive discharge claims.  Plaintiff's Memorandum in Support of Motion at 11-12;  Notice § 8, Proposed Order Exh. 2 at 13.  The parties are invited to submit a corrected version of this portion of the Settlement Agreement.

**Discovery Motion**

At the hearing, the Court granted Objectors leave to file a supplemental brief regarding their entitlement to discovery or disclosure of work force data that Morgan Stanley revealed to the Plaintiffs during settlement negotiations.  In response, Objectors noticed a discovery motion for January 21, 2008, a court holiday.  Hearing on Objectors' Motion for

Discovery is hereby VACATED. After the Court reviews the Motion, if it desires responsive briefing or a hearing, it will so order.

**Conclusion**

    The parties are HEREBY ORDERED to submit supplemental briefing not to exceed fifteen pages, and any supplemental evidence in support of their motion, on or before January 14, 2007.

**IT IS SO ORDERED.**

Dated: 12/12/07

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT