ROBERT S. NELSON (SBN# 220984)
NELSON LAW GROUP
900 Cherry Avenue, Suite 300
San Bruno, CA 94066
(650) 794-2760 (phone)
(650) 794-2761 (fax)
rnelson@nelsonlawgroup.net

MARY STOWELL (*Pro hac vice*)
LINDA D. FRIEDMAN (*Pro hac vice*)
SUZANNE E. BISH (*Pro hac vice*)
STOWELL & FRIEDMAN LTD.
321 S. Plymouth Court, Suite 1400
Chicago, Illinois 60604
(312) 431-0888
Mstowell@sfltd.com
Lfriedman@sfltd.com

BARI S. ROBINSON (SBN# 91743)
LAW OFFICES OF BARI S. ROBINSON
1970 Broadway, Suite 1250
Oakland, California 94612
(510) 625-1507
barirobinson@aol.com

Attorneys for PUTATIVE CLASS MEMBERS AND OBJECTORS Ronald Moore, Morris Allen, Jr., Michael Barnett, Anthony Bell, Patrick Carter, Martin Dixon, Ernest Dorsey, Mary Evans, Janice Grant, Justin Harris, Mark Lewers, Maurice Mabon, Brian Roy, Marion Tucker and Carlton McDowell

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DAISY JAFFE, et al., <br><br> Plaintiff, <br><br> v. <br><br> MORGAN STANLEY & CO., INC., <br><br> Defendant. | Case No. C 06-3903 TEH <br><br> **OBJECTORS' SUPPLEMENTAL BRIEF IN OPPOSITION TO CLASS CERTIFICATION AND PROPOSED SETTLEMENT** |

# TABLE OF AUTHORITIES

*Albermarle Paper Co. v. Moody*, 422 U.S. 405 (1975) .................................................................... 9

*Armour v. Network Associates, Inc.* ............................................................................................. 4
  171 F. Supp. 2d 1044 (N.D. Cal. 2001)

*Augst-Johnson v. Morgan Stanley*, Case No. 06-1142 (D.D.C.) .......................................... 14

*Chiron Corp. Securities Litigation* ............................................................................................. 2
  No. 04-4293, 2007 U.S. Dist. LEXIS 91140 (N.D. Cal. Nov. 30, 2007)

*Cremin v. Merrill Lynch* ............................................................................................................. 21
  Case No 96 C 3773 (N.D Ill)

*EEOC v. O&G Spring* ................................................................................................................. 13
  38 F.3d at 880; see 42 U.S.C. § 2000e-5(g)(1)

*EEOC v. Morgan Stanley* ........................................................................................................... 17
  No. 01-8421 (S.D.N.Y.)

*Guenther V. Pacif. Telecom, Inc.* .............................................................................................. 1
  123 F.R.D. 341, 344 (D. Ore. 1987)

*Ingram v. The Coca-Cola Co.* .................................................................................................... 12
  200 F.R.D. 685, 688 (N.D. Ga. 2001)

*Kayes v. Pacif. Lumber Co.* ....................................................................................................... 3
  51 F.3d 1449, 1465 (9th Cir. 1995)

*Kraszewski v. State Farm* ..................................................................................................... 7, 12
  No. 79-1261 (N.D. Cal.)

*Krim v. PCORDER.Com* .............................................................................................................. 5
  210 F.R.D. 581 (2002)

*Lerwill v. Inflight Motion Pictures, Inc.* .................................................................................... 3
  582 F.2d 507 (9th Cir. 1978)

*Linder v. Litton Systems, Inc.* ............................................................................................... 5, 6
  81 F.R.D. 14 (D. Md. 1978)

*Martens v. Smith Barney,* Case No. 96-3779 (S.D.N.Y.) ....................................................... 21

*Merriweather v. Family Dollar Stores of Ind.* ........................................................................... 9
  103 F.3d 576, 578 (7th Cir. 1996)

*Peregrine Systems, Inc. Securities Litigation* ......................................................................... 3
  No. 02-870, 2002 U.S. Dist. LEXIS 27690, *37 (S.D. Cal. Oct. 9, 2002)

*Quarterdeck Office Systems, Inc. Securities Litigation* ............................................................ 6
  No. 92-3970, 1993 U.S. Dist. LEXIS 19806 (C.D. Cal. Sep. 30, 1993)

*Reiter v. MTA,* 457 F.3d 224, 230 (2d Cir. 2006) .............................................................. 11

*Roberts v. Texaco, Inc.*........................................................................................................... 12
  No. 94-2015, 1997 U.S. Dist. LEXIS 23848 (S.D.N.Y. Mar. 21, 1997)

*Rutstein v. Avis Rent-A-Car Sys.*........................................................................................... 9
  211 F.3d 1228, 1237 (11th Cir. 2000)

*Smith v. Nike Retail Services*................................................................................................. 12
  No. 03-9110 (N.D. Ill.)

