# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

DAISY JAFFE, et al.,                              )
                                                  )
        Plaintiffs,                               )
                                                  )        Judge Thelton E. Henderson
                                                  )
v.                                                )
                                                  )        Case No. C-06-3903
MORGAN STANLEY & CO., INC.                        )
                                                  )
        Defendant.                                )

## DECLARATION OF JERRY GOLDMAN, PHD

I, Jerry Goldman, Ph.D., declare under penalty of perjury that the following is based on my personal knowledge and is true and accurate to the best of my knowledge:

1.      My name is Jerry Goldman. I am a retired professor of mathematical sciences with extensive experience in statistical analyses and damage computations. I earned a B.S. in Mathematics from Massachusetts Institute of Technology, and M.S. and Ph.D. degrees in Mathematics from the Illinois Institute of Technology. I was a professor of mathematics at DePaul University in Chicago, Illinois for 39 years, and retired from a tenured position as full Professor of Mathematical Sciences. I was Chairman of the Department of Mathematical Sciences for three years, and have received prestigious teaching, research and scholarship awards from DePaul. Over the course of my career at DePaul, I taught nearly every course offered by the mathematics department, including calculus, post-calculus, probability, statistics, actuarial science, and computer science. I am a member of the Mathematical Association of America, the American Mathematical Society, and the American Statistical Association of America. I have been awarded grants to do research and for other purposes from the National Science Foundation, the Amoco (now BP Petroleum) Foundation, and the Exxon Education Foundation. I have written and co-authored many articles that have been published in peer-reviewed forensic

economics and mathematical journals.

2.    I have also served as an expert witness, having been certified in state and federal courts over 30 times. I have testified on behalf of plaintiffs and defendants. Specifically, I have testified with respect to damage calculations and have been retained over the last 20 years to perform statistical analyses and/or estimate damages for both single-plaintiff and class action discrimination cases. I was the class statistical expert in two large-scale class action cases in this industry (*Cremin v. Merrill Lynch* and *Martens v. Smith Barney*). My detailed credentials are listed in my curriculum vitae, attached as Exhibit A.

3.    I have been asked to review the proposed settlement amount and the "Allocation Formula" described in the 10/22/2007 Proposed Class Action Settlement and comment upon both, the amount and the impact the proposed method of allocation of monies for injuries suffered would have on the African-American and Latino segments of the plaintiff class. My comments are based upon my expertise in mathematics and statistics, my review of the proposed settlement document, and the assumptions I have been asked to make as detailed in the next paragraph.

4.    I have not reviewed any Morgan Stanley Global Wealth Management Group Financial Advisor Trainee or Financial Advisor workforce data. I understand that counsel for objectors has requested this data, but that it has not been provided. Consequently, I have been asked to assume the following:

A.    Attrition of African-Americans in this workforce is higher than attrition for Caucasians and Latinos.

B.    African-Americans depart this workforce earlier than either Caucasians or Latinos.

C.     African-Americans earn lower compensation than either Caucasians or Latinos in this workforce.

D.     Compensation in this workforce increases with increasing length of service with the firm, as does the variability of earnings.

5.     Even with each of the African-American and Latino class members subject to the same alleged bias, and even with approximately equal percentage representation of these segments in the putative class, I conclude that applying the same allocation formula to both races would result in a systematically smaller average damage amount for African-Americans than for Latinos.  I present the basis for this conclusion in the paragraphs below.

6.     Based upon assumptions 4 A. and 4 B. above, the points assigned to claimants within the claim form component of the Allocation Formula will affect the different segments of the proposed class disparately.  The reason for this opinion is that claim amounts would largely be calculated based upon number of weeks worked during the class period.  In fact, in the example of point calculation (p. 103) provided in the settlement document, about two-thirds of an 85% component (the "Claim Form Survey") of the Allocation Formula, or nearly 57%, is tied to this service time.  The assumptions imply that service time would be smaller on the average for African-Americans than for Latinos, which would propagate to a smaller calculated award to these individuals whose earnings potential at the onset of hire was no less equal.  Consequently, the number of weeks worked time of service component within the claim form completes a vicious circle tied to race.

7.     Time at Morgan Stanley, mentioned above, is also injurious to African-Americans for loss compensation when the earnings regressions are run.  This follows from assumptions 4 B., 4 C., and 4 D. above, because, with the length of service control in the regression model, it follows that mean earnings differences would be smaller for African-Americans and,

consequently that this component of their monetary award would be smaller than that for Latinos.

8.    As is clear from the assumptions, the African-American and Latino subclasses are atypical of each other, and a formula that treats the class membership as homogeneous is flawed. In fact, as explicated in paragraphs #6 and #7, above, both components of the Allocation Formula are flawed. This is so because time spent at Morgan Stanley is differential by subclass. I conclude that applying the same allocation formula to both segments would result in a systematically smaller average damage amount for African-Americans compared to Latinos.

9.    I am aware that the proposed settlement amount available to compensate plaintiffs for injuries is valued about $16,000,000. I was advised that the plaintiffs' lawyers told the Court that "if we run the table, we get the class cert, we win on liability, we get all of the damages we're seeking we would get about $36 million." Tr. of Dec. 3 Hearing, at 13:4-6. I am informed that plaintiffs' lawyers support this statement with a compensation shortfall analysis performed by an expert that estimated the compensation shortfall at $36,000,000. I have not seen any details underlying this computation. Therefore I have no basis to question either this shortfall estimate or that what was provided was requested by counsel. But, I must note that whereas a shortfall estimate is useful to determine if compensation disparities exist for current employees, it falls far short in providing a valuation for an amount that would redress the losses of a subpopulation of employees in this class who suffered high attrition in an industry with the earnings potential of this one. I am not aware that any labor economist was asked to estimate damages for this class that included damages for class members after they left Morgan Stanley's employ. Thus, I would assume that the shortfall compensation analysis merely measures differences in earnings during the employment of class members and does not include any post

employment damages, including back pay or front pay.  Likewise, a compensation shortfall analysis would not typically include, prejudgment interest, fringe benefits, retirement benefits, compensatory or punitive damages.

10.    To allow a concrete perspective from which to view the figures in paragraph #9, above, I use publicly available data concerning Morgan Stanley.   Annualized production of commissions per Morgan Stanley financial advisor was estimated at $853,000 in 2007.[1] At a 35% payout rate, the mean 2007 amount paid to a financial advisor would be nearly $300,000 exclusive of the value of health, pension, prizes, or expense account benefits.  Thus, over a 5-year period, a financial advisor paid at this rate would earn $1,500,000.[2]  Consequently, about 10 individuals out of 1,300 (less than 1%) who lost the fully-paid amount could be paid before the $16,000,000 fund was exhausted, after expenses.[3]  Even if other considerations, such as mitigation income, are taken into account this low number calls the proposed settlement amount into question.  I conclude that the proposed settlement amount would not constitute 43% of the value of total damages for the class.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Jerry Goldman, Ph.D.

Dated:  January 14, 2008

---

[1] http://www.registeredrep.com/news/morgan_stanley_earnings/index.html
[2] The figure for the year 2007 is used here in the absence of other data.  Prejudgment interest would to some extent cancel the lack of discounting.  Clearly a more exact calculation would also take other factors such as mitigation income and past reductions in force into account, but the point is still clear.
[3] 24 such individuals would exhaust a $36,000,000 fund.