*Stallworth v. Shuler*............................................................................................................... 13
  777 F.2d 1431, 1435 (11th Cir. 1985)

*Swift v. First USA Bank*.......................................................................................................... 3
  No. 98-8238, 1999 U.S. Dist. LEXIS 19474, at *17 (N.D. Ill. Dec. 14, 1999)

*Taxman v. Bd. of Educ.* .......................................................................................................... 9
  91 F.3d 1547, 1552 (3d Cir. 1996)

*Williams v. Pharmacia* ........................................................................................................... 9
  137 F.3d 944, 951-52 (7th Cir. 1998)

*Zhang v. Am. Gem Seafoods, Inc.* ......................................................................................... 9
  339 F.3d 1020, 1044 (9th Cir. 2003)

## TABLE OF CONTENTS

I.    **The Proposed Settlement Class Lacks An Adequate Class Representative** .............................................................................................. 2

    A.    Ms. Curtis-Bauer Does Not Meet The Legal Requirements of Rule 23(a)(4) To Serve As A Class Representative ............................................ 2

    B.    A Comparison Of Ms. Curtis-Bauer's Role In This Lawsuit To Other Named Plaintiffs And The Moore Group Illustrates Her Inadequacy ........ 7

II.   **The Adverse Impact Of The Lack Of Adequate Class Representation** ......... 11

    A.    Plaintiff's Compensation Shortfall Analysis Of Aggregate Class Damages Does Not Adequately Capture Class Members' Losses.............. 8

    B.    Releases Should be Limited To Claims in Compensation Shortfall Analysis ................................................................................................... 10

    C.    Programmatic Relief is Not a Fair Substitute For Monetary Relief.......... 11

    D.    African-Americans and Latinos Should Not Be Joined Absent Sub-Classes .................................................................................................... 13

    E.    The Single Allocation Formula For The Common Settlement Fund Is Unfair ..................................................................................................... 14

III.  **Conclusion**……………………………………………………………………………………..15

Before the Court is the Joint Motion of the Parties for Class Certification and Preliminary Approval of a Settlement. On December 12, 2007, following a hearing on the motion, this Court sought additional briefing from the parties. Specifically, the Court sought input from the parties on "how it can judge Ms. Curtis-Bauer's adequacy as a representative … where Ms. Curtis-Bauer is receiving a significant additional payment in the form of settlement of her non-class claims, and she is relatively new to the suit." Dec. 12, 2007 Order, Docket No. 130, at 3. Additionally, the Court requested information about plaintiff's computation of maximum class damages in order to judge the adequacy of the proposed monetary relief. *Id.* at 7-8. On behalf of themselves and absent class members, the Moore group seeks leave to participate in this additional briefing.

## I.    The Proposed Settlement Class Lacked An Adequate Class Representative

### A.    Ms. Curtis-Bauer Does Not Meet The Legal Requirements of Rule 23(a)(4) To Serve As A Class Representative

As a threshold matter, a class action may be maintained only if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement is "essential to meet due process standards, [and] must be satisfied at all stages of a class action, because the final judgment in a class action is binding on all those whom the court determines are members of the class." Newberg on Class Actions, Sect. 3:21. "The importance of determining adequate representation cannot be understated. The rule that the representative must fairly and adequately represent the class is one of constitutional magnitude." *Guenther v. Pacif. Telecom, Inc.*, 123 F.R.D. 341, 344 (D. Ore. 1987). Basic notions of fairness and justice dictate that absent class members have an effective voice in proceedings that may extinguish their claims. *Id.*, citing 7A Wright & Miller, Fed. Prac. & Proc. § 1765 (1986).

The presence and involvement of class counsel during negotiations is not a substitute for the active representation of a named plaintiff, regardless of whether class counsel are experienced and able at their task. *In re Cavanaugh*, 306 F.3d 726, 733 (9th Cir. 2002) ("the court must keep firmly in mind that the inquiry is not into the adequacy or fitness of counsel but into the adequacy of plaintiff"). Similarly, class counsel cannot fairly and adequately serve as both class counsel and class representative. *In re Chiron Corp. Securities Litigation*, No. 04-4293, 2007 U.S. Dist.

LEXIS 91140, *46 (N.D. Cal. Nov. 30, 2007) ("When class counsel are not effectively monitored by the class representative, the result is indistinguishable from the situation in which an attorney serves as both class counsel and class representative").

Here, defense counsel, Mark Dichter, submitted a declaration to the Court affirming that the parties reached *tentative agreement on a settlement* on July 23, 2007 during mediation that day.  Dichter Dec., Docket No. 107, at ¶ 9.  Yet, plaintiff's counsel, Kelly Dermody, testifies in her declaration that a *settlement in principle* was reached in August, 2007.  Dermody Dec., Docket No. 88, at ¶ 38.  Ms. Curtis-Bauer now affirms that *her own direct contributions* in the negotiations were *probably* no more than for the week before the *agreement in principle was finalized.*[1]  Curtis-Bauer Dec., Docket No. 138, at ¶ 15.  There is no serious doubt that the Court's characterization of Ms. Curtis-Bauer as relatively new to the litigation is fair.  Likewise, there can be no serious debate that prior to joining the suit, Ms. Curtis-Bauer did not serve as a fiduciary to the class or otherwise monitor class counsels' negotiations.  Thus, the due process rights of class members were not protected by Ms. Curtis-Bauer or any other class fiduciary.  During the heart of this litigation, the class had no effective voice and the due process standards codified in Rule 23 were not met.

Since she joined the litigation, Ms. Curtis-Bauer's conduct has not instilled confidence among class members that she has made up for lost time and protected their rights.  On the contrary, Ms. Curtis-Bauer has established that she is not an adequate representative because during the "no more than a week" of her "direct contributions to the negotiations," Ms. Curtis-Bauer not only ratified the common fund, she and class counsel also secured a special payment of $125,000 to be paid to her from that fund for her "non-class claims."  These facts raise conflict and adequacy issues, and the law prevents Ms. Curtis-Bauer from being deemed an adequate

---

[1] This timeline is entirely consistent with the statements Ms. Curtis-Bauer made to Moore group members that she was contacted on a Friday and told she had only three days to think about her decision to serve as a class representative.  By Tuesday of the following week, her name had been added to the Second Amended Complaint and her $125,000 special payment secured.  *See* Ex. 2, Roy Dec., Ex. 3 Evans Dec., Ex. 4, Mabon Dec.

2

OBJECTORS' SUPPLEMENTAL BRIEF IN OPPOSITION TO CLASS CERTIFICATION AND PROPOSED SETTLEMENT
CASE NO. C 06-3903 (T.E.H.)

representative if the facts create even an *appearance* of a conflict or that she is not zealously guarding the interests of the class.

Other class representatives were deemed inadequate under Rule 23 where a conflict of interest created "the appearance that they are not able to adequately investigate and prosecute this action on behalf of the absent members of the class." *In re Peregrine Systems, Inc. Securities Litigation*, No. 02-870, 2002 U.S. Dist. LEXIS 27690, *37 (S.D. Cal. Oct. 9, 2002). Here, the disproportionately large, special payment of $125,000 to Ms. Curtis-Bauer relative to her small possible recovery under the class fund formula, in combination with her eleventh-hour assumption of the named plaintiff role, likewise create the appearance of a conflict of interest and bars Ms. Curtis-Bauer from serving as class representative. *See also Swift v. First USA Bank*, No. 98-8238, 1999 U.S. Dist. LEXIS 19474, *17 (N.D. Ill. Dec. 14, 1999) (proposed class representative was inadequate because she was "branded with the appearance of, and potential for impropriety, which is the primary" concern of the court, even though the court did not suppose that she would "change a mere appearance into an actual occurrence"); *accord Kayes v. Pacif. Lumber Co*., 51 F.3d 1449, 1465 (9th Cir. 1995) (affirming the district court's disqualification of class counsel due to the appearance of divided loyalties).

Under the apparent conflict standard, the underlying facts concerning Ms. Curtis-Bauer's negotiation of a substantial payment from the class common fund are particularly troubling given that her "non-class claims" are time-barred.[2] Ms. Curtis-Bauer left the employ of Morgan Stanley in November 2002, nearly five years before she first raised any legal claims against

---

[2] Ms. Curtis-Bauer may not attempt to revive her stale claims by relying on the standstill negotiated by the Moore group. First, the standstill applies to Moore's class claims, not Ms. Curtis-Bauer's non class claims. Second, the standstill does not revive claims that were barred as of August, 2006. Third, by filing her own action, Ms. Curtis-Bauer removed herself from the protection of the standstill and, in fact, violated the express terms of the standstill. Ex. 23 ¶ 5 (requiring 15 days written notice terminating standstill prior to initiation of legal action). Finally, if Ms. Curtis-Bauer is suggesting that she can intentionally elect to apply the Moore standstill only to herself while not protecting the rest of the class members with a class period that dates back to August, 2006, this is yet another example of impermissible self-dealing or at least an appearance of impropriety sufficient to disqualify her as a class representative.

Morgan Stanley and joined the *Jaffe* lawsuit in August 2007.[3]  The only non-class claims that Ms. Curtis-Bauer *may* have once been entitled to prosecute are now time-barred.  Thus, without the class action, she would have no potential recovery on those "non-class" claims.

Further, based on a fund allocation formula that is heavily weighted towards tenure, Ms. Curtis-Bauer will likely receive a nominal award for her class claim.  Had Ms. Curtis-Bauer been presented to the Court as an advocate for the settlement without the $125,000 favored treatment, an argument that she stood in the shoes of absent class members and protected their interests might be more compelling.  However, Ms. Curtis-Bauer was not required to balance her low recovery from the common fund against the benefits of the diversity initiatives.  The Court is left to wonder whether Ms. Curtis-Bauer would support the settlement without this favored treatment.  And class members are left to wonder whether she leveraged the class litigation for an individual recovery on time-barred claims.  Fortunately, the Court need not resolve either of these troubling issues against Ms. Curtis-Bauer to disqualify her as a class representative because the appearance of divided loyalties is enough to bar her from serving as a class representative under Rule 23.

A court may also test a named plaintiff's fulfillment of her fiduciary obligations to the class by examining her knowledge of the case and the work she has done to pursue a favorable outcome.  District courts in this circuit have denied certification where the proposed representative failed to meet a minimum standard of knowledge and effort.  In *Burkhalter Travel*

---

[3] Also significant is Morgan Stanley's agreement to extend the class period back to October 2002, thus capturing the end of Ms. Curtis-Bauer's tenure at Morgan Stanley. The limitations period under Section 1981 is four years, so the class period would seemingly begin four years prior to the January 23, 2007 effective date of the class standstill the parties executed in March 2007, that is on January 23, 2003, two months *after* Ms. Curtis-Bauer left Morgan Stanley, and outside the § 1981 statute of limitations and likely class period.  *See* Agmt., Ex. A to Dichter Dec., Docket. No. 107, at 9-11; Sec. Am. Compl., Docket No. 81, at ¶ 15.  Plaintiffs' counsel stated that Morgan Stanley agreed to set the class period four years prior to the date Denise Williams was added to the gender discrimination class action and alleged *individual* race claims in the First Amended Complaint on October 12, 2006.  Dec. 3 Hearing Transcript, 66:20-67:7.  But Ms. Williams's filing of individual claims would not toll the statute of limitations for any plaintiff except herself.  As class counsel told this Court at the time, Ms. Williams's "race discrimination claims . . . have not been brought on behalf of anyone but Ms. Williams at this time . . . who brings certain *individual* race claims not previously alleged." *See* Docket No. 32 at 1-2.  Defendant's decision to abandon a limitations defense against the sole class representative is telling.

*Agency v. MacFarms International, Inc.,* 141 F.R.D. 144, 154 (N.D. Cal. 1991), the court denied certification to a class of plaintiffs in a price-fixing antitrust case. The court noted that the *Burkhalter* plaintiff was unsure, during his deposition, as to whether the class would include a nationwide group of plaintiffs or only those in his home state, *id.,* just as Ms. Curtis-Bauer mistakenly told her friend Mary Evans that the class in this matter was restricted to Morgan Stanley FAs employed in California. Ex. 3, Evans Dec. ¶6a. The *Burkhalter* plaintiff likewise lacked "any significant understanding of price policies at his own firm or about" the industry in question as a whole. *Id*. Given this "alarming unfamiliarity" with the suit, the court could not "be certain that [the plaintiff] will adequately represent the proposed class. *Id*. Plaintiff's counsel would be acting on behalf of an essentially unknowledgeable client, so certifying a class . . . would risk a denial of due process to the absent class members." *Id*.

Similarly, because Ms. Curtis-Bauer worked for Morgan Stanley for only a few weeks in the class period, and was not involved in the investigation or prosecution of the claims, she lacks the required knowledge of the firm's practices and the injuries and wrongs suffered by class members during her five-year absence from its workforce. *Linder v. Litton Systems, Inc.*, 81 F.R.D. 14 (D. Md. 1978) (dismissing employment discrimination class action due to inadequacy of class representative, who had been employed by defendant years prior to lawsuit and had little knowledge of challenged policies and practices); *Krim v. PCORDER.Com*, 210 F.R.D. 581, 587 (W.D. Tex. 2002) (denying class certification based on inadequacy of named plaintiffs due to lack of knowledge, involvement and interest in case).[4]

Courts have denied certification where, as here, the class representative's lack of action created doubts as to her *willingness* to fulfill her fiduciary obligations to the class. *In re*

---

[4] According to the *Krim* court, the Fifth Circuit holds that "the adequacy requirement mandate[s] an inquiry into 'the willingness and ability of the representatives to take an active role in and control of the litigation and to protect the interests of the absentees' … Representatives should understand the action in which they are involved, and their 'understanding should not be limited to derivative knowledge acquired solely from counsel.' …The competency of class counsel is not enough on its own; the representatives themselves must be familiar with the case" (citations omitted). *Krim*, 210 F.R.D. at 587.

OBJECTORS' SUPPLEMENTAL BRIEF IN OPPOSITION TO CLASS CERTIFICATION AND PROPOSED SETTLEMENT
CASE NO. C 06-3903 (T.E.H.)

*Quarterdeck Office Systems, Inc. Securities Litigation*, No. 92-3970, 1993 U.S. Dist. LEXIS 19806, 16 (C.D. Cal. Sep. 30, 1993), defendants opposed certification due to the named plaintiffs' "abdication of their role as fiduciaries for the class to their attorneys." *Id*. at *17. The court agreed, finding that the plaintiffs were "true 'stand-in' parties, selected by lawyers to fill a required role." *Id*. at *17-18. Among other flaws, the plaintiffs were "not familiar with the changes in the various amended complaints filed on behalf of the class . . . and they relied on investigations by counsel to support their claims." *Id*. at *17. One plaintiff even admitted -- just as Ms. Curtis-Bauer admitted to Moore Group members -- that "she would leave the conduct of the litigation to her attorneys to vigorously pursue the case." *Id*. *See* Declarations at Ex. 2 ¶¶5-6; Ex. 3 ¶6a; Ex. 4 ¶5f. Further, Ms. Curtis-Bauer did not provide the Court with the opportunity to question her about this settlement because she elected not to appear at the preliminary approval hearing. On these facts, the Court cannot be certain that the sole class representative was sufficiently knowledgeable, willing or able to defend absent class members' rights.

**B.      A Comparison Of Ms. Curtis-Bauer's Role In This Lawsuit To Other Named Plaintiffs And The Moore Group Illustrates Her Inadequacy.**

Ms. Curtis-Bauer's late arrival and passive role in the lawsuit stand in stark contrast to class representatives in other employment discrimination lawsuits and, notably, to the extensive work the Moore group devoted to this matter over the last year and one half.

In employment discrimination cases, active involvement by class representatives is crucial for informed, vigorous representation of the class. *Linder v. Litton Systems, Inc.*, 81 F.R.D. 14 (D. Md. 1978) (sole class representative was "not adequate to undertake the grave fiduciary responsibility of representing any class of victims of defendant's alleged employment discrimination"). In contrast to the representatives in *Linder*, Judge Castillo credited the results achieved to the labors undertaken by the class representatives *Cremin v. Merrill Lynch* lawsuit,[5] which eliminated defendant's mandatory arbitration policy and created a claims resolution

---

[5] This Court found *Cremin* unpersuasive precedent, in part, because *Cremin* class members risked no recovery from settlement. Docket. No. 130, at 7, n. 4. Respectfully, only one *Cremin* claimant of over 900 received no award, after rejecting a $600,000 settlement offer. Ex. 19 ¶3.

process that was modeled in part after a case before this Court, *Kraszewski v. State Farm*. *See* Ex. 12 Fairness Hearing Tr., at 38-39; Ex. 9, Brad Seligman *Cremin* Aff. The active role of the *Cremin* representatives in selecting and overseeing counsel and the litigation, from fact and expert discovery through the negotiation of a resolution, are described in their declarations at Exhibit 18.

The Moore group has expended substantial time, effort, and resources in pursuing their claims against Morgan Stanley, as described in the declarations attached as Exhibits 5, 6, 7, 8 and 24. Members of the Moore group came together to discuss the racial discrimination they faced at Morgan Stanley and plan a response. They researched law firms and spent extensive time with the counsel they selected, explaining their experiences and Morgan Stanley's employment policies. *See* Exs. 7-8. Together with counsel, the Moore group drafted EEOC charges for the class they hoped to represent and standstill agreements to protect class members' rights.

To ensure that they understood the serious obligations they would assume if they pursued legal claims on behalf of a class, the Moore group convened in Chicago to learn the duties of class representatives, the differences between individual and class litigation, and various methods of proving and resolving these cases. *See* Exs. 5-8. Moore Group members also prepared for, traveled to, and participated in four days of mediations with Morgan Stanley and its representatives. *Id*. Ultimately, the Moore group filed suit on behalf of themselves and others in federal court in Chicago seeking to hold Morgan Stanley accountable for its systemic race discrimination and to achieve meaningful reform. *Id.*

In addition to pursuing their legal claims, members of the Moore group met with members of Congress and their staffs about discrimination on Wall Street and worked with the National Employment Lawyers Association to lobby for passage of civil rights legislation. Ex. 24. Moore group members also communicated with class representatives in analogous race discrimination lawsuits by FAs to work together towards change. Ex. 5 ¶8.

The Moore group's efforts to educate their counsel, become fully informed about the facts and law, and to discuss these issues would have enabled them to make a meaningful contribution to settlement negotiations. Their efforts, and the knowledge Moore group members gained

7

thereby, form the basis of their objections to the proposed settlement. As described below, the lack of informed and interested class representatives deprived counsel of important information during settlement negotiations and left absent class members without adequate representation.

## II. The Adverse Impact Of The Lack Of Adequate Class Representation

The Moore group provides the below examples of important issues that would have been raised by informed, engaged class representatives as part of negotiations with Morgan Stanley.

### A. Plaintiff's Compensation Shortfall Analysis Of Aggregate Class Damages Does Not Adequately Capture Class Members' Losses

One factor in determining the adequacy of a common fund is the degree of compromise it represents from the maximum recoverable damages to the class. A settlement fund is not adequate if it represents too low a percentage of the recoverable damages such that the risk of litigation does not outweigh the advantages of settlement. Toward establishing the adequacy of the common fund, plaintiff's counsel argued: "[I]f we run the table, we get the class cert, we win on liability, we get all of the damages we're seeking we would get about $36 million." Transcript, Docket No. 131, 13. Thus, plaintiff's counsel suggests that $16 million is a reasonable and fair recovery on liability capped at $36 million. *Id.* This argument is wholly dependent on the sufficiency of the class damages estimate. Plaintiff's counsel recently disclosed that its $36 million damages calculation was based on a "compensation shortfall" analysis. *See* Motion For Leave To File Under Seal, Docket No. 132, at 2-3; Finberg Dec., No. 133, at ¶¶ 2-3. A "compensation shortfall" analysis, however, does not capture the losses of class members or damages recoverable as a matter of law.

Governing law provides "make-whole" relief for victims of discrimination. *Albermarle Paper v. Moody*, 422 U.S. 405, 419 (1975). In order to further the goals of Title VII and Section 1981, backpay is presumptively due to prevailing plaintiffs. *See EEOC v. O&G Spring*, 38 F.3d at 880; 42 U.S.C. § 2000e-5(g)(1); *Rutstein v. Avis Rent-A-Car Sys.*, 211 F.3d 1228, 1237 (11th Cir. 2000). Backpay is the sum of money owed to victims of discrimination from the date of judgment backwards to the earliest actionable date, in this case October 12, 2002. Section 1981 plaintiffs may seek unlimited damages for emotional distress and punitive damages. *See, e.g.,*

*Zhang v. Am. Gem Seafoods, Inc.,* 339 F.3d 1020, 1044 (9th Cir. 2003); *Merriweather v. Family Dollar Stores of Ind.*, 103 F.3d 576, 578 (7th Cir. 1996).  Front pay is also allowed, as well as reputational injury.  *Williams v. Pharmacia*, 137 F.3d 944, 951-52 (7th Cir. 1998).  Wage losses also may include lost fringe benefits, retirement benefits, health insurance costs and other compensatory amounts.  *Taxman v. Bd. of Educ.* 91 F.3d 1547, 1552 (3d Cir. 1996).

The proposed settlement requires class members to release termination claims due to low production, but the damages calculation does not include losses that result from termination.[6]  As explained in the declaration of Professor Emeritus Jerry Goldman, an expert retained by the Moore group, the goal of a "compensation shortfall" analysis is to capture differences in wages for current employees. Ex. 1, at ¶¶ 9-10.  It measures earnings disparities *only* for the period during which class members worked at the firm.  A compensation shortfall analysis therefore omits post-employment losses, including post-employment backpay and front pay.  *Id*.

The undervalued losses from termination are acutely felt by African-American class members, who suffer a higher rate of attrition.  To illustrate, the fifteen Moore group members all suffered devastating economic losses and career injuries.  Only two of the fifteen remain employed by Morgan Stanley; the remaining thirteen were terminated or forced out of Morgan Stanley's employ due to the firm's discriminatory practices.  *See generally* Exs. to Objns., Docket Nos. 95-2 through 95-9.  Many struggled to find new employment, and suffered substantial post-employment losses.[7]  *See, e.g.,* Ex. 7, at ¶2.  The Moore group believes their experiences are typical of African-Americans class members.  *See generally* Docket Nos. 95-2 through 95-9.

The "compensation shortfall" analysis similarly undervalues the claims of currently

---

[6] The proposed Notice states that "[t]ermination and advancement into management claims for race and/or color discrimination arising out of low production, failure to satisfy position requirements, failure to satisfy requirements of the training program, production related reduction-in-force, other production based performance related terminations and any claims for constructive discharge based on the same set of facts or circumstances shall be released but any other termination, advancement into management, constructive discharge or harassment claims shall not." Docket No. 87-2, Notice at 13.

[7] Although most remain in the industry, they are working at small, independent firms where their earnings and opportunities do not approach what they should have earned at Morgan Stanley absent discrimination.  Ex. 7.

employed African-American class members by excluding front pay. Due to the denial of resources and opportunities, African-American FAs who survive at Morgan Stanley are disproportionately grouped in the lower range of production and income levels as compared to Caucasians and Latinos. *See, e.g.,* Ex. 6. African-Americans are nearly absent from the ranks of the firm's highest-earning FAs. Ex. 7. Therefore, a "compensation shortfall" analysis that ends in 2007 will not accurately determine the harm that will be suffered in the future by tenured African-American FAs.[8] Any damage model must include front pay to value the ongoing cumulative disadvantage to African-American FAs.

### B.    Releases Should be Limited To Claims in Compensation Shortfall Analysis

Plaintiff's counsel stated to the Court: "*if we … get all of the damages we're seeking,* we would get about $36 million" (emphasis added). If the class was only seeking damages for the limited wage claims captured by a "compensation shortfall" analysis, why does the settlement require class members to release termination claims and post-termination losses? If the Court relies upon the "compensation shortfall" analysis and approves the $16 million fund, class members should be required to release claims only for wage loss captured in the "compensation shortfall" analysis. Class members should not be required to release claims or damages not included in the "compensation shortfall" analysis, including claims for termination, emotional distress, punitive damages, front pay and others not sought by the class. The release must be re-written to include only the claims captured by the compensation shortfall analysis.

### C.    Programmatic Relief is Not a Fair Substitute For Monetary Relief

The "compensation shortfall" analysis plainly does not measure the aggregate damages due to the class under law. Ex. 1. Plaintiff appears to suggest that the under-valuation of damages and under-compensation of class members is lawfully offset by the settlement's programmatic relief because this is a race discrimination case. Plaintiff's Reply, Docket No.101,

---

[8] It does not appear that plaintiff's counsel attempted to value losses based on account distributions or transfers lost as a result of the firm's discriminatory account distribution and teaming practices, nor did they value the loss of opportunities to join management.

OBJECTORS' SUPPLEMENTAL BRIEF IN OPPOSITION TO CLASS CERTIFICATION AND PROPOSED SETTLEMENT
CASE NO. C 06-3903 (T.E.H.)

at 4.[9] This cannot be the outcome for a number of reasons. First, the programmatic relief will not benefit the overwhelming majority of African-American class members, who no longer work at the firm due to its systemic discrimination. Second, the bulk of the programmatic relief is already secure on account of the *Augst-Johnson* gender settlement. More importantly, the trade-off of inadequate monetary relief in exchange for injunctive relief is neither fair nor legally required. To the contrary, Congress provided for full, make-whole relief to serve the dual aims of Title VII to make whole the victims of discrimination and to achieve workplace reform. *Reiter v. MTA,* 457 F.3d 224, 230 (2d Cir. 2006). Indeed, as Congress contemplated, one of the most effective tools of reform is requiring an employer to redirect profits and make whole its victims. Allowing an employer to escape responsibility to fairly compensate victims of discrimination leaves victims with inadequate relief and undermines the business rationale to bring about change. Nor is any trade-off necessary with a defendant with the financial resources of Morgan Stanley.

Victims of race discrimination should not be required to choose between change and make-whole relief for their losses. Settlements and verdicts in similar cases have not required class members to compromise make-whole relief. For example, in *Kraszewski v. State Farm General Insurance Co.*, No. 79-1261 (N.D. Cal.), over $250 million was paid to women denied insurance agent positions at State Farm. *See* Ex. 9, Dec. of B. Seligman in *Cremin v. Merrill Lynch*, at ¶¶ 4, 14. According to press reports, after approximately 100 class members obtained relief through individual damages hearings, the defendant settled with the 814 remaining claimants for $157 million, or more than $192,000 each. Ex. 9, Seligman Aff. at ¶ 14; Ex. 10, *Business People: The Woman Who Sued State Farm And Won*, by Adam Bryant, New York Times, April 30, 1992. The lost opportunities at State Farm were less lucrative than those at issue here; veteran State Farm agents earned incomes of approximately $61,000 per year at the time of the suit. *Kraszewski,* No. 79-1261, 1985 U.S. Dist. LEXIS 20297, at *29-30 (N.D. Cal. 1985).

---

[9] Plaintiff contended that unlike other cases, which are measured by their monetary rewards, a race discrimination settlement is successful if "the agreed upon injunctive relief addresses the problems … Judged by that measure, this proposed settlement is a success." *Id.*

Similarly, in *Roberts v. Texaco, Inc.*, No. 94-2015, 1997 U.S. Dist. LEXIS 23848 (S.D.N.Y. Mar. 21, 1997), a class of salaried African-American employees attained a settlement valued at over $193 million. Ex. 26. *Roberts* class members received average awards in excess of $63,000, along with pay equity corrections (i.e., raises) averaging more than 11%, a benefit valued at more than $4 million in the first year alone. *Id*. at *4. *See also Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 688 (N.D. Ga. 2001) (African-American salaried employees settled for overall value of $176 million and received guaranteed cash awards averaging $38,000 per class member, as well as $10 million bonus fund for class members promoted during next ten-year period and a pay equity provision worth $43.5 million in employee raises); Ex. 27. [10]

Recent discrimination verdicts in similar cases in the financial services industry have brought average individual awards more than ten times larger than those contemplated here. *See, e.g.,* Ex. 13, *Sumner v. Merrill Lynch* Arbitration Award ($2.2 million awarded to individual FA in sex discrimination case); Ex. 14, *Hardin v. Merrill Lynch* ($501,979 award); Ex. 15, *Marcus v. Merrill Lynch* ($558,000 award); Ex. 16, *Twombly v. Merrill Lynch* ($210,000 award); Ex. 17, *Wyatt v. Merrill Lynch* ($284,712 discrimination award). *See also* Ex. 22, *Zubulake v. UBS Warburg LLC*, No. 02-1243 (S.D.N.Y. 2005)(jury awarded $29 million in compensatory and punitive damages to equities broker terminated for reporting gender discrimination); Ex. 21, *Sojaji v. Merrill Lynch & Co.*, (NASD panel awarded $400,000 in compensatory damages and $1.2 million in punitive damages to broker fired because of his race).

**D.    African-Americans and Latinos Should Not Be Joined Absent Sub-Classes**

In its December 12, 2007 Opinion, the Court stated that "[t]here has been no showing that Ms. Curtis-Bauer is an unsuitable class representative for Latinos" and that "[t]here is no discernable conflict based on race." Docket No. 130, at 3, 5. The Court relied upon plaintiff's

[10] Other recent cases involving hourly or part-time workers have resulted in higher per class member damage awards than this settlement offers MSDW FAs. *See, e.g., Smith v. Nike Retail Services*, No. 03-9110 (N.D. Ill.) http://www.nikediscrimination.com/NikeConsentDecree.pdf, at 25-26 (race discrimination class action settled in 2007 for $5 million). Taking the largest estimate of the class size, the average award was nearly $22,000 to hourly retail workers, many whom worked part-time. *Smith*, 234 F.R.D. 648, 659 (N.D. Ill. 2006).

allegations that the account transfer policies applied to and affected African-Americans and Latinos in the same way, as well as counsel's representation that its analysis of compensation data and representation rates demonstrated common patterns across the class. *Id.* at 4.

The Moore group respectfully submits that the challenged practices do not affect African-Americans and Latinos in the same way and that the working conditions and outcomes of the two groups at Morgan Stanley are very different. As set forth in the declarations attached as Exhibits 5 - 8, the Moore group believes that actual conflicts exist between African-American and Latino class members that should prevent a single class.[11] As described in their Motion for Discovery, the Moore group believes that these conflicts will be apparent from a review of the workforce data they have requested. Motion For Discovery, Docket No 125, at 6-9.

Plaintiff's central allegation is that Morgan Stanley's system of transferring accounts harm both groups similarly. Plaintiff does not allege that she conducted a statistical analysis of account transfers for purposes of determining damages or the impact of the account transfer and teaming policies on African-Americans and Latinos. The Moore group would have insisted that such an analysis be performed and informed counsel that Latinos appear to fare better under the firm's account transfer practices, for a number of reasons. *See, e.g.,* Ex. 5, ¶¶ 2-9.

First, unlike African-Americans, Latinos are not excluded from favorable teams. *Id.* at ¶6. Under the express terms of the "new" account distribution policy, assets from a departing partner are transferred to the remaining partner and not distributed to the other FAs in the office. Proposed Stlmt., Docket No.87-2, at 26. Nevertheless, accounts received from teams count toward an FA's points on the power ranking. *Id*. at 26-27. Thus, the exclusion of African-

---

[11] Plaintiff contends that a single class of Latinos and African-Americans is acceptable because both earn less than white men. Tr. at 17:11-17. White women, too, earn less than white men. Yet when African-American Denise Williams joined the lawsuit seeking to represent a class of female FAs in October 2002, she did not add class race discrimination claims or seek to also represent a class of African-Americans, despite her individual race claims. She undoubtedly recognized that such a class would not have been sufficiently cohesive to proceed and effectively represent the interests of both women and African-Americans, due to differences in their treatment and outcome, and that antagonism would exist if the two groups were joined in a single class. Due to the difference in treatment and outcomes between Latinos and African-Americans, similar conflicts exist that make a single class inappropriate.

Americans from teams harms them as compared to both Latinos and Caucasians. The Moore would not have agreed to any resolution that did not effectively combat the exclusion of African-Americans from teams and the differential impact of teams by race on the power-ranking and account distribution policy. Ex. 5, ¶ 22; Ex. 6, ¶ 30; Ex. 7, ¶ 37; Ex. 8, ¶ 21.

Second, Latino FAs have access to and rely upon a large and lucrative client base of domestic and international Latino clients, which Morgan Stanley promotes and supports. *See, e.g.,* http://www.morganstanley.com/about/press/articles/4281.html. The vast majority of Caucasian FAs do not, and cannot, compete for this market. As a result, many Latinos, and Latino teams, fare better on the power ranking, receive account transfer opportunities and otherwise fare better than African-Americans, who lack a similar market to combat the discrimination they face. Ex. 5, ¶8-9. While Latinos and African-Americans may not fare as well as Caucasians when competing for domestic accounts, Latinos appear to be *favored* under the account distribution system with respect to domestic and international Latino clients.

**E.       The Single Allocation Formula For The Common Settlement Fund Is Unfair**

There was no debate between knowledgeable class members about allocating the settlement proceeds, so the formula applicable to both groups does not fairly allocate relief and disadvantages African-Americans relative to Latinos. *See, e.g.,* Ex. 1, at ¶ 5.

Class members could have decided that given the composition or variation of the class, a single formula was not appropriate and instead looked to sub-classes and separate formulas, or to an individualized process to allocate damages to class members. An individualized hearing approach was taken after a *Teamsters* liability finding in a discrimination class action before this Court in *Kraskwieski v. State Farm*, to the benefit of class members. Ex. 9, Seligman Dec. In very similar discrimination class actions involving FAs at other brokerage firms, informed class representatives chose an individualized claims resolution process for damages as part of a settlement, again to the great benefit of class members. *See* discussion of *Cremin v. Merrill Lynch,* Case No. 96-3733 (N.D. Ill.), at Ex. 11 ($200 million paid to resolve claims of class members), Ex. 25 (Hughes Article) at App. A, 4; *Martens v. Smith Barney,* at Ex. 25, App. C, 3.

The settlement's allocation formula rewards longevity. Proposed Notice, Docket No. 87-

2, at 13, ¶ 8.  Due to their higher attrition rate, most African-American class members are likely to have worked at Morgan Stanley for far fewer weeks than their Latino counterparts and so will not fare as well in competing for a share of the common fund.  As Dr. Goldman, an expert retained by the Moore group, explains in his declaration:

> [I]n the example of point calculation (p. 103) provided in the settlement document, about two-thirds of an 85% component (the "claim form survey") of the allocation formula, or nearly 57%, is tied to this service time. The assumptions imply that service time would be smaller on the average for African-Americans than for Latinos, which would propagate to a smaller calculated award to these individuals whose earnings potential at the onset of hire was no less equal.  Consequently, the number of weeks worked time of service component within the claim form completes a vicious circle tied to race.  Ex. 1, at ¶ 6.

The substantial damages that result from termination are often career-ending and may eclipse disparities suffered by those who remain at the firm, even if they earn lower wages than whites.

Similarly, Plaintiffs' counsel confirmed that Latino FAs out-earn African-American FAs at Morgan Stanley.  Dec. 3 Tr. at 17:11-13.  However, only a small portion of the allocation formula, 15%, is determined based on these disparities.  Proposed Notice at 13, ¶ 8.  Thus, although African-Americans were harmed the most by Morgan Stanley's discrimination, the terms of the proposed settlement may result in Latino FAs recovering a greater percentage of the common settlement fund and, frequently, larger awards than African-American class members. The Moore group would not have agreed to the single formula to allocate the common fund set forth in the proposed notice, to the disadvantage African-Americans as compared to Latinos. Instead, it is likely that subclasses would have been deemed appropriate.

For the above reasons and those in their Objections and Motion for Discovery, the Moore group asks the Court to deny the parties' motion for class certification and preliminary approval.

Respectfully submitted on behalf of the Moore Group,
STOWELL & FRIEDMAN LTD.

Mary Stowell  (*pro hac vice*)
Linda D. Friedman  (*pro hac vice*)
Suzanne E. Bish  (*pro hac vice*)
STOWELL & FRIEDMAN LTD
321 S. Plymouth Court, Suite 1400
Chicago, Illinois  60604
(312) 431-0888

Robert Nelson /s/

NELSON LAW GROUP

15

ROBERT S. NELSON (SBN# 220984)
NELSON LAW GROUP
900 Cherry Avenue, Suite 300
San Bruno, CA 94066
(650) 794-2760 (phone)
(650) 794-2761 (fax)
rnelson@nelsonlawgroup.net

16